JUDGE RAKOFF

ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED NOV 2 5 2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA              :       **SEALED INDICTMENT**

        - v. -                        :       19 Cr. ___

PARKER H. PETIT and                   :
WILLIAM TAYLOR,                       :       **19 CRIM   850**

        Defendants.                   :       JUDGE RAKOFF

- - - - - - - - - - - - - - - - - x

## COUNT ONE
### (Conspiracy to Commit Securities Fraud, to Make False Filings with the SEC, and to Improperly Influence the Conduct of Audits)

The Grand Jury charges:

### Relevant Individuals and Entities

1.     At all times relevant to this Indictment, MiMedx Group Inc. ("MiMedx") was a publicly traded biopharmaceutical company headquartered in Marietta, Georgia.  MiMedx's securities traded under the symbol "MDXG" on the NASDAQ.  MiMedx sold regenerative biologic products, such as skin grafts and amniotic fluid. MiMedx sold its products both directly to end users such as public and private hospitals and to various stocking distributors, which, in turn, resold the product to medical professionals.

2.     At all times relevant to this Indictment, PARKER H. PETIT, the defendant, known as "Pete," was the Chief Executive Officer ("CEO") of MiMedx.

3.    At all times relevant to this Indictment, WILLIAM TAYLOR, the defendant, was the Chief Operating Officer ("COO") of MiMedx.

## Public Company Reporting Requirements

4.    At all times relevant to this Indictment, MiMedx was required to comply with the federal securities laws, which are designed to ensure that a publicly traded company's financial information is accurately recorded and disclosed to the investing public.  Specifically, pursuant to the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, MiMedx was required to: (a) file with the United States Securities and Exchange Commission (the "SEC") annual financial statements (on SEC Form 10-K); (b) file with the SEC quarterly financial reports (on SEC Form 10-Q); and (c) make and keep books, records and accounts that accurately and fairly reflected MiMedx's business transactions.

5.    At all times relevant to this Indictment, PARKER H. PETIT, the defendant, signed MiMedx's quarterly and annual financial reports.  Additionally, MiMedx filed with each of its quarterly and annual financial reports certifications entitled "Certification of Periodic Report Under Section 302 of the Sarbanes-Oxley Act of 2002" in which PETIT certified, in part:

    1.    I have reviewed this [quarterly or annual report] of MiMedx Group, Inc.;

2

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report; . . .

In these certifications, PETIT also certified that he had disclosed to MiMedx's auditor and the Audit Committee of its Board of Directors (or persons performing the equivalent functions):   "Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

6.   In conjunction with each of its quarterly and annual financial reports, MiMedx included a second set of certifications entitled "Certification Pursuant to 18 U.S.C. Section 1350 As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002," in which PARKER H. PETIT, the defendant, further certified, in part, that the quarterly or annual financial report:

[F]ully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; . . . [T]he information contained in this [quarterly or annual] report fairly presents, in all material respects, the financial condition and results of operations of the Company.

7.    Federal securities law further required that MiMedx's annual financial statements be audited by independent certified public accountants.

8.    As set forth below, one of the most critical financial metrics disclosed in MiMedx's public filings with the SEC, and touted in MiMedx's accompanying press releases, was MiMedx's quarterly and annual sales revenue.

### Revenue Recognition Requirements

9.    Under Generally Accepted Accounting Principles (GAAP) and SEC guidance, a company like MiMedx that engages in the sale of products through a distributor may recognize revenue upon transfer of the product to a distributor if each of the following criteria is satisfied: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed or determinable; and (4) collectability (i.e., payment) is reasonably assured. *See* SEC Staff Accounting Bulletin No. 104 (Topic 13, Revenue Recognition, Dec. 17, 2003).

10.   When the distributor has a right of return (i.e., the ability to return the product without having to pay for it, either implicitly or as set forth in a written agreement), revenue cannot be properly recognized unless all of the following criteria are met: (1) the seller's price to the buyer is fixed or determinable at the date of sale; (2) the buyer's

4

obligation to pay the seller is not contingent on the resale of
the product; (3) the buyer's obligation to pay the seller is not
excused in the event that the product is damaged or lost; (4)
the buyer has economic substance separate from the seller; (5)
the seller does not have significant obligations for future
performance to directly bring about the resale of the product by
the buyer; and (6) the amount of future returns can be
reasonably estimated.  *See, e.g.*, Accounting Standards
Codification, Subtopic 605-15-25-1.

11.   In its 2015 quarterly and annual reports, MiMedx
included the following discussion of revenue recognition:

> The Company sells its products primarily through a
> combination of a direct sales force, independent
> stocking distributors and third-party representatives
> in the U.S. and independent distributors in
> international markets.  The Company recognizes revenue
> when title to the goods and risk of loss transfers to
> customers, provided there are no material remaining
> performance obligations required of the Company or any
> matters of customer acceptance.  In cases where the
> Company utilizes distributors or ships products
> directly to the end user, it recognizes revenue
> according to the shipping terms of the agreement
> provided all revenue recognition criteria have been
> met.  A portion of the Company's revenue is generated
> from inventory maintained at hospitals or with field
> representatives.  For these products, revenue is
> recognized at the time the product has been used or
> implanted.

12.   PARKER H. PETIT and WILLIAM TAYLOR, the defendants,
repeatedly touted their understanding of these rules governing
revenue recognition both within MiMedx and to the investing

public.  For example, on or about March 29, 2016, in response to public reporting concerning the inappropriate revenue recognition practices of a MiMedx competitor, TAYLOR circulated a memorandum to the MiMedx sales force, which both PETIT and TAYLOR had edited.  In the memorandum, TAYLOR explained: "The key accounting question related to revenue recognition is when revenue can be recognized, at shipment or at payment."  TAYLOR noted the requirements for revenue recognition at the time of shipment, including that the price be "fixed and determinable, and the invoice is collectable."  TAYLOR stated: "This means that the customer does not have a right to return the product and there is a reasonable expectation that we will be paid within a determinable period of time."  Similarly, PETIT and TAYLOR participated in sending an email to MiMedx's auditors, in or about February 2016, which addressed a MiMedx employee's concerns about revenue recognition issues at MiMedx.  The email noted: "Company leadership has been managing public companies for 34 years with an impeccable track record of building strong internal controls.  Management is fully aware of the rules regarding revenue recognition."

