UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- x

UNITED STATES OF AMERICA   :

             :

– v. –           :

             :  19 Cr. 850 (JSR)

PARKER H. PETIT and WILLIAM TAYLOR, :

             :

      Defendants.  :

----------------------------------------------------------------- x

### DEFENDANTS PARKER H. PETIT AND WILLIAM TAYLOR'S MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION TO COMPEL DISCOVERY AND SET DISCLOSURE DEADLINES

Eric B. Bruce
Freshfields Bruckhaus Deringer US LLP
700 13th Street, NW
10th Floor
Washington, DC 20005
Telephone: (202) 777-4577
Email: Eric.Bruce@freshfields.com

Altin. H. Sila
Freshfields Bruckhaus Deringer US LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 230-4622
Email: Altin.Sila@freshfields.com

*Attorneys for Parker H. Petit*

William D. Weinreb
Michael T. Packard
Quinn Emanuel Urquhart & Sullivan, LLP
111 Huntington Ave., Suite 520
Boston, MA 02199
Telephone:  (617) 712-7100
Email: billweinreb@quinnemanuel.com
Email: michaelpackard@quinnemanuel.com

William A. Burck
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone:  (202) 538-8000
Email: williamburck@quinnemanuel.com

Michael B. Carlinsky
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Email:michaelcarlinsky@quinnemanuel.com

*Attorneys for William Taylor*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ....................................................................................... 1

FACTUAL BACKGROUND ............................................................................................ 2

1.     Petit and Taylor Built MiMedx Into A Successful Business That Helped Save Lives And Limbs With Innovative Wound Care Products. ....................................... 2

2.     In 2018, MiMedx Undertook A Wide-Ranging And Expensive Internal Investigation.................................................................................................................. 2

3.     DOJ Relied Upon Evidence And "Conclusions" Obtained from MiMedx's Internal Investigators. ................................................................................................. 4

4.     DOJ Relied On MiMedx's Work Product In Charting Its Investigative Steps. ............... 6

5.     Under Pressure From MiMedx, Petit And Taylor Submit A 'White Paper' On September 10, 2018 To Defend Themselves Against False Allegations......................... 9

6.     Petit Is Frozen Out Of MiMedx's Board And Subsequently Resigns. ........................ 11

7.     Following A Joint Investigation, DOJ And SEC Bring Charges In November 2019 That Rely On MiMedx's Internal Investigation............................................................. 11

8.     DOJ Produces Massive Discovery And *Brady* Disclosures That Are Partly Indecipherable.............................................................................................................. 15

ARGUMENT .................................................................................................................... 15

I.     DOJ Should Produce All Correspondence And Presentations From MiMedx And Its Counsel Concerning This Matter, And Disclose Its Involvement In MiMedx's Internal Investigation. ..................................................................................................... 15

II.     DOJ Should Supplement And Amplify Its 21-Page *Brady* Letter So That Its Disclosures Are Understandable and Usable By The Defense. ...................................... 19

III.     DOJ Should Also Disclose The Authors Of The Notes In Its 21-page *Brady* Letter. ............................................................................................................................ 21

IV.     The Defendants Ask The Court To Set Additional Deadlines Sufficiently In Advance Of Trial To Allow For Adequate Trial Preparation......................................... 21

(1)     DOJ Should Disclose Its Initial Witness List 45 Days Before Trial............................... 21
(2)     DOJ Should Disclose Its Initial Exhibit List 45 Days Before Trial............................... 24
(3)     DOJ Should Disclose Jencks Act Material 45 Days Before Trial. ................................. 25

V.     DOJ Should Be Compelled To Provide Rule 404(b)(2) Notice Two Months Before Trial................................................................................................................... 26

CONCLUSION................................................................................................................. 28

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Garrity v. New Jersey*,
    385 U.S. 493 (1967)...............................................................................................1, 18, 19

*SEC v. MiMedx Group, Inc., et al.*,
    No. 1:19-cv-10927 (S.D.N.Y. Dec. 4, 2019) ...................................................4, 7, 27

*United States v. Blumberg*,
    No. 2:14-cr-00458-JLL (D.N.J. Jan. 26, 2015.)..............................................16, 17

*United States v. Cannone*,
    528 F.2d 296 (2d Cir. 1975)..................................................................................22

*United States v. Connolly*,
    No. 16-CR-0370 (CM), 2019 WL 2120523 (S.D.N.Y. May 2, 2019)....................18

*United States v. Coppa*,
    267 F.3d 132 (2d Cir. 2001)..................................................................................25

*United States v. Freeman*,
    No. 18-CR-217 (KMW), 2019 WL 2590747 (S.D.N.Y. June 25, 2019)...............25

*United States v. Giffen*,
    379 F. Supp. 2d 337 (S.D.N.Y. 2004)......................................................25, 26, 28

*United States v. Gupta*,
    848 F. Supp. 2d 491 (S.D.N.Y. 2012)..................................................................12

*United States v. Havens*,
    446 U.S. 620 (1980)..............................................................................................25

*United States v. Inadi*,
    475 U.S. 387 (1986)..............................................................................................26

*United States v. Kastigar*,
    406 U.S. 441 (1972)...................................................................................1, 18, 19

*United States v. Levine*,
    249 F. Supp. 3d 732, (S.D.N.Y 2017)......................................................24, 25, 26

*United States v. Mahaffy*,
    693 F.3d 113 (2d Cir. 2012)..................................................................................21

*United States v. Martoma*,
   990 F. Supp. 2d 458 (S.D.N.Y. 2014) .................................................................11

*United States v. Nachamie*,
   91 F. Supp. 2d 565 (S.D.N.Y. 2000) ..................................................................26

*United States v. Rosenthal*,
   No. 91-cr-412 (LLS), 1991 WL 267767 (S.D.N.Y. Dec. 3, 1991) ........................24

*United States v. Stewart*,
   513 F.2d 957 (2d Cir. 1975) ..............................................................................20

*United States v. Turkish*,
   458 F. Supp. 874 (S.D.N.Y. 1978) .....................................................................23

*United States v. Vilar*,
   530 F. Supp. 2d 616 (S.D.N.Y. 2008) .......................................................22, 23, 24

**Statutes**

18 U.S.C. § 3500 (Jencks Act) ...................................................................1, 2, 25, 26

**Other Authorities**

FED. R. EVID. 404(b) ...........................................................................1, 2, 26, 27, 28

## PRELIMINARY STATEMENT

Discovery and *Brady* disclosures to date make clear that the Government's ("DOJ") investigation of Defendants Parker H. "Pete" Petit and William Taylor relied *heavily* on evidence and conclusions generated during an internal investigation conducted by their former employer, MiMedx Group, Inc. ("MiMedx" or the "Company"). That investigation cost over $42 million – a *staggering* sum given MiMedx's relatively modest size. DOJ's reliance on MiMedx's work product raises legitimate and important questions as to whether DOJ "outsourced" significant aspects of its investigation to MiMedx or otherwise directed its internal investigation in a manner that could impact the Defendants' constitutional rights. As a result, further disclosures by DOJ are warranted and necessary to protect the Defendants' constitutional rights under *Garrity v. New Jersey*, 385 U.S. 493 (1967) and *United States v. Kastigar*, 406 U.S. 441 (1972).

