# EXHIBIT E

# REPORT OF THE SPECIAL LITIGATION COMMITTEE OF THE BOARD OF DIRECTORS OF MIMEDX GROUP, INC.

## JUNE 28, 2019

**BRIGIDA BENITEZ**
**PATRICK LINEHAN**
**WILLIAM DRAKE**
**STEPTOE & JOHNSON LLP**

*Counsel for Special Litigation Committee of the MiMedx, Inc. Board of Directors*

I.   **EXECUTIVE SUMMARY**

   A.   **The Formation of the SLC**

On February 20, 2018, MiMedx Group, Inc. ("MiMedx" or the "Company") announced that it would postpone the release of its financial results and the filing of its Form 10-K for the year ending December 31, 2017. The same day, the Company also announced that the Audit Committee of the MiMedx Board of Directors (the "Board") had hired independent legal counsel and outside accounting experts to conduct an investigation into allegations related to sales and distribution practices, including the accounting treatment of certain distributor contracts.

In the following months, attorneys representing a series of purported shareholders of MiMedx stock sent letters to the Company and the Board alleging improper revenue recognition practices and other misconduct, and demanding that the Company and its Board act in response to those allegations. The independent Directors of the Board determined that the allegations raised in the letters should be investigated to determine whether the allegations were true and whether it would be in the best interest of the Company to pursue any or all of the relief demanded. In response, the Special Litigation Committee (the "SLC") of the MiMedx Board of Directors was formed by the independent Directors of the Board on June 6, 2018. The independent Directors authorized the SLC "to conduct a review of and take such investigative steps as are necessary to evaluate the Demands, including the allegations, assertions, and requests for actions contained therein, and to make a determination regarding what action(s) to take in response to the Demands." In other words, the Board charged the SLC to investigate the claims made by the demanding shareholders and to determine the Company's response to those claims. The SLC is currently comprised of two independent Directors—Luis A. Aguilar, who serves as the Chair of the SLC, and Neil S. Yeston.

Following the submission of the demand letters, certain purported shareholders filed derivative lawsuits in the U.S. District Court for the Northern District of Georgia, and, on December 6, 2018, the Court entered an order consolidating the three actions that had been filed in that Court.  On January 22, 2019, the plaintiffs in the consolidated action ("the Plaintiffs") filed a Consolidated Shareholder Derivative Complaint ("the Complaint"), which named several current and former Directors and Officers of the Company as Defendants ("the Defendants").

The Plaintiffs named the following current members of the Board as Defendants:

- Luis A. Aguilar
- J. Terry Dewberry, Director, Chair of the Audit Committee;
- Charles R. Evans
- Charles E. Koob
- Neil S. Yeston

The Plaintiffs also named the following former members of the Board (who were members of the Board on the dates the lawsuits were filed) as Defendants:

- Joseph G. Bleser
- Bruce L. Hack
- Larry W. Papasan

The Plaintiffs also named the following former and current Officers of the Company as Defendants (including individuals who concurrently served as Directors):

- Parker H. "Pete" Petit, who served as CEO until his resignation from that position in June 2018, and served as Chairman of the Board until his resignation from that position in September 2018.  The Board and its Compensation Committee later determined to reclassify Petit's resignation as a "for cause" termination.

2

- ➢ William C. Taylor, who served as the Company's President and Chief Operating Officer and as a member of the Board until his resignation from both positions in June 2018. The Board and its Compensation Committee later determined to reclassify Taylor's resignation as a "for cause" termination.

- ➢ Michael J. Senken, who served as Chief Financial Officer until his resignation in June 2018. The Board and its Compensation Committee later determined to reclassify Senken's resignation as a "for cause" termination.

- ➢ John E. Cranston, who served variously as Treasurer, Corporate Controller and Vice President of MiMedx until his resignation in June 2018. The Board and its Compensation Committee later determined to reclassify Cranston's resignation as a "for cause" termination.

- ➢ Alexandra O. Haden, who has served as MiMedx's General Counsel and Secretary since March 2015.

- ➢ Christopher M. Cashman, who served as Executive Vice President & Chief Commercialization Officer until that position was eliminated in December 2018.

