# EXHIBIT I

AO 106 (SDNY Rev. 01/17)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>See Attachment A | ) **19MAG 4561**<br>) Case No.<br>)<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH AND SEIZURE WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____Southern_____ District of _____New York_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attached Affidavit and its Attachment A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☐ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section(s)* | *Offense Description(s)* |
|---|---|
| 18 U.S.C., sections 371, 1343, 1348, 1349; 15 U.S.C., sections 78j(b) and 78ff; 17 C.F.R, section 240.10b-5 | Securities fraud and wire fraud |

The application is based on these facts:

See Attached Affidavit and its Attachment A

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

DIANA CHAU, U.S. Postal Inspector

*Printed name and title*

Sworn to before me and signed in my presence.

Date: **May 10, 2019**

*Judge's signature*

City and state:  New York, NY

HON. ONA T. WANG, United States Magistrate Judge

*Printed name and title*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In the Matter of the Application of the United States of America for a Search Warrant for the Search of the Dell E075 PowerEdge Computer Server bearing serial number ▮▮▮▮ in the Custody of the United States Postal Inspection Service Currently Located in the Southern District of New York, USAO Reference No., USAO Reference No. 2016R00246.

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

---

STATE OF NEW YORK     )
                        ) ss.
COUNTY OF NEW YORK  )

       DIANA CHAU, Postal Inspector, United States Postal Inspection Service, being duly sworn, deposes and states:

## I. Introduction

### A. Affiant

       1. I am a Postal Inspector with the U.S. Postal Inspection Service (the "USPIS" or "Investigating Agency"). As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. During my tenure with the USPIS, I have participated in the investigations of numerous frauds, and have conducted physical and electronic surveillance, the execution of search warrants, debriefings of informants, and reviews of taped conversations. Through my training, education, and experience, I have become familiar with the manner in which securities frauds and insider trading offenses are perpetrated.

       2. I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the electronic device specified below for the

5.9.2019

1

items and information described in Attachment A. The information contained in this affidavit is based upon my personal knowledge and involvement in the investigation of this matter, as well as information obtained from other sources, including conversations with other law enforcement officers and employees of the United States Securities and Exchange Commission ("SEC"), as well as my review of documents gathered during the course of this investigation. Because this affidavit is being submitted for a limited purpose, it does not include every fact that I have learned during the course of the investigation. Where the contents of documents and actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### B. The TARGET SERVER

3. I respectfully submit this affidavit in support of an application for a warrant to search the Dell E075 PowerEdge Computer Server bearing serial number ▮▮▮▮▮ in the Custody of the United States Postal Inspection Service Currently Located in the Southern District of New York (the "TARGET SERVER"). Until on or about April 2, 2019, the TARGET SERVER was maintained at or near the facilities of MiMedx Group, Inc. ("MiMedx" or the "Company") in the state of Georgia. From speaking with representatives of MiMedx and reviewing documents obtained from MiMedx, I have learned that the TARGET SERVER was owned by Parker H. "Pete" Petit ("PETE PETIT"), the former Chief Executive Officer ("CEO") of MiMedx, but beginning in at least in or about September 2015 the TARGET SERVER was maintained on MiMedx's premises and was under the supervision of MiMedx's IT personnel. As further described below, the TARGET SERVER was used to host a domain associated with an entity run by PETIT and members of his family. On or about April 2, 2019, MiMedx turned the TARGET SERVER over to the USPIS pursuant to a Grand Jury subpoena issued in the Southern District of New York and it was brought to New York, New York where it is currently being held.

2

5.9.2019

4.  Based on my training, experience, and research, I know that the TARGET SERVER is a rack server that is designed for web hosting and multi-purpose applications.  In other words, the TARGET SERVER has the capabilities to host web-based applications such as email services and/or webpages, and allow other computers, or "clients," to access the TARGET SERVER's applications from other locations.

**C. The Subject Offenses**

5.  As described further below, there is probable cause to believe that the TARGET SERVER contains evidence, fruits, and instrumentalities of (i) an accounting fraud scheme (the "Accounting Fraud Scheme," described more fully herein) constituting violations of Title 18, United States Code, Sections 1343 (wire fraud) and 1348 (securities fraud); and Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 (securities fraud); and aiding and abetting and conspiring to commit these offenses, in violation of Title 18, United States Code, Section 2 (aiding and abetting), 371 (conspiracy) and 1349 (conspiracy); and (ii) an insider trading scheme (the "Insider Trading Scheme," described more fully herein) constituting violations of Title 18, United States Code, Sections 1343 (wire fraud) and 1348 (securities fraud); and Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 (securities fraud); and aiding and abetting and conspiring to commit these offenses, in violation of Title 18, United States Code, Section 2 (aiding and abetting), 371 (conspiracy) and 1349 (conspiracy).  All of the offenses set forth in this Paragraph, taken together, are referred to herein as the "SUBJECT OFFENSES."

