# EXHIBIT P


(USAO GAN 6/10) Search Warrant

**FILED IN CHAMBERS**
U.S.D.C. Atlanta

APR 1 0 2019

JAMES N. HATTEN, Clerk
By: ⎯⎯⎯⎯⎯ Deputy Clerk

# United States District Court
## NORTHERN DISTRICT OF GEORGIA

In the Matter of the Search of

The Premises Known and Described as ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ and the Person of
▮▮▮▮▮▮▮

**APPLICATION AND
AFFIDAVIT FOR
SEARCH WARRANT**
Case number: 1:19-MC-534
**UNDER SEAL**

I, Diana Chau, being duly sworn depose and say:

I am a Postal Inspector of the U.S. Postal Inspection Service and have reason to believe that on the property described as:

### See Attachment A-1,

in the Northern District of Georgia there is now concealed certain property, certain information, and certain data, namely,

### See Attachment B-1,

which constitutes evidence of a crime, contraband, fruits of crime, or items illegally possessed, and property designed for use, intended for use, or used in committing a crime, concerning violations of Title 18, United States Code, Section(s) 1343, 1348, 1349, and 371; Title 15, United States Code, Section(s) 78j(b) and 78ff; and Title 17, United States Code Section(s) 240.10b-5. The facts to support a finding of Probable Cause are as follows:

### SEE ATTACHED AFFIDAVIT

Continued on attached sheet made a part hereof.

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Signature of Affiant

Sworn to before me, and subscribed in my presence

Diana Chau

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
April 10, 2019
Date

Atlanta , Georgia
City and States

JANET F. KING
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer
AUSA Brent A. Gray

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Signature of Judicial Officer

USAO_SDNY_000213560

**Attachment A-1**

Person and Property to Be Searched

The premises to be searched (the "Subject Premises") is located at ████████████████
████████████. The Subject Premises is an approximately 3,506 square foot single
family home.

The person to be searched is ████████████████. ████████ is pictured as follows:



**Attachment B-1**

## I. Devices Subject to Search and Seizure

The devices that are the subject of this search and seizure warrant (the "SUBJECT DEVICES-1") are described as iPhones that are, or ever have been, assigned phone number ████ ████ and further described as follows:

    a.  An iPhone 7 with IMEI number beginning in ██████████

    b.  An iPhone 7 with IMEI number beginning in ██████████

    c.  An iPhone 6 with IMEI number beginning in ██████████

    d.  An iPhone 6 with IMEI number beginning in ██████████

## II. Review of ESI on the SUBJECT DEVICES

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained on the SUBJECT DEVICES-1 for evidence, fruits, and instrumentalities of (i) an accounting fraud scheme involving MiMedx's recognition of revenue from a September 2015 transaction with SLR (the "Accounting Fraud Scheme") constituting violations of Title 18, United States Code, Sections 1343 (wire fraud) and 1348 (securities fraud); and Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 (securities fraud); and aiding and abetting and conspiring to commit these offenses, in violation of Title 18, United States Code, Section 2 (aiding and abetting), 371 (conspiracy) and 1349 (conspiracy); and (ii) an insider trading scheme involving the sale of MiMedx shares in our about January and February 2018 based on material, non-public information (the "Insider Trading Scheme") constituting violations of Title 18, United States Code, Sections 1343 (wire fraud) and 1348 (securities fraud); and Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 (securities fraud); and aiding and abetting and conspiring to commit these offenses in violation of Title 18, United States Code, Section 2 (aiding and abetting), 371 (conspiracy) and 1349 (conspiracy), (altogether, the "Subject Offenses") described as follows:

- Communications during and after September 2015 regarding the Accounting Fraud Scheme involving improper revenue recognition at MiMedx relating to a September 2015 transaction between MiMedx and SLR, including, but not limited to, communications relating to the timing, quantity, nature and price of any SLR purchase of MiMedx products, the timing and terms of any payments to MiMedx by SLR, SLR's ability to pay, returns and credits offered to SLR, any side agreements or subsequent contractual revisions with SLR or any persons affiliated with SLR, and the involvement of MiMedx personnel in effectuating resales of product by SLR;

- Communications during and after September 2015 related to the extension of credit or other things of monetary value by officers or employees of MiMedx or their friends and relatives to SLR, or any persons affiliated with SLR, the terms of such loans, and the repayment of such loans;

- Communications during and after September 2015 related to Torpin LLC, including but not limited to all loans and/or investments by Torpin LLC and all communications relating to those loans and investments, and all sources and uses of Torpin LLC proceeds;

- Communications during and after September 2015 regarding the provision of information relating MiMedx's sales to, and relationship with, SLR to auditors, regulators, investigators, or any other party tasked with analyzing MiMedx's sales and revenue recognition practices, including but not limited to information relating to the September 2015 transaction between MiMedx and SLR;

- Communications regarding MiMedx earnings and revenue targets or analyst projections;

- Evidence of state of mind, including but not limited to, consciousness of guilt and awareness of the propriety of revenue recognition practices at MiMedx, including but not limited to with respect to the September 2015 transaction between MiMedx and SLR, or awareness of, or attempts to influence, any audits or investigations regarding MiMedx's revenue recognition or sales and distribution practices;

- Evidence relating to any efforts to mislead others or conceal pertinent information with respect to the September 2015 transaction between MiMedx and SLR, MiMedx's recognition of revenue from that transaction, or any loans made to SLR.

