# EXHIBIT T



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 10, 2019

**BY ELECTRONIC MAIL**

Eric Bruce, Esq.
Freshfields Bruckhaus Deringer US LLP
700 13th Street, NW
Ste 10th Floor
Washington D.C., DC 20005

William Burck, Esq.
William Weinreb, Esq.
Michael Packard, Esq.
Quinn Emmanuel Urquhart & Sullivan, LLP
777 6th Street NW 11th floor
Washington, DC 20005

      **Re:**    *United States* **v.** *Parker H. Petit and William Taylor*, 16 Cr. 595 (JPO)

Dear Counsel:

      The Government below discloses excerpts of information contained in notes of witness interviews and/or witness statements. This disclosure is governed by the Protective Order entered by the Court.

      **Contemporaneous notes prepared in 2016 by Mark Andersen,[1] an individual previously employed by MiMedx, include the following statements:**

- On December 15, 2015, we discussed bad debt reserve with the Audit Committee. The audit committee requested this follow up discussion on bad debt reserve as a result of discussions at the end of Q3 and the increasing number of days sales in accounts receivable. The discussion on bad debt reserve did not go well and lasted for nearly 50 minutes. At one point the chairman of the audit committee said the words revenue recognition, but then stopped himself and changed direction with his comment.

- Afterward, Mike Senken, CFO, called John Cranston and me into his office. He told us that if we could not come up with a method to get $5 million in the bad debt reserve he would replace us with someone who could. I stated very directly and openly to Mike that

---

[1] Mr. Andersen is represented by Jenna Dabbs, Esq. of Kaplan Hecker and Fink LLP.

the real concern was revenue recognition and that we were having the wrong discussion with the Audit Committee – that's why it went so poorly.

- I had another meeting late afternoon on January 19th with Mike, Al, and John. They asked me to walk through each of the items from me email and explain my concerns. This was another hostile meeting. I shared the GAAP references that underlie my concerns with MiMedx revenue recognition. They argued that I did not have all the facts and circumstances required to reach judgment because I had not spoken with the marketing professionals to understand the market demand. They also argued that these practices were just normal business and were the way things had always been done at MiMdex. But they did not share any technical GAAP references or rationale to counter my opinions.

- I had another meeting on the evening of January 21 with Mike, Al, and John. Essentially this was a repeat of the discussion from two days prior. However, Mike informed me that the concerns I raised had been discussed with external counsel, the audit committee, and the external auditors. None believed there was a revenue recognition issue. He asked what would make me comfortable signing the rep letter for the auditors. I responded that if all issues were transparently presented and discussed with the audit committee and the external auditors, and they still believed there were no revenue recognition issues, then I would sign the rep letter[.]

Notes of a meeting that took place on or about October 12, 2018, indicate that Mark Andersen, an individual previously employed by MiMedx, provided the following information to criminal authorities, in substance and in part:

- Rest of the day, no one talks to MA - not until next day the 19th, discussion with MS, AE, and JC. Walked through the points - GAAP references the 605 on rev rec, SEC guidance, talked about why he had concerns with rev rec. Response GAAP is gray area and MA does not have all the facts and circumstances. Nothing they shared back that was technical GAAP literature saying MA was wrong. There were facts and circumstances eventually shared, not sure if this meeting[.]

Notes of a meeting that took place on or about December 9, 2018, indicate that Andrew Brock,[2] an individual previously employed by Ernst and Young, provided the following information to criminal authorities, in substance and in part:

- JC at some point said to AB that he didn't understand some of the accting principles until they engaged w ST, in terms of SEC's views of these matters. JC said he was not well versed in some of this issues. JC explained his rule of thumb was very contractual based. Their contract gen structured w no ROR stated in agreement and title transfer was upon shipment. In john's mind in trying to managing this was, is there the proper

---

[2] Mr. Brock is represented by Alan Tabak, Esq. and Michael Crane, Esq., in-house counsel for Ernst & Young.

documentation in place to recognize the revenue, there was a PO, that it was shipped at a certain point in time.

**Notes of a meeting that took place on or about May 30, 2019, indicate that Marc Brooks,[3] a former MiMedx distributor, provided the following information to criminal authorities, in substance and in part:**

- Addtl free product, bought mil 5, if raise to mil 8—give u 5-10% free product or extra 5% off invoice.
  Discounts—tier levels
  MB would say no, dont want to do that, theyd say how about if u move slow moving product addtl product and discount? Diff every time and wasn't every time it happened.

- BATES MB00000421 - MB don't recall meeting with bill taylor, wouldn't be in a meeting with bill taylor. Meeting didnt happen, MB refused to respond to bill taylor , don't know why he would email,  wouldn't talk to him on phone.

- Sending product back right after june over, wanted to swap AI5050 bc pending orders coming up.

- As soon as replacement product was made MB was sending back, that was the orders. Still tried to sell, not moving to hospital was gonna take slow moving stuff MB woudlve swapped back bc pending PO to subdistributor. MB  said if he take order hes still gona hve to buy other stuff so hes gonna have to swap out pending orders.

- Highlighted stuff as of june—anticipating swapping it. They knew it too..everyone at corporate and schultzy. Reason on purchase order was bc they wanted MB to buy it. They told MB u were gonna sell it as soon as u get gpo contracts. MB didn't trust em. Made em verbally commit they would swap out. Schultzy made verbal agmt. MB not sure taylor was part of this pete may have been on conference calls. MB don't recall dealing with pete on swap outs.

