```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          19 CR 850 (JSR)

PARKER H. PETIT and WILLIAM
TAYLOR,

            Defendants.                 Conference
------------------------------x

                                        New York, N.Y.
                                        January 23, 2020
                                        2:15 p.m.


Before:


                    HON. JED S. RAKOFF,

                                        District Judge

                       APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  SCOTT A. HARTMAN
     EDWARD A. IMPERATORE
     Assistant United States Attorneys

FRESHFIELDS BRUCKHAUS DERINGER US LLP
     Attorneys for Defendant Petit (Via Telephone)
BY:  ERIC BRENDAN BRUCE
     ALTIN HERBERT SILA


QUINN ENNAMUEL URQUHART & SULLIVAN, LLP
     Attorneys for Defendant Taylor (Via Telephone)
BY:  WILLIAM WEINREB
     MICHAEL PACKARD
```

1                    (Case called)

2             THE DEPUTY CLERK:  Will the parties please identify

3       themselves for the record, and everyone else may be seated.

4             MR. HARTMAN:  Good afternoon, your Honor.  Scott

5       Hartman and Edward Imperatore for the government.

6             MR. PETIT:  This is Parker H. Petit.

7             MR. BRUCE:  Good afternoon, your Honor.  Eric Bruce

8       and Altin Sila on behalf of Mr. Petit, who is participating by

9       telephone.  And we wanted to thank your Honor for that

10      accommodation.

11            MR. WEINREB:  Good afternoon, your Honor.  William

12      Weinreb and Michael Packard on behalf of William Taylor, who is

13      also participating by phone.

14            THE COURT:  So I had asked defense counsel if they

15      wanted to waive their clients' personal appearance here today,

16      which they both did, to provide the Court with a written

17      statement that they had fully discussed that with their clients

18      and that their clients waived their personal appearance.  But

19      neither counsel complied with that direction.

20            Then I got a request that they appear by telephone.  I

21      granted that request on the following condition:  That, number

22      one, experience has shown me that when people are on the

23      speaker phone, they will often not hear everything that's said.

24      Too bad.  Any objection to that is waived.

25            Second, they will not be able to speak whatsoever, and

1   of course they can't consult with their counsel because their

2   counsel and they are not both here.

3           So I take it, counsel, that that is still agreeable to

4   counsel?  Or shall we just put this over till they can be here

5   at maybe 6:00 p.m. today?

6           MR. BRUCE:  It's acceptable to us, your Honor.  The

7   sequence of events -- we do have a letter --

8           THE COURT:  Let me see the letter.

9           MR. BRUCE:  Certainly, your Honor.

10          THE COURT:  You were supposed to provide it prior to

11  today's hearing.

12          MR. BRUCE:  I apologize, your Honor.  I didn't

13  understand you still needed it when they're going to be

14  participating by telephone.

15          THE COURT:  It's not the same when they're

16  participating by telephone.  They can't consult with counsel.

17  They may or may not hear everything.  But I was happy to

18  accommodate their request.

19          MR. WEINREB:  Your Honor, may I approach and provide a

20  letter as well?

21          THE COURT:  Yes.  Let me see it.

22          These are in acceptable format.  I'll give them to my

23  courtroom deputy to docket.  In the future, I don't expect such

24  noncompliance.

25          MR. BRUCE:  I understand, your Honor.  We didn't mean

 1    to non comply.  I apologize.

 2         THE COURT:  Now, there have been some discovery

 3    disputes raised.  So let me hear from the government.

 4         The first one relates to a company called MiMedx.  I'm

 5    not sure how it's pronounced.  In that connection, my law clerk

 6    received a telephone call from the government and counsel from

 7    Sidley & Austin on behalf of MiMedx earlier today saying that

 8    in MiMedx's view, some documents had been filed as part of the

 9    defense motions that were protected by work product privilege

10    or the like.  And they wanted to move to exclude them from the

11    public record.

12         Now, I was informed -- but maybe the government can

13    speak to this -- that the government and MiMedx counsel were

14    unable to reach defense counsel who otherwise obviously should

15    have been on that call.

16         Is that correct?

17    MR. HARTMAN:  Your Honor, we received a call from

18    MiMedx, which is the company where Mr. Petit and Mr. Taylor

19    worked that's at issue in this case earlier today.  And they

20    raised concerns about whether certain of the documents that

21    were attached to the motion were work product protected.