13.  On a quarterly basis, PARKER H. PETIT, the defendant, signed and caused to be submitted to the independent certified public accountants who were retained to audit MiMedx's SEC filings (the "Audit Firm") a management representation letter,

6

in which PETIT represented, among other things, that "[r]elated-party transactions, including sales, purchases, loans, transfers, leasing arrangements, guarantees, and amounts receivable from or payable to related parties" had "been properly accounted for and adequately disclosed" and that "[t]here are no material transactions that have not been properly recorded in the accounting records" of MiMedx. In an annual management representation letter for year-end 2015, which MiMedx submitted to the Audit Firm on or about February 29, 2016, PETIT represented that "[t]here are no . . . [s]ide agreements or other arrangements (either written or oral) that have not been disclosed to [the Audit Firm]."

### MiMedx's Disclosure of Revenue Guidance and Results to the Investing Public

14.  MiMedx's public filings with the SEC included its sales revenue for the relevant reporting period, i.e., quarter or full year.  In press releases accompanying MiMedx's filings, MiMedx provided guidance on its expected revenue for the upcoming quarter and full year, and in some cases tightened, or narrowed, that guidance over time.  For example, MiMedx provided the following quarterly and annual revenue guidance for 2015:

| February 26, 2015 Revenue Guidance | |
|---|---|
| Q1 2015 Guidance | Full Year 2015 Guidance |
| $40 - 41 million | $175 - 190 million |

| April 27, 2015 Revenue Guidance | |
| --- | --- |
| Q2 2015 Guidance | Full Year 2015 Guidance |
| $44 - 46 million | $180 - 190 million |

| July 30, 2015 Revenue Guidance | |
| --- | --- |
| Q3 2015 Guidance | Full Year 2015 Guidance |
| $47 - 50 million | Reiterated $180 - 190 million |

| October 12, 2015 Revenue Guidance | |
| --- | --- |
| Q4 2015 Guidance | Full Year 2015 Guidance |
| $49.5 - 52.5 million | $185 - 188 million |

15.  MiMedx's press releases accompanying its quarterly filings also included the actual revenue for the quarter and year-to-date, as reflected in MiMedx's SEC filings.

### MiMedx Touted Its Revenue Growth and the Fact That It Had Met Revenue Guidance Quarter After Quarter

16.  MiMedx executives, including PARKER H. PETIT and WILLIAM TAYLOR, the defendants, publicly identified revenue as the principal metric demonstrating MiMedx's growth and touted MiMedx's consistent record of quarter-over-quarter revenue growth and meeting or exceeding revenue guidance, which itself typically increased quarter-over-quarter.  In fact, MiMedx press releases touted that MiMedx met or exceeded its revenue guidance for 17 quarters in a row, through the fourth quarter of 2015. The following are excerpts of MiMedx's press releases accompanying its public filings in 2015:

| April 27, 2015 Press Release | |
|---|---|
| Headline | *Company Records Revenue of $40.8 million and Net Income of $4.1 million* |
| Q1 2015 "Highlights" | <ul><li>Q1 2015 revenue of $40.8 million increases 108% over Q1 2014</li><li>Q1 2015 is 14th consecutive quarter of meeting or exceeding revenue guidance</li><li>Company increases full year guidance range from $175-$190 million to $180-$190 million</li></ul> |

| July 30, 2015 Press Release | |
|---|---|
| Headline | *MiMedx Announces Record Results for Second Quarter of 2015; Company Records Revenue of $45.7 million and Net Income of $5.4 million* |
| Q2 2015 "Highlights" | <ul><li>Q2 2015 is 15th consecutive quarter of meeting or exceeding Company revenue guidance</li><li>Q2 2015 revenue of $45.7 million increased 79% over Q2 2014</li><li>Revenue is at the upper end of Company Q2 guidance</li></ul> |

| October 29, 2015 Press Release | |
|---|---|
| Headline | *MiMedx Announces Record Results For Third Quarter Of 2015: Company Records Revenue of $49 Million, Net Income of $6.6 million and EPS of $0.06* |
| Q3 2015 "Highlights" | <ul><li>Q3 is 16th consecutive quarter of meeting or exceeding revenue guidance</li><li>YTD 2015 revenue of $135.5 million increased by 72% over same period of 2014</li><li>Q3 revenue of $49 million increased by 46% over Q3 2014</li><li>Q3 revenue is at upper end of $47 to $50 million guidance range</li></ul> |

| January 10, 2016 Press Release | |
|---|---|
| Headline | *MiMedx Exceeds Fourth Quarter and Full Year 2015 Revenue Consensus: $187.3 Million Full Year 2015 Revenue is 58% Increase Over 2014 and $51.8 Million Q4 2015 Revenue is 31% Increase over Q4 2014* |
| Q4 2015 "Highlights" | • Q4 2015 is the 17th consecutive quarter of meeting or exceeding revenue guidance<br>• Q4 2015 revenue of $51.8 million in upper range of MiMedx Q4 2015 guidance<br>• Full Year 2015 revenue of $187.3 million nears upper end of MiMedx guidance range<br>• 2015 is the 4th consecutive fiscal year of meeting or exceeding revenue guidance |

Each of these press releases was filed with the SEC as an exhibit to a Form 8-K, which is a report companies must file with the SEC to inform the investing public about major corporate events or announcements.

17.  In public remarks, PARKER H. PETIT and WILLIAM TAYLOR, the defendants, touted the consistency and stability of MiMedx's revenue growth.  They highlighted in each quarter that the company's revenue figures were in line with previously provided quarterly and annual guidance and that MiMedx anticipated continued revenue growth.  For example:

a.  During an earnings call on or about April 28, 2015, announcing MiMedx's first quarter 2015 results, PETIT stated: "Let me begin by making a statement that has become very

routine. The first quarter of 2015 was the 14th consecutive quarter of MiMedx meeting or exceeding our revenue guidance." In the same call, TAYLOR stated: "We anticipate our quarter-over-quarter growth will replicate the pattern established last year . . . . And for 3.5 years, we've shown that we can accurately project our performance quite well . . . . And then if things go the right way and you did a very good job planning and those negative things don't happen, then you exceed your guidance. It's really just that simple."

b. During a presentation to investors and analysts on or about June 3, 2015, in New York, New York, TAYLOR stated: "We've got 3 1/2 years of meeting or exceeding our revenue guidance."

c. During an earnings call on or about July 30, 2015, announcing MiMedx's results for the second quarter of 2015, PETIT noted that the "second quarter was our 15th consecutive quarter of meeting or exceeding our revenue guidance. Our second quarter revenues were almost 80% higher than our second quarter a year ago."

d. During an "analyst day" presentation on or about October 13, 2015, in New York, New York, PETIT delivered a presentation touting "16 consecutive quarters of meeting or exceeding quarterly guidance."

e.   During an earnings call on or about February 23, 2016, announcing MiMedx's year-end 2015 results, PETIT stated: "Our fourth quarter results represent the 17th consecutive quarter of meeting or exceeding revenue guidance. Again, very few young companies can match that type of stable forecasting." During the same call, TAYLOR boasted: "After a 24% average price decrease in our biggest product line, we were still able to grow our market share in terms of revenue dollars, take business from competitors, grow the market and increase our year-over-year revenue in this business area by over 50%. We managed this transition, as we told investors we would, and the results were as we anticipated."