In addition, given the massive volume of discovery (i.e. over 650,000 documents and thousands of audio and video recordings), huge pool of potential witnesses (both here and abroad), and noncommittal responses by DOJ to various *Brady* requests this case needs firm, early dates for the production of DOJ witness and exhibit lists, Jencks Act material, as well as Rule 404(b) notice.

Accordingly, and for reasons that follow, Petit and Taylor respectfully request that this Court order DOJ to:

- produce all correspondence and presentations received from MiMedx and its counsel concerning this matter, and disclose the extent of DOJ/SEC involvement in MiMedx's internal investigation;

- supplement its 21-Page *Brady* letter so that Petit and Taylor can decipher and make use of the disclosures;

- disclose the authors of the witness-interview notes excerpted in its 21-page *Brady* Letter;

- disclose its initial witness list, initial exhibit list, and Jencks Act material at least 45 days before trial; and

- provide notice pursuant to Rule 404(b)(2) of the Federal Rules of Evidence at least two months before trial.

## FACTUAL BACKGROUND

**1.      Petit and Taylor Built MiMedx Into A Successful Business That Helped Save Lives And Limbs With Innovative Wound Care Products.**

MiMedx is a biopharmaceutical company that develops, manufactures, and sells regenerative wound care products and tissues to healthcare providers.  The Company has over 45 patents on products and technologies in the regenerative wound care space.

Petit was Chief Executive Officer and Chairman of the Board at MiMedx from 2009 through 2018.  Before that he served for almost 30 years as CEO of other publicly traded companies, including Healthdyne, a company he developed to provide affordable, in-home monitors designed to prevent infant mortality.

Taylor was President and Chief Operating Officer of MiMedx from 2009 through 2018 and also served on the Board of Directors.  He supervised the Company's sales, marketing, manufacturing, and research and development efforts. Before joining MiMedx, Taylor was president of Facet Technologies, a company that created and marketed medical devices.  He is an engineer by training and is listed on eight patents.

Petit and Taylor joined MiMedx when it was nearly bankrupt and had virtually no sales. Under their leadership, MiMedx developed, produced, and sold hundreds of thousands of wound care products that helped save patients' lives and limbs.

**2.      In 2018, MiMedx Undertook A Wide-Ranging And Expensive Internal Investigation.**

In April 2017, the Securities and Exchange Commission ("SEC") sent MiMedx a subpoena "requesting information related to, among other things, the Company's recognition of

revenue, practices with certain distributors and customers, its internal accounting controls and certain employment actions." Ex. B (MiMedx Schedule 14A Definitive Proxy Statement 72, May 31, 2019). On information and belief, this SEC subpoena was prompted by misinformation spread by aggressive short sellers and disgruntled former MiMedx employees.

In February 2018, MiMedx publicly announced that its Audit Committee had launched an internal investigation into the company's sales and distribution practices, including allegations made by ex-employees and opportunistic short sellers. Ex. C (MiMedx Form 8-K, Ex. 99.1, Feb. 20, 2018); Ex. D (MiMedx Form 8-K, Ex. 99.1, Mar. 15, 2018) (describing review of "certain sales and distribution practices, including allegations made by former employees and short sellers"). The Audit Committee retained King & Spalding LLP ("K&S") and a forensic accounting firm to conduct the internal investigation. Over the next 15 months, K&S reviewed approximately 1.7 million documents, 2,750 hours of video, and "significant volumes of data stored in the Company's accounting, customer relationship management, inventory, and other systems." Ex. E (Report of the Special Litigation Committee 5, June 28, 2019). It also "interviewed over 85 witnesses, many of them multiple times." Ex. F (MiMedx Form 8-K, Ex. 99.1 at 1, May 23, 2019).

The investigation cost an estimated $42 million in legal and accounting fees during its first 11 months (Ex. G (MiMedx Q3 2018 Management Reporting Package, EY-MDXG-CUST-JH-006243 at -255, Oct. 24, 2018) (Slide 10)) and it continued for approximately another five months after that.[1] Yet this massive expenditure was completely out of proportion with the alleged wrongdoing uncovered: MiMedx settled the SEC charges "without admitting or denying

---

[1] The attached Exhibit shows that the investigation was initially estimated to cost approximately $38.5 million, but the handwritten notes indicate that this estimate was revised to approximately $42 million for 2018 alone. The Exhibit was produced as SEC-DOJ-EPROD-000471652.

the allegations" for a *mere $1.5 million*, and DOJ did not even require the Company to enter into a deferred prosecution or non-prosecution agreement. Ex. H (Final Judgment as to Defendant MiMedx Group, Inc., *SEC v, MiMedx Group, Inc., et al.*, No. 1:19-cv-10927, ECF No. 18 at 1, 5 (S.D.N.Y. Dec. 4, 2019)).

3. **DOJ Relied Upon Evidence And "Conclusions" Obtained from MiMedx's Internal Investigators.**

MiMedx's announcement of its internal investigation triggered a full-blown DOJ investigation, as the DOJ case agent, Postal Inspector Diana Chau ("Inspector Chau"), explained in a search warrant affidavit:

> ***Since early 2018, members of the United States Attorney's Office for the Southern District of New York and agents of the USPIS have been investigating*** whether MiMedx, through its senior management and directors from approximately 2012 through 2017, routinely and knowingly filed public financial reports with the SEC that contained false and inflated earnings information, with the intent to deceive the investing public. ***This investigation followed MiMedx's February 20, 2018 issuance of a press release and its filing of a Form 8K with the SEC, announcing that the filing of the company's reports of financial results for fourth quarter 2017 and fiscal year 2017 would be delayed and that the company's audit committee had begun "an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company***."

Ex. I (Chau Search Warrant Affidavit ¶7, May 10, 2019) (***May 10, 2019 Chau S/W Aff.***) (emphasis added).

DOJ's investigation was not only triggered by MiMedx's, but relied upon it. MiMedx's outside counsel provided detailed debriefs to DOJ concerning details of the investigation, as well as "the conclusions reached" regarding complex accounting issues at the heart of this case. These meetings were previewed in a July 2018 memorandum from E&Y:

> K&S is moving towards a meeting in DC with Southern District of New York (SDNY) and the SEC to discuss the work that was done that precipitated the 8K and the conclusions reached on the restatement. The SEC is briefed on the tapes and that will be discussed at the meeting.

Ex. J (Ernst & Young, Mem. for Discussion on Audit Steps and Investigation Update 2, July 16, 2018) (produced as SEC-DOJ-EPROD-000465324) (***July 16, 2018 E&Y Mem.***).  They were also described in a July 2018 letter from MiMedx to NASDAQ:

> Since May 1, our counsel's communication with the SEC Staff have primarily related to … [*inter alia*] the revenue recognition issues that led to the Audit Committee's decision to restate our historical financial statements and the recent departures of our senior leadership. We anticipate that K&S will be making a presentation to the SEC and the U.S. Attorney's Office for the Southern District of New York at the end of July.

Ex. K (Letter from MiMedx to NASDAQ, EY-MDXG-EM-155152 at -155, July 10, 2018) (produced as SEC-DOJ-EPROD-000630850).