The Plaintiffs alleged a wide range of misconduct attributable to these Defendants, and assert claims of (1) breach of fiduciary duties, (2) corporate waste, and (3) unjust enrichment. The SLC investigated the factual claims alleged in the Complaint and considered whether it would be in the best interest of the Company to pursue any or all of those claims.

On March 8, 2019, the U.S. District Court for the Northern District of Georgia issued an Order granting a stay of the proposed litigation pending the issuance of the SLC's findings on or before July 1, 2019.

B.   The SLC's Investigation

The SLC, through and with the assistance of independent counsel, conducted an independent, in-depth, and extensive factual investigation, including: (1) conducting 52 interviews of MiMedx's current and former Directors, Officers, employees, and outside advisors; (2) reviewing several hundred thousand documents; and (3) hiring, and consulting with accounting experts. Specifically, the SLC retained the law firm Steptoe & Johnson LLP ("Steptoe") to assist with all facets of the investigation. With approval from the SLC, counsel to the SLC also engaged forensic accounting experts at AlixPartners, LLP ("AlixPartners") to advise on all auditing and accounting issues under investigation.

The Company cooperated completely with the SLC's investigation. No current employee who was asked to be interviewed declined. Some were interviewed more than once. In addition, the Company was fully responsive to counsel requests for the documents and materials necessary for its investigation. Similarly, the Company's current and former outside counsel cooperated fully in the SLC's investigation. The majority of the Defendants also cooperated in the investigation by producing documents and sitting for interviews with counsel to the SLC. However, Petit, Taylor, and Cashman refused to be interviewed by counsel to the SLC; counsel for Petit and Taylor made an oral presentation to counsel to the SLC. Cherry Bekaert LLP ("Cherry Bekaert"), the Company's former outside auditor, also refused to cooperate with the SLC's investigation, as did several other individuals. The SLC does not believe that the refusal by Cherry Bekaert or by any of these individuals to cooperate with the investigation materially impeded the SLC's ability to perform its mandate or to reach its conclusions.

The SLC has convened 18 times since its inception. During these meetings, the members of the SLC received briefings about the progress and processes of the investigation and provided

4

oversight and direction with respect to the investigation's scope and process to ensure that the investigation was independent, in good faith, and reasonable.

The SLC also benefited substantially from work prepared in other investigations. Principally, the SLC was able to use, because it concluded that the information was reliable, the investigative work and findings prepared by the Company's Audit Committee ("the Audit Committee Investigation"), which was directed by the Board to investigate issues related to the Company's sales practices, revenue recognition, treatment of whistleblowers, and corporate culture created by top management.

The Audit Committee retained the law firm King & Spalding LLP ("counsel to the Audit Committee") and the accounting firm KPMG to assist in its investigation. The Audit Committee, through its counsel, conducted interviews of over 85 individuals. In the course of its investigation, counsel to the Audit Committee collected approximately eight million documents. Within this set of documents, counsel to the Audit Committee used predictive coding to identify relevant documents, and ultimately reviewed 200,000 documents identified by predictive coding. Counsel to the Audit Committee also ran additional search terms against the entire original universe of eight million documents, and, together with KPMG, reviewed over 1.5 million documents that that search yielded, as well as significant volumes of data stored in the Company's accounting, customer relationship management, inventory, and other systems. Counsel to the Audit Committee also reviewed over 2,750 hours of video derived from a video surveillance system installed at the direction of Petit.

Counsel to the SLC was granted access to a wide range of investigatory materials prepared by counsel to the Audit Committee. Counsel to the Audit Committee shared with counsel to the SLC memoranda and notes of its witness interviews. Counsel to the Audit

5

Committee also provided sets of key documents that were identified as relevant to witnesses, presentations on investigative findings that were provided to the Board of Directors and the U.S. government, and assessments of the conduct of key employees. Counsel to the SLC also gained access to the eight million documents collected by counsel to the Audit Committee. To confirm that the SLC could properly rely on the Audit Committee's document review and factual findings, the SLC evaluated the thoroughness of the Audit Committee's work through targeted reviews of its process. Counsel to the SLC also held several discussions with counsel to the Audit Committee and KPMG regarding the work that each performed on behalf of the Audit Committee. Through these verification processes, the SLC gained confidence that the Audit Committee's investigation was thorough and that its findings were reliable.