**II. Probable Cause Regarding the SUBJECT OFFENSES**

*Relevant Individuals and Entities*

6.  Based on my review of publicly available information, my review of records produced by MiMedx in response to a subpoena from the SEC, and my conversations with personnel and

3

5.9.2019

USAO_SDNY_000213698

representatives of MiMedx and other companies that conducted business with MiMedx, I have learned the following, in substance and in part:

a. At all relevant times, MiMedx was a publicly traded biopharmaceutical company headquartered in Marietta, Georgia, that develops and markets regenerative and therapeutic biologics using human placental tissue allografts, colloquially referred to as wound care products or tissues, whose shares traded under the symbol "MDXG" on the NASDAQ. MiMedx distributed its wound care products to end users directly as well as through independent distributors, a number of which are discussed below.

b. PETE PETIT was MiMedx's CEO between approximately 2009 and 2018. PETE PETIT resigned from his position at MiMedx on or about June 30, 2018, in lieu of being terminated by MiMedx's board of directors. Since at least in or about 2008, PETE PETIT has also held the position of president and/or manager of The Petit Group LLC (the "Petit Group"), a Florida limited liability company. The Petit Group utilized a domain for email and other services, "@thepetitgroup.com" (the "Domain"). According to publicly available information, the Domain was established in or about May 2008 through GoDaddy.com, an internet domain name registrar, by an individual who was employed by MiMedx. PETE PETIT, as well as various members of his family, maintained email addresses associated with the Domain, for example, ███████████████ (the "PETE PETIT EMAIL"). The PETE PETIT EMAIL was listed as PETE PETIT's email address on the MiMedx company directory in 2012 and 2013.

c. William "Bill" Taylor ("TAYLOR") was MiMedx's chief operating officer ("COO") between approximately 2009 and 2018. In his role as COO, TAYLOR reported directly to, and worked closely with, PETE PETIT. TAYLOR resigned from his position at MiMedx on or about June 30, 2018, in lieu of being terminated by MiMedx's board of directors.

5.9.2019

USAO_SDNY_000213699



## A. Probable Cause Regarding the SUBJECT OFFENSES Relating to the Accounting Fraud Scheme

7. Since early 2018, members of the United States Attorney's Office for the Southern District of New York and agents of the USPIS have been investigating whether MiMedx, through its senior management and directors from approximately 2012 through 2017, routinely and knowingly filed public financial reports with the SEC that contained false and inflated earnings information, with the intent to deceive the investing public. This investigation followed MiMedx's February 20, 2018 issuance of a press release and its filing of a Form 8K with the SEC, announcing that the filing of the company's reports of financial results for fourth quarter 2017 and fiscal year 2017 would be delayed and that the company's audit committee had begun "an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company." To date, MiMedx has not filed its financial results for fourth quarter 2017 or fiscal year 2017.

8. On or about June 6, 2018, MiMedx announced that its previously issued financial statements for the years 2012 through 2016 and for the first three quarters of 2017 needed to be restated and should no longer be relied upon. Pursuant to applicable federal law, PETE PETIT

5

USAO_SDNY_000213700

had certified each of MiMedx's annual SEC filings (i.e., Form 10-K) during that period.  In announcing the need to restate those filings, MiMedx explained that "the determination of the need to restate was based on investigation results to date which have primarily been focused on the accounting treatment afforded to such sales and distribution practices for two distributors for which certain implicit arrangements modified the explicit terms of the contracts, impacting revenue recognition during specified periods."  Based on my participation in this investigation, I am aware that the two distributors referenced in the above announcement were AvKare, a domestic distributor that primarily handled sales to the federal government, and First Medical, a Saudi distributor.

9.  Following MiMedx's stated intention to restate its financial statements, this investigation focused on the relationships between MiMedx and various of its external distributors to determine whether MiMedx, through any of these relationships engaged in various forms of accounting fraud by, among other things, improper revenue recognition, channel-stuffing, and undisclosed related-party transactions.  In addition to MiMedx's relationship with AvKare and First Medical, this investigation includes MiMedx's relationship with other distributors, including a Texas-based distributor known as SLR Medical Consulting LLC ("SLR").  As set forth below, there is probable cause to believe that PETE PETIT, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and others engaged in, and assisted MiMedx in engaging, in accounting fraud in connection with the recognition of revenue from its distributors, including AvKare, First Medical, and SLR, among others.

*Relevant Accounting Principles*

10. Generally accepted accounting principles (GAAP) refer to a common set of accounting principles, standards and procedures that companies must follow (or represent that they follow)

6

USAO_SDNY_000213701

when preparing and filing financial statements. GAAP is meant to ensure a minimum level of methodological consistency across the financial statements of different companies, which makes it easier for investors to analyze and extract useful information and compare GAAP metrics across different companies. For publicly traded companies, the SEC also promulgates accounting rules and guidance that companies must follow when filing their financial reports.

11. Under GAAP and SEC guidance, a company that engages in the sale of products through a distributor may recognize revenue upon transfer of the product to a distributor if, among other things, collectability (i.e., receiving payment) is reasonably assured. *See* SEC Staff Accounting Bulletin No. 104 (Topic 13, Revenue Recognition, Dec. 17, 2003). When the distributor has a right of return (i.e., the ability to return the product without having to pay for it), revenue cannot be properly recognized unless all of the following criteria are met: (1) the seller's price to the buyer is fixed or determinable at the date of sale; (2) the buyer's obligation to pay the seller is not contingent on the resale of the product; (3) the buyer's obligation to pay the seller is not excused in the event that the product is damaged or lost; (4) the buyer has economic substance separate from the seller; (5) the seller does not have significant obligations for future performance to directly bring about the resale of the product by the buyer; and (6) the amount of future returns can be reasonably estimated. *See, e.g.*, Accounting Standards Codification, Subtopic 605-15-25-1.