- Communications during and after August 2017 regarding the Insider Trading Scheme involving the sale of Mimedx stock in January and February 2018, including but not limited to, communications relating to the sharing of information about the status of audits and/or investigations into MiMedx in 2018, the timing of MiMedx's SEC filings in 2018, the status or prospects for any MiMedx press release that was considered or issued by MiMedx, and any expected movements in the stock price of MiMedx;

- Communications during and after August 2017 regarding any trading, acquiring, selling, or otherwise transacting in the publicly traded shares of MiMedx;

- Evidence of any deleted communications between Parker H. "Pete" Petit and ▆▆▆▆ and any communications concerning the deletion of any ESI;

- All communications between ▆▆▆▆ and Parker H. "Pete" Petit between January 23, 2018 and February 20, 2018; and

- Evidence of state of mind, including but not limited to, awareness of the status of audits and/or internal investigations into MiMedx in 2018, the timing or status of MiMedx's

2

SEC filings in 2018, the status or prospects for any MiMedx press release that was considered or issued by MiMedx, and any expected movements in the stock price of MiMedx; consciousness of guilt and awareness of, or attempts to hide, any insider trading activity.

- Evidence relating to any efforts to mislead others or conceal pertinent information with respect the sale of shares of MiMedx by ███████ or any other friends, relatives, or associates of Parker H. "Pete" Petit in January and February 2018, including the motivation for executing any such sales.

USAO_SDNY_000213564

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

In the Matter of the Application of the United
States of America for Warrants to Search

The Premises Known and Described as ▊▊▊

▊▊▊ and the Person of ▊▊▊ ; and

The Premises Known and Described as ▊▊▊
▊▊▊ and the
Person of ▊▊▊ .

**TO BE FILED UNDER SEAL**

**Agent Affidavit in Support of
Application for Search and Seizure
Warrants**

NORTHERN DISTRICT OF GEORGIA) ss.:

DIANA CHAU, Postal Inspector, United States Postal Inspection Service, being duly
sworn, deposes and states:

**I. Introduction**

**A. Affiant**

1.      I am a Postal Inspector with the U.S. Postal Inspection Service (the "USPIS" or
"Investigating Agency").  As such, I am a "federal law enforcement officer" within the meaning
of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in
enforcing the criminal laws and duly authorized by the Attorney General to request a search
warrant.  During my tenure with the USPIS, I have participated in the investigations of numerous
frauds, and have conducted physical and electronic surveillance, the execution of search warrants,
debriefings of informants, and reviews of taped conversations.  Through my training, education,
and experience, I have become familiar with the manner in which securities frauds and insider
trading offenses are perpetrated.

2.      I make this Affidavit in support of an application pursuant to Rule 41 of the Federal
Rules of Criminal Procedure for warrants to search:

1

     a.   The residence of ████████████ (the "Subject Premises-1"), which is more fully described in Attachment A-1 hereto, and the person of ████████████, for an iPhone 7 with IMEI number beginning in ████████████ and call number ████████████ (the ████ Number"), and for any predecessor cellphones, as described more fully below (collectively, the "SUBJECT DEVICES-1"). This affidavit also seeks authorization to search data stored on the SUBJECT DEVICES-1 for the items and information described in Attachment B-1 to this Affidavit.

     b.   The residence of ████████████ (the "Subject Premises-2"), which is more fully described in Attachment A-2 hereto, and the person of ████████████, for the iPhone associated with call number ████████████ (the ████ Number") (the "SUBJECT DEVICE-2"). This affidavit also seeks authorization to search data stored on SUBJECT DEVICE-2 for the items and information described in Attachment B-2 to this Affidavit. The SUBJECT DEVICES-1 and SUBJECT DEVICE-2 are collectively referred to herein as the "TARGET PHONES."

     3.    This Affidavit is based upon my personal knowledge and involvement in the investigation of this matter, as well as information obtained from other sources, including conversations with other law enforcement officers and employees of the United States Securities and Exchange Commission ("SEC"), as well as my review of documents gathered during the course of this investigation, and my experience and guidance received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.

---

[1] An IMEI number is a number that uniquely identifies an individual wireless device. From speaking with representatives of AT&T, the service provider for the SUBJECT DEVICES, I have learned that the first 14 digits of an IMEI number uniquely identify a particular phone and that an additional digit or two is often added to signify various software updates that are applied to the phone.

USAO_SDNY_000213566

Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### B. The Subject Premises

4.     The Subject Premises-1 is described as a residential home located at █████ ██████████████████████████████████. Law enforcement database records as well as corporate records that I have reviewed as part of my investigation reflect that the Subject Premises-1 is the residence of ███████████████████ and members of his family.  The Subject Premises-1 is an approximately 3,506 square foot single family home.  Based upon my training and experience, I know that users of cellphones like the SUBJECT DEVICES-1 often keep cellphones on their person when they are inside or outside of their home.  Accordingly, this Affidavit also requests authorization to search ████████ person.  The following is an image of ███████ from a law enforcement database:



5.     The Subject Premises-2 is described as a residential home located at ███████ ██████████████████████. Law enforcement database records as well as corporate records that I have reviewed as part of my investigation reflect that the Subject Premises-2 is the residence of ██████████████████) and members of his family.  The Subject Premises-2 is an approximately 4,210 square foot single family home.  Based upon my training and experience, I know that users of cellphones like SUBJECT DEVICE-2 often keep cellphones