- Original consulting agmt paid by hr no 200,000 pmt. Mb doesnt even think there was paid by hr on that. MB thought it was based on options. And then later 200,000 gets added in. MB believe only addtl obligations was bringing on hospitals. First and 2nd version was the same based on performance. Just got them to give MB more. Reason for that was MB believed hoping rly gonna get GPO contract. MB believd 200,000 was given to eventually bring on hospitals.

- 5,000 mthly mtgs. Had mtgs but they never moved contracts over so not rly did anything. Just 5k monthly pmt? MB was supposed to do something they sent it over to him thinking MB would do something but never sent it. Anticipating doing consulting work but they

---

[3] Mr. Brooks is represented by Lawrence Iason, Esq. of Morvillo Abramowitz Grand Iason & Anello PC.

ended up canceling contract. Never did expecting consulting work.

- Mb didnt look at it like a sweetener to buy prodct, says the first line about place order- They were summarizing all discusssions 2 mil was diff than consulting it wasn't all bundled together it was for separate things. Mb didn't look at 5k montly pmt as sweetener or incentive to buy product –MB was expecting do consulting work, didnt do any consulting work. Gpo contracts were what they were paying MB to do.

- 5k each mo. July aug sept nov monthly mtgs relative to duties in section 2. Mtgs conf call held in person. Mb never got a chance to do those. Intend to do meetings with whoever pete petit put in charge of him for transfer of hospitals, didn't think pete was in charge of it but would put someone on charge for updates and contacts and things like that.

**Notes of an interview that took place on or about April 11, 2019, indicate that Todd Campbell,[4] Parker Petit's son-in-law, provided the following information to criminal authorities, in substance and in part:**

- Campbell understood Jerry's use of the money was going to be used as sales incentives for his sales force and possibly purchase other product. Jerry did not disclose to Campbell that any of the money went towards debt he acquired as a distributor.

**The transcript of a deposition of Michael Carlton,[5] a former MiMedx employee, on or about March 29, 2018, in the matter of *MiMedx Group, Inc. v. Fox*, 16 Civ. 11715 (N.D. Ill.), includes the following questions and answers:**

- Q Was anyone at CPM, including Mark Brooks, ever provided stock or other incentives beyond discounting -- discounted prices of product to help motivate purchases?
  MR. PERNINI: Object to the form of the question.
  A At one point Mark Brooks was provided stock as a consultant, yes.
  BY MR. HALUNEN:
  Q And over what period of time did he act as a consultant?
  A I can't remember the dates.
  Q And how much stock was he provided?
  MR. PERNINI: Object to the form of the question.
  A I don't remember. I wasn't involved in

---

[4] Mr. Campbell is represented by Jonathan Bach, Esq. of Shapiro Arato Bach LLP.

[5] Mr. Carlton is represented by John Hillibrecht, Esq. of DLA Piper LLP.

those decisions.

- Q One last question. Do you know for the
  contract with First Medical what rights of return, if
  any, there were?
  A Don't know.

**Notes of an interview that took place on or about January 7, 2019, indicate that Carlton provided the following information to criminal authorities, in substance and in part:**

- Carlton would say that it was not an unusual thing for the company to ship product and then exchange it later.  If a customer asked for a certain mix of product and the company did not have that mix on hand, the company would never ship a different mix without the customer's knowledge.  Having an subsequent change of product was not a big deal.

- Although MM was aggressive in its sales goals, he never thought he was asked to do anything illegal by anyone at MM.  he would acknowledge lack of familiarity with accounting rules.  He would say that he believes that all of MM product that was sold to customers was ultimately used, even if a customer received incentive to buy more than it needed at the end of a quarter.

**Notes of an interview that took place on or about March 12, 2019, indicate that Carlton provided the following information to criminal authorities, in substance and in part:**

- Spreading #'s across the qtrs, MC found it odd. As long as the customer was ok with it, MC was ok w spreading shipment across qtrs. Talk to anyone abt splitting orders - no, trusted the system and accounting. MC's job was getting the orders in. MD's job was to get the orders out. MC never thought anyone was doing anything illegal or unethical as long as the customer agreed to it.

- MC thought that if mdx didn't have the sizes they wanted at the time, they could swap it out later. It wasn't atypical to do swaps. It was more of a negotiation on the revenue #. MC's issue was not having enough product.

- Understand that CPM didn't want/need prod - Yes, but no one really believed Brooks. He always said things like that. Mdx knew they could swap out sizes overtime and he could use product and he would pay.

- MC had no understanding of FM's obligation w/re to the first shipment, to pay was contingent on their ability to sell the prod.

- **[Re first med email:]**  MC never talked to BT and whether BT talked to the finance team about [the email]. MC didn't know this would be a problem. MC thought you could always rtn products if customer wasn't happy with it. Not sure how it ties with revenue.

- 2016-02-12 17:27:24 - 17:27:40 "no extra commentary just sign" - MC thought if you made changes at the last minute, it was like a red line of a contract and goes back to legal. BT wanted BE to sign for the inventory and MC thought that was kind of normal. MC didn't really know at the time why BT said no extra commentary, but not w new information he knows otherwise. MC thought he just wanted BE to sign to say he got the shipment.

- At this time in feb, MC knew mdx had booked this revenue. MC understood the PO he got from BE had terms of 180 days. As far as what was on paper, Mdx expected to receive pymt for the order 6 mths from December. Pymt due in June. MC knows the purchase orders say 6 months. BT didn't call MC to explain himself. MC's impression then was that the auditors wanted the shipment signed on the receiving end and if the product got there. MC didn't understand BT was trying hide the true deal from the auditors when he got this message.