22         They then sent an email to all counsel in this case

23    requesting that counsel get on the phone and call the Court.  I

24    think their concern was that under the case law, there's a

25    requirement that a party who's attempting to claw back

documents act with diligence to alert parties to the fact that

they're asserting a claim of privilege over those documents.

THE COURT:  No.  But my question is -- I understand

that -- why weren't they on the call?  Why weren't defense

counsel on the call?

MR. HARTMAN:  Your Honor, there was an email that went

out to all counsel.  I think about 20 or 30 minutes passed, and

we didn't receive a response.  We didn't send the email.

MiMedx counsel sent the email.  And they asked if we would call

the Court with them.  We were available.  So we agreed to do

that.

THE COURT:  Is someone here by any chance from Sidley

Austin?  No.

Now that I hear what you're telling me, it's not clear

to me that Sidley Austin made adequate attempts to reach

defense counsel.

These are two large firms.  It's almost impossible

that they couldn't have had someone who would be available for

a conference call.  So that was a blatant violation of my

individual rules, which the government participated in.

MR. HARTMAN:  And we apologize for that, your Honor.

THE COURT:  I'm hearing a lot of apologies today.

What I'd rather hear is compliance with the rules.

MR. HARTMAN:  Understood.

THE COURT:  In any event, I sent an email -- my law

1    clerk sent an email at my request to all counsel, which you may

2    or may not have received yet since it was just shortly before,

3    where MiMedx will put in a letter explaining their position by

4    no later than close of business.  So midnight today.

5         Counsel for the parties will have until close of

6    business Monday to respond in writing, if they wish to.  I'm

7    very skeptical that I allow those -- I haven't looked at those

8    letters.

9         But when we're talking about work product, what

10   litigation is MiMedx involved in now?

11        MR. HARTMAN:  Your Honor, are you asking the

12   government?

13        THE COURT:  Well, there's no one here from MiMedx.  I

14   thought you might have some information.

15        MR. HARTMAN:  So, Judge, we haven't seen the letter.

16   We don't have a position on the merits of the clawback.

17        THE COURT:  I know it's not the usual.  I'm just

18   asking because I was, needless to say, not on that phone call.

19        Do you know what grounds MiMedx has for asserting work

20   product?

21        MR. HARTMAN:  So, Judge, I know generally.  I haven't

22   looked closely at the cases.  But I know that -- it has been

23   proffered to me that there are cases that hold that auditor

24   work product can come within the scope of the attorney work

25   product doctrine, if the auditors are working with attorneys.

1          THE COURT:  I, of course, will consider anything

2     anyone presents to me.  My general view, as Wigmore said over a

3     hundred years ago, that these privileges should be narrowly

4     construed because they conflict with the public's right to

5     know.

6          And of all the doctrines -- it's not really even a

7     privilege.  It's properly called the doctrine of work

8     product -- is among the most defeasible.  And from what you're

9     telling me, it's an attempt to glom on to someone else's work

10    product or privilege.  So all that strikes me as dubious on its

11    face, but I still have an open mind on the subject.

12          Now let's turn to the motions that have been made.

13    The first one is to produce all correspondence and

14    presentations received from MiMedx and its counsel concerning

15    this matter and disclose the extent of DOJ and SEC's

16    involvement in MiMedx's internal investigation.

17          So what does the government say about that?

18          MR. HARTMAN:  Your Honor, we would oppose that motion.

19    This material is not subject to Rule 16.  It's not Brady.  It's

20    not Giglio.

21          THE COURT:  Or even Giglio as Mr. Giglio pronounced

22    his name.

23          MR. HARTMAN:  Yes, your Honor.  Sorry about that.

24          Judge, the motion is a little light on the law.  As

25    far as we can tell, what the defendants are attempting to do is

1    develop evidence that would support a *Garrity* claim along the

2    lines of what Judge McMahon looked at in the *Connolly* case.

3          THE COURT:  Yes.  I'm sure those were the origins of

4    the request.  But as that case well illustrates, sometimes

5    there are very serious legal issues involved.

6          MR. HARTMAN:  That's absolutely true, Judge.  What I

7    would say about that case versus this case is that even on the

8    evidence that the defendants cite to support their discovery

9    motion, *Connolly* couldn't be any more different than what

10   happened here.

11         The internal investigation here began before the DOJ

12   got involved at all.  Our first meeting with the audit

13   committee counsel was in the summer of 2018.  Our understanding

14   is that the internal investigation began in February of 2018.