18.   By 2015 and 2016, it was increasingly difficult for MiMedx to reach its revenue guidance due to decreased demand from certain distributors and the increasingly aggressive revenue targets MiMedx had publicly announced.   In fact, MiMedx did not meet the low end of its revenue guidance until the very last day of the quarter in each of the four quarters of 2015. In the first quarter 2016, MiMedx missed its revenue guidance for the first time in 18 quarters.

## Overview of the Accounting Fraud Scheme

19.   Confronted with the difficulties faced by MiMedx in meeting its quarterly and annual revenue guidance, from at least in or about 2015 through at least in or about 2016, PARKER H.

PETIT and WILLIAM TAYLOR, the defendants, engaged in a scheme to falsely recognize revenue from four distributors: a Texas-based distributor ("Distributor-1") in the second quarter of 2015, a second Texas-based distributor ("Distributor-2") in the third quarter of 2015, a Tennessee-based distributor that MiMedx later acquired ("Distributor-3") in the third and fourth quarters of 2015, and a Saudi Arabia-based distributor ("Distributor-4") in the fourth quarter of 2015. Through the scheme, PETIT, TAYLOR, and others caused MiMedx to report fraudulently inflated revenue figures to the investing public in the second, third, and fourth quarters of 2015 (together, the "Implicated Quarters") and in MiMedx's 2015 annual filings. PETIT, TAYLOR, and others caused MiMedx to report these fraudulently inflated revenue figures to the investing public in order to ensure that the reported figures fell within MiMedx's publicly announced revenue guidance, and to fraudulently convey to the investing public that MiMedx was accomplishing consistent growth quarter after quarter, as PETIT and TAYLOR had falsely touted to the investing public.

### MiMedx's Fraudulent Recognition of Revenue from Distributor-1 in the Second Quarter of 2015

20. By early 2015, Distributor-1 was a significant MiMedx distributor whose purchases helped MiMedx reach its quarterly revenue guidance. For example, if Distributor-1 had not

purchased approximately $3 million of MiMedx product during the
first quarter of 2015, MiMedx would not have reached its revenue
guidance that quarter of $40 million to $41 million.

21.   As the end of the second quarter of 2015 approached,
MiMedx had not yet hit its revenue guidance and MiMedx
salespeople were not anticipating the ability to generate
substantial additional sales revenue from Distributor-1.   On or
about May 31, 2015, a MiMedx sales representative sent an email
to other sales representatives in which he acknowledged that
Distributor-1 had "ordered way more than they needed last
quarter and will be fine with minimal or nothing this quarter."

22.   To meet MiMedx's revenue guidance for the second
quarter of 2015, PARKER H. PETIT and WILLIAM TAYLOR, the
defendants, took steps to fraudulently inflate MiMedx's sales to
Distributor-1.   Specifically, PETIT and TAYLOR, through two
fraudulent means, caused MiMedx to improperly recognize
approximately $1.4 million of revenue in the second quarter of
2015.

23.   First, PARKER H. PETIT and WILLIAM TAYLOR, the
defendants, agreed to give the owner of Distributor-1 (the
"Distributor-1 Owner") $200,000 as an inducement to purchase
approximately $2.1 million of MiMedx product by the end of June
2015.   To hide the fact that the $200,000 payment was a quid pro
quo exchange for Distributor-1's purchase of MiMedx product in

the second quarter of 2015 (which would have reduced the revenue that MiMedx could recognize from the sale), PETIT and TAYLOR falsely characterized the $200,000 as payment for purported consulting services provided by the Distributor-1 Owner.  On or about June 30, 2015, the last day of the second quarter of 2015, MiMedx and the Distributor-1 Owner entered into this purported "consulting agreement," which was signed by PETIT, and which provided for an up-front payment of $200,000 to the Distributor-1 Owner, in his personal capacity, and four additional monthly $5,000 payments for purported monthly consulting meetings.  The agreement provided that the Distributor-1 Owner "shall provide reasonable and mutually agreed upon market intelligence and other reasonable sales consulting as requested by [MiMedx] from time to time."  The consulting agreement also awarded the Distributor-1 Owner a total of 17,455 shares of restricted MiMedx stock "as compensation for [consulting] services performed under this Agreement."

24.  In truth and in fact, as PARKER H. PETIT and WILLIAM TAYLOR, the defendants, well knew, the purported "consulting agreement" was a sham.  At no time did the Distributor-1 Owner perform any consulting work (or contemplate doing so) in return for the cash payment or restricted stock, and MiMedx expected no such services from him.  As PETIT and TAYLOR well knew, the $200,000 personal payment was instead an undisclosed inducement

to purchase product, and accordingly, as discussed, it should have reduced the revenue that MiMedx could legitimately recognize from its second quarter 2015 sale to Distributor-1.

25. Second, when MiMedx management realized that they did not have in stock the particular MiMedx products that Distributor-1 agreed to order, PARKER H. PETIT and WILLIAM TAYLOR, the defendants, agreed with the Distributor-1 Owner that (1) as part of Distributor-1's approximately $2.1 million order, Distributor-1 would purchase approximately $1.2 million of MiMedx product that Distributor-1 neither wanted nor intended to sell, and (2) in a subsequent quarter, Distributor-1 could return the unwanted product and exchange it for product of equal value that Distributor-1 actually wanted and intended to sell. PETIT and TAYLOR reached this agreement with the Distributor-1 Owner in an effort to finalize MiMedx's $2.1 million sale to Distributor-1 during the second quarter of 2015 and thereby falsely inflate MiMedx's revenue that quarter. As PETIT and TAYLOR well knew, however, it was improper for MiMedx to recognize any revenue in the second quarter of 2015 for the approximately $1.2 million of product that PETIT and TAYLOR understood Distributor-1 would not sell and would swap for a different product in a subsequent quarter.