DOJ has provided discovery confirming that the prosecutors received at least two presentations from counsel for MiMedx's Audit Committee.  *See* Ex. L (Email from E. Imperatore to E. Bruce, *et al.*, Jan. 17, 2020).  These presentations were drafted by MiMedx's counsel as non-privileged documents so that they could be presented to DOJ and SEC, and they include  "identical findings and conclusions as the other [privileged] presentation" made to the Company's Audit Committee and Board of Directors:

> - Two versions of the presentation exist:
>   - One presented to the Audit Committee and the Board
>     - Presentation contains privileged content and additional documents that helped form findings and conclusions
>   - Another that was presented to the Southern District of New York and SEC. This is the presentation shared with EY
>     - Presentation contains identical findings and conclusions as the other presentation, however is without privileged content

Ex. M (Ernst & Young, Mem. on Investigation Update 1, Sept. 26, 2018) (produced as SEC-DOJ-EPROD-000465324) (***Sept. 26, 2018 E&Y Mem.***).

Discovery further shows that MiMedx's counsel, not DOJ, focused the investigation on transactions charged in the indictment involving Distributor-1, -2, -3, and -4, as charged in the Indictment. For example, E&Y memoranda show that by September 26, 2018, MiMedx counsel had begun investigating transactions with more than six distributors, including the four at issue in the Indictment. *Id.* at 10-14.

In short, discovery makes clear that DOJ relied on *both* the evidence and "conclusions" provided by MiMedx's counsel in two important ways:

> *First*, DOJ relied on this evidence and MiMedx's "conclusions" to take further investigative steps, as set out more fully in section 4 below; and,

> *Second*, DOJ relied on MiMedx's conclusions to shape the charges that were ultimately brought in the indictment, as set out more fully in section 7 below.

### 4.      DOJ Relied On MiMedx's Work Product In Charting Its Investigative Steps.

There can be no dispute that DOJ relied upon MiMedx's internal investigation to chart its investigative steps, given that Inspector Chau's sworn affidavits repeatedly cite to and rely on evidence and conclusions generated by MiMedx's counsel.

Beginning in 2018 – when MiMedx's internal investigation *and* DOJ's criminal investigation were focused primarily on a single MiMedx distributor, AvKare, Inc. – Inspector Chau relied upon "conversations with representatives of MiMedx" regarding AvKare in attempting to establish probable cause for search warrants. Ex. N (Chau Search Warrant Affidavit ¶11, Aug. 31, 2018). She did the same thing when seeking additional warrants in May 2019, relying on "conclusions" of MiMedx and its counsel regarding the accounting treatment for the Company's shipments involving AvKare:

> *From conversations with representatives of MiMedx*, I have learned that the company's decision to re-state its earnings was prompted, in part, *by the conclusion that, based on the information above, MiMedx's practice of recognizing revenue at the time tissue was shipped was inconsistent with GAAP and SEC guidance*.

Ex. O (Chau Search Warrant Affidavit ⁋16.f., Mar. 7, 2019) (***Mar. 7, 2019 Chau S/W Aff.***) (emphasis added).  Ironically, although suspicions regarding AvKare instigated the investigations that led to this case, no AvKare transactions are charged in the Indictment – although they are the subject of civil charges brought by the SEC in a companion case.[2]  *See, e.g.*, Compl., ECF No. 1 in *SEC v. MiMedx Group, Inc., et al.*, 19 Civ. 10927 (NRB) (S.D.N.Y.) ¶2 (alleging impropriety regarding sales to "Distributor E," i.e. AvKare).

As MiMedx's investigation widened, so too did DOJ's.  Inspector Chau began to rely on MiMedx's conclusions with respect to *other* distributors.  For example, in a March 2019 affidavit, Inspector Chau explained that "based on [her] review of documents produced by MiMedx, [she had] learned that MiMedx recognized revenue upon shipment from sales to certain distributors *other than AvKare* in which cases MiMedx also apparently excused payment until resale and/or agreed to post-sale obligations." Ex. O (Mar. 7, 2019 Chau S/W Aff. at ⁋17) (emphasis added).  She specifically noted that MiMedx's counsel told her about another distributor, "a Saudi based [company] known as First Medical [i.e. Distributor-4]" for which there were alleged accounting misdeeds:

> ***From speaking with representatives of MiMedx***, I understand that First Medical is the second distributor referenced in the June 6, 2018 MiMedx press release referring to "two distributors for which certain implicit arrangements modified the explicit terms of the contracts, impacting revenue recognition during specified periods."

---

[2] DOJ likely chose not to include AvKare allegations because, even prior to the internal investigation conducted by K&S and DOJ's follow-on criminal investigation, allegations of AvKare accounting impropriety had been raised by an ex-MiMedx employee, thoroughly investigated by an independent law firm (in consultation with an accounting firm), and found to be baseless. Thus, Petit and Taylor could not credibly be accused of any wrongdoing with respect to AvKare, where the facts and accounting had been thoroughly vetted.

*Id.* at ¶¶17–18 (emphasis added).[3]  As with the allegations concerning AvKare, Inspector Chau also adopted MiMedx's legal conclusions regarding the supposed impropriety of the accounting for shipments to First Medical in her affidavit:

> ***From conversations with representatives of MiMedx***, I have learned that the company's decision to re-state its earnings was prompted, in part, by the conclusion that, based on the information above, ***MiMedx's practice of recognizing revenue at the time tissue was shipped to First Medical was inconsistent with GAAP and SEC guidance***.

*Id.* at ¶13.h (emphasis added).

DOJ also trusted MiMedx's counsel to guide and streamline its investigative steps.  For example, in an April 2019 affidavit, Inspector Chau relied on MiMedx's counsel's analysis of Petit's electronic devices:

> ***Based upon information shared by MiMedx's outside counsel, which oversaw a review of MiMedx's review of PETE PETIT's electronic devices***, I have learned that this iMessage (or messages) are no longer available because they appear to have been deleted by PETE PETIT, along with dozens of other iMessages that had been stored on PETE PETIT's company-issued phone, at some time before that phone was returned to the Company in or about August 2018.

Ex. P (Chau Search Warrant Affidavit ¶20, Apr. 10, 2019) (emphasis added).  MiMedx's counsel further led DOJ to a server that it understood belonged to Petit but had been stored on MiMedx premises: MiMedx counsel informed DOJ about the existence of the server and turned it over wholesale, pursuant to a subpoena.  Inspector Chau then secured a warrant to search it, again relying on information and "conclusions" provided by MiMedx's counsel.  Per her affidavit:

> ***From speaking with representatives of MiMedx*** and reviewing documents obtained from MiMedx, I have learned that the TARGET SERVER was owned by Parker H. "Pete" Petit ("PETE PETIT"), … but beginning in at least in or about September 2015 the TARGET SERVER was maintained on MiMedx's premises and was under the supervision of MiMedx's IT personnel.... On or about

---

[3] Several of Inspector Chau's affidavits contain details concerning an insider trading investigation.  But this aspect of the Government's investigation – like its investigation of AvKare and other distributors – did not yield any criminal charges.

April 2, 2019, MiMedx turned the TARGET SERVER over to the USPIS
pursuant to a Grand Jury subpoena issued in the Southern District of New York
and it was brought to New York, New York where it is currently being held.

Ex. I (May 10, 2019 Chau S/W Aff.) (emphasis added).

**5.     Under Pressure From MiMedx, Petit And Taylor Submit A 'White Paper' On
September 10, 2018 To Defend Themselves Against False Allegations.**

On June 30, 2018, approximately four months into the investigation, the Board demanded

Petit and Taylor's resignations. The Board also reserved the right retroactively to deem the

terminations as being "for cause" – a determination that, if made, would cost each man many

millions of dollars in deferred compensation.  Significantly, Petit remained a Board member (a

position for which he was entitled to receive both compensation and stock awards) and continued

to be a major shareholder of the Company.