The scope of the SLC's investigation included all allegations included in the Complaint as well as allegations made in demand letters submitted by the Plaintiffs prior to the Complaint. The SLC, in consultation with its counsel, identified the following categories of factual allegations:

- ➢ Allegations of serious and pervasive deficiencies in the Company's accounting and financial reporting systems, including an improper revenue recognition scheme and a practice of engaging in "channel stuffing."
- ➢ Allegations of a pattern of retaliation against employees who brought issues to the attention of management.
- ➢ Allegations of violations of the Physician Payments Sunshine Act and payments made to certain health care providers.
- ➢ Allegations regarding the Company overcharging the VA under its federal supply schedule.

- ➢ Allegations of inadequate internal controls over the Company's accounting and financial reporting operations.

- ➢ Allegations that members of the Audit Committee lacked independence from management and failed to investigate and respond in good faith to reports of misconduct raised by two employees.

- ➢ Allegations that the Defendants knowingly disseminated to the public materially false and misleading statements.

- ➢ Allegations that the Defendants caused the Company to make improper stock buybacks knowing that the Company's stock was inflated because of underlying misconduct.

- ➢ Allegations that the Defendants caused the Company to pay improper benefits and compensation to Officers in light of underlying misconduct.

Based on these factual allegations, the Complaint contained three principal legal claims. *First*, it asserted a claim that the Defendants breached their fiduciary duties of care and loyalty. *Second*, it asserted a claim that the Defendants caused the waste of corporate assets. *Third*, it asserted a claim that the Defendants were unjustly enriched at the expense of and to the detriment of MiMedx. To determine whether it is in the Company's best interest to allow the proposed derivative litigation to proceed, the SLC reviewed the merits of each claim with its counsel, and considered a range of factors, including: (1) the factual validity of the relevant allegations; (2) the legal strength of each claim; (3) the likelihood of recovery of damages if those claims were successful; (4) the potential costs to the Company in legal fees, advancement, and indemnity costs; and (5) possible interference with the Company's ongoing operations if it went forward with any given claim.

C. The SLC's Findings and Conclusions

Consistent with the Company's public statements and the findings of the Audit Committee Investigation, the SLC has concluded that the Company improperly recognized revenue from transactions with AvKARE and certain other customers. The SLC also evaluated the knowledge of each of the Defendants, and has determined, among other things, that Petit, Taylor, and Senken were aware of the Company's course of dealing with AvKARE and its implications for the Company's revenue recognition. With respect to Petit and Senken, the SLC has concluded that both made an intentional misrepresentation when each signed the November 8, 2016 management representation letter to the Company's outside auditor Cherry Bekaert. The SLC has also determined that Petit and Taylor engaged in a pattern of retaliatory practices against certain employees.

The SLC has concluded that no Defendants engaged in or were aware of any misconduct relating to the Company's payments to certain healthcare providers, its handling of investigations into these payments, and its failure to disclose the payments under the Sunshine Act. The SLC has concluded that MiMedx lacked adequate internal controls over accounting and financial reporting, but that the Audit Committee reasonably relied on internal controls testing conducted by Cherry Bekaert, and that the remainder of the Board reasonably relied on the Audit Committee's oversight over internal controls. The SLC has concluded that the Audit Committee was sufficiently independent in connection with its investigation (as conducted by the law firm Troutman Sanders LLP ("Troutman")) into allegations raised by two former employees, and that, despite problems with the investigation, the Audit Committee acted reasonably when it relied on Troutman, a well-regarded law firm. The SLC has also concluded that allegations that the individual Defendants made false statements, caused improper share repurchases, or caused the Company to pay improper executive compensation, turned on each individual Defendant's

8

knowledge of the underlying misconduct at the Company. Finally, the SLC has also concluded that the Company did not violate the Sunshine Act based on good faith reliance on reasonable legal advice from outside counsel, and did not engage in any misconduct in connection with the payments to health care providers alleged in the Complaint. Finally, the SLC has determined that although the Company may have provided to the VA false and misleading information in support of its Federal Supply Schedule Contract, it cannot definitively conclude that such information was provided intentionally or with actual knowledge of falsity.