*MiMedx's Relationship with AvKare*

12. Based on my review of documents produced by MiMedx, and from speaking with representatives of MiMedx and AvKare, I have learned the following in substance and in part:

a. AvKare, Inc, is a Tennessee-based medical supply company that primarily supplies products to the Veterans Affairs ("VA") hospital system.

7

USAO_SDNY_000213702

b.   During the relevant period, distribution through AvKare was the primary means by which MiMedx sold its products to VA hospitals.  These sales, in turn, accounted for a significant part of MiMedx's revenue.

c.   Although AvKare nominally acted as a distributor of MiMedx's products within the VA system, in practice, AvKare employees played little role in marketing or distributing MiMedx products.  Rather, MiMedx maintained what the company called a "federal sales force," whose members were responsible for interacting with VA employees, monitoring the stock of MiMedx product on the shelves at VA hospitals, and keeping track of when tissue was implanted in patients.

d.   When MiMedx's personnel determined that a particular VA facility was in need of tissue, they notified MiMedx's sales department, which then shipped the product directly to the VA facility.  Although AvKare was notified of the shipment, no AvKare employees were physically involved in handling the product.  During the relevant period, MiMedx treated such shipments as sales to AvKare and recognized revenue at the time of shipment.  In practice, however, AvKare was under no obligation to pay MiMedx for the tissue until the VA purchased it from AvKare, generally at the time of implantation.  Moreover, because AvKare had a limited sales force of its own, MiMedx employees were responsible for promoting MiMedx products to VA doctors and facilities.

e.   Moreover, despite the fact that MiMedx recognized revenue for tissue at the time of shipment to the VA, during the relevant period, MiMedx routinely issued AvKare credits for lost or damaged tissue, even after it had been shipped to the VA.  As TAYLOR explained to an AvKare principal in an email dated March 8, 2013:

> Contractually, AvKare owns the inventory once received (under the new amendment, once shipped), but practically speaking, MiMedx will work with

8

USAO_SDNY_000213703

AvKare if any issues arise with the inventory. Some recent examples highlight this. Over the past few months, several grafts have been dropped or otherwise lost and MiMedx replaced them at no cost to AvKare. Because MiMedx is directing the placements in the 120+ VAs we service, we obviously are very involved with the inventory management and will not leave you with any losses!

f. Nor was it the case that AvKare's obligation to pay MiMedx for shipped tissue existed independent of AvKare's ability to resell the product to the VA. Indeed, beginning in April 2015, the product distribution agreement between AvKare and MiMedx explicitly provided that in the event the relationship were to terminate, MiMedx would "repurchase any remaining inventory of Products from AvKare at the price paid by AvKare for such Products."

g. From conversations with representatives of MiMedx, I have learned that the company's decision to re-state its earnings was prompted, in part, by the conclusion that, based on the information above, MiMedx's practice of recognizing revenue at the time tissue was shipped was inconsistent with GAAP and SEC guidance.[1]

*Transactions Between MiMedx and First Medical in 2015*

---

[1] Following PETIT and TAYLOR's resignations, they submitted through counsel a memorandum laying out various justifications for their conduct (the "Memo"). In the Memo, PETIT and TAYLOR argue, among other things, (a) that they were generally uninformed about the GAAP principles governing revenue recognition, and (b) that they relied in good faith on accounting professionals, the audit committee, outside auditors, and lawyers, in connection with MiMedx's recognition of revenue from AvKare. These assertions however are not consistent with documents and other evidence that I have received and reviewed from MiMedx. Furthermore, based on my review of documents and communications exchanged between MiMedx senior management and its auditors and audit committee, and my conversations with members of MiMedx's auditors and audit committee, I do not believe that Mimedx's lawyers, auditors, and/or the audit committee were informed of certain facts concerning the MiMedx-AvKare relationship including, among other things, (a) that the extent to which MiMedx salespeople were responsible for selling the tissue to the VA and ensuring that the VA paid AvKare, and (b) the fact that MiMedx tracked what the VA paid AvKare to anticipate when and how much AvKare would pay MiMedx.

9

5.9.2019

13. Based on my review of documents produced by MiMedx, and from speaking with representatives of MiMedx and First Medical, I have learned the following, in substance and in part:

a.  First Medical is a Saudi-based company that sells medical technologies in the Kingdom of Saudi Arabia.

b.  In or about December 2015, First Medical was attempting to obtain a large contract or "tender" to provide medical equipment to the Saudi Ministry of Health (the "MOH"). First Medical, in turn, sought to obtain products from MiMedx to be sold to the MOH in the event that First Medical was awarded the tender.  Accordingly, on or about December 20, 2015, First Medical submitted a purchase order to MiMedx for approximately $2.5 million worth of MiMedx product.