3

on their person when they are inside or outside of their home. Accordingly, this Affidavit also requests authorization to search ▇▇▇▇▇▇▇ person. The following is an image of ▇▇▇▇▇▇▇ from a law enforcement database:



## C. The SUBJECT OFFENSES

6. For the reasons detailed below, I submit that there is probable cause to believe that the TARGET PHONES contain evidence, fruits, and instrumentalities of (i) an accounting fraud scheme (the "Accounting Fraud Scheme," described more fully herein) constituting violations of Title 18, United States Code, Sections 1343 (wire fraud) and 1348 (securities fraud); and Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 (securities fraud); and aiding and abetting and conspiring to commit these offenses, in violation of Title 18, United States Code, Section 2 (aiding and abetting), 371 (conspiracy) and 1349 (conspiracy); and (ii) an insider trading scheme (the "Insider Trading Scheme," described more fully herein) constituting violations of Title 18, United States Code, Sections 1343 (wire fraud) and 1348 (securities fraud); and Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 (securities fraud); and aiding and abetting and conspiring to commit these offenses, in violation of Title 18, United States Code, Section 2 (aiding and abetting), 371 (conspiracy) and 1349 (conspiracy). All of the offenses set

USAO_SDNY_000213568

forth in this Paragraph, taken together, are referred to herein as the "SUBJECT OFFENSES." As set forth below, there is probable cause to believe that the SUBJECT DEVICES-1 are likely to be found at the Subject Premises-1 or on ▉▉▉▉▉ person, and that SUBJECT DEVICE-2 is likely to be found at the Subject Premises-2 or on ▉▉▉▉▉ person, and that the TARGET PHONES are likely to contain evidence of the SUBJECT OFFENSES regarding the Accounting Fraud Scheme and the Insider Trading Scheme.

## II. Probable Cause Regarding the SUBJECT OFFENSES

### Relevant Individuals and Entities

7.      Based on my review of publicly available information, my review of corporate records produced in response to subpoenas issued by the SEC, and my conversations with personnel and representatives of MiMedx Group, Inc. ("MiMedx") and other companies that conducted business with MiMedx, I have learned the following, in substance and in part:

a. At all relevant times, MiMedx was a publicly traded biopharmaceutical company headquartered in Marietta, Georgia, that develops and markets regenerative and therapeutic biologics using human placental tissue allografts, colloquially referred to as wound care products or tissues, whose shares traded under the symbol "MDXG" on the NASDAQ. MiMedx distributed its wound care products to end users directly as well as through independent distributors.

b. Parker H. "Pete" Petit ("PETE PETIT") was MiMedx's chief executive officer ("CEO") between approximately 2009 and 2018. PETE PETIT resigned from his position at MiMedx on or about June 30, 2018, in lieu of being terminated by MiMedx's board of directors.

c. William "Bill" Taylor ("TAYLOR") was MiMedx's chief operating officer ("COO") between approximately 2009 and 2018. In his role as COO, TAYLOR reported directly to, and

5

worked closely with, PETE PETIT.  TAYLOR resigned from his position at MiMedx on or about

June 30, 2018, in lieu of being terminated by MiMedx's board of directors.



d. ▓▓▓▓ and ▓▓▓▓▓▓▓ are husband and wife, and ▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

e. ▓▓▓▓ and ▓▓▓▓▓▓▓ are husband and wife, and

▓▓▓▓▓▓▓▓▓▓▓, respectively.

f. ▓▓▓▓ and ▓▓▓▓ are husband and wife, and ▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓).

## A. Probable Cause Regarding the SUBJECT OFFENSES Relating to the Accounting Fraud Scheme

8.     Since early 2018, members of the United States Attorney's Office for the Southern

District of New York and agents of the USPIS have been investigating whether MiMedx, through

its senior management and directors from approximately 2012 through 2017, routinely and

knowingly filed public financial reports with the SEC that contained false and inflated earnings

information, with the intent to deceive the investing public. This investigation followed MiMedx's

February 20, 2018 issuance of a press release and its filing of a Form 8K with the SEC, announcing

that the filing of the company's reports of financial results for fourth quarter 2017 and fiscal year

2017 would be delayed and that the company's audit committee had begun "an internal

investigation into current and prior-period matters relating to allegations regarding certain sales

and distribution practices at the Company."  To date, MiMedx has not filed its financial results for

fourth quarter 2017 or fiscal year 2017.

9.     On or about June 6, 2018, MiMedx announced that its previously issued financial

statements for the years 2012 through 2016 and for the first three quarters of 2017 needed to be

6

restated and should no longer be relied upon.  Pursuant to applicable federal law, PETE PETIT had certified each of MiMedx's annual SEC filings (i.e., Form 10-K) during that period.  In announcing the need to restate those filings, MiMedx explained that "the determination of the need to restate was based on investigation results to date which have primarily been focused on the accounting treatment afforded to such sales and distribution practices for two distributors for which certain implicit arrangements modified the explicit terms of the contracts, impacting revenue recognition during specified periods."  Based on my participation in the investigation, I am aware that the two distributors referenced in the above announcement were AvKare, a Tennessee based distributor that primarily handled sales to the federal government, and First Medical, a Saudi distributor.