- MC knew the PO said 180 days, but at the same time in MC's mind he thought the 6 months was triggered on both ends - they had 3 months to do the tender and if they got the tender then they had 3 months to pay. If they didn't get the tender then mdx would take the prod back. MC didn't think the 6 months PO was alarming or different than the deal of being able to return. MC thought it was the deal that mdx could take prod back. But the PO needed to have some term, so MC thought 6 months was reasonable.

**Notes of an interview that took place on or about May 10, 2019, indicate that Carlton provided the following information to criminal authorities, in substance and in part:**

- MC doesn't believe BT typed this email in 4 seconds. It looks like BT prepped both emails before sending them. MC didn't realize the emails were sent 4 seconds apart at the time. Back then MC didn't know what BT was trying to do. From MC's current perspective, it looks like BT was trying to signal one way to MS and a different way to BE. MC didn't notice this at the time. If MC noticed it at the time, he thinks he would have gone to PP, but BT and PP were aligned on everything. Looking at this today this is troubling. MC is not sure what would have happened. It was a high pressured environment and they were slaves to the #. There was never at time where he thought this was illegal. At the time MC thought it was crazy, aggressive, circus, and unnecessary. Using relationships to leverage favors. MC hated it, but never thought it was against the law. Tough to say what he would have done in hindsight. Probably would have gone to PP to see what he says.

  BT: "This is separate. Just the confirm for the auditors."
  • MC thinks this is about Athletic Surgical.
  BT: "No extra commentary. Just sign and send."
  • Thinks this is about Charlie Hopper too. BT wanted MC to get his CFO on the phone & sign off on inventory w Athletic Surgical Products (ASP). . . .Today, MC believes it could be for both FM and ASP.

- Figure out what mdx had available and get customer to agree to match the po w what could ship. If their preference was a diff prod, they needed to wait until inventory was available next qtr and swap it for an even exchange. MC never thought it was a rev rec problem, but it was a definite problem with customers. Send what you have and swap it later. CPM shipment - AmnioFix was in their contract or AmnioChoice.

**Notes of an interview that took place on or about September 17, 2019, indicate that Carlton provided the following information to criminal authorities, in substance and in part:**

- As a sales person, MC's job was to get a PO. Never heard whether a ROR should be included in the PO.

- BT would say that if you send something that would come back, that's a boomerang sale; that was what OSR did. What mdx did was to send the customer something, hit their revenue #, and then exchange on a no charge exchange. BT said that exchanges are fine bc the customer is still good for the original revenue tied to the invoice and the bill. In this case, Amniovo wasn't available and mdx shipped him epifix. CH was going to keep some of the EpiFix but knew that he was going to swap the prod. From MC's recollection, per BT, exchange was different from returns.

**Notes of an interview that took place on or about November 12, 2018, indicate that Paul Chancey,[6] an employee of Cherry Bekaert, provided the following information to criminal authorities, in substance and in part:**

- 2015 AUDIT
  No confirmation procedures tested for SLR having economic substance separate from mdx. It was based on management's representation. Another piece of CB's understanding of SLR having economic sub came from doing their AR testing and sending a confirmation. SLR was an est comp rather than just something set up to accept mdx sales. Confirm showed SLR was an est business - CB saw SLR as a business and wasn't just going to JM to sign something and also sent confirm to a physical address.

- MMDX_00277093 re SLR.  doesn't remember drilling into this. More about where was MA getting this from.
  Separate economic substance of SLR - CB did not have understanding of this piece bc MA did not want to meet with CB. CB told mgmt they want to discuss/understand w MA where this is coming from. By that time he got attorney. In meeting, CB expressed wanted to meet w. MA but believes MS said that MA wasn't available.

- 4202.00 A/R Substantive testing
  CB-LAPTOP-2014-0000122-125
  (C,32)

---

[6] Mr. Chancey is represented by Paul Childress, Jr., Esq., in-house counsel for Cherry Bekaert.

CPM did not return their confirm - no understanding why.
CPM not responding - CB would send another confirmation. Normally sends two confirms. CB at mercy of customer taking time to fill out confirm and responding back to CB. Instead of getting a confirm, rely on subsequent receipts.
Disputes btwn MDX and CPM - not aware at this time. Didn't personally ask anyone including @ MDX why CPM did not respond.

**According to representatives of King & Spalding, in or about April or May 2018 John Cranston,[7] a former MiMedx employee, provided the following information, in substance and in part:**

- Taylor's 2016 revenue recognition memo. Cranston had no input. Memo was "written by the wrong person."

**Notes of an interview that took place on or about June 17, 2019, indicate that Cranston provided the following information to criminal authorities, in substance and in part:**

- To the extent that they were able to assess collectability, the revenue would be booked. Assessed collectability by running D&B (dunn and Bradstreet) for new customers. Beyond that, they looked at history. The history was bad debts.

- Discussions w MS, LH, TK (involved in drafting the agreement) - how to properly bookkeep the $200k pymt. Was it to be considered as a discount to a distributor and thereby debiting the revenue or reserve. Or should it be booked as a consulting agreement.

- Understanding that MB was going to do w/e it was said in the consulting agreement to receive the $200K. Believes there is a specific agreement that talks about specific duties, requirements. JC didn't get into discussions w anything about what he was going to do. Understanding was that MB was going to be earning the money; learned from reading the agreement. Discussion about what MB was going to do to earn the money - doesn't believe so.

- JC believes he raised if it should be booked as consulting or reduction to revenue thru reserve or directly against revenue. JC wasn't sure what the proper bookkeeping was. JC knows there were discussions with MS, LH, TK and auditors to make sure they booked it correctly.