15   So it began much before.

16         The SEC had sent a subpoena in 2017 to the company.

17   But in 2017, no internal investigation was commenced.  Our

18   understanding is that the reason that an internal investigation

19   was commenced in February of 2018 was that the auditors, Ernst

20   & Young, had raised concerns about the financials of the

21   company.

22         They were new auditors.  They came in to audit the

23   2017 10-K, and they refused to sign off on the 2017 10-K.  And

24   that sparked this investigation that looked into the company's

25   revenue practices.  So those are the facts --

1          THE COURT:  Are there going to be any witnesses from

2     MiMedx at the trial?

3          MR. HARTMAN:  Your Honor, we do intend to call

4     witnesses from MiMedx at the trial.

5          Another thing that distinguishes this case from the --

6          THE COURT:  So when you call these witnesses, what

7     kind of discovery are you going to make available in terms of

8     those witnesses?

9          MR. HARTMAN:  Judge, we intend to produce their 3500s

10    for our meetings with them.  There were also, for certain

11    MiMedx witnesses, downloads that we received from the audit

12    committee.

13         Those were memorialized by the U.S. Attorney's Office

14    or its staff.  And we would produce those as 3500 material or

15    Jencks Act material of the witnesses.  Those are hypothetical

16    summaries of what the audit committee expected the witnesses to

17    say, but we treat those as prior statements of the witness.  So

18    we would produce those.

19         But I think it's important to emphasize a thing that

20    distinguishes this case from the *Connolly* case.  Judge McMahon

21    in that case took issue with the fact that the government

22    really couldn't show that it had conducted its own

23    investigation, separate and apart from what the audit committee

24    had done there or the internal investigation had done.

25         This case is miles away from that.  We received

1    presentations from the audit committee from 2018, both in the

2    summer and in the fall.  We didn't bring charges for a year and

3    a half after that.

4         In the interim, we interviewed over 50 witnesses.  We

5    conducted 70 interviews.  We reviewed thousands and thousands

6    of documents.  Of the documents we reviewed and the witnesses

7    we spoke to, there were witnesses and documents that were not

8    available to the audit committee.  In particular, we spoke to

9    representatives of the counterparties who had not spoken to the

10   audit committee.

11        We also, as the defendants note in their filings,

12   obtained search warrants and conducted reviews of electronic

13   evidence.  That information was not available to the audit

14   committee.  They didn't rely on that information in reaching

15   their conclusions.

16        So it's not in any way the case that we were just fed

17   information and adopted that and that became the basis for the

18   charges in this case.  In fact, the government conducted a

19   wide-ranging investigation over a long period of time, spoke to

20   many witnesses, obtained a lot of additional evidence.

21        It's true that there are some allegations that are the

22   same as the issues that were brought to light by the audit

23   committee, but that's no different than a bank that reports to

24   law enforcement --

25        THE COURT:  And of course nothing stops the defendants

1   from subpoenaing from MiMedx whatever materials they think

2   MiMedx should provide.  MiMedx may want to oppose those

3   subpoenas in part or in whole.

4         But it's not as if the underlying documents of MiMedx

5   are not at least potentially available to defense counsel.  So

6   as near as I can see -- but I want to hear now from defense

7   counsel -- based on the representations that were just made by

8   the government, I'm not sure why I should grant this motion.

9         MR. BRUCE:  Well, your Honor, here's why:  As I just

10  understood what Mr. Hartman said, the government plans to

11  produce most of what we've asked for anyway as Jencks Act

12  material, depending on how the trial unfolds.  We think there

13  are serious constitutional issues here under *Garrity* as

14  your Honor referenced.

15        THE COURT:  The point is the government has

16  represented that this was an independent investigation that had

17  none of the special circumstances of *Garrity* that made

18  Judge McMahon believe that -- I think it was Paul, Weiss in

19  that case -- was acting at the government's direction and

20  behest.  That was the underlying fact on which her opinion was

21  premised.

22        Now, if you want, we can get affidavits from the

23  government.  But assuming you don't need that, based on the

24  representations just made, there is nothing like that here.

25        MR. BRUCE:  Well, your Honor, certainly Judge McMahon

1    talked about her view of the government's investigation, that

2    it was really, you know, nonexistent and just a piggyback on to

3    the company's own investigation.