26. To carry out their fraudulent scheme, PETIT and TAYLOR enlisted the assistance of a vice president of sales at MiMedx

(the "Sales Vice President"). On or about June 29, 2015, when MiMedx management learned that the products Distributor-1 was willing to purchase were not in stock, the Sales Vice President stated in an email to members of the MiMedx sales team, that was also received by PARKER H. PETIT and WILLIAM TAYLOR, the defendants: "Ship to the amount of the total dollar amount. Fill what you can that he wants and then send the rest of the product we have in stock and we will exchange it in July." On or about that same date, the Sales Vice President emailed the Distributor-1 Owner, copying PETIT, among others, asking the Distributor-1 Owner to change his purchase order to reflect what MiMedx had in stock (but not the products the Distributor-1 Owner had been willing to order). The Sales Vice President stated in the email to the Distributor-1 Owner: "Can we please get a change order from you so we can ship what we have now in stock and I will physically come to Dallas to make the changes in early July[.]" After the Distributor-1 Owner agreed to the product swap, PETIT signed the purported "consulting agreement."

27. At no time following this sale to Distributor-1, did PARKER H. PETIT and WILLIAM TAYLOR, the defendants, disclose to the Audit Firm (1) the existence of the $200,000 "consulting agreement" with the Distributor-1 Owner or (2) that MiMedx and the Distributor-1 Owner had reached a side agreement that Distributor-1 would purchase approximately $1.2 million of

product that it would swap for different product in a subsequent quarter.

28. Based upon the secret agreement between MiMedx and the Distributor-1 Owner to swap the product, on or about June 29, 2015, Distributor-1 sent MiMedx a purchase order for approximately $2.1 million that reflected the products that MiMedx had in stock and wanted to sell to Distributor-1. MiMedx recognized all of that revenue in the second quarter of 2015.

29. In or about early July 2015, MiMedx sent the Distributor-1 Owner a $200,000 check, which the Distributor-1 Owner deposited into his personal bank account. The Distributor-1 Owner then used those funds in part to repay the money Distributor-1 owed to MiMedx for its purchase of MiMedx product in the second quarter of 2015. In or about September 2015, the Distributor-1 Owner submitted to MiMedx phony consulting invoices, which PARKER H. PETIT, the defendant, had agreed to pay pursuant to the purported consulting agreement. As PETIT well knew, the Distributor-1 Owner had not, in fact, performed any consulting services. MiMedx paid two of the invoices, totaling approximately $10,000.

30. In or about July 2015, MiMedx sales executives discussed how to provide Distributor-1 the product that PARKER H. PETIT and WILLIAM TAYLOR, the defendants, had agreed to swap for the product Distributor-1 had agreed to receive the previous

quarter but did not want.  On or about July 10, 2015, a senior
MiMedx operations executive emailed a MiMedx executive vice
president ("the Executive Vice President"), in relevant part:
"Has it been discussed how the [Distributor-1] returns will be
managed?"  The Executive Vice President responded, in relevant
part: "We have to manage timing for 2 reasons; our inventory
rebuild and revenue recognition issue.  Bill [TAYLOR] wants to
ship the [Distributor-1] replacement product in August over a 2-
3 week period in 4 shipments.  We have auditors here in the end
of July looking at the books.  No more emails on this."

### MiMedx's Fraudulent Recognition of Revenue from Distributor-2 in the Third Quarter of 2015

31.  By the third quarter of 2015, MiMedx sought to sell
product to a new Texas-based distributor that could make up for
the revenue shortfall resulting from the winding down of
MiMedx's relationship with Distributor-1.  To make up that
revenue, MiMedx first turned to Distributor-2, a small Texas-
based distributor that was owned and operated by a former MiMedx
employee (the "Distributor-2 Owner").

32.  On or about September 15, 2015, approximately two
weeks before the end of the third quarter of 2015, MiMedx and
Distributor-2 entered into a written "Domestic Distributor
Agreement," which made Distributor-2 MiMedx's exclusive
distributor in Texas and provided that Distributor-2 would make

payment for any product that Distributor-2 purchased from MiMedx within 30 days of purchase. On or about September 30, 2015, the final day of the third quarter 2015, following negotiations with PARKER H. PETIT and WILLIAM TAYLOR, the defendants, Distributor-2 agreed to purchase approximately $4.6 million of OrthoFlo product, MiMedx's new amniotic-fluid based product. This was the second largest quarterly order in MiMedx's history. The timing and size of the order were dictated by PETIT and TAYLOR as a condition of Distributor-2's being made MiMedx's exclusive distributor in Texas. MiMedx, in turn, recognized approximately $4.6 million of revenue upon shipment of the product to Distributor-2 in the third quarter of 2015.

### PETIT and TAYLOR Understood that Distributor-2 Would Not Pay Within the Specified Time Frame and Entered Into a Side Agreement with the Distributor-2 Owner

33. At the time that MiMedx recognized revenue for the September 2015 sale to Distributor-2, PARKER H. PETIT and WILLIAM TAYLOR, the defendants, fully understood that Distributor-2 would not make a timely payment of $4.6 million for the product, and certainly would not do so within contractual terms. As noted above, Distributor-2's $4.6 million order was, at that point, the second largest quarterly order that MiMedx had ever received from any customer. Yet Distributor-2, a company in its infancy, had never ordered from MiMedx before and had no record of making payments. MiMedx

20

likewise had no record of selling OrthoFlo, a new MiMedx product, to any customer.  Moreover, as PETIT and TAYLOR well knew, the $4.6 million order was nearly ten times larger than Distributor-2's annual revenue.

34.  Notwithstanding the terms of the written distribution agreement between MiMedx and Distributor-2, PARKER H. PETIT and WILLIAM TAYLOR, the defendants, reached a secret side agreement with the Distributor-2 Owner that Distributor-2 did not need to pay within the contractual 30-day terms and that MiMedx would be flexible as to when Distributor-2 paid.