The Board informed Petit and Taylor that its determination on this issue depended in part

on the Audit Committee's investigation.  The Audit Committee asked to interview Petit and

Taylor, and Board counsel informed their counsel that if the two men did not sit for interviews,

the Board could draw an adverse inference from their silence.  At the same time, the Board and

Audit Committee refused to conduct the interviews in a manner that would keep them privileged,

meaning that they would be available to DOJ (and the SEC) in those ongoing investigations.

Faced with this Hobson's choice and having just witnessed firsthand what would happen

if they continued to remain silent, on September 10, 2018 Petit and Taylor's counsel submitted a

"white paper" to the Audit Committee and MiMedx's outside counsel entitled "Quinn Emanuel's

Memorandum in Response to the Audit Committee Inquiries to Pete Petit and William Taylor"

("the White Paper").  In the White Paper, Petit and Taylor's counsel addressed the allegations of

improper revenue recognition to the best of their ability at that time – a difficult task, given that

MiMedx's counsel had provided only limited documents and limited information.  Among other

things, Petit and Taylor's counsel detailed their clients' understanding of the facts surrounding the First Medical (Distributor-4) and SLR Medical Consulting ("SLR") (Distributor-2) transactions at issue in the Indictment. They also detailed their clients' knowledge and understanding at the time of relevant GAAP and accounting principles. Put simply, Petit and Taylor felt compelled to defend themselves by having their attorneys lay out for the Company (and DOJ) many of their potential defenses in this trial.

Although Petit and Taylor do not know whether MiMedx was communicating with DOJ about their proposed interviews, they do know what MiMedx did with the White Paper: MiMedx promptly handed it over to DOJ. Petit and Taylor also know what DOJ did with it: they used it to further their investigation, including to discredit Petit and Taylor's version of events in *ex parte* search warrant affidavits. For example, Inspector Chau stated in one affidavit that:

> Following PETIT and TAYLOR's resignations, they submitted through counsel a memorandum [the "White Paper"] laying out various justifications for their conduct. In the memo, PETIT and TAYLOR argue, among other things, (a) that they were generally uninformed about the GAAP principles governing revenue recognition, and (b) that they relied in good faith on accounting professionals, the audit committee, outside auditors, and lawyers. These assertions however are not consistent with documents and other evidence that I have received and reviewed from MiMedx.

Ex. O (Mar. 7, 2019 Chau S/W Aff. ⁋ 19).

Indeed, it appears MiMedx's counsel also provided DOJ with evidence that purported to rebut some of the White Paper's assertions. *Id.* ("These assertions however are not consistent with documents and other evidence that I have received and reviewed from MiMedx.") And E&Y's Memoranda show that MiMedx's counsel carefully analyzed key portions of the White Paper and searched for contrary evidence to supply DOJ:

> o  September 10, 2018 Quinn Emanuel letter: "AvKare made a payment to MiMedx to
>    reduce its outstanding balance, and those payments were applied to the oldest invoices
>    first"....."evidently, this was its preferred way of managing its cash flow"
>    ▪  Quinn Emanuel letter makes the argument that AvKare wasn't really paying only
>       when it got paid. K&S concluded that this argument ignores that MiMedx
>       regularly accepted credits for tissues that had been paid for even when the VA
>       hadn't received a PO. Additionally, even when AvKare had been paid for tissue
>       there was a right of return for product if an issue arose

Ex. M (Sept. 26, 2018 E&Y Mem. 4).

DOJ's reliance on the White Paper may expand even beyond its investigation:  it has produced the White Paper in discovery, suggesting it may seek to introduce this document at trial.

### 6.    Petit Is Frozen Out Of MiMedx's Board And Subsequently Resigns.

Despite Petit and Taylors' best efforts to address the allegations being made against them in their White Paper (notwithstanding their lack of access to key documents and other information), MiMedx's Board effectively excluded Petit from its meetings by conducting all business during "executive sessions" from which he was excluded.  Notwithstanding the Board's intentional efforts to exclude him, Petit attempted to assist the Board in running the Company in a businesslike manner. Over time, however, given that the Board had (i) forced him to resign as CEO and Chairman, (ii) effectively excluded him from all Board decisions, and (iii) were actively planning to take other actions adverse to his interests, Petit resigned from the Board on September 20, 2018.

### 7.    Following A Joint Investigation, DOJ And SEC Bring Charges In November 2019 That Rely On MiMedx's Internal Investigation.

DOJ unsealed its indictment in this case on November 26, 2019, and the SEC filed a related civil enforcement action the same day.  There is no question that the SEC and DOJ conducted a joint investigation that culminated in their related charges.  *See, e.g.*, *United States*

*v. Martoma*, 990 F. Supp. 2d 458, 460-61 (S.D.N.Y. 2014) (finding joint investigation where DOJ "conferred with the SEC about [its] parallel investigation," conducted joint interviews, and "[t]he SEC also provided the USAO with documents it obtained during its investigation"); *United States v. Gupta*, 848 F. Supp. 2d 491, 493-95 (S.D.N.Y. 2012) (Rakoff, J.) (similar).  At minimum, these agencies: (1) conducted joint witness interviews; (2) communicated in tandem with MiMedx's counsel;[4] (3) held joint meetings with MiMedx's counsel, during which they were briefed on the progress and findings of the internal investigation; [5] (4) exchanged documents so that, at the very least, DOJ could produce the SEC's documents in discovery; and (5) coordinated with each other to file their respective charges and issue press releases on the same day.   In respective press releases, the SEC and DOJ even acknowledged the other's cooperation in their joint effort. *See* Ex. R (*SEC Charges Biotech Company and Executives With Accounting Fraud*, SEC.GOV, Nov. 26, 2019 (available at https://www.sec.gov/news/press-release/2019-243) (last visited Jan. 10, 2020)) ("The SEC appreciates the cooperation of the U.S. Attorney's Office for the Southern District of New York."); Ex. S (*Former Chief Executive Officer And Chief Operating Officer Of Publicly Traded Biopharmaceutical Company Charged*

---

[4] Notes from a March 22, 2018 meeting with MiMedx's counsel state that the firm was in touch with both the SEC *and* DOJ regarding their investigations by no later than March 2018.  Ex. Q (Ernst & Young, Mem. on Investigation Status Update 3, Mar. 22, 2018) (produced as SEC-DOJ-EPROD-000465324).

[5] MiMedx's July 10, 2018 letter to NASDAQ states that the Company had by then "already produced approximately 6000 additional documents to the SEC," planned to produce more, and "anticipate[d] that K&S w[ould] be making a presentation to the SEC and the U.S. Attorney's Officer for the Southern District of New York at the end of July."  Ex. K (Letter from MiMedx to NASDAQ, EY-MDXG-EM-155152 at -155, July 10, 2018) (produced as SEC-DOJ-EPROD-000630850).  Relatedly, a memorandum from a July 16, 2018 meeting attended by MiMedx's outside counsel and the Audit Committee state that MiMedx's outside counsel was then "moving towards a meeting in DC with SDNY and the SEC to discuss the work that was done that precipitated the 8K and the conclusions reached on the restatement."  Ex. J (July 16, 2018 E&Y Mem. 2).