Next, the SLC reviewed the merits of each claim with its counsel and applied the relevant facts and applicable law to each of the Defendants in the Complaint.

**Officer-Director Defendants (Petit and Taylor).** The SLC has concluded that there is sufficient evidence to show that Petit and Taylor both breached their fiduciary duties of loyalty, good faith, and due care to MiMedx, in connection with, among other things, MiMedx's improper revenue and channel-stuffing activity, retaliation against employees, the issuance of false and misleading statements, the Company's repurchase of shares, and improper executive compensation. The SLC, however, has concluded that the conduct of Petit and Taylor does not meet the high standard for a claim of corporate waste and that the existence of contracts between both Defendants and MiMedx dictating their compensation forecloses an unjust enrichment claim.

**Other Officer-Defendants (Senken, Cranston, Haden, and Cashman).** The SLC has concluded that Senken's conduct was grossly negligent and therefore sufficient to establish a breach of his fiduciary duties. The SLC has concluded that Cranston acted negligently in multiple respects, but that his conduct did not meet the high standard for gross negligence necessary to find a breach of fiduciary duties.

9

The SLC found no evidence to conclude that Haden and Cashman engaged in intentional, reckless, or grossly negligent misconduct. The SLC further found that the conduct of Senken, Cranston, Haden, and Cashman did not meet the high standard for a claim of corporate waste and that employment contracts dictating these Officers' compensation foreclosed an unjust enrichment claim.

**Audit Committee Director Defendants (Bleser, Dewberry, Evans, and Papasan).** The SLC has concluded that the Audit Committee was sufficiently independent and found no evidence that the members of the Audit Committee knew of MiMedx's misconduct related to revenue recognition or channel stuffing or committed any other misconduct. The SLC has concluded that the Audit Committee's reliance on the Company's outside auditor to test and report on internal controls was reasonable. The SLC has concluded that while the Audit Committee was reasonable in its reliance on the Company's outside auditors, the Audit Committee did not implement an effective oversight system.

**Non-Officer Director Defendants (Aguilar, Hack, Koob, and Yeston).** The SLC found no evidence that the other Directors knew of MiMedx's misconduct related to revenue recognition or channel stuffing, consciously disregarded their oversight duties or otherwise committed any other misconduct. The SLC also concluded that the other Directors were reasonable in their reliance on the Audit Committee to oversee and assess the Company's system of internal controls. Given the lack of misconduct, the SLC has concluded that there was no basis for either waste or unjust enrichment claims against these Directors.

Finally, the SLC considered whether pursuing the potentially meritorious claims against Petit, Taylor, and Senken is in MiMedx's best interest. In reaching its conclusions, the SLC not only considered the legal and factual strengths and weaknesses of all of the claims, but also

undertook a comprehensive weighing and balancing of numerous other factors. Although the SLC has concluded that some claims against Petit, Taylor, and Senken have a reasonable probability (though not certainty) of success, a number of countervailing factors counseled against pursuing those claims. *First*, the SLC has concluded that any litigation would be very costly, due to the Company's own legal fees and the Company's obligation to provide an advance and indemnification to potential Defendants. *Second*, the SLC has concluded that the insurance policies available to cover these costs, as well as any judgment it obtains against Petit, Taylor, or Senken would likely be exhausted. *Third*, given the limited insurance coverage, the SLC has concluded that litigation would likely require extensive cash expenditures by the Company, which would impinge on its ability to implement its Long-Range Strategic Plan that the Company's new management team believes is critical to the Company's recovery and growth prospects. The SLC has also concluded that pursuing these claims would be distracting and disruptive to management at an existential moment in the Company's path to growth. *Fourth*, the SLC has concluded that the Company's ongoing commitment to cooperate fully with pending government investigations weighs against pursuing the claims at this time.

In sum, the SLC has concluded that it is not in the best interest of the Company to permit this derivative action to go forward.