c.  On or about December 21, 2015 at approximately 2:30:02 pm, TAYLOR sent an email to an employee of First Medical clarifying the payment terms for First Medical's order, namely that it would be "180 days from receipt of product by First Medical."  On or about December 23, 2015, TAYLOR provided these payment terms via email to MiMedx accounting employees stating, "[h]ere is the updated order with 6 month payment terms."

d.  On or about December 21, 2015 at approximately 2:30:06 pm – approximately four seconds after the email referenced in the preceding paragraph between TAYLOR and First Medical – TAYLOR sent another email to the same employee of First Medical providing different payment terms and other conditions attendant to the sale, specifically: "We understand that it is expected that the 2016 tender will be issued in March of 2016, and it is expected to be as big or bigger than the tender that was issued to First Medical in 2015. In the event that the tender is delayed, or for some unlikely event it does not occur, MiMedx will give First Medical additional

10

USAO_SDNY_000213705

extended payment terms if requested, and will assist First Medical in selling the product or another option would be to repurchase the product." Based on my participation in this investigation, I understand TAYLOR to be conveying to First Medical that MiMedx is willing to extend payment terms beyond 180 days; and that, if First Medical is not awarded the tender by the MOH, to assist First Medical in reselling the MiMedx product or have MiMedx buy it back.[2]

e. From speaking with MiMedx employees, I have learned that MiMedx accounting employees were not provided with a copy of the second TAYLOR email containing the extended payment terms and resale obligations. According to the MiMedx Accountant, this email should have been shared with MiMedx'x accounting department in order to ensure that the accounting department was given the opportunity to make an informed decision as to how to account for this transaction. Furthermore, based on my training and experience and as set forth above in the accounting literature, I am aware that a right of return combined with flexible payment terms and/or obligations to assist in resale will preclude the recognition of revenue upon the shipment of product to a distributor.

f. Based on my review of MiMedx records and from speaking with representatives of MiMedx, I have learned that MiMedx nevertheless recognized this the entire amount of the sale to First Medical (approximately $2.5 million) as revenue in the fourth quarter of 2015. Without that revenue in the fourth quarter, MiMedx would not have met its previously announced revenue expectations for the fourth quarter.

---

[2] According to the Memo, TAYLOR's "best guess" to explain why a second email was sent four second after the initial one is that it was sent by his executive assistant who would send emails after they were dictated and/or reviewed by TAYLOR. According to representatives of MiMedx, however, the metadata from the email is not consistent with the email having been sent on behalf of TAYLOR by his assistant.

11

5.9.2019

g. First Medical subsequently struggled to make payments and did not pay for the product purchased in 2015 until in or about 2017. On or about March 25, 2016, PETE PETIT emailed a number of MiMedx executives about First Medical's inability to make payments, noting that he was "not optimistic about [F]irst [M]edical. We might squeeze something out of them just to show progress."

h. From conversations with representatives of MiMedx, I have learned that the company's decision to re-state its earnings was prompted, in part, by the conclusion that, based on the information above, MiMedx's practice of recognizing revenue at the time tissue was shipped to First Medical was inconsistent with GAAP and SEC guidance.

*Transactions Between MiMedx, SLR, and*        *in 2015*

14. Based on my review of documents provided by MiMedx, and from speaking with representatives of MiMedx and SLR, I have learned the following, in substance and in part:

a. Beginning in approximately 2010, a MiMedx employee (the "SLR Owner") also owned and operated SLR (which was previously known by another name) together with another individual. SLR is a distributor of medical products in the state of Texas and recorded revenues of approximately $300,000 and $1 million in 2014 and 2015, respectively.

b. In or about late 2015, MiMedx's relationship with its main distributor in Texas ("CPM") was winding down. Prior to that time, CPM was often responsible for a significant volume of MiMedx sales per quarter. In that same period, the SLR Owner left MiMedx to work exclusively at SLR. On or about September 15, 2015, SLR entered into a distribution relationship

12

USAO_SDNY_000213707

with MiMedx through which the SLR Owner hoped to replace CPM as a significant distributor of MiMedx product in Texas.

c. Immediately afterwards, MiMedx employees and the SLR Owner began having conversations about how much inventory SLR could purchase, including the purchase of product that needed to be stored in a freezer that SLR had not previously distributed. To facilitate such purchases, MiMedx helped SLR to procure and pay for freezers to store the product that SLR would agree to buy from MiMedx. For example, on or about September 17, 2015, the SLR Owner informed PETE PETIT by email that he only had one freezer that could hold 3500 units. PETE PETIT forwarded the email to others at MiMedx and suggested buying SLR additional freezers. The MiMedx employees then discussed how much product could fit in a freezer including asking whether they could "stuff some more" in particular units. PETE PETIT then asked "How many dollars?" to which another MiMedx employee responded that the sale could amount to between $2.5 and $4.5 million depending on the size of the units included in the sale. Based on my participation in this investigation and my review of emails like this one, I believe that the mix of units that would be included in the sale to SLR was intended to maximize the sale price and the quantity of the proposed sale was driven by how much quantity could be stored in SLR's freezers rather than on SLR's needs.[3]

d. On or about September 30, 2015, right before the close of the third quarter, SLR and MiMedx agreed on the sale for approximately $4.5 million. The terms of the sale called for SLR

---

[3] During an interview on March 20, 2019, the SLR Owner stated that, at the time of this purchase, he believed that SLR would ultimately be able to sell all of the product from the September sale, and understood, based on conversations with TAYLOR, that MiMedx would be "flexible" with SLR's payment schedule, notwithstanding the firm 30-day payment deadline referenced in the sale contract.