10.     Following MiMedx's stated intention to restate its financial statements, this investigation focused on the relationships between MiMedx and various of its external distributors to determine whether MiMedx, through any of these relationships engaged in various forms of accounting fraud by, among other things, improper revenue recognition, channel-stuffing, and undisclosed related-party transactions.  In addition to MiMedx's relationship with AvKare and First Medical, this investigation includes MiMedx's relationship with other distributors, including specifically a Texas-based distributor known as SLR Medical Consulting LLC ("SLR").  As set forth below, there is probable cause to believe that ▮▮▮▮▮▮▮ assisted MiMedx in engaging in accounting fraud in connection with SLR.  MiMedx's accounting fraud with respect to its transactions with SLR is the Accounting Fraud Scheme referenced herein.

### Relevant Accounting Principles

11.     Generally accepted accounting principles (GAAP) refer to a common set of accounting principles, standards and procedures that companies must follow (represent that they

follow) when preparing and filing financial statements.  GAAP is meant to ensure a minimum level of methodological consistency across the financial statements of different companies, which makes it easier for investors to analyze and extract useful information and compare GAAP metrics across different companies.  For publicly traded companies, the SEC also promulgates accounting rules and guidance that companies must follow when filing their financial reports.

12.     Under GAAP and SEC guidance, a company that engages in the sale of products through a distributor may recognize revenue upon transfer of the product to a distributor if, among other things, collectability (i.e., receiving payment) is reasonably assured.  *See* SEC Staff Accounting Bulletin No. 104 (Topic 13, Revenue Recognition, Dec. 17, 2003).  When the distributor has a right of return (i.e., the ability to return the product without having to pay for it), revenue cannot be properly recognized unless all of the following criteria are met: (1) the seller's price to the buyer is fixed or determinable at the date of sale; (2) the buyer's obligation to pay the seller is not contingent on the resale of the product; (3) the buyer's obligation to pay the seller is not excused in the event that the product is damaged or lost; (4) the buyer has economic substance separate from the seller; (5) the seller does not have significant obligations for future performance to directly bring about the resale of the product by the buyer; and (6) the amount of future returns can be reasonably estimated.  *See, e.g.*, Accounting Standards Codification, Subtopic 605-15-25-1.

*Transactions Between MiMedx, SLR, and* ▮▮▮▮▮ *in 2015*

13.     Based on my review of documents provided by MiMedx, and from speaking with representatives of MiMedx and SLR, I have learned the following, in substance and in part:

a. Beginning in approximately 2010, a MiMedx employee (the "SLR Owner") also owned and operated SLR (which was previously known by another name) together with another

8

individual. SLR is a distributor of medical products in the state of Texas and recorded revenues of approximately $300,000 and $1 million in 2014 and 2015, respectively.

b. In or about late 2015, MiMedx's relationship with its main distributor in Texas ("CPM") was winding down. Prior to that time, CPM was often responsible for a significant volume of MiMedx sales per quarter. In that same period, the SLR Owner left MiMedx to work exclusively at SLR. On or about September 15, 2015, SLR entered into a distribution relationship with MiMedx through which the SLR Owner hoped to replace CPM as a significant distributor of MiMedx product in Texas.

c. Immediately afterwards, MiMedx employees and the SLR Owner began having conversations about how much inventory SLR could purchase, including the purchase of product that needed to be stored in a freezer that SLR had not previously distributed. To facilitate such purchases, MiMedx helped SLR to procure and pay for freezers to store the product that SLR would agree to buy from MiMedx. For example, on or about September 17, 2015, the SLR Owner informed PETE PETIT by email that he only had one freezer that could hold 3500 units. PETE PETIT forwarded the email to others at MiMedx and suggested buying SLR additional freezers. The MiMedx employees then discussed how much product could fit in a freezer including asking whether they could "stuff some more" in particular units. PETE PETIT then asked "How many dollars?" to which another MiMedx employee responded that the sale could amount to between $2.5 and $4.5 million depending on the size of the units included in the sale. Based on my participation in this investigation and my review of emails like this one, I believe that the mix of units that would be included in the sale to SLR was intended to maximize the sale price and the

9

quantity of the proposed sale was driven by how much quantity could be stored in SLR's freezers rather than on SLR's needs.[2]

d. On or about September 30, 2015, right before the close of the third quarter, SLR and MiMedx agreed on the sale for approximately $4.5 million. The terms of the sale called for SLR to pay the full amount within 30 days of the date of shipment. According to the SLR Owner, prior to this transaction, SLR's annual revenues had never exceeded $500,000.

e. MiMedx recognized all of the revenue related to this SLR transaction in the third quarter of 2015 despite the fact that SLR did not pay any portion of the approximately $4.5 million owned for the product in September. Without the recognition of that sale in September, MiMedx's revenue would have fallen short of its previously projected revenue forecast for the third quarter of 2015. Under the accrual method of accounting, MiMedx's decision to recognize the revenue from its approximately $4.5 million sale to SLR was proper only if collectability of that sum could be reasonably assured. There is probable cause to believe that, as PETE PETIT and others at MiMedx well knew in and around September 2015 that collectability from SLR on this transaction was not reasonably assured. As explained above, the sales to SLR involved new product and in quantities intended to maximize the sale price. Moreover, as described below, PETE PETIT and

---

[2] During an interview on March 20, 2019, the SLR Owner stated that, at the time of this purchase, he believed that SLR would ultimately be able to sell all of the product from the September sale, and understood, based on conversations with TAYLOR, that MiMedx would be "flexible" with SLR's payment schedule, notwithstanding the firm 30-day payment deadline referenced in the sale contract.