- Nature of discussion w MS - consulting expense or reduction of revenue. Ultimately decided as consulting expense.

- JC understood MB was going to do some kind of consulting work. There was no link to JC's understanding for this pymt and purchase of prod. JC wanted to see if this

---

[7] Mr. Cranston is represented by Clay Wheeler, Esq. of Kilpatrick Townsend & Stockton LLP.

would be a discount to prod or if there were separate distinct actions that took place. JC doesn't recall exactly when or how he learned about the agreement. It was ultimately deemed that the proper bookkeeping was to be recorded as consulting. In JC's mind this had nothing to do with a future purchases.

- JC doesn't know what gave rise to the lvl of knowledge he had that raised the question to his mind. Trigger to bring up concern about pymt of $200K and offsetting revenue - if it was just an add'l discount given to a distributor, that would have given JC an understanding that it should have been a discount. MB's relationship as a customer is what triggered JC to question the appropriate treatment. In other words, the consultant was an individual who worked for a company (CPM), a purchaser of mdx prod. JC understood MB was the president of CPM. When consulting arrangement was reached - just before the end of the quarter. Did not raise concern in JC's mind. Knows CPM purchased product in that quarter. Reaction - JC didn't consider the two were linked. The group reached a consensus that this pymt was a consulting pymt. There was a question of whether it was a discount of past business. The timing of was not a factor JC considered. The factor in JC's mind was that it was a pymt that needed to be investigated.

- Believes it was mostly TK and LH who drafted the agreement together. JC recalls that bc the arrangement was w MB, as an individual, and they were separate duties nothing to do w the distrib agreement, the decision was made to book it as consulting.

- Doesn't remember if he spoke to MS one on one or in a group.
  Believes MS made ultimate decision for pymt not to reduce revenue.
  LH's input - MS LH and JC worked together on a lot of things and wouldn't be unusual for LH to have input. They also got input from the auditors. JC doesn't remember specifically speaking to auditor, but bc of the timing of the pymt (paid at end of qtr), and would have come up in auditors review of subsequent pymts at the end of a qtr, and it was sizable enough. JC believes he had convo with auditor. Would have been one of two or three auditors.

- Discussion w CB about $200K pymt - can't seem to recall specifics but thinks he did. Would have been audit senior or audit manager. JC had lots of conversations with them, but can't be 100% certain he had convos about it. It makes sense that CB should have seen the consulting agreement. Typically these would be brought to their attn. Not 100% certain they saw it. The responsibility would have been on legal and finance for new agreements (CB made these requests for new agreements). Thinks assistant in legal or someone in accounting who would have requested for a copy from legal, Barry Schwartz from accounting. JC responsibility to bring agreement to auditors attn thru Barry. JC signed mgmt rep letters indicating in connection w the audit saying all material contracts have been disclosed. Facts that $200K MB pymt was brought up to CB - JC has recollection of having a discussion with CB and the funds leaving the co would have been on CB's radar screen. CB

looked at all subsequent pymts over a certain amt over a period of time to make sure they were properly accrued.

- Focus of analysis when dealing w someone who is both principal of co and a separate consultant - In JC's mind, was this an agreement for something outside of the distributor relationship; and it was yes. Was this a discount or was this something else related to the relationship. JC remembers they looked to the agreement, what it stated, and had no reason to believed it wasn't what was contemplated. There might have been other discussions, but JC doesn't recall.

- MMDX_00065676:  This does not give JC a sense of when exchanges took place. Doesn't know if this email is referring to a product purchased in June, but it might seem to indicate that. This email did not raise any concerns for JC. No recall of having discussions with BT about exchanges.

- MMDX_00665856:  2 a)Doesn't refer this as a contingent payment. JC reads this as a reference to the tender they already had. B is irrelevant bc they already had the tender. Not being able to sell it didn't seem to be an issue bc they already had the tender and prod was already shipped.

- What accounting did to be satisfied the $4.5M shipped to SLR was collectable - pulled a D&B of the co and JC recalls MS having specific discussions w sales mgmt about the co (BT and PP). Believes under the basis of those convos that MS felt comfortable that the shipment of products to SLR were collectible an the time they were recognized.

- Effort to link purchase with the anticipated acquisition -
  No recall of discussions about that. If neg for the sale involved stb buying more than they otherwise would, under the assurance that they were going to be purchased anyways, JC doesn't know if that would have any bearing on the propriety of the recognition of revenue from the Q3 sale. Would need to review what the white paper said and what the timing was. Would have required further investigation on JC's part.

**Notes of an interview that took place on or about July 18, 2019, indicate that Cranston provided the following information to criminal authorities, in substance and in part:**

- Factors relevant to JC - Was it a dollar for dollar exchange. There are other factors such as the returns and allowance reserve. And depending on the size. If rev had never been recognized in the past bc of rtns and allowance provision. It may be problematic if in an extreme case: if there was an agreement that a distributor wanted a different product bc the seller didn't have the product they wanted, but there was an agreement to take product available now and exchange it later. Could impair the revenue at the time of the sale.

- JC may have at some point advised someone in mdx mgmt, that as long as it had a dollar for dollar exchange, it would have no impact on revenue. It was in the context at the time of the exchanges.

**Notes of an interview that took place on or about April 9, 2019, indicate that Rick Creese,[8] an employee of Cherry Bekaert, provided the following information to criminal authorities, in substance and in part:**

- MA concerns about distributors -
  Knows MA had concerns, but RC's understanding from his team was that MA had convos w MS, but after that convo RC understood that MA didn't have any further concerns. PC told RC this. PC describe MA's concerns - PC indicated that MA thought that some of the revenue may have been recognized too early. Believes the WPs and K in '15 would show that the lvl of rtns were insignificant.