4            Really the critical issue, as I see it, is did the

5    government direct the company's investigation in any way in

6    terms of saying, go into Mr. Petit or look at this issue with

7    respect to Mr. Petit.

8            THE COURT:  I agree.  Let's find out the answer to

9    that.

10           I'm sorry.  We'll come right back to you in a second.

11           What's the answer to that?

12           MR. HARTMAN:  Your Honor, we didn't do that.  And

13   in fact --

14           THE COURT:  Did you at any point -- you were in charge

15   of the investigation?

16           MR. HARTMAN:  Mr. Imperatore and I and our colleague,

17   Mr. Tracer.  Yes, your Honor.

18           THE COURT:  Did you at any point say to MiMedx or any

19   of its representatives or counsel, you ought to question X, or

20   you ought to take a look at document Y, or anything like that?

21           MR. HARTMAN:  No, your Honor.  In fact, we've

22   disclosed that fact to defense counsel in response to a request

23   that they made for information along those lines.

24           THE COURT:  You can be seated.  I know you want to say

25   more, and you will be given that opportunity in a minute.

1          Back to defense counsel.  Again, we could, in theory,

2     require the AUSA to submit a sworn affidavit saying what he

3     just said.  I don't see any need for that.

4          Given what he just said, why isn't that the end of the

5     story?

6          MR. BRUCE:  A couple reasons.  Your Honor, first, the

7     SEC was also actively involved in this investigation.  So it's

8     part of the same federal government.  So the same issues would

9     arise.  If any of the attorneys or investigators involved in

10    the SEC made any requests to MiMedx --

11         THE COURT:  Do you have any reason to believe that's

12    true?

13         MR. BRUCE:  I don't have a specific factual basis,

14    other than the high degree of coordination we've seen and

15    outlined in our brief between the company's outside counsel and

16    both the SEC and DOJ which I think at least gives rise to the

17    question were there any instructions coming from either agency,

18    the SEC or the DOJ, back to MiMedx.

19         THE COURT:  Who was the outside counsel involved at

20    that stage?

21         MR. HARTMAN:  For the company, your Honor?

22         THE COURT:  Yes.

23         MR. HARTMAN:  With respect to the audit committee

24    investigation, your Honor, King & Spalding was their attorneys.

25    And then the company was represented separately by Dave Rody at

1  Sidley Austin.

2           THE COURT:  Let me ask the government:

3           Would you have any objection to the defense

4  propounding some tailored interrogatories, a handful of

5  interrogatories, asking questions similar to the ones I just

6  asked you?

7           For instance, did you, the representative of the

8  company at the relevant time, receive any instructions from the

9  SEC?

10          Did you receive any specific requests to interview X

11 or to inquire beyond what you had already independently

12 inquired?  I'm not getting the exact wordings, but you get the

13 idea.  I would think no more than six such interrogatories max.

14          Any objection to that?

15          (Government counsel conferred)

16          MR. HARTMAN:  Judge, before I answer that, if it's

17 okay, I'd just like to point out one thing, which is as I

18 understand the ultimate issue here or the motion that would be

19 teed up by this discovery request, the defense wants to make an

20 argument that the white paper that they submitted to the audit

21 committee was compelled under *Garrity* and *Connolly*.

22          And the one thing I would just note on that is that

23 Exhibit J to their motion is notes of a conversation between

24 King & Spalding and Ernst & Young.  This was produced by Ernst

25 & Young.

1          In that document, it's clear that they haven't yet met

2     with the SEC and the government to discuss the findings of the

3     internal investigation.  But it does reference the audit

4     company's efforts to obtain statements from Mr. Petit and

5     Mr. Taylor.

6          What it said about that -- here is the issue.  This is

7     at page 2 of Exhibit J:  "A big issue with the board was the

8     due process, giving Pete Petit and Bill Taylor a chance to be

9     interviewed with regards to a response to regulatory issues.

10    We've been briefing the committee on these issues weekly.  We

11    need to do that briefing with E&Y."

12         But it's clear from that, in our view, Judge, that

13    what was motivating the audit committee, in terms of their

14    efforts to obtain a statement from Mr. Petit and Mr. Taylor,

15    was a desire to make sure that they had a sufficient

16    opportunity to be heard on these allegations that were the

17    basis, both for their termination, which had already occurred

18    before July 16, and also efforts to claw back their

19    compensation or just terminate their going-forward

20    compensation.  So I think that actually addresses this issue

21    head on.