35.  PARKER H. PETIT and WILLIAM TAYLOR, the defendants, further understood that Distributor-2 lacked the means to store and distribute OrthoFlo, a product that needed to be kept frozen.  Before the end of the third quarter of 2015, at the direction of PETIT and TAYLOR, MiMedx purchased freezers, which it provided to Distributor-2 so that Distributor-2 could purchase and store the quantity of OrthoFlo that MiMedx needed Distributor-2 to buy in order for MiMedx to meet its quarterly revenue guidance.  On or about August 22, 2015, PETIT emailed TAYLOR and others: "We have to find freezers for a number of people . . . can we use our purchasing power to expedite some of the shipments to our new distributors?"  On or about September 17, 2015, PETIT sent additional emails to TAYLOR, the Executive Vice President, and others, stating: "I believe we need to get

21

[the Distributor-2 Owner] additional freezers."  In one email, PETIT asked "[h]ow many dollars" of product could fit in the freezers.

### PETIT Orchestrated a Secret Loan to Distributor-2 Through His Children

36.   To hide from MiMedx's auditors that the collectability of receivables from Distributor-2 was questionable, PARKER H. PETIT, the defendant, in or about the fourth quarter of 2015, arranged for his adult children to loan money to Distributor-2 through a shell company, which was funded with money from a trust fund established by PETIT for his family.

37.   Although Distributor-2's payment to MiMedx for the product it had purchased during the third quarter of 2015 was due on or about October 30, 2015 (i.e., within 30 days of shipment), by the end of November 2015 Distributor-2 had paid only approximately $10,000 of the $4.6 million it owed. Additionally, in or about the fall of 2015, the Distributor-2 Owner advised PARKER H. PETIT, the defendant, that Distributor-2 was having trouble distributing the OrthoFlo and that it needed an infusion of capital to pay MiMedx.  The Distributor-2 Owner informed PETIT that he had attempted to secure a loan from a bank, but had been unsuccessful.

38.   As PARKER H. PETIT, the defendant, well knew, Distributor-2's failure to pay down a significant amount of the

money it owed to MiMedx before the end of 2015 made it more
likely that the Audit Firm would challenge Distributor-2's
creditworthiness, which could lead to a restatement of MiMedx's
third quarter revenue figures or a reduction in the revenue that
MiMedx could recognize in its annual SEC filing.  PETIT,
therefore, arranged for the Distributor-2 Owner to speak with
PETIT's son-in-law ("Individual-1") about obtaining a loan.

39.  In or about late November 2015, the three adult
children of PARKER H. PETIT, the defendant, and their spouses
(including Individual-1) incorporated a shell company (the
"Shell Company") in order to issue a loan from the Shell Company
to Distributor-2.  Individual-1 set up a bank account in the
name of the Shell Company and arranged for funds to be
transferred from a generation-skipping trust that PETIT had
established for his family into the Shell Company's bank account
in order to fund the loan to Distributor-2.  PETIT personally
reviewed a promissory note between the Shell Company and
Distributor-2, which PETIT sent to the Distributor-2 Owner.
Individual-1, however, privately expressed to PETIT that
Individual-1 was not comfortable with the terms of the loan and
told PETIT in an email: "In general, [I am] not a huge fan of
loaning money.  I think that is what banks are for."

40.  At the time the loan was issued, PARKER H. PETIT, the
defendant, understood that the loan proceeds would be used, in

substantial part, by Distributor-2 to pay down its debt to MiMedx for product that Distributor-2 had purchased.  On or about December 21, 2015, pursuant to the promissory note, the Shell Company wired approximately $1.5 million to Distributor-2. Within approximately the next week, Distributor-2 used the loan proceeds in substantial part to make payments to MiMedx totaling approximately $1.2 million.

41.  PARKER H. PETIT, the defendant, hid from MiMedx's internal accountants and the Audit Firm that Distributor-2 had received a loan from PETIT's adult children.  With knowledge that Distributor-2 had used the loan proceeds in substantial part to pay down its debt to MiMedx for product it had purchased in the third quarter of 2015, PETIT made false and misleading statements to MiMedx's accountants and the Audit Firm about the collectability of payment from Distributor-2.

42.  For example, on or about February 4, 2016, in response to concerns raised by a member of MiMedx's accounting department about the propriety of recognizing revenue from Distributor-2, PARKER H. PETIT, the defendant, approved the submission of a response to the Audit Firm, which, in relevant part, touted that Distributor-2 "has paid over $1.4M since the first shipments had been made.  Their payment history to date is very similar to that of other distributors."  PETIT hid from the Audit Firm that Distributor-2's payments of $1.2 million to MiMedx had been

funded in large part by the Shell Company loan orchestrated by PETIT and his children and funded from a trust fund that PETIT himself had established.  Based in large part on Distributor-2's payments to MiMedx that were funded by the Shell Company loan, the Audit Firm's concerns about collectability were assuaged and the Audit Firm continued to allow MiMedx to recognize revenue from the sale to Distributor-2.

### MiMedx's Fraudulent Recognition of Revenue from Distributor-3 in the Third and Fourth Quarters of 2015

43.   By the third quarter of 2015, MiMedx also sought to sell product to Tennessee-based Distributor-3 to help make up for the revenue shortfall resulting from, among other things, the winding down of MiMedx's relationship with Distributor-1. For example, on or about September 18, 2015, a MiMedx senior vice president of sales (the "Senior Sales Vice President") emailed PARKER H. PETIT and WILLIAM TAYLOR, the defendants, and others stating that he had just spoken with an employee of Distributor-3 and "[t]hey are excited to work with us and he asked me 'what can I personally do for you'. I told him we will need to move a significant amount of liquid into his freezer and he said 'it's done'.  This couldn't have happened at a better time."

44.   At approximately the same time, during the third and fourth quarters of 2015, PARKER H. PETIT, the defendant, and the

chief executive officer and part-owner of Distributor-3 (the "Distributor-3 Owner") engaged in negotiations over MiMedx's acquisition of Distributor-3. These negotiations ultimately resulted in MiMedx's acquisition of Distributor-3 on or about January 13, 2016 (the "Acquisition").

45. Prior to the Acquisition, and while the negotiations were ongoing, MiMedx sold product to Distributor-3 in both the third and fourth quarters of 2015. On or about September 29 and 30, 2015, the last two days of the third quarter, MiMedx sold approximately $2.2 million of product to Distributor-3 and recognized all of that revenue upon shipment. This purchase, the first ever made by Distributor-3 from MiMedx and consisting primarily of OrthFlo product, was made at the request of PARKER H. PETIT, the defendant. After Distributor-3 agreed to make the purchases, sales employees at MiMedx informed Distributor-3 as to which MiMedx products were immediately available for shipment, so that Distributor-3 could order those products before the end of the quarter.