*With Accounting Fraud*, JUSTICE.GOV, Nov. 26, 2019 (available at https://www.justice.gov/usao-sdny/pr/former-chief-executive-officer-and-chief-operating-officer-publicly-traded) (last visited Jan. 10, 2010)) ("Mr. Berman praised the work of the investigative work of USPIS.  Mr. Berman also thanked the SEC, which brought a separate civil action.").

There is also no question that DOJ's Indictment includes allegations and conclusions that MiMedx's counsel fed to prosecutors and their investigators.  The DOJ's indictment in this case bears a distinct resemblance to Inspector Chau's statements regarding what she learned from MiMedx's counsel.   Thus, as referenced above, the second way in which MiMedx's "conclusions" were used by DOJ is to shape the actual charges against Petit and Taylor.  For example, Inspector Chau repeatedly emphasized that she learned from MiMedx's counsel that the reason MiMedx decided to restate the Company's earnings was based, "in part, [on] *the conclusion* [reached by MiMedx and its counsel] that … MiMedx's practice of *recognizing revenue at the time tissue was shipped was inconsistent with GAAP and SEC guidance*."   Ex. O (Mar. 7, 2019 Chau S/W Aff. ¶16.f) (emphasis added).  The indictment alleges a conspiracy to violate the securities laws with respect to Distributor-3 (Stability Biologics LLC), in part, because "MiMedx recognized all of the revenue from that sale *upon shipment*."   Indictment ¶ 46 (emphasis added).  Similarly, the indictment also charges that "WILLIAM TAYLOR … well knew that *it was improper for MiMedx to recognize any revenue upon shipment of the product to Distributor-4* based upon the terms he had negotiated with Distributor-4 [First Medical]."  Indictment ¶ 55 (emphasis added).

Furthermore, the E&Y memorandum regarding one of MiMedx counsel's presentations to the SEC and DOJ shows that MiMedx's counsel addressed *every* transaction that is encompassed by the Indictment.  Ex. M (Sept. 26, 2018 E&Y Mem.).  Consider:

- <u>Distributor-1, i.e. CPM Medical Consultants LLC</u>: The bulk of DOJ's allegations regarding this distributor (including the allegedly improper consulting agreement and agreement to exchange product) are outlined on pages 11-12 of E&Y's memorandum, including quotations from some of the very emails quoted in the Indictment (i.e. "they ordered way more than they needed last quarter and will be fine with nothing or minimal this quarter") (Indictment ¶ 21);

- <u>Distributor-2, i.e. SLR</u>: The bulk of DOJ's allegations regarding this distributor (including the allegedly improper loan and product return) are outlined on pages 12-13 of E&Y's memorandum;

- <u>Distributor-3, i.e. Stability Biologics</u>:   The bulk of DOJ's allegations regarding this distributor (including allegedly improper sales and doubts regarding the distributor's ability to pay) are outlined on page 12 of E&Y's memorandum, including quotations from some of the very emails quoted in the Indictment (i.e. "[t]hey are excited to work with us and he asked me 'what can I personally do for you'. I told him we will need to move a significant amount of liquid into his freezer and he said 'it's done'" (Indictment ¶ 43);

- <u>Distributor-4, i.e. First Medical</u>:   The core of DOJ's allegations regarding this distributor (including the pair of allegedly suspicious emails sent on December 21, 2015, and the alleged attempt to secure a false audit confirmation) are outlined on pages 13-14 of E&Y's memorandum.

In short, DOJ appears to have adopted MiMedx's conclusion that Petit and Taylor violated the securities laws with respect to the distributors at issue.  Given the heavy reliance that DOJ placed on MiMedx's internal investigation, Petit and Taylor seek additional information

14

and documents, as set out below, regarding the non-privileged communications between MiMedx's counsel and DOJ and/or SEC.

8.    **DOJ Produces Massive Discovery And *Brady* Disclosures That Are Partly Indecipherable.**

Following Indictment, on December 10, 2019 – and in connection with its overall production of over 650,000 documents and thousands of video and audio recordings – DOJ sent defense counsel a 21-page, single-spaced letter outlining *Brady* material it had collected from 26 different sources, including witness interviews and documents. Ex. T (*Brady* Letter, Dec. 10, 2019). Even a cursory review of DOJ's *Brady* letter proves that many key witnesses in this case, who were in a position to understand the facts and the accounting at MiMedx, believe no misconduct occurred. Such a review also shows that the way DOJ prepared this letter – i.e. cutting and pasting snippets from interview notes that include cryptic abbreviations and acronyms – makes it incomprehensible in certain places. On January 13, 2019, DOJ supplemented its disclosure with an additional *Brady* letter providing further exculpatory information. Ex. U (*Brady* Letter, Jan. 13, 2020).

## ARGUMENT

I.    **DOJ Should Produce All Correspondence And Presentations From MiMedx And Its Counsel Concerning This Matter, And Disclose Its Involvement In MiMedx's Internal Investigation.**

Given what discovery has revealed thus far – i.e. that MiMedx's counsel shared evidence *and* key legal "conclusions" with DOJ regarding the alleged impropriety of the transactions at issue, which DOJ adopted in their theory of the case – Petit and Taylor submit that they have made a sufficient showing to warrant an order compelling DOJ to produce all correspondence and presentations between MiMedx and its counsel and DOJ/SEC concerning MiMedx's internal investigation.

Discovery to date proves that MiMedx's counsel provided DOJ with specific, targeted information against Petit and Taylor, which DOJ used as part of its criminal investigation. For example, in addition to the passages set out above, Inspector Chau also receive detailed information about each of Petit's email accounts from MiMedx for purposes of her investigation:

> ***From speaking with representatives of MiMedx***, I have learned that PETIT was able to access at least four separate email accounts — including his MiMedx-issued email account … — from at least one iPad that PETIT used at MiMedx. Accordingly, and because PETIT was regularly using iPads to communicate with MiMedx personnel and others over email about the Accounting Fraud Offenses, I submit that SUBJECT ACCOUNT-1 will contain relevant evidence of the Accounting Fraud Offenses.

Ex. O (Mar. 7, 2019 Chau S/W Aff. ⁋ 27) (emphasis added).

As set out above, the presentation of the "the conclusions reached" by MiMedx's counsel also appears to have dramatically shaped the charges in this case.  Given the impact that MiMedx's counsel and its internal investigation appear had on DOJ's criminal investigation of Petit and Taylor, further inquiry and document production is warranted.

In *United States v. Blumberg*, the defendant argued that DOJ had "outsourced" its investigation to his employer, the brokerage firm ConvergEx. In response to the defendant's motion to compel further discovery, the Honorable Jose L. Linares ultimately ordered, *inter alia*, "that the Government … produce to Defendants: (a) non-privileged communications directed to third parties (including but not limited to subpoenas) wherein the Government is requesting specific documentation or information, and (b) the third party's written response regarding the Government's request for documents." Order, *United States v. Blumberg*, No. 2:14-cr-00458-JLL, ECF No. 54 (D.N.J. Jan. 26, 2015.).  In that case DOJ eventually provided vast amounts of information and documents—far exceeding what the defense requests here—which DOJ itself characterized as follows:

Not only has the government produced over 2 million documents (consisting of approximately 6.8 million pages) and more than 11,000 audio recordings, it has produced materials that vastly exceed its discovery obligations in an effort to assist defendant in preparing his defense, including approximately 129 FBI 302s and Postal Inspection Service Memoranda of Interviews ("MOIs") (including FBI 302s and MOI of three individuals who have pleaded guilty and are cooperating with the government), many of which identify by Bates number the documents shown to witnesses; 17 SEC MOIs; approximately 35 memoranda containing summaries of various witness interviews ConvergEx's counsel (Bracewell & Giuliani) or Bank of New York's counsel (Richards, Kibbe & Orbe), which were provided orally to the government; approximately five memoranda summarizing presentations by ConvergEx's counsel on various topics and six accompanying documents and binders; 10 binders of key documents to assist defendant in understanding the evidence; electronic versions of all produced documents with metadata enabling defendant to conduct searches; cover letters accompanying productions the government has received from third parties; correspondence (consisting of 912 emails and 1,139 attachments) between the government and third parties concerning the government's request for documents; and several letters summarizing all information from attorney proffers that defendant has characterized as *Brady* material.