13

USAO_SDNY_000213708

to pay the full amount within 30 days of the date of shipment. According to the SLR Owner, prior to this transaction, SLR's annual revenues had never exceeded $500,000.

  e. MiMedx recognized all of the revenue related to this SLR transaction in the third quarter of 2015 despite the fact that SLR did not pay any portion of the approximately $4.5 million owned for the product in September. Without the recognition of that sale in September, MiMedx's revenue would have fallen short of its previously projected revenue forecast for the third quarter of 2015. Under the accrual method of accounting, MiMedx's decision to recognize the revenue from its approximately $4.5 million sale to SLR was proper only if collectability of that sum could be reasonably assured. There is probable cause to believe that, as PETE PETIT and others at MiMedx well knew in and around September 2015 that collectability from SLR on this transaction was not reasonably assured. As explained above, the sales to SLR involved new product and in quantities intended to maximize the sale price. Moreover, as described below, PETE PETIT and others continued to learn additional facts about SLR's lack of ability to make payments to MiMedx.[4]

  f. During the weeks after the September transaction with SLR, the SLR Owner told PETE PETIT that SLR was having trouble making payments to MiMedx. By in or around November 2015, SLR had paid only approximately $10,000 out of the approximately $4.5 million at issue, and the contractual 30-day deadline for payment had passed. On or about November 24, 2015, ▇▇▇▇▇ incorporated an entity, known as Torpin LLC ("Torpin"). According to the operating agreement for Torpin, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, and ▇▇▇▇▇▇▇▇▇▇▇▇ (collectively ▇▇▇▇▇) were each listed as

---

[4] On or about September 1, 2015, MiMedx also entered into a consulting agreement with the SLR Owner pursuant to which he was paid approximately $15,000 per month for October, November, and December 2015. The SLR Owner used that money to help cover SLR's expenses.

USAO_SDNY_000213709

a "member" in Torpin, and each of ██████████ was required to make initial capital contribution of $250,000. According to the SLR Owner, in or about late 2015, PETE PETIT recommended to the SLR Owner that the SLR Owner speak to ██████████ and others about ways that SLR could obtain capital. According to the SLR Owner, the SLR Owner met in-person with ██████████ ██████████, and others at MiMedx's headquarters in Georgia in or about December 2015 and discussed the possibility of obtaining a loan for SLR. Calendar records obtained from MiMedx reflect that the SLR Owner, ██████████ and PETE PETIT were invited to a meeting on or about December 17, 2015.

g. According to bank records, on or about December 21, 2015, pursuant to a promissory note, Torpin wired approximately $1.5 million to SLR comprised of funds contributed by all ██ ██████████ In or about December 2015, SLR paid down over $750,000 of its outstanding balance to MiMedx, and thereby lowered the amount of money that SLR owed to MiMedx and provided a track record of a large SLR payment on the owed obligation. According to the SLR Owner, at least some of these funds came from the proceeds of the SLR Loan received from Torpin. Between in or about December 1 and 3, 2015, ██████████████████, and others participated in an email chain concerning documents related to Torpin, including the operating agreement discussed above, and which documents were forwarded to PETE PETIT.

h. Based on my review of documents from MiMedx and from speaking with representatives of MiMedx, I have learned that approximately 40 percent of the products from the September sale to SLR were ultimately returned to MiMedx in exchange for other product, and that SLR did not pay off its approximately $4.5 million balance to MiMedx until approximately the end of 2017. SLR also paid off the loan to Torpin – after taking out additional loan amounts – in or about 2017. Based on my review of records provided by MiMedx, I am unaware of any

15

USAO_SDNY_000213710

documents demonstrating that the SLR-loan described above was disclosed to MiMedx's accounting department, its auditors, its shareholders and/or the investing public. Based on my conversations with representatives of MiMedx, I understand that the company's internal investigation concerning the proper accounting treatment of MiMedx's transactions with SLR remains ongoing.

i. Based upon my training and experience, I know that for purposes of GAAP accounting, in assessing whether the approximately $4.5 million sale to SLR could continue to be properly recognized as revenue, SLR's December 2015 payment of approximately $750,000 to MiMedx would be relevant evidence in establishing that the collectability was reasonably assured from SLR. Indeed, in a memorandum to MiMedx's independent auditors on or about February 16, 2016, MiMedx's corporate treasurer cited SLR's payment history as evidence that the balance of the $4.5 million purchase by SLR was fully collectible. However, the fact that the payment was funded by various ▮▮▮▮▮▮▮ substantially undermines the bone-fide nature of this payment or its use as a date point in assessing the reasonableness of collectability.