USAO_SDNY_000213574

others continued to learn additional facts about SLR's lack of ability to make payments to MiMedx.[3]

      f. During the weeks after the September transaction with SLR, the SLR Owner told PETE PETIT that SLR was having trouble making payments to MiMedx. By in or around November 2015, SLR had paid only approximately $10,000 out of the approximately $4.5 million at issue, and the contractual 30-day deadline for payment had passed. On or about November 24, 2015, ▮▮▮▮▮ and ▮▮▮▮▮ incorporated an entity, known as Torpin LLC ("Torpin"). According to the operating agreement for Torpin, each of ▮▮▮▮▮ was listed as a "member" in Torpin, and each of ▮▮▮▮▮ was required to make initial capital contribution of $250,000. According to the SLR Owner, in or about late 2015, PETE PETIT recommended to the SLR Owner that the SLR Owner speak to ▮▮▮▮▮ and others about ways that SLR could obtain capital. According to the SLR Owner, the SLR Owner met in-person with ▮▮▮▮▮ ▮▮▮▮▮, and others at MiMedx's headquarters in Georgia in or about December 2015 and discussed the possibility of obtaining a loan for SLR. Calendar records obtained from MiMedx reflect that the SLR Owner, ▮▮▮▮▮ and ▮▮▮▮▮ were invited to a meeting on or about December 17, 2015.

      g. According to bank records, on or about December 21, 2015, pursuant to a promissory note, Torpin wired approximately $1.5 million to SLR comprised of funds contributed by all ▮▮ ▮▮▮▮▮. In or about December 2015, SLR paid down over $750,000 of its outstanding balance to MiMedx, and thereby lowered the amount of money that SLR owed to MiMedx and provided a track record of a large SLR payment on the owed obligation. According to the SLR Owner, at

---

[3] On or about September 1, 2015, MiMedx also entered into a consulting agreement with the SLR Owner pursuant to which he was paid approximately $15,000 per month for October, November, and December 2015. The SLR Owner used that money to help cover SLR's expenses.

USAO_SDNY_000213575

least some of these funds came from the proceeds of the SLR Loan received from Torpin. Between in or about December 1 and 3, 2015, the ▮▮▮▮▮▮ ▮▮▮▮▮▮, and ▮▮▮▮▮▮ participated in an email chain concerning documents related to Torpin, including the operating agreement discussed above, and which documents were forwarded to PETE PETIT.

h. Based on my review of documents from MiMedx and from speaking with representatives of MiMedx, I have learned that approximately 40 percent of the products from the September sale to SLR were ultimately returned to MiMedx in exchange for other product, and that SLR did not pay off its approximately $4.5 million balance to MiMedx until approximately the end of 2017. SLR also paid off the loan to Torpin – after taking out additional loan amounts – in or about 2017. Based on my review of records provided by MiMedx, I am unaware of any documents demonstrating that the SLR-loan described above was disclosed to MiMedx's accounting department, its auditors, its shareholders and/or the investing public. Based on my conversations with representatives of MiMedx, I understand that the company's internal investigation concerning the proper accounting treatment of MiMedx's transactions with SLR remains ongoing.

i. Based upon my training and experience, I know that for purposes of GAAP accounting, in assessing whether the approximately $4.5 million sale to SLR could continue to be properly recognized as revenue, SLR's December 2015 payment of approximately $750,000 to MiMedx would be relevant evidence in establishing that the collectability was reasonably assured from SLR. Indeed, in a memorandum to MiMedx's independent auditors on or about February 16, 2016, MiMedx's corporate treasurer cited SLR's payment history as evidence that the balance of the $4.5 million purchase by SLR was fully collectible. However, the fact that the payment was

12

funded by various ████████████ substantially undermines the bone-fide nature of this payment or its use as a date point in assessing the reasonableness of collectability.

**B. Probable Cause Regarding the Subject Offenses Relating to the Insider Trading Scheme**

14.     I further submit that there is probable cause to believe that in or about January and February of 2018, ████████ engaged in the Insider Trading Scheme by converting material non-public information ("MNPI") that PETE PETIT had obtained by virtue of his employment at MiMedx to their own use for personal gain.  Through that trading, among other things, ████ ████████ avoided at least approximately $2 million in losses by selling MiMedx stock from in and around late January to late February 2018, shortly before the MiMedx announced a delay in the release of its 10-K filing, which caused an approximately 36 percent decrease in the stock price.

*MiMedx's Share Price Decreases as a Result of Delayed Financial Filings*

15.     As set forth above, based on my review of MiMedx documents and from speaking with MiMedx personnel and representatives, I have learned that in or about August 2017, MiMedx engaged Ernst and Young ("EY") as an external auditor.  From speaking with representatives of EY, I have learned that over the course of January and February 2018, EY conveyed to MiMedx management that in light of the amount of work necessary to investigate MiMedx's prior revenue recognition practices, MiMedx would not be able to file its annual 10-K on time, i.e., by March of 2018.  Based on my training and experience, I am aware that a company's inability to file a timely 10-K usually causes a company's stock price to decline.