- RC understanding that bc SLR was startup customer, mdx was going to provide flexibility on collectability. RC doesn't know what the source of the funds were. RC learned thru engagement team. Not sure what the parameters where. If it was more than a year, it would raise concerns for RC.

**Notes of an interview that took place on or about March 19, 2019, indicate that Mark Diaz,[9] an employee of MiMedx, provided the following information to criminal authorities, in substance and in part:**

- MMDX_00212335
  In terms of the revenue recognition issue, he does not know what issue was being discussed here, but it looks like it would have been around the time they took away EpiFix. DIAZ said the exchange could be for different sizes. He is concerned that if they do not do something it will create a revenue recognition issue. He does not think there is a revenue recognition issue if they are doing an exchange. If they use one inventory, they can get an RMA number and they will send out an equivalent product which they can exchange. You can use different sizes on the same wound, either a bigger size or several smaller sizes. Sometimes, they are out of a product a customer wants. At the end of a quarter, if they were out of a product they could use a different product and then exchange it for another product. They would do that at the end of the quarter so they could hit their revenue numbers. Their inventory levels fluctuated, so as they got past the on again and off again hiring when they went direct. This would not happen all the time, but it would happen some quarters if they needed it to meet the numbers. This was done to meet sales targets and he does not think it created a revenue recognition risk. They received a PO and sold products. They would say, "Take 50,000 of this product and test your network." He was never told it created a revenue recognition issue when the customer got an alternate

---

[8] Mr. Creese is represented by Paul Childress, Jr., Esq., in-house counsel for Cherry Bekaert.

[9] Mr. Diaz is represented by John Hillibrecht, Esq. of DLA Piper LLP.

product they could exchange at a later date. All sales are final, but if the customer could not move a product in their market, they could exchange it. Nobody ever told him that arrangement created a revenue recognition risk.

- DIAZ said CPM, Arthomed, and Alphatec were not necessarily offered an exchange as far as he knows.

- There could have been quarters when MiMedx would not have made revenue goals without exchanges. Offering an exchange helps sale products.

- Regarding financial and non-financial returns, DIAZ said a financial return has a direct hit on company financials. He said an RMA would be a credit. DIAZ said non-financial returns would be zero dollars. DIAZ said the accounting department made the decision whether something was a financial or non-financial return. He said nobody on this email made the decision for financial or non-financial returns.

- DIAZ said in terms of the CPM replacement product in August, that they probably had low inventory levels and they did not want to be in an out of stock situation. He said he has no idea if auditors were aware of exchanges and he has no idea if these exchanges were being hidden from auditors.

- DIAZ said that TAYLOR knows customers could exchange their product later. He said TAYLOR was the person who made that decision. DIAZ said that since it is a return, any returns of substance would have to be approved. If it is a non-financial return, he is not sure. DIAZ said RMAs were at signature levels. He said even with a non-financial exchange, there would be repackaging, so there was communication flowing through the company because it impacted inventory levels and schedules would be reconfigured. TAYLOR knew that customers knew about non-financial returns. They had conversations about it. He would say, "Company xyz wanted to exchange the product," and they would decide if they would exchange all or half depending on the situation. DIAZ said TAYLOR would give the approval. TAYLOR generally knew that customers were being sold the option to exchange in order to sell at the end of the quarter. He does not know what PETIT knew. DIAZ said he assumes SENKEN or John CRANSTON in accounting would know because it had a financial impact. There were meetings he now recalls where both TAYLOR and PETIT were there and exchanges were discussed. It could have been, do your best effort to sell to the market, but if you cannot move it we can exchange it.

- MMDX_00212335
  DIAZ said this is a potential revenue recognition issue. When the quarter would close, it would go silent from Accounting and they would not hear the numbers until the press release came out. The numbers would be different than DIAZ expected and Accounting, usually Mike or John, would say they had to take off things which caused their numbers to be lower. DIAZ sad the Q2 exchange is the portion of product shipped at end of the second quarter that they anticipate will come back in the third quarter. DIAZ said there was inventory requested that MiMedx did not have

in stock. DIAZ said he assumes the "Bill" referenced in this email refers to Bill TAYLOR. DIAZ said again that he thinks it would be Bill TAYLOR. He is flagging this return as a revenue recognition issue. He does not recall having a discussion with Brent and he did not talk about this with anyone else. Once the quarter is over, it is in his rearview window, but he does have to think about exchanges in the next quarter.

- DIAZ said in this email they are saying not to ship it all in order to manage their inventory. When he got this email, he would not think something was funky. He never thought the company was doing something funky. DIAZ said he does not recall other emails about auditors looking at the books. He does not recall emails about not sending emails about this. He does not recall getting this email. He does not recall the transaction other than what is in the email. He does not have any memory of receiving this email at the time. He does not recall opening his email and reading this email.

- MMDX_00662008
  This practice he is referring to is when they shipped a mix of products at the end of the quarters when they did not have what the customer needed. They did this in order to meet numbers. DIAZ said it is his understanding that Accounting generally knew this was happening.

**Notes of an interview that took place on or about January 22, 2019, indicate that Alexandra ("Lexi") Haden,[10] a former MiMedx employee, provided the following information to criminal authorities, in substance and in part:**

- LH recalls in Fall of '15 that MA came to her regarding issues. LH didn't notify anyone bc it wasn't significant. LH recalls this bc her mind that he just started and there was a lot of facts that he didn't know.