22         To the extent there's any evidence one way or another

23    on this issue, the evidence that's in the record points in

24    favor of an independent decision by the audit committee to

25    obtain --

```
 1                 THE COURT:  Let me go back to defense counsel.

 2                 MR. BRUCE:  Your Honor, I disagree with Mr. Hartman.

 3      What's in the collective minds of the board as to interviews is

 4      totally irrelevant.  They could have wanted to interview

 5      Mr. Petit for their own purposes.

 6                 But if any government actor also directed them to do

 7      it, we have the same issue, and we're back in the same place,

 8      regardless of whatever reasons the board may have had.

 9                 THE COURT:  Yes.  If the government directed them to

10      do that.

11                 MR. BRUCE:  Or encouraged.

12                 THE COURT:  I'm not sure about "encouraged."  I think

13      that is a closer question.

14                 Let me hear from your colleague, if he wants to be

15      heard on this issue.

16                 MR. WEINREB:  Thank you, your Honor.  I'll defer to my

17      co-counsel on this.

18                 MR. BRUCE:  Your Honor, a couple things.  Mr. Hartman

19      also didn't really answer your question about propounding

20      interrogatories to the company.  If that's the route your Honor

21      wants to go, it would also be wise I think to propound them to

22      the SEC.

23                 THE COURT:  Of course.  The only thing that's even

24      giving me any pause, because from what I'm hearing from the

25      government, I think this motion is probably not sufficient to
```

1    warrant discovery, except that we have no one here from the

2    SEC.  We don't know what they may have done.

3            So here's what I think makes sense:  Defense counsel

4    should draft and submit to the government plus the SEC -- and

5    I'll leave it to the government to apprise the SEC of what's

6    going on here -- no more than six limited interrogatories of

7    the sort that I have somewhat inartfully indicated.  The

8    government will then -- and we'll set dates for this in a

9    minute.

10           The government will then be able to put in any

11   opposition, including the point just made.  But they may have

12   objections also to the wording.  Who knows.

13           And the SEC on the same schedule can put in any

14   objections they have.  And then I will rule on the motion

15   in-chief as well as the more narrow issues that may be

16   presented by things like wording of the interrogatories.

17           Is there any reason why defense counsel cannot

18   propound those interrogatories initially being sent, not to be

19   responded to by the government and the SEC but just to be

20   looked at and possibly objected to by the government and the

21   SEC, by a week from today?

22           MR. BRUCE:  No, your Honor.  There's no reason for

23   that.

24           THE COURT:  And how long does the government want to

25   respond?

1          MR. HARTMAN:  Judge, we could respond within a couple

2     of days.

3          THE COURT:  So let's put some dates on this.  Defense

4     counsel will send his proposed interrogatories to the parties

5     and the Court by January 30, and the government and the SEC

6     will respond by Tuesday, February 4.

7          MR. BRUCE:  Your Honor, may I ask:  As a part of that

8     exercise, I think it would be prudent, since this investigation

9     happened two years ago, for whoever is responding to the

10    interrogatories to affirm that they've gone back and looked at

11    the correspondence from the time instead of just giving sort of

12    off-the-cuff answers, that didn't happen.

13         THE COURT:  I'm not going to require this.  I'll think

14    about that.  If you want to put in, when you send me the

15    interrogatories, some further requests of that sort -- I don't

16    want a further request for all the documents and so forth.

17         Frankly, if I had to rule on that right now, I would

18    deny that motion, but I want to see what happens.  Put that in

19    your cover letter, and then the other side can respond to it.

20    But I'm disinclined at this time to order that.

21         MR. HARTMAN:  Your Honor, can I just clarify the

22    timing.  So the February 4 response that the Court wants is our

23    views and the SEC's views about the --

24         THE COURT:  Yes.  I want it separately from you and

25    the SEC.  So tell the SEC that congratulations.  They're now

involved.

MR. HARTMAN:  Judge, you want our objections or
concerns about the fact of the interrogatories and the wording;
is that right?  You don't want substantive answers to the
question.

THE COURT:  Exactly right.  If I then find in the
interrogatories, in part or in whole, something I want to have
issued, then I will then so order it and set a date for you to
respond.

At this point, I'm not even sure that any
interrogatories are justified, but I'm at least willing to
contemplate the possibility.  But I want to make sure that we
decide in advance, if I do so order them, that the wording is
acceptable to the Court since the last thing I want is a
satellite litigation later on by either you or the SEC saying,
oh, no.  No.  No.  We object to the wording of this
interrogatory.