46. On or about December 31, 2015, the last day of the fourth quarter, PARKER H. PETIT, the defendant, asked Distributor-3 to purchase an additional MiMedx product at a cost of approximately $450,000. At the time he made the request, PETIT had already determined to recommend that MiMedx make the Acquisition. The Distributor-3 Owner agreed to PETIT's request.

26

MiMedx recognized all of the revenue from that sale upon
shipment.  On the same day, after members of MiMedx's accounting
department expressed concern that Distributor-3 had not yet paid
any of the approximately $2.2 million it owed for the purchase
in the prior quarter, PETIT asked the Distributor-3 Owner to
make a partial payment.  Accordingly, Distributor-3 paid MiMedx
approximately $225,000 on or about December 31, 2015.  This was
the only payment that Distributor-3 ever made for MiMedx
product.

47.  These sales to Distributor-3 should not have been
recognized as revenue by MiMedx in the third and fourth quarters
of 2015, as PARKER H. PETIT and WILLIAM TAYLOR, the defendants,
well knew, for at least three reasons.  First, MiMedx and
Distributor-3 had not agreed upon the essential terms of the
sale, including when payment was due.  In fact, substantial
disagreements between Distributor-3 and MiMedx over payment
terms remained unresolved well after MiMedx booked revenue for
sales to Distributor-3.  Because of these outstanding
disagreements, the Distributor-3 Owner refused to sign a
distribution agreement with MiMedx.  For example, as late as on
or about November 4, 2015, over a month after recognizing
revenue from sales to Distributor-3, PETIT emailed the
Distributor-3 Owner, "[o]n the distribution agreement, please
let me know the specific concerns. I understand the general

concerns, but I would like to try to complete this document."
The Distributor-3 Owner responded a few hours later with certain
concerns and PETIT forwarded the email to TAYLOR. Ultimately, a
distribution agreement, which established standard payment
terms, was not signed until sometime in 2016. The signed
distribution agreement was undated.

48. Second, PARKER H. PETIT and WILLIAM TAYLOR, the
defendants, reached a secret side understanding with the
Distributor-3 Owner that Distributor-3 would buy product in the
third quarter that it did not want and would not sell, and that
Distributor-3 could either swap that product for different
product or return the unwanted product to MiMedx in a subsequent
quarter for a refund or credit.

49. For example, on or about September 29 and 30, 2015,
the last two days of the third quarter, when MiMedx management
realized that they did not have in stock the particular MiMedx
products that Distributor-3 agreed to purchase and planned to
sell, PARKER H. PETIT and WILLIAM TAYLOR, the defendants, agreed
with the Distributor-3 Owner that (1) as part of Distributor-3's
approximately $2.2 million order, Distributor-3 would purchase
approximately $2 million of MiMedx products that Distribtor-3
neither wanted nor intended to sell, and (2) in a subsequent
quarter, Distributor-3 could return the unwanted product and
swap it for product of equal value that Distributor-3 could

sell.   PETIT and TAYLOR reached this agreement with the
Distributor-3 Owner in an effort to finalize MiMedx's $2.2
million sale to Distributor-3 during the third quarter of 2015
and thereby falsely inflate MiMedx's revenue in order to meet
the company's quarterly revenue guidance.

50.   Moreover, toward the end of 2015, in an effort to
induce the Distributor-3 Owner to purchase additional MiMedx
product in the fourth quarter and sign a distribution agreement,
PARKER H. PETIT, the defendant, gave the Distributor-3 Owner a
secret letter granting Distributor-3 the right to return any and
all MiMedx product that it had been previously purchased.   On or
about December 31, 2015, PETIT provided the secret letter to the
Distributor-3 Owner, stating that if the Acquisition did not
proceed, MiMedx would "commit to exchange or take back any of
our amniotic related products so you may proceed on your own."
PETIT back-dated the letter to September 25, a date immediately
prior to Distributor-3's first purchase of MiMedx product, and
hid the letter from MiMedx's internal accountants and the Audit
Firm.   After receiving this letter, the Distributor-3 Owner
emailed an employee of Distributor-3: "I told [PETIT] I would
not sign the distribution agreement unless we could return the
product! :-)."   Accordingly, as PETIT well knew, the sales to
Distributor-3 were not final because Distributor-3 had the right
to return the product to MiMedx at any time and the amount of

any return could not be reasonably estimated.  Ultimately,
Distibutor-3 returned more than half of the product that it had
purchased from MiMedx and exchanged some of it for other
products.

51.    Third, based upon, among other things, discussions
with the Distributor-3 Owner, PARKER H. PETIT and WILLIAM
TAYLOR, the defendants, understood that Distributor-3 could not
and would not pay for the product in a timely fashion.  As noted
above, Distributor-3 ultimately paid MiMedx only approximately
$225,000, less than ten percent of the value of product that it
purchased during the third and fourth quarters of 2015.

52.    In or about early 2016, as part of its annual audit,
the Audit Firm questioned MiMedx's senior management about the
propriety of revenue recognized from sales to Distributor-3.   In
response, PARKER H. PETIT and WILLIAM TAYLOR, the defendants,
made false and misleading statements to the Audit Firm about
MiMedx's arrangement with Distributor-3.  For example, in a
written summary prepared for the Audit Firm on or about February
4, 2016, PETIT and TAYLOR asserted that "[t]he MiMedx products
were sold to [Distributor-3] under a signed distributor
agreement similar to agreements signed with other distributors
such as [Distributor-1]."  As set forth above, however, PETIT
and TAYLOR knew that statement was false, because there was no
such distribution agreement at the time the products were sold

in the third quarter of 2015.  In reality, the distribution agreement was not actually signed until in or about 2016, but was undated in order to conceal when it was actually executed. Similarly, PETIT and TAYLOR asserted in the written summary that Distributor-3's sales of MiMedx product in the fourth quarter were "minimal" because the Distributor-3 Owner was "preoccupied during the fourth quarter," and that Distributor-3 made an additional order in the fourth quarter "as they wanted to be assured they could continue to supply their customers if the merger agreement negotiations slowed down or were discontinued." In truth and in fact, as PETIT and TAYLOR well knew, Distributor-3 never intended to sell most of the product it had purchased in the third quarter, let alone within the following three months, and Distributor-3 purchased additional product in the fourth quarter only because PETIT had requested that Distributor-3 do so as part of the Acquisition negotiations.