Gov. Opp. Br., *United States v. Blumberg*, No. 2:14-cr-00458-JLL, ECF No. 97 at 1 (D.N.J. Mar. 24, 2015.). Petit and Taylor make a much more modest request here and seek only the communications between MiMedx's counsel and DOJ/SEC during the course of the investigation.

In *United States v. Connolly*, defendant Gavin Black similarly argued that he was entitled to post-conviction relief because statements he made to his employer, Deutsche Bank, during its internal investigation were both compelled and fairly attributable to DOJ under *Garrity*. The Honorable Colleen McMahon held that DOJ violated *Garrity* because Black was compelled to sit for the Deutsche Bank interviews under threat of termination, and those interviews were fairly attributable to DOJ, which had essentially "outsourced" its investigation to the bank  and its outside counsel. *See United States v. Connolly*, No. 16-CR-0370 (CM), 2019 WL 2120523, at *14 (S.D.N.Y. May 2, 2019) ("[T]he limited record suggests that Deutsche Bank was told by DOJ to conduct an investigation into a particular matter, to do so in a particular fashion, to

interview particular people (including Black), to share its findings with DOJ on a regular basis, and to carry out governmental investigative demands that were generated by its earlier efforts."). Although Judge McMahon held there was a *Garrity* violation in *Connolly*, she ultimately determined that Black was not entitled to any relief under *Kastigar* because DOJ did not "use" his compelled statements in front of the grand jury, at trial, or to guide its investigation in any way.

Here, DOJ indisputably "used" critical statements Petit made in his White Paper - after he had been forced to resign as CEO, but while he still held an important position as a Director - to guide its own criminal investigation, as well as (at least) to obtain a search warrant for the Defendants' iCloud accounts.  Ex. O (Mar. 7, 2019 Chau S/W Aff. ¶19).  Since DOJ has also produced the White Paper in discovery, it may also be contemplating using it against Defendants at trial.  If DOJ played any role in MiMedx's internal investigation, Petit's Fifth Amendment rights may have been violated and he may be entitled to relief under *Garrity* and *Kastigar*.

Although Petit makes no *Garrity* or *Kastigar* allegation at this time, he and Taylor do seek to obtain further information regarding this important constitutional issue. They respectfully submit to the Court that, even with the limited discovery to which they have had access regarding this issue, they have made a sufficient showing such that the Court should order DOJ to:

- produce all correspondence between the SEC and DOJ (the USAO SDNY and any other DOJ components involved in this matter) and MiMedx, its agents, or counsel;

- produce all presentations and/or white papers exchanged between the SEC and DOJ (the USAO SDNY and any other DOJ components involved in this matter) and MiMedx, its agents, or counsel; and

- disclose to the Court and defense counsel whether the SEC and DOJ (the USAO SDNY and any other DOJ components involved in this matter) played any role whatsoever in MiMedx's internal investigation in this matter.

Petit further submits that this modest request is commensurate with the showing he has already made with limited access to information, and is not unduly burdensome to DOJ.[6] Once Petit and Taylor have had an opportunity to review the requested materials, they would request leave of this Court to file further motions, if appropriate and warranted.

## II.    DOJ Should Supplement And Amplify Its 21-Page *Brady* Letter So That Its Disclosures Are Understandable and Usable By The Defense.

DOJ's December 10, 2019 *Brady* letter purports to contain "excerpts of information contained in notes of interviews and/or witness statements."  Ex. T (*Brady* Letter 1, Dec. 10, 2019).  But many of DOJ's disclosures are unintelligible because they are limited snippets of information written by an unknown note-taker, replete with undefined shorthand, and devoid of context.  For example, under the heading, "Notes of a meeting that took place on or about May 30, 2019, indicate that Mark Brooks, a former MiMedx distributor, provided the following information to criminal authorities," DOJ disclosed the following:

- Addtl free product, bought mil 5, if raise to mil 8—give u 5-10% free product or extra 5% off invoice.
        Discounts—tier levels
  MB would say no, dont want to do that, theyd say how about if u move slow moving product addtl product and discount? Diff every time and wasn't every time it happened.

- Sending product back right after june over, wanted to swap AI5050 bc pending orders coming up.

---

[6] Although DOJ has informally indicated to the defense that it did not play a role in MiMedx's internal investigation, given the importance of this issue and its potential constitutional significance, Petit and Taylor request that this disclosure is formally made after DOJ has a chance to review the correspondence between the SEC and DOJ with MiMedx, its agents, and/or counsel.

Ex. T (*Brady* Letter 3, Dec. 10, 2019).   For another example, DOJ disclosed the following
excerpt from an interview that law enforcement authorities conducted with a MiMedx distributor:

- August over 2-3 week – this at least included Q2 exchange and could have
  included epifix. TAYLOR wanted to do it this way – he didn't know why. He
  doesn't recall discussions on this issue.

*Id.*   The defense has excerpted in Exhibit A to this Memorandum each of the additional
indecipherable *Brady* disclosures made by DOJ for which we seek further information, context,
and clarification.

Put simply, DOJ must do more in order to meet its *Brady* obligations.   *Brady* requires
DOJ to disclose "the essential facts which would enable [the defendants] to call the witness[es]
and thus take advantage of any exculpatory testimony that [they] might furnish."   *United States
v. Stewart*, 513 F.2d 957, 960 (2d Cir. 1975).   While DOJ is not obligated to produce *Brady*
material in any particular format, to meet its constitutional obligations, DOJ must disclose the
exculpatory information in a manner in which it can be used and exploited by the defense.

Here, DOJ has not met its *Brady* obligations by producing excerpts of shorthand notes
from an unknown notetaker that include the undefined abbreviations and acronyms.   For some of
DOJ's disclosures, these notes are unintelligible without further context and so do not provide
the "essential" facts needed to enable the defense to make use of this exculpatory information.
Without additional context, it is not even clear what many of the disclosures mean, much less
why they are exculpatory.

Petit and Taylor therefore respectfully request that the Court order DOJ to supplement its
prior *Brady* disclosures identified in Exhibit A to this motion with additional context,
explanation, and information sufficient to make these disclosures understandable and usable by
defense counsel.