## B. Probable Cause Regarding the SUBJECT OFFENSES Relating to the Insider Trading Scheme

15. I further submit that there is probable cause to believe that in or about January and February of 2018, ▮▮▮▮▮ engaged in the Insider Trading Scheme by converting material non-public information ("MNPI") that PETE PETIT had obtained by virtue of his employment at MiMedx to their own use for personal gain. Through that trading, among other things, the ▮▮▮▮▮ avoided at least approximately $2 million in losses by selling MiMedx stock from in and around late January to late February 2018, shortly before the MiMedx announced a delay in the release of its 10-K filing, which caused an approximately 36 percent decrease in the stock price.

16

USAO_SDNY_000213711

*MiMedx's Share Price Decreases as a Result of Delayed Financial Filings*

16. As set forth above, based on my review of MiMedx documents and from speaking with MiMedx personnel and representatives, I have learned that in or about August 2017, MiMedx engaged Ernst and Young ("EY") as an external auditor. From speaking with representatives of EY, I have learned that over the course of January and February 2018, EY conveyed to MiMedx management that in light of the amount of work necessary to investigate MiMedx's prior revenue recognition practices, MiMedx would not be able to file its annual 10-K on time, i.e., by March of 2018. Based on my training and experience, I am aware that a company's inability to file a timely 10-K usually causes a company's stock price to decline.

17. From speaking with representatives of MiMedx and EY, and my review of documents produced by MiMedx and obtained from the Financial Industry Regulatory Authority ("FINRA"), I have learned of the following developments that occurred in early 2018:

a. On or about January 23, 2018, MiMedx managers, including PETE PETIT and TAYLOR, had a meeting with EY personnel. During the meeting, EY discussed concerns about MiMedx's accounting practices relating to AvKare.

b. On or about January 25 and 26, 2018, MiMedx managers, including PETE PETIT and TAYLOR, participated in an email exchange with the subject "E&Y." In an email on January 26, MiMedx's CFO noted that "I am sure we all realize that this extra review and focus by EY puts the timely filing of our financial statements in jeopardy. We need to move quickly to avoid any delays." In response, PETE PETIT wrote that he was "now concerned"; that he wanted EY to

USAO_SDNY_000213712

speak with the CFO and others directly; and that "[t]his has reached the point where I want to be involved in almost every conversation."

      c. On or about February 6, 2018, EY met with MiMedx's audit committee and told them that the Company needed an independent investigation concerning its sales and distribution practices before MiMedx's 2017 financial statements could be filed.  At the meeting, EY raised the possibility that in light of these circumstances, MiMedx might not meet its regulatory filing deadlines. Over the next few days, MiMedx engaged a law firm—King & Spalding LLP—and an accounting firm—KPMG—to conduct the independent investigation.

      d. On or about February 16, 2018, EY met with MiMedx management again concerning the investigation of MiMedx's sales and distribution practices.   During this meeting, EY advised that MiMedx would not be able to file its 2017 10-K by March.

      e. On or about February 20, 2018, MiMedx issued the aforementioned press release concerning the delay.   Following the issuance of the press release, MiMedx's stock dropped approximately 36 percent from a share price of $15.38 to $9.90.

                 *Avoided Significant Losses in MiMedx Stock*

      18. Based on my review of documents obtained from FINRA, MiMedx, iCloud records from accounts registered to PETE PETIT and ▬▬▬▬ (the "iCloud Accounts"), and trading records, I have learned that during January and February of 2018, PETE PETIT and ▬▬▬▬ avoided significant losses by engaging in sales of MiMedx stock through the following chain of events, among others:

      a.  In January 2018, ▬▬▬▬ invited PETE PETIT to a meeting on January 24, 2018 entitled "Lunch MDXG."

18

USAO_SDNY_000213713

b.  Between January 25 and February 15, 2018, the ████████ sold over 300,000 shares of MiMedx in trading accounts at Fidelity Brokerage Services ("Fidelity"). Based on these timely sales, the ████████ avoided over $2 million in losses. For example, between January 25 and 29 the ████████ sold over 189,000 shares of MiMedx.[5]

19. In addition, ████████ sold MiMedx shares in other trading accounts held in their names and through trusts at Fidelity and/or Oppenheimer & Co. Inc. ("OpCo"). For example, on or about February 1, 2018, ████████ sold over 78,000 shares in a trust account held at OpCo.

20. On or about February 20, 2018 – the same day as the aforementioned press release – ████████ had the following exchange over iMessage as reflected in the iCloud Accounts. ████████ ████████ sent a message asking, "Everybody ok after today?" Approximately five minutes later, ████████ responded "Yes sir!"

21. According to records obtained from FINRA, in response to questions from FINRA that were submitted to MiMedx following this period, PETE PETIT asserted through MiMedx in a submission to FINRA on or about June 13, 2018 that he was not aware of any circumstances under which ████████ would have obtained knowledge of information concerning MiMedx's February 20 press release. According to the records, PETE PETIT asserted that he "had no contact" with ████████ from February 6 through February 16, 2018. Based on my review of documents provided by MiMedx, however, I have learned that on or about February 7, 2018, PETE PETIT and ████████ communicated via iMessage which messages were sent and/or received from a phone assigned the ████ Number. Based upon information shared by MiMedx's outside

---

[5] On or about February 13, 2018, the ████████ invested in certain short term put options that would be valuable if MiMedx stock increased. The cost of these options was less than $50. Based on my training and experience, I submit that the investment in a small amount of options, while reducing a substantial equity position, is a potential attempt to conceal illegal trading based on MNPI.