16.     From speaking with representatives of MiMedx and EY, and my review of documents produced by MiMedx and obtained from the Financial Industry Regulatory Authority ("FINRA"), I have learned of the following developments that occurred in early 2018:

13

a. On or about January 23, 2018, MiMedx managers, including PETE PETIT and TAYLOR, had a meeting with EY personnel.  During the meeting, EY discussed concerns about MiMedx's accounting practices relating to AvKare.

b. On or about January 25 and 26, 2018, MiMedx managers, including PETE PETIT and TAYLOR, participated in an email exchange with the subject "E&Y."  In an email on January 26, MiMedx's CFO noted that "I am sure we all realize that this extra review and focus by EY puts the timely filing of our financial statements in jeopardy.  We need to move quickly to avoid any delays."  In response, PETE PETIT wrote that he was "now concerned"; that he wanted EY to speak with the CFO and others directly; and that "[t]his has reached the point where I want to be involved in almost every conversation."

c. On or about February 6, 2018, EY met with MiMedx's audit committee and told them that the Company needed an independent investigation concerning its sales and distribution practices before MiMedx's 2017 financial statements could be filed.  At the meeting, EY raised the possibility that in light of these circumstances, MiMedx might not meet its regulatory filing deadlines. Over the next few days, MiMedx engaged a law firm—King & Spalding LLP—and an accounting firm—KPMG—to conduct the independent investigation.

d. On or about February 16, 2018, EY met with MiMedx management again concerning the investigation of MiMedx's sales and distribution practices.  During this meeting, EY advised that MiMedx would not be able to file its 2017 10-K by March.

e. On or about February 20, 2018, MiMedx issued the aforementioned press release concerning the delay.  Following the issuance of the press release, MiMedx's stock dropped approximately 36 percent from a share price of $15.38 to $9.90.

14



███████████ *Avoided Significant Losses in MiMedx Stock*

17.    Based on my review of documents obtained from FINRA, MiMedx, iCloud records from accounts registered to PETE PETIT and ████████ (the "iCloud Accounts"), and trading records, I have learned that during January and February of 2018, PETE PETIT and ████████ avoided significant losses by engaging in sales of MiMedx stock through the following chain of events, among others:

a.   In January 2018, ████████ invited PETE PETIT to a meeting on January 24, 2018 entitled "Lunch MDXG."

b.   Between January 25 and February 15, 2018, the ████████ sold over 300,000 shares of MiMedx in trading accounts at Fidelity Brokerage Services ("Fidelity"). Based on these timely sales, the ████████ avoided over $2 million in losses. For example, between January 25 and 29 the ████████ sold over 189,000 shares of MiMedx.[4]

18.    In addition, ████████ sold MiMedx shares in other trading accounts held in their names and through trusts at Fidelity and/or Oppenheimer & Co. Inc. ("OpCo"). For example, on or about February 1, 2018, ████████ sold over 78,000 shares in a trust account held at OpCo.

19.    On or about February 20, 2018 – the same day as the aforementioned press release – ████████ had the following exchange over iMessage as reflected in the iCloud Accounts. ████████ sent a message from the ██ Number asking, "Everybody ok after today?" Approximately five minutes later, ████████ responded from the ██ Number "Yes sir!"

---

[4] On or about February 13, 2018, the ████████ invested in certain short term put options that would be valuable if MiMedx stock increased. The cost of these options was less than $50. Based on my training and experience, I submit that the investment in a small amount of options, while reducing a substantial equity position, is a potential attempt to conceal illegal trading based on MNPI.

USAO_SDNY_000213579

20.     According to records obtained from FINRA, in response to questions from FINRA that were submitted to MiMedx following this period, PETE PETIT asserted through MiMedx in a submission to FINRA on or about June 13, 2018 that he was not aware of any circumstances under which ▮▮▮▮▮▮ would have obtained knowledge of information concerning MiMedx's February 20 press release.  According to the records, PETE PETIT asserted that he "had no contact" with ▮▮▮▮▮▮ from February 6 through February 16, 2018.  Based on my review of documents provided by MiMedx, however, I have learned that on or about February 7, 2018, PETE PETIT and ▮▮▮▮▮▮ communicated via iMessage which messages were sent and/or received from a phone assigned the ▮▮▮ Number.  Based upon information shared by MiMedx's outside counsel, which oversaw a review of MiMedx's review of PETE PETIT's electronic devices, I have learned that this iMessage (or messages) are no longer available because they appear to have been deleted by PETE PETIT, along with dozens of other iMessages that had been stored on PETE PETIT's company-issued phone, at some time before that phone was returned to the Company in or about August 2018.[5]

## C.   Probable Cause Justifying Search of the TARGET PHONES

21.     There is probable cause to believe that evidence, fruits, or instrumentalities of the SUBJECT OFFENSES will be found on the SUBJECT DEVICES-1 and SUBJECT DEVICE-2. From my review of records produced by AT&T, the service provider for the SUBJECT DEVICES-1, I have learned that as recently as approximately February 7, 2019, the ▮▮▮ Number was (i)

---

[5] In or about January 2012, PETIT was the subject of an SEC enforcement action into alleged insider trading by PETIT and an associate.  The associate settled with the SEC without any acknowledgement of wrongdoing, and the SEC dropped its case against PETIT.  In addition, in or about February 2016, TD Ameritrade terminated its relationship with ▮▮▮▮▮▮ and closed numerous accounts in their names on suspicion that they were involved in insider trading with respect to MiMedx shares.

USAO_SDNY_000213580

assigned to the user ▮▮▮▮▮▮ (ii) was assigned to an iPhone 7 with IMEI number beginning in ▮▮▮▮▮▮ and (iii) was registered to ▮▮▮▮▮▮ at the Subject Premises-1. Based on my review of records produced by MiMedx and from the iCloud Accounts, I have also learned that ▮▮▮▮▮▮ used the ▮▮ Number between at least 2016 and 2018, including to send iMessages.[6]

22.     Like individuals engaged in any other kind of activity, individuals who engage in accounting fraud and insider trading store records relating to their illegal activity and to persons involved with them in that activity on electronic devices such as the TARGET PHONES. Such records can include, for example, contact records, phone logs, text messages, iMessages, emails, web browser search histories, and copies of documents and records. With respect to accounting fraud, such communications may include, for example, discussions about a company's financial status and means of manufacturing indicia that the collection of payments from its distributors are reasonably assured. With respect to insider trading, such communications may include, for example, the conveyance of MNPI about a company over email or text messages.