- Recalls MS saying that couple things MA alleged is not right. MS said that MA had raised issues by talking to JC and Al Evans, but not in the sense that there was an issue - more about asking Q's about things. JC & Al explained to MA that there was more facts that MA didn't know about and MA seemed satisfied w the explanation he got. MS expressed he was surprised bc this came out of the blue to MS bc he felt they already discussed why what MA brought up weren't accounting issues and he is bringing up these issues again.

**Notes of an interview that took place on or about May 21, 2019, indicate that Haden provided the following information to criminal authorities, in substance and in part:**

- PP told LH about MB being upset about losing his stock options. Reason for new consulting agreement - trying to put back in place the original arrangements. He was

---

[10] Ms. Haden is represented by Jamila Hall, Esq. of Jones Day.

a distrib and was providing mkt intel services and MB wanted to be compensated for it.

- Section 3: Compensation
  Pg 248 to 249
  "There will be a $200,000 one-time consulting fee, to be paid to MB on or b4 June 30th"
  PP and BT specified this term. $200K one-time fee paid on or b4 June 30th - LH recalls that there was the issue that MB losing his options and making a big deal that he did all of this work and now he basically did it for free and it wasn't fair. Thinks the $200K was to make it up to him for taking the options away and moving forward, not give any more stock and just give cash to people. The only reason mdx gave stock originally was bc they didn't have a lot of cash and now that they had cash they can give cash. Thinks the 200K came up as a way to make up for the stock that MB lost.

- There was a cover email where BT questioned MB getting stock and $200K and PP was referencing to MB's complaint that he lost money when mdx signed a GPO contract. LH understood PP was saying that they're giving him $200K to make up for the GPO contract and re-instate stock for the stock mdx took from him. LH understood the $200K was to make up for the GPO issue. GPOs signs up hospitals and hospitals decide whether they want to participate in contract. It doesn't mean the hospital can't purchase from others bc they are a member of a GPO, but you typically get better pricing when purchasing off of a GPO contract. MB didn't have GPO contract and had contracts w individual with hospitals who happen to be members of the GPO. When MDX entered into an agreement w the GPO, mdx's pricing/incentives thru the GPO contracts made the member hospitals realize it would be more beneficial to buy directly from mdx rather than a distrib for mdx. So it cut MB out.

- As of June 26, 2015, consideration to give $200K pymt - they had a situation where each party had a gripe against each other. Mdx wanted the consulting services. MB wanted to be made whole. There was also the distrib agreement that is also in the mix. Between everything in the consulting agreement and distrib agreement, these agreements represented everyone's gripe being resolved. Looking back on it now, the $200K should have been pulled out and it should have been a settlement agreement. LH thinks she missed it. It was sloppy and things were going fast.

- In LH's mind understood the $200K represented payment part in parcel for making up for the GPO. LH believes this pymt probably didn't end up going towards consulting services. This agreement was a consulting agreement bc mdx was restoring MB back to the arrangement b4 he was terminated where there was a distrib agreement and consulting agreement. LH thinks they got off track bc the deal kept changing. At some point, the concept of giving $200k got thrown in and it should have been a settlement agreement. It would have been LH's job to stop it. LH thinks she just missed it.

- Doesn't think anyone asked for it to be styled as a consulting agreement. That's just the way it went.

- Connection between $200K pymt and desire to get MB to buy prod in Q2- did not see it this way. If you have 2 parties who have gripes and reconcile, there is some tit for tat.

- MB say to PP that if he was going to do order it needs to be for $200k less - not to LH's understanding.

**Notes of a phone conversation that took place on or about May 31, 2019, indicate that counsel for Brent Miller,[11] a former MiMedx employee, provided the following information to criminal authorities, in substance and in part:**

- Not aware at time that Petit and Taylor were engineering a fraud.  They were aggressive and hard driving.  Helped speed up product approvals.  He relied on internal investigations. Some things are dawning on him in retrospect.

- Email (MMDX_00212335) – he thinks he was parroting something Taylor said.  Not the subject of lot of reflection

**Notes of an interview that took place on or about March 20, 2019, indicate that Jerry Morrison,[12] a MiMedx distributor, provided the following information to criminal authorities, in substance and in part:**

- Volume of storage space did not determine the size of the order JM placed w mdx. Took measurements of freezer bc he knew they were going to buy a healthy order, but god forbid you get the frozen product and can't fit it in the freezer. The max SLR ended up ordering fit in the freezer. Thinks mdx had a lot of vials, but not sure how much. Thinks mdx would have had a limit on how much they were willing to sell to someone. JM didn't have a history as a distributor.

- SLR bought $4.5M in Sept 2015 w a net thirty - thought he could pay it off by hustling.

- JM wanted it all if he was going to be the exclusive distributor for oflo nationwide he knew he needed to get a good deal, have a lot of inventory, be flexible w customers and pump it out.

- JM understood PP didn't know the details of the loan. PP knew it existed, but didn't know the terms of the loan (interest rate, time rate). PP told JM he didn't know.

---

[11] Mr. Miller is represented by Jeffrey Brown, Esq. of Dechert LLP.

[12] Mr. Morrison is represented by S. Michael McColloch, Esq. of Dallas, Texas.

- CONSULTING - Flew up to ATL a handful of times and got calls in Q4 of 2015. JM was getting calls from regional directors bc they wanted insight w distributors. Mdx was still going to sell orthoflo thru other regional mgrs. RSDs were trying to figure out how to initiate conversations to distributors. Friends w Sean Cronin [sp] and some other guys. Not sure how many times. Could be couple times a week, couple of times a day. In ATL- met w mgrs, targeting new competitors. Biz convos on how to move prod, mkt dynamics

**Notes of an interview that took place on or about July 23, 2019, indicate that Morrison provided the following information to criminal authorities, in substance and in part:**

- JM doesn't have a specific recollection of an advanced agreement w MB for the June 30th sale where he would take possession of product, hold it, and exchange it later. JM doesn't recall a deal like this for any other sales.