This is why, frankly, interrogatories in many similar
cases are a total waste of time, because, no matter what, one
side propounds 20 interrogatories.  The other side first has a
boilerplate of about 35 general objections and then about 25
more specific objections.  And then I have to hear a response
from the other side.  I'm trying to cut through all of that.

MR. HARTMAN:  Judge, one other issue that I think may
come up in the context of responding to these questions is our

1   view is that the questions should be limited to the *Garrity*

2   issue.  I assume that's what the Court is interested in.

3          THE COURT:  I gave a couple examples of what I had in

4   mind.  I'm not going to make any final decisions on the

5   interrogatories till I see what they are.

6          MR. HARTMAN:  Okay.  Thank you, your Honor.

7          THE COURT:  The next motion was that there be a

8   supplementation of the government's 21-page Brady letter which

9   they say is, in effect, indecipherable.  They set forth several

10  examples in their letter.

11         To be frank, I was surprised that this was something

12  that counsel for both sides hadn't been able to work out.  If

13  the question is truly one of decipherability, for lack of a

14  word -- I'm sure there is such a word -- so that, for example,

15  where the disclosure at one point says Mark Andersen, an

16  individual previously employed by MiMedx, provided the

17  following information to criminal authorities:  "Rest of the

18  day no one talks to MA, not until next day, the 19th.

19  Discussion with MS, AE, and JC.  Walked through the points.

20  GAP.  References the 605 on rev rec.  SEC guidance.  Talked

21  about why he had concerns with rev rec."

22         I'm assuming it's revenue recognition.  "Response.

23  GAP.  Is gray area, and MA does not have all the facts and

24  circumstances.  Nothing they shared back that was technical.

25  GAP.  Literature saying MA was wrong.  There were facts and

circumstances eventually shared.  Not sure if this meeting."

Now what I generally grasped from that was that Mr. Andersen was asserting something about the applicability or inapplicability of GAP.  It's left somewhat vague.  I don't think it's really so much a question of indecipherability as fleshing out whatever the note-taker meant by the notes taken.

Which if it were 3500 material, would be an automatic. I would require the government, as I have in many cases, to tell defense counsel when it says in your note-taking, X, M, T, Z, Y with Q -- tell them what that means.  Why shouldn't that be even more appropriate in the case of Brady which is potential exculpatory information.

So I'm inclined to order the government to flesh this out, but I'm really surprised that this wasn't worked out between counsel.

MR. HARTMAN:  Your Honor, can I respond to that?

THE COURT:  Yes.

MR. HARTMAN:  So as far as I know -- and I may have missed an email -- we didn't receive a request for this type of clarification before this motion was filed.

There was a request for the complete set of notes, but I don't think I saw a request for help interpreting what we sent them.  There were certain documents that were referenced in the Brady disclosure that they were unable to locate.  And we helped them locate them, and we provided Bates numbers for

those.

         We don't have any objection, for example, when the
notes reference MS, AE, and JC to telling them who MS, AE, and
JC are.  I think they may be able to figure out that pretty
easily because they know the case as well, but we don't have a
problem with that.

         To the extent the motion asks us to construct a
narrative as to what was memorialized --

         THE COURT:  I'm more skeptical of that.

         MR. HARTMAN:  That's our concern.

         THE COURT:  So what you're saying is you have no
problem telling them when the sentence says MA, MA means
Mr. Andersen presumably.

         MR. HARTMAN:  Correct.

         THE COURT:  Things that have kind.

         MR. HARTMAN:  That's right.

         THE COURT:  But you don't feel you need to do anything
beyond that to fulfill your Brady obligations.  They also
wanted, while we're on it, to disclose the authors of the
notes.

         MR. HARTMAN:  And we don't have any problem doing
that.

         THE COURT:  Very good.  So let me go now to defense
counsel.

         So they're going to tell you what all the

1    abbreviations mean.  And if there's any word that's sort of

2    ambiguous on its face, they'll tell you what that means.  And

3    they'll tell you who the authors are.

4           Why isn't that sufficient?

5           MR. WEINREB:  Well, your Honor, we appreciate that

6    they're willing to tell us who the authors are.  But with

7    respect to the rest of it, merely knowing who the initials

8    stand for really does not sufficiently put us in a position to

9    make effective use of this as Brady material.