### MiMedx's Fraudulent Recognition of Revenue from Distributor-4 in the Fourth Quarter of 2015

53.  As the end of the fourth quarter of 2015 approached, in order to reach its quarterly and annual revenue guidance, MiMedx sought to sell product to Distributor-4, a Saudi Arabia-based distributor that sold medical products to hospitals in the Middle East.  At the time, Distributor-4 was attempting to

obtain a "tender" (or contract) to sell products to state-sponsored hospitals in Saudi Arabia.

54.    During negotiations between MiMedx and Distributor-4, a principal of Distributor-4 (the "Distributor-4 Principal") made clear to WILLIAM TAYLOR, the defendant, that there was a risk that the Saudi government would not award the tender to Distributor-4 and that Distributor-4 therefore could not assume the risk of purchasing MiMedx product if the tender was not awarded.    Accordingly, TAYLOR agreed with the Distributor-4 Principal, in substance, that (1) MiMedx sales representatives would assist Distributor-4 in selling product to Saudi hospitals, (2) MiMedx would take back the product if the tender were not awarded, and (3) MiMedx would not leave Distributor-4 with any losses.

55.    Distributor-4 ultimately agreed to purchase approximately $2.54 million of MiMedx's EpiFix product in or about late December 2015, and MiMedx recognized revenue from the sale upon shipment.    WILLIAM TAYLOR, the defendant, well knew that it was improper for MiMedx to recognize any revenue upon shipment of the product to Distributor-4 based upon the terms he had negotiated with Distributor-4.    Accordingly, TAYLOR crafted a false cover story to mislead MiMedx's internal accountants and

the Audit Firm about the true terms of MiMedx's arrangement with Distributor-4.

56.   On or about December 21, 2015 at approximately 2:30:02 p.m., WILLIAM TAYLOR, the defendant, sent an email, entitled "Purchase Order," (the "Cover Email") to the Distributor-4 Principal, copying the Senior Sales Vice President, stating:

> Thank you very much for the EpiFix order placed earlier today.  It is very much appreciated.  Our accountants have asked for a clarification on the Payment Terms. Because the email referenced was related to the 2015 tender and the July order, they wish to have a clarification.  I know this order is for 2016 sales by [Distributor-4].  I have clarified below their proposal.
>
> Payment terms:   180 days from receipt of product by [Distributor-4].
>
> Thank you for your consideration.  Please advise if this will be acceptable.

57.   Just four seconds later, on or about December 21, 2015 at approximately 2:30:06 p.m., WILLIAM TAYLOR, the defendant, sent a second email to the Distributor-4 Principal, entitled "Purchase Order - Clarification" (the "Clarification Email"). The Clarification Email did not copy anyone at MiMedx and memorialized terms that differed materially from those set forth in the Cover Email.   TAYLOR's Clarification Email stated:

> Further to my email that I just sent relative to the Purchase order 212-2015.   We understand that it is expected that the 2016 tender will be issued in March 2016, and it is expected to be as big, or bigger than the tender that was issued to [Distributor-4] in 2015. In the event the tender is delayed, or for some unlikely

event does not occur, MiMedx will give [Distributor-4]
additional extended payment terms if request[ed] and
will assist [Distributor-4] in selling the product or
another option would be to repurchase the product. We
will continue supporting sales efforts in the territory
by continued training . . . . Thank you again for a
strong partnership with MiMedx. Please feel free to
contact me at any time with any questions. Best regards,
Bill.

58.  WILLIAM TAYLOR, the defendant, subsequently arranged

for the Cover Email, but not the Clarification Email, to be

circulated to MiMedx's accounting department.  As TAYLOR well

knew, the Clarification Email memorialized the true terms of

Distributor-4's purchase, and the Cover Email was a cover story

designed to mislead MiMedx's internal accountants and the Audit

Firm into believing that Distributor-4 was required to make

payment to MiMedx within 180 days and that, accordingly, MiMedx

could immediately recognize revenue from the sale.

59.  In or about early 2016, in connection with its annual

audit, the Audit Firm sought written confirmation from

Distributor-4 that it had purchased MiMedx product in or about

December 2015 subject to specified payment terms.  WILLIAM

TAYLOR, the defendant, thereafter arranged for the Distributor-4

Principal to receive and sign an audit confirmation that falsely

indicated that Distributor-4 had agreed to pay within 180-day

terms and omitted the true terms of Distributor-4's arrangement

with MiMedx as reflected in the Clarification Email.  TAYLOR hid

the Clarification Email and the true terms of the deal from MiMedx's internal accountants and the Audit Firm.

**Impact of the Fraudulent Recognition of Revenue**

60.  The efforts of PARKER H. PETIT and WILLIAM TAYLOR, the defendants, to manipulate MiMedx's revenue caused MiMedx to report fraudulently inflated revenue in the second, third and fourth quarters of 2015 and for the full year 2015, as follows:

a.  MiMedx's fraudulent recognition of a total of approximately $1.4 million in revenue in the second quarter of 2015 from Distributor-1 resulted in the false inflation of MiMedx's revenue by approximately 3 percent that quarter.  Absent this fraudulent recognition of revenue, MiMedx's revenue would have been near the bottom of its revenue guidance range for the quarter rather than near the top of the range, as MiMedx reported, and MiMedx would have missed Wall Street analyst revenue consensus.

b.  MiMedx's fraudulent recognition of a total of approximately $6.8 million in revenue in the third quarter of 2015 from Distributor-2 and Distributor-3 resulted in the false inflation of MiMedx's revenue by approximately 13.9 percent that quarter.  Absent this fraudulent recognition of revenue, MiMedx would have missed both (1) its revenue guidance in the third

quarter of 2015 for the first time in approximately 15 quarters and (2) analyst revenue consensus.

     c.   MiMedx's fraudulent recognition of a total of approximately $2.95 million in revenue in the fourth quarter of 2015 from Distributor-3 and Distributor-4 resulted in the false inflation of MiMedx's revenue by approximately 5.7 percent that quarter.  Absent this fraudulent recognition of revenue, MiMedx would have missed both (1) its revenue guidance in the fourth quarter of 2015 for the first time in approximately 16 quarters and (2) analyst revenue consensus.

     d.   In its 2015 10-K, MiMedx reported annual revenue for 2015 of approximately $187.3 million.  In truth, the annual revenue that MiMedx disclosed for 2015 was fraudulently inflated by approximately $9.5 million, or approximately 5 percent. Absent this fraudulent inflation of revenue, MiMedx would have missed both (1) its annual revenue guidance for 2015 and (2) analyst revenue consensus for 2015.