### III.   DOJ Should Also Disclose The Authors Of The Notes In Its 21-page *Brady* Letter.

In supplementing the content of its *Brady* disclosures, DOJ should also be compelled to identify the authors of the notes identified in its *Brady* Letter.  Without knowing who took those notes, Petit and Taylor cannot effectively use the *Brady* material at trial to discipline and/or impeach a witness who contradicts something he or she said to the notetaker.  *See, e.g.*, *United States v. Mahaffy¸* 693 F.3d 113, 131 (2d Cir. 2012) ("Aside from exculpatory material, *Brady* applies to material that would be an effective tool in disciplining witnesses during cross-examination.") (internal quotation marks and citation omitted).  Petit and Taylor also cannot contact the notetakers in advance of trial to "interview and possibly subpoena" those individuals to aid in the defense.  *See id.*   Finally, as noted above, some of the notes are so cryptic that reviewing them with the notetakers may turn out to be the only way to understand them.  In sum, because the identities of the notetakers are among the "essential facts" necessary for Petit and Taylor "to take advantage of [the *Brady* Letter's] exculpatory evidence," those identities must be disclosed.  *Id.* at 131 n.11.

### IV.   The Defendants Ask The Court To Set Additional Deadlines Sufficiently In Advance Of Trial To Allow For Adequate Trial Preparation.

#### (1)   DOJ Should Disclose Its Initial Witness List 45 Days Before Trial.

To ensure that Petit and Taylor are able to defend themselves adequately in this complex case, the Court should order DOJ to disclose its initial list of witnesses no later than 45 days before trial, i.e. May 23, 2020.  *See United States v. Cannone*, 528 F.2d 296, 298-300 (2d Cir. 1975) (courts have discretion to order pre-trial production of a witness list); *United States v. Vilar*, 530 F. Supp. 2d 616, 638-39 (S.D.N.Y. 2008) (ordering production of witness list at least 60 days before trial).  This is not the ordinary case in which the likely government witnesses are small in number and easy to predict.  DOJ has identified the universe of "potential witnesses" in

this case as all current and former employees, officers, and directors of MiMedx, along with all current and former employees of its distributors, accounting firms, and law firms, among others. It has also provided DOJ with a 21-page *Brady* letter which indicates that many of the seemingly likely government witnesses have made exculpatory statements and therefore may not be government witnesses after all. Defendants acknowledge that they must prepare for trial without knowing from the outset exactly who DOJ's witnesses will be; but given the vast number of individuals DOJ has identified as potential witnesses, and the difficulty of predicting which ones will actually be called to testify, the Defendants need an initial witness list at least 45 days before trial to get adequately prepared.

Courts considering a request for pretrial identification of government witnesses must balance the defendant's "need" for the witness list against the "possible dangers" disclosure might create. *See Vilar*, 530 F. Supp. 2d at 637 (citing cases). In doing so, courts "frequently" consider the factors enumerated in *United States v. Turkish*, 458 F. Supp. 874, 881 (S.D.N.Y. 1978):

(1)     Did the offense alleged in the indictment involve a crime of violence?

(2)     Have the defendants been arrested or convicted for crimes involving violence?

(3)     Will the evidence in the case largely consist of testimony relating to documents (which by their nature are not easily altered)?

(4)     Is there a realistic possibility that supplying the witnesses' names prior to trial will increase the likelihood that the prosecution's witnesses will not appear at trial or will be unwilling to testify at trial?

(5)     Does the indictment allege offenses occurring over an extended period of time, making preparation of the defendants' defense complex and difficult?

(6)     Do the defendants have limited funds with which to investigate and prepare their defense?

*See Vilar*, 530 F. Supp. 2d at 637-38 (citing cases).

Here, every factor favors disclosure.  *On the first two*: the fraud offenses at issue are not crimes of violence, and there is no suggestion that Petit or Taylor has ever been charged with such a crime (let alone convicted) or poses a risk of committing one in the future.  *On the third*: the volume of discovery (over 650,000 documents produced to date, along with hundreds of hours of video and audio recording) and the nature of the charges indicate that trial evidence will consist largely of testimony related to materials that cannot easily be altered.  *On the fourth*: there is no "realistic possibility" that disclosure will cause any witness to refuse to appear or testify at trial.  *On the fifth*: there is no dispute that that "preparation of the defense [is] complex and difficult" given that the events at issue: (i) took place five years ago; (ii) concern multiple transactions involving distributors in several states and abroad; (iii) involve a mass of discovery and vast pool of potential witnesses; and (iv) contemplate the analysis and application of complex accounting rules regarding revenue recognition.  Indeed, DOJ acknowledged the complexity of this matter in representing to the Court that it would need four weeks to present its case.[7]  *On the sixth*: even with the resources at Defendants' disposal, the significant size of the potential witness pool (including individuals from several states and the Middle East) imperils their ability to mount an adequate defense absent a timely, good-faith disclosure of  DOJ's witness list to guide their preparation.

Defense counsel are familiar with this Court's Individual Rules of Practice, but this Court has also recognized that disclosure of a witness list 45 days *or more* before trial is appropriate in complex fraud prosecutions that, like this one, require the review of voluminous discovery to

---

[7] As stated by AUSA Imperator at the initial conference in this matter: "Your Honor, the government would estimate its case to be in the ballpark of four weeks approximately."  *See* ECF No. 20, Dec. 4, 2019 Hr'g Tr. at 7:13-15.

prepare for cross-examination. *See United States v. Levine*, 249 F. Supp. 3d 732, 733 n.1 (S.D.N.Y. 2017) (Rakoff, J.) ("The Court also ordered the Government to provide to the defense its witness list and exhibit list 50 days before trial."); Mar. 30, 2017 Minute Entry, *Levine*, No. 16-cr-00715 (S.D.N.Y.) (ordering disclosure of witness list 50 days before tax and wire fraud trial). So have other courts in this District. *See e.g.*, *Vilar*, 530 F. Supp. 2d at 638-39 (ordering disclosure of witness list 60 days before securities fraud trial involving substantial documentary evidence); *see also United States v. Rosenthal*, No. 91-cr-412 (LLS), 1991 WL 267767, at *4-5 (S.D.N.Y. Dec. 3, 1991) (ordering disclosure of witness list 30 days before securities, mail, and wire fraud trial involving voluminous evidence and large pool of potential witnesses). The Court should issue a similar order here.

(2)    <b>DOJ Should Disclose Its Initial Exhibit List 45 Days Before Trial.</b>

DOJ likewise should be compelled to produce its initial exhibit list at least 45 days before trial (including the proposed evidentiary basis for the admission of each exhibit). This Court issued just such an order in *Levine*, another fraud case involving voluminous discovery in which the defendants – like Petit and Taylor – were prejudiced in their ability to prepare for trial absent guidance as to what was truly relevant within the morass of material produced. *See Levine*, 249 F. Supp. 3d at 733 n.1 (ordering production of witness and exhibit lists 50 days pre-trial); Mar. 30, 2017 Minute Entry, *Levine*, No. 16-cr-00715 (S.D.N.Y.). Other judges have similarly compelled early production of exhibit lists. *See United States v. Freeman*, No. 18-CR-217 (KMW), 2019 WL 2590747, at *4 (S.D.N.Y. June 25, 2019) (ordering production of exhibit list 30 days before wire fraud, identity theft, and conspiracy trial); *United States v. Giffen*, 379 F. Supp. 2d 337, 344 (S.D.N.Y. 2004) (ordering disclosure of exhibit list 30 days before FCPA trial). Such an order is appropriate here, too.