5.9.2019

USAO_SDNY_000213714

counsel, which oversaw a review of MiMedx's review of PETE PETIT's electronic devices as well as my review of the iCloud Accounts, I have learned that this iMessage (or messages) are no longer available because they appear to have been deleted by PETE PETIT, along with dozens of other iMessages that had been stored on PETE PETIT's company-issued phone, at some time before that phone was returned to the Company in or about August 2018.[6]

C. Probable Cause Regarding Use of the TARGET SERVER

22. As set forth above, from speaking with representatives of MiMedx, I have learned that the TARGET SERVER was used to host information associated with the Domain, including email communications to and from accounts using the Domain. Based on my training and experience, I know that businesspeople routinely use email and other web-based services in order to communicate about all means and manner of their business and with customers, distributors, associates, and affiliates. Based on my training and experience, I am also aware that when emails or other electronic materials associated with a domain are stored on a server, those contents will typically remain on the server unless intentionally removed or deleted.

23. Based on my review of documents obtained from MiMedx and from speaking with former employees of MiMedx and certain of its outside distributors, I have also learned that although PETE PETIT also had an email address with the MiMedx domain, he nevertheless used the PETE PETIT EMAIL to communicate about MiMedx related business, including MiMedx's relationship with distributors and business practices. For example, on or about February 11, 2014,

---

[6] In or about January 2012, PETE PETIT was the subject of an SEC enforcement action into alleged insider trading by PETE PETIT and an associate. The associate settled with the SEC without any acknowledgement of wrongdoing, and the SEC dropped its case against PETE PETIT. In addition, in or about February 2016, TD Ameritrade terminated its relationship with █████ ████████ and closed numerous accounts in their names on suspicion that they were involved in insider trading with respect to MiMedx shares.

5.9.2019

a MiMedx employee sent an email to PETE PETIT at the PETE PETIT EMAIL, TAYLOR, and others, that contained sales information and "Incorporates the new 'pay on PO' methodology for AvKare." Based on my participation in this investigation, I understand the "pay on PO" methodology to be a reference to the content of a memorandum circulated by a MiMedx employee to PETE PETIT and others on or about January 21, 2014 that explained why MiMedx salespeople would only be paid their commissions once the VA issued a purchase order for product that MiMedx had sold to AvKare, namley: "[t]here is an obvious lag from the time the product is implanted to when the Federal facility places the [purchase order] with Avkare. This extends the time when MiMedx gets paid." Based on my participation in this investigation, I believe that this reference is a justification for delaying the payment of commissions to MiMedx sales employees until a purchase order is issued to the VA because MiMedx did not get paid by AvKare until such time.

24. ▮▮▮▮▮ and ▮▮▮▮▮ also used their emails associated with the Domain to exchange information related to other MiMedx distributors. For example, on or about December 15, 2015, ▮▮▮▮▮ sent an email from the ▮▮▮▮▮▮▮▮ to ▮▮▮▮▮ and others with wire instructions for funding Torpin, which funds were used to extend credit to SLR. Similarly, on or about December 17, 2015, ▮▮▮▮▮ sent an email from the ▮▮▮▮▮▮ ▮▮▮▮ to PETE PETIT's assistant with an amortization schedule of the loan from Torpin to SLR.

25. In addition, based on my review of documents obtained from MiMedx, I have learned that PETE PETIT and ▮▮▮▮▮ communicated about the status of MiMedx and its publicly traded stock. For example, on or about October 30, 2014, PETE PETIT forwarded analyst research concerning MiMedx to the ▮▮▮▮▮▮ which included an assessment of the Company's status and a recommendation concerning MiMedx's stock. Additionally, on or about August 13,

21

USAO_SDNY_000213716

2015, PETE PETIT sent an email to the ████████████ with the subject line "MiMedx" and stating, "Watch things carefully today."

26. Like individuals engaged in any other kind of activity, individuals who engage in accounting fraud and insider trading offenses store records relating to their illegal activity and to persons involved with them in that activity on electronic devices and programs such as those hosted on the TARGET SERVER. Such records can include, for example, email correspondence or contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social medial accounts. Individuals engaged in criminal activity often store such records in order to, among other things, keep track of co-conspirator's contact information, or keep a record of illegal transactions for future reference.

27. Computer files or remnants of such files can be recovered months or even years after they have been created or saved on an electronic device such as the TARGET SERVER. Even when such files have been deleted, they can often be recovered, depending on how the hard drive has subsequently been used, months or years later with forensics tools. Thus, the ability to retrieve information from the TARGET SERVER depends less on when the information was first created or saved than on a particular user's device configuration, storage capacity, and computer habits.

28. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on TARGET SERVER will contain evidence, fruits, and instrumentalities of the SUBJECT OFFENSES, as more fully described in Attachment A to the proposed warrant. The proposed time period for the search will be 2012, the year in which MiMedx began dealing with AvKare, through August 2018, the month when PETE PETIT's phone was returned to MiMedx with deleted iMessages.

5.9.2019

USAO_SDNY_000213717

III. Procedures for Searching

   A.  Review of ESI

     29. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained on the TARGET SERVER for information responsive to the warrant.