23.     In addition, as set forth above, both ▮▮▮▮▮▮ and ▮▮▮▮▮▮ participated in a meeting with the SLR Owner in or about December 2015. From the iCloud accounts, I know that calendar invites for this meeting included both ▮▮▮▮▮▮ and ▮▮▮▮▮▮. Based on my training and experience, I know that individuals can access emails and calendar invites from phones such as the TARGET PHONES.

24.     Furthermore, as set forth above, on or about February 20, 2018, both ▮▮▮▮▮▮ and ▮▮▮▮▮▮ exchanged iMessages associated with the ▮▮ Number and the ▮▮ Number,

---

[6] Records related to the ▮▮ Number have been subpoenaed from AT&T, and I am awaiting the results.

USAO_SDNY_000213581

respectively.  Also, based on logs of deleted iMessages recovered from PETE PETIT's phone, there is probable cause to believe that ▇▇▇▇▇ used a phone assigned the ▇▇ Number (i.e., one of the SUBJECT DEVICES-1) to exchange messages with PETE PETIT at or near the time he engaged in the sale of MiMedx shares.  Toll records that I have reviewed further demonstrate that ▇▇▇▇▇ and PETE PETIT communicated over SUBJECT DEVICE-2 many times between 2016 and 2018.  Similarly, records from the iCloud Accounts, show that PETE PETIT exchanged many messages with ▇▇▇▇▇ at the ▇▇ number between 2016 and 2018.

25.     Computer files or remnants of such files can be recovered months or even years after they have been created or saved on an electronic device such as the TARGET PHONES. Even when such files have been deleted, they can often be recovered, depending on how the hard drive has subsequently been used, months or years later with forensics tools.  Moreover, a user of a mobile device can transfer over information from a previous cellphone including contacts and communications thereby preserving such records even if they did not originate on a particular device. Thus, the ability to retrieve from information from the TARGET PHONES depends less on when the information was first created or saved than on a particular user's device configuration, storage capacity, and computer habits.

26.     With respect to ▇▇▇▇▇ in addition to authorization to seize and search the phone with IMEI number beginning in ▇▇▇▇▇ this Affidavit also seeks authorization to seize and search any predecessor cellphone to which the ▇▇ Number was assigned that may have been in use at the time the SUBJECT OFFENSES occurred.  Based upon my review of records produced by AT&T, I have learned that the ▇▇ Number was previously assigned to the following cellphones (collectively, the "Predecessor Cellphones"), as follows:

18

a.   An iPhone 7 with IMEI number beginning in ███████ between in or about October 2017 and January 2019.

b.   An iPhone 6 with IMEI number beginning in ███████ between in or about August 2017 and October 2017.

c.   An iPhone 6 with IMEI number beginning in ███████ between in or about January 2016 and August 2017.

27.   I know, based on my training and experience, that individuals generally replace or update cellphones with some regularity.  When doing so, individuals will oftentimes keep old cellphones for various reasons, including for use as a backup or because the phone contains stored data.  Records from AT&T and from Apple, the manufacturer of the SUBJECT DEVICES-1 and the provider iCloud services to them, reflect that ███████ began using the ███ Number at least as early as in or about 2011.  Accordingly, the Predecessor Cellphones may retain evidence of the SUBJECT OFFENSES.

28.   Based on the foregoing, I respectfully submit there is probable cause to believe that PETE PETIT, ███████████████, and others engaged in the SUBJECT OFFENSES, and that evidence of this criminal activity is likely to be found on the TARGET PHONES.

## III.  Procedures for Searching ESI

### A.  Review of ESI

29.   Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained on the TARGET PHONES for information responsive to the warrant.

19

30.    In conducting this review, law enforcement may use various techniques to determine which files or other ESI contain evidence or fruits of the SUBJECT OFFENSES.  Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of search terms related to the subject matter of the investigation. (Keyword searches alone are typically inadequate to detect all information subject to seizure. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.)

31.    Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant.  Depending on the circumstances, however, law enforcement may need to conduct a complete review of all the ESI from the TARGET PHONES to locate all data responsive to the warrant.

## B.  Return of the TARGET PHONES

32.    If the Government determines that the TARGET PHONES are no longer necessary to retrieve and preserve the data on the device, and that the TARGET PHONES are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return the TARGET PHONES, upon request.  Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an

USAO_SDNY_000213584

instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the TARGET PHONES.

## IV.  Conclusion and Ancillary Provisions

33.     Based on the foregoing, I respectfully request the court to issue a warrant to search (a) the Subject Premises-1 and person described in Attachment A-1 to this affidavit and to the Search and Seizure Warrant and look for such evidence within the SUBJECT DEVICES-1 as described in Attachment B-1; and (b) the Subject Premises-2 and person described in Attachment A-2 to this affidavit and to the Search and Seizure Warrant and look for such evidence within SUBJECT DEVICE-2 as described in Attachment B-2.