- Additional Loan:  No recall having convo with PP. Thinks it was just Todd.  Did not talk to BT about the loans JM got.

**Notes of an interview that took place on or about November 12, 2019, indicate that David Nix,[13] a MiMedx distributor, provided the following information to criminal authorities, in substance and in part:**

- MMDX_00212335

- Discuss Monday afternoon – he can't recall if a meeting ever took place, no memory of meeting or discussion based on this email.

- Inventory rebuild – they sell a lot of product at end of each quarter. Then they have to rebuild their inventory in anticipation of selling it at the end of the quarter again.

- Rev rec issue – he assumed that part was for MARK. He didn't have anything to do with rev rec. he doesn't recall what he was thinking at the time for rev rec issue. In 2015 he had never heard the term channel stuffing. He had heard the term rev rec prior. He doesn't know if he had an impression about this.

- Auditors coming – he had never met with auditors so he didn't know what they were meeting with auditors about specifically. He doesn't know what the auditors were reviewing. He dealt with auditors in December with inventory and that was it. MILLER was expressing concern about the auditors. He didn't think much about this or think it was bad. He thought the customer bought product and then wanted to exchange it. He didn't know if it was right or wrong. He doesn't recall what he understood at the time about this email.

---

[13] Mr. Nix is represented by Christopher LaVigne, Esq. of Sherman & Sterling LLP.

- BILL TAYLOR is the Bill wanting to ship the product. He wasn't part of any discussion of what Bill Taylor wanted to do.

- Later, there was an email in September regarding CPM and what we could do with product they were holding for them for these exchanges. He was told they were no longer doing the exchange and they could sell the product to anyone. He doesn't recall other conversations with PETIT OR TAYLOR. He doesn't think he was part of any meeting or ever sat down with him where this came up.

- August over 2-3 week – this at least included Q2 exchange and could have included epifix. TAYLOR wanted to do it this way – he didn't know why. He doesn't recall discussions on this issue.

- No more emails – he just didn't want any more emails. He thinks he is expressing concern having this memorialized via email. He doesn't recall a specific memory, but he knows he would not have responded via email because the boss asked for no more emails.

- With respect to this email at this time, he doesn't recall what he thought at the time. Today, it seems something suspicious is going on. They shipped product in Q2 and then they took it back and were going to exchange it and MILLER didn't want it to happen now because auditors were going to be looking at the books. Then, his mindset was different. At the time, they weren't being investigated and there were no allegations. So he wasn't thinking about if they were doing things wrong. It made him nervous at the time because he thought there was something he sent in the email chain that the boss didn't want in email.

- He doesn't recall thinking this email was bad at the time. He thinks MILLER said no more emails because of the things he listed. He thinks MILLER didn't want an exchange taking place when auditors were in, but he doesn't know why. He didn't recall these emails until he saw the emails again and prep.

**Notes of a telephone call on or about June 30, 2019, indicate that Jonathan Bach, Esq., counsel for the adult children of Mr. Petit, provided the following information to criminal authorities, in substance and in part:**

- They don't know GAAP accounting.  They are outside of Mimedx.  Nobody told them that giving loan to Morrison would serve accounting purpose.  This was presented to them as interesting opportunity by Pete in November 2015.  It did not strike them as unusual.  They understood from their communications with Pete that they were not alone in being asked to consider this opportunity.  they understood from communications and interactions that they should decide whether to make loan. They were not being pressed into it.

- From the point of view of these six people, this was a bona fide business transaction negotiated at arm's length. They brought in outside professionals to advise them – law firms and accountants involved. Terms were changed even before the first arrangement was reached

**Notes of an interview that took place on or about June 7, 2019, indicate that Jeff Schultz,[14] a former MiMedx employee, provided the following information to criminal authorities, in substance and in part:**

- MB00000323: Swapping products in this qtr - not sure. Swaps - you would send what you had and exchange it out. It was always dollar for dollar exchanges.

- AGREEMENT AT TIME OF SHIPMENT THAT PRODUCT WOULD BE SWAPPED -Not sure. They frequently exchanged product as long as it was dollar for dollar.

- Shipping non-conforming product, concern was not raised. It was just the biz that was done

- The point of the swaps was from the standpoint to hit the revenue number. JS didn't find it strange where mdx sent product to CPM they were not going to sell and send it back the next qtr bc the distrib knew it was going on.

- Convos with PP about $200K - at a party at BT's house. PP asked JS if they were giving stock MB lost bc they cut his contract. Paying him back on stock he lost. PP said that's what he thought it was for.

- MMDX_00209682: "like 'channel stuffing' language" -- CH said to JS something to the effect of he will claim channel stuffing like Brooks told him. JS didn't think there was validity to the comment about channel stuffing. Not sure what he meant by it. JS recalls texting with BT about it. BT told JS he needs to deal with it. BT edited what JS was to say.

**Notes of an interview that took place on or about August 15, 2019, indicate that Michael Senken,[15] a former MiMedx employee, provided the following information to criminal authorities, in substance and in part:**

- Preparation of co's financial statements - PP wasn't very involved. PP was involved on the operational side of the FS, but in terms of prep for the Qs or K, he would not be part of that. The audit committee was more involved in reviewing drafts of Qs and Ks. Joe Bleser was involved in preparation of the financials.