10          Just, for example, this disclosure begins:  "Rest of

11   the day no one talks to MA."

12          Rest of what day?  What day is he talking about?  How

13   are we supposed to --

14          MR. WEINREB:  I agree.  You would be entitled to know

15   whether that was March 5, 2019, or whatever the date was.  I

16   agree with that.  What I don't think you're entitled to -- or

17   at least I would need to be convinced -- is a more generalized

18   narrative.

19          They should have to, as I said before, translate

20   anything that's not obvious on its face and provide the

21   particulars of anything that is not obvious like what day are

22   we talking about.  But I don't see that they have to go beyond

23   that.

24          MR. WEINREB:  Your Honor, I'm trying to take a

25   practical approach to this, and I have a proposal.  As I

1    understand Brady, Brady isn't a rule of discovery.  It's not

2    something like --

3           THE COURT:  No.  Brady is a constitutional doctrine.

4           MR. WEINREB:  Correct.  It's not like the government

5    needs to -- it doesn't compel the government to produce

6    documents or other things like Rule 16 does.

7           But it does require them to produce information that

8    may be exculpatory, even if it's not captured in a document.

9    Even if it's just in their heads, they have to write it out to

10   the defense.

11          THE COURT:  An extremely common Brady situation is

12   that a witness will say something in an interview by the

13   government that the government thinks is not exculpatory at all

14   but which the government realizes that defense counsel, viewing

15   it from a different angle, might view it as exculpatory.

16          So what the government then does typically is, in an

17   excess of caution, they disclose what that statement was and

18   why they thought defense counsel might think it's exculpatory

19   is not something they have to -- they don't have to play

20   lawyers for defense.

21          If they disclose the statement, recognizing that it

22   was at least theoretically exculpatory, then it's up to defense

23   counsel to decide whether it really is and what they want to do

24   about it.  So I don't think a narrative is called for.

25          MR. WEINREB:  We have no objection to that approach.

```
 1  But what we're asking for -- and what we did request in our

 2  discovery letter by way of clarification of these statements --

 3  is that we receive the entire report or the entire set of notes

 4  and any documents that were shown to the witness in connection

 5  with taking the notes so that we can decipher what this really

 6  means because these notes in many respects are recording

 7  responses that witnesses were given in asking to describe or

 8  look at a letter or a document that the witness may have

 9  authored or the witness may have received.  And they're asked,

10  what did you mean by this?  What did you mean by that?

11          Without having that document, this really is never

12  going to be truly decipherable to us because we'll never be

13  able to really --

14          THE COURT:  No.  I think on your theory, Brady really

15  would become a discovery doctrine and not one consistent with

16  the federal rules.  So what I'm going to order the government

17  to do is to translate any of the abbreviations or clarify any

18  of the ambiguities and provide all the specifics that might not

19  be crystal clear from the words themselves but limited to the

20  disclosures themselves, not to other documents, other

21  statements, other reports, and so forth.

22          Of course, Brady is an ongoing issue.  If, after

23  receiving all that, counsel has strong reason to suppose that

24  there has been a failure to disclose significant Brady material

25  in some respect, they can always come back to the Court.
```

1          But I must say I thought this was, by normal criminal

2    standards, a quite expansive Brady disclosure going well beyond

3    what courts would have ordered.  So I'm not going to order more

4    than what I just ordered now.

5          MR. WEINREB:  Very well, your Honor.

6          May I ask for a slight modification though?

7          THE COURT:  Yes.

8          MR. WEINREB:  Even if the government does not disclose

9    new documents that it believes we're not entitled to in

10   discovery, if a witness in a particular excerpt is referencing

11   a document that they have produced to us in discovery

12   already --

13         THE COURT:  Then they should let you know that.

14         MR. HARTMAN:  Your Honor, we have no objection to

15   that.  There have been at least a couple cases where they asked

16   about references.  We did that.

17         THE COURT:  That's fine.  Also they are to disclose

18   the authors, as I previously mentioned.

19         MR. WEINREB:  Thank you, your Honor.

20         MR. HARTMAN:  The one request that I think we made

21   with respect to the abbreviations and such is it's not always

22   easy for us to identify what's understandable from the defense

23   perspective and what's not.

24         For example, there are references to BT in here.  I

25   think it's kind of obvious from the context that BT is Bill

1    Taylor, but I don't know that it's obvious to them.

2              Could we propose that they would identify for us the

3    terms that they need definitions for or that they need an

4    understanding of.