     61.   In MiMedx's annual management representation letter for 2015, which MiMedx submitted to the Audit Firm on or about February 29, 2016, PARKER H. PETIT, the defendant, falsely represented that "all sales recorded by the Company to new distributors in 2015 ([Distributor-2], [Distributor-3], and

[Distributor-4]) have met the four criteria for revenue recognition pursuant to ASC 605, *Revenue Recognition.*"

## Statutory Allegations

62.  From at least in or about 2015 through at least in or about 2016, in the Southern District of New York and elsewhere, PARKER H. PETIT and WILLIAM TAYLOR, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; making false and misleading statements of material fact in applications, reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, in violation of Title 15, United States Code, Sections 78m(a) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13; and improperly influencing the conduct of audits, in violation of Title 15, United States Code, Sections 7202, 7242, and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2.

## Objects of the Conspiracy

63.  It was a part and an object of the conspiracy that PARKER H. PETIT and WILLIAM TAYLOR, the defendants, and others

known and unknown, willfully and knowingly, directly and

indirectly, by use of the means and instrumentalities of

interstate commerce, and of the mails and of the facilities of

national securities exchanges, would and did use and employ, in

connection with the purchase and sale of securities,

manipulative and deceptive devices and contrivances, in

violation of Title 17, Code of Federal Regulations, Section

240.10b-5 by: (a) employing devices, schemes, and artifices to

defraud; (b) engaging in acts, practices, and courses of

business which operated and would operate as a fraud and deceit

upon persons; and (c) making untrue statements of material fact

and omitting to state material facts necessary in order to make

the statements made, in the light of the circumstances under

which they were made, not misleading, in violation of Title 15,

United States Code, Sections 78j(b) and 78ff.

64.   It was a further part and an object of the conspiracy

that PARKER H. PETIT and WILLIAM TAYLOR, the defendants, and

others known and unknown, willfully and knowingly would and did

make and cause to be made statements in reports and documents

required to be filed with the SEC under the Securities Exchange

Act of 1934 and the rules and regulations promulgated

thereunder, which statements were false and misleading with

respect to material facts, in violation of Title 15, United

States Code, Sections 78m(a) and 78ff, and Title 17, Code of

Federal Regulations, Sections 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13.

65.  It was a further part and an object of the conspiracy that PARKER H. PETIT and WILLIAM TAYLOR, the defendants, and others known and unknown, willfully and knowingly would and did take actions to fraudulently influence, coerce, manipulate, and mislead independent public and certified accountants engaged in the performance of audits of the financial statements of an issuer for the purpose of rendering such financial statements materially misleading, and did so by, as officers of a company issuing publicly traded securities, (a) making, and causing to be made, materially false or misleading statements to an accountant, and (b) omitting to state, and causing another person to omit to state, material facts necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant; with these false statements and omissions being in connection with audits, reviews and examinations of required financial statements of the company and the preparation and filing of documents and reports required to be filed with the SEC, in violation of Title 15, United States Code, Sections 7202, 7242, and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2.

## Overt Acts

66.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    On or about June 3, 2015, WILLIAM TAYLOR, the defendant, stated during a presentation to investors and analysts in the Southern District of New York: "We've got 3 1/2 years of meeting or exceeding our revenue guidance."

b.    On or about June 30, 2015, PARKER H. PETIT, the defendant, entered into a purported consulting agreement with the Distributor-1 Owner, which was designed to disguise the undisclosed financial inducement paid to the Distributor-1 Owner in exchange for Distributor-1 purchasing MiMedx product.

c.    On or about October 13, 2015, PETIT, during an "analyst day" presentation in the Southern District of New York, delivered a presentation touting "16 consecutive quarters of meeting or exceeding quarterly guidance."

d.    On or about October 28, 2015, MiMedx transmitted its third quarter 2015 earnings release to a New York, New York-based publicity firm, which disseminated the earnings release to the market.

e.    On or about December 7, 2015, PETIT sent the Distributor-2 Owner a copy of the promissory note between the Shell Company and Distributor-2.

f.    On or about December 21, 2015, at 2:30:02 p.m., TAYLOR sent the Cover Email to the Distributor-4 Principal.

g.    On or about December 21, 2015, at 2:30:06 p.m., TAYLOR sent the Clarification Email to the Distributor-4 Principal.

h.    On or about December 31, 2015, PETIT granted the Distributor-3 Owner a written right of return for all products that Distributor-3 had purchased from MiMedx.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Securities Fraud)

The Grand Jury further charges:

67.    The allegations contained in paragraphs 1 through 61 and paragraph 66 of this Indictment are repeated and realleged as if fully set forth herein.

68.    From at least in or about 2015 through at least in or about 2016, in the Southern District of New York and elsewhere, PARKER H. PETIT and WILLIAM TAYLOR, the defendants, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, used and

employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons; and (c) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, to wit, PETIT and TAYLOR engaged in a scheme to mislead the shareholders of MiMedx and the investing public by fraudulently inflating MiMedx's reported revenue.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATION

69. As a result of committing one or more of the offenses charged in Counts One and Two of this Indictment, PARKER H. PETIT and WILLIAM TAYLOR, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency

representing the amount of proceeds traceable to the commission of said offenses that the defendants personally obtained.

## Substitute Assets Provision

70.  If any of the above-described forfeitable property, as a result of any act or omission by either of the defendants:

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461, to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461.)

GRAND JURY FOREPERSON

Geoffrey S. Berman
GEOFFREY S. BERMAN
United States Attorney

43

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

PARKER H. PETIT and
WILLIAM TAYLOR,

Defendants.

### SEALED INDICTMENT

19 Cr. _____

(Title 15, United States Code, Sections
78j(b) and 78ff; Title 17, Code of Federal
Regulations, Section 240.10b-5; Title 18,
United States Code, Sections 2 and 371.)

|  | GEOFFREY S. BERMAN |
| --- | --- |
| Foreperson | United States Attorney |

TRUE BILL, & SEALED INDICTMENT & ARREST WARRANTS

MAG. B ROBERT W. LEHRBURGER — 11-25-19

44