(3)     **DOJ Should Disclose Jencks Act Material 45 Days Before Trial.**

Although the Jencks Act prevents the Court from ordering early disclosure of 18 U.S.C. § 3500 material, *see*, *e.g.*, *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001), courts (including this one) have recognized that DOJ's failure to produce Jencks Act material well before trial can necessitate long delays during the trial in order to ensure that defendants have a meaningful opportunity to make use of Jencks Act material. Here, unless DOJ produces Jencks Act material at least 45 days before trial, there is a genuine risk that those delays will become necessary.

DOJ has no just reason for refusing to produce prior witness statements at least 45 days before trial. "There is no gainsaying that arriving at the truth is a fundamental goal of our legal system," *United States v. Havens,* 446 U.S. 620, 626 (1980), and courts have long recognized "the critical importance of cross-examination in the truth-seeking process," *United States v. Inadi*, 475 U.S. 387, 406 (1986). Examination of a witness's prior statements are the main way a defendant prepares for cross-examination; yet, as far as Defendants are aware, they have not seen, nor received in discovery, any prior statement of any likely government witness. Where, as here, DOJ has identified well over a thousand potential government witnesses and provided over 600,000 documents in discovery, the Court should, at minimum, encourage DOJ to disclose § 3500 material 45 days before trial, in conjunction with the production of initial witness and exhibit lists. *See* Mar. 30, 2017 Hr'ing Tr., ECF No. 27 in *Levine*, No. 16-cr-00715 (S.D.N.Y.), at 34:10-14 ("[W]hat I will order is that the witness list and the list of exhibits be provided 50 days before trial and I'm going to ask the government right now to agree to provide 3500 material on that same date."); Mar. 30, 2017 Minute Entry, *Levine*, No. 16-cr-00715 (S.D.N.Y.) ("Witness and Exhibit Lists plus 3500 material shall be produced: By the Govt to the defense within 50 days of trial. . .").

## V.   DOJ   Should   Be   Compelled   To   Provide   Rule   404(b)(2)   Notice Two Months Before Trial.

DOJ should also be compelled to provide notice pursuant to Fed. R. Evid. 404(b)(2) of its intent to introduce other-act evidence at least two months prior to trial.  Although such "notice is typically provided no more than two to three weeks before trial, a longer period is appropriate [where there is an] absence of any threat to the safety of prospective witnesses and the ... Rule 404(b) evidence [is important to] th[e] action."  *United States v. Nachamie*, 91 F. Supp. 2d 565, 577 (S.D.N.Y. 2000) (cited with approval in, *inter alia*, *Giffen*, 379 F. Supp. 2d at 345).  This is such a case because (i) there is no suggestion any witness is in danger in this white-collar matter, (ii) if the 404(b) evidence includes allegations concerning AvKare, a MiMedx distributor, it could markedly alter the content and duration of trial, and (iii) DOJ has announced an intention to withhold *Brady* material related to 404(b) matters until such time as it makes its 404(b) disclosure.

As the Court knows, the Indictment's charges concern the accounting treatment of several sales that MiMedx made in 2015 to four distributors.  But the investigation that led to these charges scrutinized sales in other years, to other distributors, including one – AvKare (i.e. "Distributor E") – that is a source of substantial civil fraud charges lodged by the SEC.  *See, e.g.*, Compl., ECF No. 1 in *SEC v. MiMedx Group, Inc., et al.*, 19 Civ. 10927 (NRB) (S.D.N.Y.).  The SEC's allegations regarding AvKare concern transactions over a *five-year period* (i.e. 2013-2017), and include claims of revenue manipulation, fraudulent SEC filings, and concealment of material facts from internal investigators, auditors, and others.  *See, e.g.*, *id.* ¶2 (alleging that Defendants caused MiMedx to improperly recognize revenue related to sales to AvKare "[f]rom the [Q1] 2013 through [Q3] 2017"), ¶¶ 134-216 (expanding on fraud allegations), ¶¶ 217-261 (alleging concealment of fraud from auditors, audit committee, and internal investigators).  Were

DOJ to succeed in an attempt to introduce such evidence under Rule 404(b), the scope of relevant discovery and potential witnesses would expand considerably.

Moreover, DOJ's noncommittal responses to Petit and Taylor's requests for additional *Brady* material regarding transactions involving AvKare (or any other non-charged distributors) demonstrate the potential prejudice that delayed 404(b) disclosure may cause.  More specifically, when Petit and Taylor first requested *Brady* material related to transactions involving AvKare and other non-charged distributors, DOJ responded that material suggesting innocence with respect to non-charged distributors was categorically *not* subject to *Brady*, presumably because such transactions are not subject to criminal charges.  Of course, that position could only make sense if DOJ has no intention of using such transactions to prove its case.  Accordingly, Petit and Taylor advised that they understood DOJ's response to indicate it did "not intend to introduce evidence regarding any sales to/accounting for those other distributors as part of [DOJ's] case in chief (e.g., as either 404(b) or intrinsic evidence), since such material would obviously implicate[ ] *Brady* if [DOJ had] such an intention."  Ex. V (Email from E. Bruce to S. Hartman, *et al.*, Jan. 16, 2020) (emphasis in original).  In response, DOJ was noncommittal, claiming it "ha[d] not yet decided whether [it] will seek to introduce [such] evidence pursuant to Rule 404(b)," but that *if* it did, then it would "provide appropriate *Brady* disclosures at the time [it] provide[s] 404(b) notice."  Ex. L (Email from E. Imperatore to E. Bruce, *et al.*, Jan. 17, 2020) (emphasis in original).  This slight-of-hand attempt to delay *Brady* production to the eve of trial should not be permitted: if DOJ's game is to withhold potential *Brady* material pending 404(b) notice, then that notice deadline must be early enough to allow Petit and Taylor to make use of related *Brady* material in their defense.

Accordingly, it is imperative that the Court order DOJ to provide notice of its intention to introduce 404(b) evidence at least two months before trial, so that (1) admissibility disputes can be settled in a timely fashion, in line with Rule 404(b)'s purpose "'to reduce surprise and promote early resolution' of any challenge to the admissibility of the proffered evidence," *and* (2) so that Petit and Taylor can receive related *Brady* disclosures sufficiently in advance of trial. *Giffen*, 379 F. Supp. 2d at 345 (quoting Fed. R. Evid. 404(b) advisory committee note (1991)).

## <u>CONCLUSION</u>

For the foregoing reasons, Petit and Taylor respectfully request that this Court order DOJ to produce the additional documents and information requested herein in order to ensure that their constitutional rights are protected and to set additional disclosure deadlines that will help ensure that the trial of this matter proceeds without lengthy interruptions and delays.

Dated: January 22, 2020

Respectfully submitted,

/s/
Eric B. Bruce
Freshfields Bruckhaus Deringer US LLP
700 13th Street, NW
10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Email: Eric.Bruce@freshfields.com

Altin. H. Sila
Freshfields Bruckhaus Deringer US LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 230-4622
Email: Altin.Sila@freshfields.com

*Attorneys for Parker H. Petit*

/s/
William D. Weinreb
Michael T. Packard
Quinn Emanuel Urquhart & Sullivan, LLP
111 Huntington Ave., Suite 520
Boston, MA 02199
Telephone: (617) 712-7100
Email: billweinreb@quinnemanuel.com
Email: michaelpackard@quinnemanuel.com

William Burck
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Email: williamburck@quinnemanuel.com

Michael B. Carlinsky
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010

Telephone: (212) 849-7000
Email:michaelcarlinsky@quinnemanuel.com

*Attorneys for William Taylor*

—