     30. In conducting this review, law enforcement may use various techniques to determine which files or other ESI contain evidence or fruits of the SUBJECT OFFENSES. Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of search terms related to the subject matter of the investigation. (Keyword searches alone are typically inadequate to detect all information subject to seizure. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.)

     31. Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant. Depending on the circumstances, however, law enforcement may need to conduct a complete review of all the ESI from the TARGET SERVER to locate all data responsive to the warrant.

23

USAO_SDNY_000213718

### B. Return of the TARGET SERVER

32. If the Government determines that the TARGET SERVER is no longer necessary to retrieve and preserve the data on the device, and that the TARGET SERVER is not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return the TARGET SERVER, upon request.  Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the SUBJECT OFFENSES.

## IV. Conclusion and Ancillary Provisions

33. Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.  In addition, because servers are often encrypted and require the provision of a username and/or password to access its content, I respectfully request that the warrant require any person with knowledge of the username and/or password to access the TARGET SERVER to provide such username and/or password to law enforcement agents tasked with carrying out the execution of the warrant.

34. The existence and scope of this ongoing criminal investigation are not publicly known.  As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation.  In particular, given that PETIT, ████████ and/or other targets of the investigation are known to use computers and electronic communications in furtherance of their activity, they could easily delete, encrypt, or otherwise conceal such digital evidence from law enforcement were they to learn of the Government's investigation.  I therefore respectfully request that this affidavit and all papers

24

USAO_SDNY_000213719

submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

DIANA CHAU
Postal Inspector
United States Postal Inspection Service

Sworn to before me this
10th day of May, 2019

HONORABLE ONA T. WANG
United States Magistrate Judge
Southern District of New York

5.9.2019

25

## Attachment A

### I. Device Subject to Search and Seizure

The device that is the subject of this search and seizure warrant (the "TARGET SERVER") is described as follows:

> The Dell E075 PowerEdge Computer Server bearing serial number ▮▮▮▮▮ in the Custody of the United States Postal Inspection Service Currently Located in the Southern District of New York

### II. Review of ESI on the Subject Device

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained on the TARGET SERVER from 2012 through August 2018, inclusive, for evidence, fruits, and instrumentalities of (i) an accounting fraud scheme involving MiMedx's recognition of revenue from a September 2015 transaction with SLR (the "Accounting Fraud Scheme") constituting violations of Title 18, United States Code, Sections 1343 (wire fraud) and 1348 (securities fraud); and Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 (securities fraud); and aiding and abetting and conspiring to commit these offenses, in violation of Title 18, United States Code, Section 2 (aiding and abetting), 371 (conspiracy) and 1349 (conspiracy); and (ii) an insider trading scheme involving the sale of MiMedx shares in our about January and February 2018 based on material, non-public information (the "Insider Trading Scheme") constituting violations of Title 18, United States Code, Sections 1343 (wire fraud) and 1348 (securities fraud); and Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 (securities fraud); and aiding and abetting and conspiring to commit these offenses in violation of Title 18, United States Code, Section 2 (aiding and abetting), 371 (conspiracy) and 1349 (conspiracy), (altogether, the "Subject Offenses") described as follows:

- Communications regarding the Accounting Fraud Offenses, including improper revenue recognition practices and related sales practices at MiMedx, including, but not limited to, communications relating to the timing, quantity, nature and price of any purchase of MiMedx products by distributors/customers, the timing and terms of any payments to MiMedx by the distributors/customers, returns and credits offered to distributors/customers, and the involvement of MiMedx personnel in effectuating resales by MiMedx's distributor/customers;

- Communications related to the extension of credit or other things of monetary value by employees of MiMedx or their friends and relatives to any distributors or agents who conducted business with MiMedx;

- Communications regarding the provision of information to auditors, regulators, investigators, or any other party tasked with analyzing MiMedx's sales and revenue recognition practices;

- Communications regarding earnings and revenue targets or analyst projections;

- Evidence of state of mind, including but not limited to, consciousness of guilt and awareness of the propriety of revenue recognition practices at MiMedx or awareness of, or attempts to influence, any audits or investigations regarding MiMedx's revenue recognition or sales and distribution practices;

- Communications regarding the Insider Trading Offenses, including but not limited to, communications relating to the sharing of information about the status of audits and/or investigations into MiMedx in 2018, the timing of MiMedx's SEC filings in 2018, the status or prospects for any MiMedx press release that was considered or issued by MiMedx, and any expected movements in the stock price of MiMedx;

- Communications regarding any trading, acquiring, selling, or otherwise transacting in the publicly traded shares of MiMedx; and

- Evidence of state of mind, including but not limited to, awareness of the status of audits and/or investigations into MiMedx in 2018, the timing of MiMedx's SEC filings in 2018, the status or prospects for any MiMedx press release that was considered or issued by MiMedx, and any expected movements in the stock price of MiMedx; consciousness of guilt and awareness of, or attempts to hide, any insider trading activity.

Furthermore, any person with knowledge of the username and/or password to access the TARGET SERVER shall provide such username and/or password to law enforcement agents tasked with carrying out the execution of this warrant.

5.9.2019

2