34.     The existence and scope of this ongoing criminal investigation are not publicly known.   As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation.  In particular, given that PETE PETIT, ▆▆▆▆▆▆▆▆▆▆▆▆ and/or other targets of the investigation are known to use computers and electronic communications in furtherance of their activity, they could easily delete, encrypt, or otherwise conceal such digital evidence from law enforcement were they to learn of the Government's investigation.  I therefore respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

21

## Attachment A-1

### Person and Property to Be Searched

The premises to be searched (the "Subject Premises") is located at ███████████████. The Subject Premises is an approximately 3,506 square foot single family home.

The person to be searched is ███████████████. ████████ is pictured as follows:



USAO_SDNY_000213586

## Attachment B-1

### I. Devices Subject to Search and Seizure

The devices that are the subject of this search and seizure warrant (the "SUBJECT DEVICES-1") are described as iPhones that are, or ever have been, assigned phone number ████ ████ and further described as follows:

    a.  An iPhone 7 with IMEI number beginning in ████████

    b.  An iPhone 7 with IMEI number beginning in ████████

    c.  An iPhone 6 with IMEI number beginning in ████████

    d.  An iPhone 6 with IMEI number beginning in ████████

### II. Review of ESI on the SUBJECT DEVICES

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained on the SUBJECT DEVICES-1 for evidence, fruits, and instrumentalities of (i) an accounting fraud scheme involving MiMedx's recognition of revenue from a September 2015 transaction with SLR (the "Accounting Fraud Scheme") constituting violations of Title 18, United States Code, Sections 1343 (wire fraud) and 1348 (securities fraud); and Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 (securities fraud); and aiding and abetting and conspiring to commit these offenses, in violation of Title 18, United States Code, Section 2 (aiding and abetting), 371 (conspiracy) and 1349 (conspiracy); and (ii) an insider trading scheme involving the sale of MiMedx shares in our about January and February 2018 based on material, non-public information (the "Insider Trading Scheme") constituting violations of Title 18, United States Code, Sections 1343 (wire fraud) and 1348 (securities fraud); and Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 (securities fraud); and aiding and abetting and conspiring to commit these offenses in violation of Title 18, United States Code, Section 2 (aiding and abetting), 371 (conspiracy) and 1349 (conspiracy), (altogether, the "Subject Offenses") described as follows:

- Communications during and after September 2015 regarding the Accounting Fraud Scheme involving improper revenue recognition at MiMedx relating to a September 2015 transaction between MiMedx and SLR, including, but not limited to, communications relating to the timing, quantity, nature and price of any SLR purchase of MiMedx products, the timing and terms of any payments to MiMedx by SLR, SLR's ability to pay, returns and credits offered to SLR, any side agreements or subsequent contractual revisions with SLR or any persons affiliated with SLR, and the involvement of MiMedx personnel in effectuating resales of product by SLR;

- Communications during and after September 2015 related to the extension of credit or other things of monetary value by officers or employees of MiMedx or their friends and relatives to SLR, or any persons affiliated with SLR, the terms of such loans, and the repayment of such loans;

- Communications during and after September 2015 related to Torpin LLC, including but not limited to all loans and/or investments by Torpin LLC and all communications relating to those loans and investments, and all sources and uses of Torpin LLC proceeds;

- Communications during and after September 2015 regarding the provision of information relating MiMedx's sales to, and relationship with, SLR to auditors, regulators, investigators, or any other party tasked with analyzing MiMedx's sales and revenue recognition practices, including but not limited to information relating to the September 2015 transaction between MiMedx and SLR;

- Communications regarding MiMedx earnings and revenue targets or analyst projections;

- Evidence of state of mind, including but not limited to, consciousness of guilt and awareness of the propriety of revenue recognition practices at MiMedx, including but not limited to with respect to the September 2015 transaction between MiMedx and SLR, or awareness of, or attempts to influence, any audits or investigations regarding MiMedx's revenue recognition or sales and distribution practices;

- Evidence relating to any efforts to mislead others or conceal pertinent information with respect to the September 2015 transaction between MiMedx and SLR, MiMedx's recognition of revenue from that transaction, or any loans made to SLR.

- Communications during and after August 2017 regarding the Insider Trading Scheme involving the sale of Mimedx stock in January and February 2018, including but not limited to, communications relating to the sharing of information about the status of audits and/or investigations into MiMedx in 2018, the timing of MiMedx's SEC filings in 2018, the status or prospects for any MiMedx press release that was considered or issued by MiMedx, and any expected movements in the stock price of MiMedx;

- Communications during and after August 2017 regarding any trading, acquiring, selling, or otherwise transacting in the publicly traded shares of MiMedx;

- Evidence of any deleted communications between Parker H. "Pete" Petit and ███████ and any communications concerning the deletion of any ESI;

- All communications between ███████ and Parker H. "Pete" Petit between January 23, 2018 and February 20, 2018; and

- Evidence of state of mind, including but not limited to, awareness of the status of audits and/or internal investigations into MiMedx in 2018, the timing or status of MiMedx's

2

SEC filings in 2018, the status or prospects for any MiMedx press release that was considered or issued by MiMedx, and any expected movements in the stock price of MiMedx; consciousness of guilt and awareness of, or attempts to hide, any insider trading activity.

- Evidence relating to any efforts to mislead others or conceal pertinent information with respect the sale of shares of MiMedx by ███████ or any other friends, relatives, or associates of Parker H. "Pete" Petit in January and February 2018, including the motivation for executing any such sales.

USAO_SDNY_000213589