---

[14] Mr. Schultz is represented by Jeffrey Brown, Esq. of Dechert LLP.

[15] Mr. Senken is represented by Christian Everdell of Cohen & Gresser LLP

- MMDX_00566839 --  BT is not an accountant and not a CPA. MS is surprised he is sending out a rev rec memo. It's not something BT should have sent. Not aware if BT reached out to LH and her SEC attorneys for input on this.

- Consulting services MB was providing -
  2015 was the year of moving into sports medicine applications (including oflo and looking into injectable prod). MS believes that, as it was explained to him, primary reason for consulting contract was to get customer info and where several suppliers were selling into for oflo in TX. Doesn't know if MB provided that market intel to MDX with the consulting agreement or even prior to the consulting agreement.

- MS was aware CPM made large purchase in Q2 2015. CPM making purchase from mdx and MB amending his consulting agreement to get greater benefits - wasn't MS's understanding.

- Recalls the $200K pymt to MB. Understands it was for the market data related to oflo. MS would not consider this as a large pymt if it was related to market data especially if it was targeted towards a key growth area for the company.

  MS recalls that the info being provided was bc MB was in the industry in TX. He had specific info related to other competitors where he could provide customer lists. MS heard this from either JC or LH.

- MS's understanding that MB was going to get paid the $200K to provide market intel documentation and in formation. MS doesn't know if MB actually provided this information, but that was his understanding that MB would.

- MMDX_00665869 - No idea why this needs to be kept confidential.

- MS was aware MDX provided freezers to SLR. Believes he became aware of this after the initial shipments were made, in 2015. Mdx didn't provide freezers in the past bc this was the first frozen product.

- Reason to give freezers to SLR - MS thinks it was an indication that mdx was going to partner with SLR as an exciting new opportunity. Also it was natural to do so bc it's a way of building a relationship.

- JM had a minor consulting agreement with mdx. MS is aware of it by seeing an invoice that passed thru his email later in the year.  Services JM was intended to provide - As MS recalled from the invoice, various pieces of info he was providing, it was spelled out in the invoice.  Believes he was paid $20K for 2-3 months.

- Evaluation of company before becoming mdx distributor
  Running D&B reports

SLR was privately held co and there was limited data. Inputs and representations came from the CEO and COO and members of the salesforce speaking about the co's presence in the market place.

- Credit limit determined for SLR - it was established at ~$4.7M around getting and understanding of the size of SLR's biz and if they can support the size of this credit limit. The convo was part of getting background on who they were, their existing distributorship, type of biz SLR was in prior to distributorship agreement w mdx. PP was an entrepreneur was supportive of SLR and endorsing them on their success. Based on size of SLR's existing biz, their credit limit was reasonable. BT PP represented to MS that SLR's existing biz was similar in size to CPM even prior to mdx selling prod to SLR. MS didn't see financials of CPM either, but CPM had a history of buying and paying. MS's understanding that SLR's existing biz was similar in size to CPMs

- Understanding of credit decision and revenue recognition decision - focusing on collectability

- If PP made the credit decision, it's the same as making the decision that it was collectable for revenue recognition purposes. MS said that PP understood the rev rec criteria bc he made it clear he understood it. If PP said he made the credit decision, but it was up to MS to make the rev rec decision on collectability, MS wouldn't agree with that. It was reinforced that for mdx to recognize revenue, they have to be comfortable that collectability is reasonably assured. This decision was made when PP decided to extend the credit.

- PP's motivation to extend credit to a customer -Part of the rationale for going at $4.5M was the sense of urgency in attacking the market in a short period of time. It felt like there were opportunities in the mkt and loading the product in the rep network quickly required that level of purchase. MS got this understanding from BT and PP describing how they were going to go after the market.

- When there is credit limit discussion w any customer, it's an understanding that if they didn't sell thru a single prod, they could still finance the purchase. You get to that by looking at the nature of the biz and the volumes the biz goes thru. This was the discussion. It wasn't the case that this was a new distrib, didn't have any biz, and didn't have financial backing.

- In the mind of the ppl who entered in the agreement w JM, it was a longer pymt term than 30 days. It's impractical for anyone to believe there was a 30 day term on a $4.7 M purchase. It was a mistake in the paperwork that wasn't contingent upon anything. As a biz practice and the relationships mdx had with other distributors, they didn't have distrib agreements that were 30 days. The invoice followed the agreement, and accounting didn't check to confirm these terms. When you're moving as quickly as mdx did and paperwork not catching up with intent of the agreement, this is what happens.

- This is purely the paperwork being rushed thru and not coinciding with the intent was and not being consistent w past practices. It's obvious there should have been more due diligence in reviewing the final contract to ensure the proper pymt term was defined.

**Notes of an interview that took place on or about November 13, 2018, indicate that Mathew Urbizo,[16] a Cherry Bekaert employee, provided the following information to criminal authorities, in substance and in part:**

- CPM - Reserved against revenue any outstanding rev for CPM. Probably not going to get paid and decided to reserve against rev. PP, MS, JC, PC, MU @ meeting. Saying terminating under clause of contract. More trouble than they were worth. Main issue was they were selling outside of their territory and PP didn't want to deal w them anymore and cause prob w other customers.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

by: _____/s/_____
     Edward Imperatore
     Scott Hartman
     Daniel Tracer
     Assistant United States Attorneys
     (212) 637-2327/2357/2329

---

[16] Mr. Urbizo is represented by Paul Childress, Jr., Esq., in-house counsel for Cherry Bekaert.