5              THE COURT:  I think that's a good idea.  I'm very

6    fortunate that we have highly responsible counsel here on both

7    sides.  So I don't think we need to have every last thing in

8    writing.  If they want to call you up and say, what does BT

9    mean?  And you'll tell them.

10             MR. HARTMAN:  Of course.

11             THE COURT:  That's good enough.  I don't think they

12   need to make a formal letter to you.  I don't think you need to

13   make a formal letter back.

14             Now, if there's something that either side thinks is

15   so significant that they want it reduced to writing, then

16   you'll reduce it to writing.  Short of that, I think something

17   more informal would be appropriate.

18             MR. HARTMAN:  And we don't have any problem doing it

19   that way, Judge.  I think our only request is it would be

20   helpful to us if they could identify the things that are not

21   clear.

22             THE COURT:  Yes.

23             MR. WEINREB:  Your Honor, just so the government

24   understands where we're coming from and the Court as well, it

25   may be that we could guess with 60 percent or 90 percent

1    certainty --

2           THE COURT:  If you want to ask is MA Mr. Andersen, you

3    should ask that.  And then you'll have 100 percent assurance.

4    I have no problem with that.

5           MR. WEINREB:  Thank you, your Honor.

6           THE COURT:  The next motion is that the government

7    should disclose its initial witness list, initial exhibit list,

8    and Jencks Act material at least 45 days before trial.

9           What about that?

10          MR. HARTMAN:  Judge, on these issues, the scheduling

11   issues, I think our request would be that we have an

12   opportunity to speak with defense counsel about this.

13          As often happens in these cases, there can be

14   negotiation over when the government will produce materials.

15   We would expect reciprocal productions from the defense,

16   for example, defense Rule 16.

17          THE COURT:  That's fine, as long as you don't let it

18   go.  Now we don't have a trial until July, much to my

19   displeasure.  But I don't want to let this go till like May.

20          But here's what I will tell you:  Normally in

21   white-collar cases, I suggest to the government that they

22   supply their initial witness list and their initial exhibit

23   list 30 days before the start of trial.

24          I can't order them to disclose Jencks Act material 30

25   days before trial, but that has always been agreed to, after

1   the Court suggested it, by the government, maybe because, as

2   the late Charles Bryant said to me when I objected to one of

3   the Jencks Act orders that he wanted to put in place on the

4   ground that the government under the law doesn't have to

5   disclose Jencks Act until the end of the direct testimony of

6   the witnesses, and Judge Bryant said, you're right.  I can't

7   order you to do that, but I can make you wish you had.  So

8   anyway, I throw out for your consideration.

9           Thirty days is what I've employed in other such cases.

10  Of course, it's understood that this can change from those 30

11  days, but it's a good-faith attempt to do a final listing.

12          I usually ask defense counsel to give me their initial

13  list of witnesses and exhibits a week before the start of

14  trial, recognizing that as the trial goes on, things may

15  change.

16          But, again, that gives the government an opportunity

17  to do a little homework before the trial begins.  So those are

18  just my suggestions.  Why don't you confer.  If it's all

19  agreeable, you'll let me know.

20          MR. HARTMAN:  That's fine with us.

21          THE COURT:  And then the final motion is for 404(b)

22  disclosures to be at least two months before trial.  I guess I

23  should ask first:

24          Does the government anticipate there likely will be

25  404(b) material in this case?

1          MR. HARTMAN:  Your Honor, we haven't reached a final

2     determination on that.  It's possible.  But we haven't

3     ultimately decided on that issue.  It's possible there wouldn't

4     be.

5          THE COURT:  All right.  Again, this is just at this

6     point a suggestion.  My practice in white-collar cases of this

7     sort has been to have the government -- and this of course I

8     can order -- disclose 404(b) six weeks before the start of

9     trial.

10          But I will let you all negotiate, and then you'll

11     either tell me that's fine or you'll report back, in which case

12     I'll enter an order at that time.

13          Now, is there anything that we haven't discussed?

14          MR. HARTMAN:  No, your Honor.

15          THE COURT:  Good.  I thank you all and look forward to

16     seeing you at the next court proceeding.

17          MR. HARTMAN:  Thank you, Judge.

18          MR. BRUCE:  Thank you, your Honor.

19          (Adjourned)

20

21

22

23

24

25