UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- against -<br><br>PARKER H. PETIT and<br>WILLIAM TAYLOR<br><br>Defendants. | No. 19 Cr. 850 (JSR) |

# MEMORANDUM OF LAW IN SUPPORT OF
# PARKER H. PETIT'S AND WILLIAM TAYLOR'S MOTION FOR AN ADJOURNMENT

FRESHFIELDS BRUCKHAUS
DERINGER US LLP

Eric B. Bruce
Jennifer B. Loeb
Altin H. Sila
700 13th Street, NW
10th Floor
Washington, DC 20005
Telephone: (202) 777-4577
Eric.Bruce@freshfields.com
Jennifer.Loeb@freshfields.com
Altin.Sila@freshfields.com

KOBRE & KIM LLP

Matthew I. Menchel
Amanda N. Tuminelli
800 Third Avenue
6th Floor
New York, NY 10022
Telephone:  (212) 488-1200
matthew.menchel@kobrekim.com
Amanda.tuminelli@kobrekim.com

*Attorneys for Parker H. Petit*

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

William Weinreb
Michael Packard
111 Huntington Ave., Suite 520
Boston, MA 02199
Tel: (617) 712-7100
Fax: (617) 712-7200
billweinreb@quinnemanuel.com
michaelpackard@quinnemanuel.com

William Burck
Daniel Koffmann
51 Madison Avenue, 22nd Floor
New York, New York
Tel: (212) 849-7000
Fax: (212) 849-7100
williamburck@quinnemanuel.com
danielkoffmann@quinnemanuel.com

*Attorneys for Defendant William Taylor*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ..............................................................................................................................2

      A.      The Complex Accounting Matters At Issue In This Case ......................................2

      B.      The Configuration Of The Courtroom And Trial Logistics....................................4

      C.      The Recent Increase In COVID-19 Infections.........................................................8

ARGUMENT ..................................................................................................................................8

I.      THE COURT SHOULD ORDER AN ADJOURNMENT UNTIL MR. PETIT AND MR. TAYLOR CAN RECEIVE A FAIR TRIAL. ...................................................8

      A.      The Courtroom Configuration And Trial Logistics Are Inconsistent With A Fair Trial. ................................................................................................................8

      B.      The Worsening COVID-19 Conditions Pose An Additional Risk That Mr. Petit And Mr. Taylor Will Not Receive A Fair Trial.............................................13

II.     AT A MINIMUM, THE COURT SHOULD ADJUST THE COURTROOM SETUP AND TRIAL LOGISTICS. ..............................................................................15

CONCLUSION..............................................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Grubbs v. O'Neill*,
  744 Fed. App'x 20, 23 (2d Cir. 2018) ................................................................................... 11

*Maryland v. Craig*,
  497 U.S. 836, 846 (1990) ...................................................................................................... 12

*Riggins v. Nevada*,
  504 U.S. 127, 142 (1992) ........................................................................................................ 9

*United States v. Triumph Capital Grp., Inc.*,
  487 F.3d 124, 135 (2d Cir. 2007) ......................................................................................... 11

## Additional Authorities

Christina Maxouris, *The US is reporting more than 46,000 positive Covid-19 tests on average every day*, CNN (Oct. 9, 2020), https://cnn.it/33JNcpJ ................................................. 8

Jesse McKinley, *Cuomo Imposes Tight Virus Rules on Areas Hit by Spikes Across State,*
  N.Y. Times (Oct. 6. 2020), https://nyti.ms/3nxJeIq ................................................................ 8

Luis Ferré-Sadurní and Jesse McKinley, *Cuomo Imposes Tight Virus Rules on Areas Hit by Spikes Across State*, N.Y. Times (Oct. 6. 2020), https://nyti.ms/3nxJeIq ............................ 8

Press Release, *Governor Cuomo Announces New Record High Number of COVID-19 Tests Reported*, Oct. 8, 2020, https://on.ny.gov/3lGFvXB ........................................................ 8

Ross Todd, *Did a Juror COVID Scare Affect the Outcome of a Federal Criminal Trial Against 2 Former Deutsche Bank Traders?*, Am. Law Litigation Daily (Sept. 29, 2020), https://bit.ly/36KoozP .................................................................................................. 14

Standing Order M10-468 at 1–2,
  No. 20 Misc. 316 (CM) (S.D.N.Y. Sept. 9, 2020) ................................................................... 7

United States District Court, Sothern District of New York, 2020 Phased Re-entry Plan (COVID-19) (June 22, 2020), http://bitly.ws/a3it ..................................................................... 5

Defendants Parker H. Petit and William Taylor respectfully submit this memorandum of law in support of their motion for an adjournment until courtroom logistics and configuration permit a fair trial.

**PRELIMINARY STATEMENT**

Mr. Petit and Mr. Taylor cannot receive a fair trial in the courtroom in its current configuration or under the protocols currently in place.  To be clear, they acknowledge that the Court, Chief Judge McMahon, the Ad Hoc Committee, and the courthouse staff have made many adjustments to courtroom configuration and protocols to permit criminal jury trials to resume safely during the COVID-19 pandemic.  But many of these adjustments, as described below, are inconsistent with a fair trial.  Placing part of the jury and all the alternates in the gallery will prevent them from meaningfully observing Mr. Petit and Mr. Taylor during the trial or the witnesses as they testify.  Removing all but three seats from the defense table will mean that either Mr. Petit or Mr. Taylor will not be able to communicate with his counsel for long stretches of time during the trial.  Examination and cross-examinations will occur with a significantly obstructed view of the witness, disorienting reflections caused by the panes of plexiglass encasing the attorney podium, and glare from the plexiglass around the podium and the witness stand.  Limitations on the number of defense counsel and legal support who can be in the courtroom, difficulties communicating among the members of the defense team, and other challenges will exacerbate these problems.

Under the totality of the current circumstances, it does not seem possible for Mr. Petit and Mr. Taylor to receive a fair trial consistent with their constitutional rights.  Accordingly, Mr. Petit and Mr. Taylor object to proceeding to trial with the current courtroom layout, respectfully request that the Court adjourn the trial until conditions permit a fair proceeding, and expressly reserve all appellate rights concerning this issue.  At a minimum, the Court should grant the

specific proposals outlined below that may ameliorate some of the prejudice to Mr. Petit and Mr. Taylor from the current courtroom setup and logistics.

## BACKGROUND

### A. The Complex Accounting Matters At Issue In This Case

The Indictment alleges a complex securities fraud scheme in which Mr. Petit and Mr. Taylor supposedly sought to inflate the revenue of MiMedx, of which Mr. Petit was the Chairman and CEO and Mr. Taylor was the President and COO. The gravamen of the government's case is that (1) a handful of sales the company made between June and December 2015 did not satisfy the relevant GAAP and SEC criteria for recognizing revenue, and (2) Mr. Petit and Mr. Taylor wrongfully concealed facts that, if known to auditors, would have resulted in some or all of the revenue from these sales being deferred to later quarters and not included in the financial statements for the periods in which the sales actually occurred. Indictment ¶¶ 19, 60–61. The government has not alleged any misconduct with respect to the sales themselves or suggested that the revenue was illegitimate. Instead, its theory is that MiMedx should have waited to record the revenue from the sales until a different reporting period. The government has suggested that Mr. Petit and Mr. Taylor engaged in this alleged conduct because of "the difficulties faced by MiMedx in meeting its quarterly and annual revenue guidance" and "to fraudulently convey to the investing public that MiMedx was accomplishing consistent growth quarter after quarter." Dkt. No. 72, at 2.

At the time these sales took place in 2015, accountants applied four principles to determine when a company could book revenue based on sales like the ones at issue in this case: whether (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed or determinable; and (4) collectability of payment is reasonably assured. Fin. Acct. Standards Bd., 605-10-S99.

Applying these criteria requires informed judgment, familiarity with a company's business, and analysis of the material facts of each transaction.

In this case, the five transactions at issue were with four separate distributors: CPM, SLR, Stability Biologics, and First Medical. MiMedx's course of conduct with each distributor, and each of the challenged transactions with those distributors, has a long and complicated backstory. For example, MiMedx's agreement with CPM was one of its most successful distributor partnerships for a number of years. As the relationship began to sour, the companies conducted a series of negotiations, entered into a variety of agreements and amendments to agreements that became so convoluted that seemingly no one understood what each party's rights and responsibilities precisely were, and ultimately decided to part ways after they were unable to resolve their differences. In CPM's place came SLR, a company run by a former MiMedx salesman whose accounts at MiMedx had included CPM and who ultimately took over CPM's business with MiMedx. The third distributor, Stability Biologics, began as a potential distributor of MiMedx products and then became a subsidiary. The companies ultimately did not work as a combined entity—in part because it became clear that Stability had defrauded MiMedx during pre-acquisition due diligence—and the prior shareholders bought the company back fewer than two years after the acquisition. The principals from all three of these entities are expected to be government witnesses at trial, and the history between MiMedx and the three distributors will be relevant to, among other things, understanding the transactions at issue, assessing Mr. Petit's and Mr. Taylor's state of mind with respect to the transactions, and judging the witnesses' credibility and bias.

To date, the government has produced in discovery more than 377 gigabytes of data, including 1,757,778 pages of documents, thousands of additional spreadsheets, audio- and video-

recordings, other native files, and most recently thousands of pages of Jencks Act and *Giglio* material regarding 90 individuals. Its witness list includes 20 potential witnesses, and before the COVID-19 pandemic began, it estimated its case would last four weeks. Given the shortened trial day and other logistical changes under the Court's Reentry Plan, one can reasonably expect the case to take even longer.

### B. The Configuration Of The Courtroom And Trial Logistics

At the Court's invitation, counsel toured Courtroom 26B in the Daniel Patrick Moynihan Courthouse at 500 Pearl Street, New York, New York 10007 on Wednesday, October 7, 2020. Although there was a suggestion during the tour that Mr. Petit's and Mr. Taylor's trial might take place in Courtroom 26A, that courtroom had not been set up at that time. Because counsel were invited to view Courtroom 26B and Courtroom 26A has not been finally set up, this motion addresses the configuration of Courtroom 26B.

Courtroom 26B has undergone a significant overhaul. As relevant to this motion, the changes include:

- Construction of a second jury box in the gallery of the courtroom where certain members of the petit jury and any alternates will sit;

- Installation of a plexiglass encasement around the witness stand;

- Placement of the attorney podium between the government counsel's table and defense counsel's table, at roughly a 45 degree angle to the center of the traditional jury box and roughly a 135 degree angle to the second jury box;

- Installation of a plexiglass encasement around the front, top, and sides of the attorney podium;

- Removal of all but three seats from the defense counsel's table; and

- Room in what remains of the gallery for only 11 individuals to sit, at least one of which will be reserved for a Court Security Officer.

*See generally* United States District Court, Sothern District of New York, 2020 Phased Re-entry Plan (COVID-19) (June 22, 2020), http://bitly.ws/a3it; Declaration of Daniel Koffmann (Oct. 9, 2020).   The diagram below represents defense counsel's best attempt to illustrate the configuration of the courtroom based on the tour:



5

As illustrated in the diagram, the jurors sitting in the second jury box will be unable to see Mr. Petit's and Mr. Taylor's faces during the trial, and Mr. Petit, Mr. Taylor, and their respective counsel will be unable to observe the jurors in the second jury box at all. Koffmann Decl. ¶ 3. The jurors in the second jury box also will be at least 60 feet away from the witness stand, making it difficult for them to observe witnesses during testimony and evaluate their credibility.

The plexiglass encasements around the witness stand and the attorney podium present additional issues. The podium is positioned such that part of the witness stand and part of the bench sit in the line of vision where the plexiglass on the front and side of the podium meet. *Id.* ¶ 7. As a result, an attorney examining a witness has to contend with multiple layers of glass at different angles, which distorts perception of the witness and creates disorienting glares and reflections. *Id.* ¶ 8. Even by leaning forward or to the side, glare and reflections from several panes of plexiglass persist. *Id.* ¶ 9. Similarly, the position of the attorney podium makes it difficult for an attorney to observe the jurors in the second jury box while examining a witness. *Id.* ¶ 10. To be able to observe those jurors, an attorney at the podium would have to crane her neck to look back over her right shoulder or turn her whole body away from the witness stand. *Id.*

The position of the podium creates a similar problem for jury addresses. Standing at the podium and facing the traditional jury box, an attorney is looking through a pane of plexiglass at roughly a 45 degree angle. *Id.* ¶ 9. This creates a distracting reflection. *Id.* Facing the second jury box, the end of the plexiglass pane on the right side of the podium cuts through the attorney's field of vision, interrupting the plane and distorting or blocking the view of the jury. *Id.* ¶ 10.

As reflected in the diagram above, there are only three seats permitted at the defense counsel's table.  That means that, in this two-defendant trial, either Mr. Petit or Mr. Taylor will not be able to communicate with his lawyer at all during portions of the proceedings.

During the tour, courthouse staff suggested that the defense table could be separated into two tables, which could accommodate one attorney for each client, and that it was contemplated that Courtroom 26A would be set up this way.  As noted above, however, at the time of the tour, Courtroom 26A had not received a final configuration.  Regardless of whether the defense counsel's table will be one long table or two small tables, defense counsel will not be able to communicate easily with their colleagues and other counsel in the case.  This, combined with the limited seating in the gallery (one spot for the Court Security Officer and 10 additional spots), restricts the number of defense counsel and support staff who can be present in the courtroom and available to assist during witness examinations and other critical portions of the trial.  *See generally* Standing Order M10-468 at 1–2, No. 20 Misc. 316 (CM) (S.D.N.Y. Sept. 9, 2020) ("WHEREAS, the need to enforce social distancing rules means that not all counsel and parties may be able to sit together at counsel table, and that paralegals, technology assistants and others involved in the presentation of evidence may be at a remove from an attorney who needs to communicate with them, such that it will not be possible for such individuals to hold private communications in close quarters during the trial day without interrupting the trial and delaying proceedings.").[1]

---

[1] Unless otherwise noted, we have omitted internal citations, quotation marks, and alterations from citations in this brief.  We have also shrunk lengthy website names using bit.ly's URL shortener.

7

### C. The Recent Increase In COVID-19 Infections

After a period of declining COVID-19 infections and promising signs that we had begun to contain the virus, conditions appear to be worsening. As of this morning, the United States is "averaging more than 45,000 new Covid-19 positive tests each day -- up 8% from the previous week and more than double what the country was seeing in June, as lockdown restrictions were easing." Christina Maxouris, *The US is reporting more than 46,000 positive Covid-19 tests on average every day*, CNN (Oct. 9, 2020), https://cnn.it/33JNcpJ. In New York, Governor Andrew Cuomo announced yesterday a record-high number of positive COVID-19 tests. Press Release, *Governor Cuomo Announces New Record High Number of COVID-19 Tests Reported*, Oct. 8, 2020, https://on.ny.gov/3lGFvXB. And in New York City, officials are reinstating shutdown orders in parts of the city where infections are surging. *See* Luis Ferré-Sadurní and Jesse McKinley, *Cuomo Imposes Tight Virus Rules on Areas Hit by Spikes Across State*, N.Y. Times (Oct. 6. 2020), https://nyti.ms/3nxJeIq. While the City's renewed shutdown orders so far have targeted areas in the Eastern District, parts of the Southern District, in Rockland and Orange Counties, have been shut down, too. *Id.* Rockland County has the third-worst infection rate in the state, and Orange County has the sixth-worst. *New York Covid Map and Case Count*, N.Y. Times, Oct. 9, 2020, https://nyti.ms/34EZUFh.

## ARGUMENT

**I. THE COURT SHOULD ORDER AN ADJOURNMENT UNTIL MR. PETIT AND MR. TAYLOR CAN RECEIVE A FAIR TRIAL.**

### A. The Courtroom Configuration And Trial Logistics Are Inconsistent With A Fair Trial.

Taken together, the conditions proposed for Mr. Petit's and Mr. Taylor's trial violate their rights to a fair trial. Placing four jurors and the alternates behind Mr. Petit and Mr. Taylor so that they are unable to see the jurors and the jurors are unable to see their faces violates the

8

"fundamental assumption of the adversary system that the trier of fact observes the accused throughout the trial, while the accused is either on the stand or sitting at the defense table." *Riggins v. Nevada*, 504 U.S. 127, 142 (1992) (Kennedy, J., concurring). "At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial." *Id.* As currently configured, the courtroom in which Mr. Petit's and Mr. Taylor's trial is scheduled to occur violates these fundamental maxims and denies them an essential element of a jury trial.

This configuration also denies Mr. Petit and Mr. Taylor the ability to observe the jurors in real time, to gauge their reactions, evaluate their attentiveness, and craft a presentation that they believe will be likely to persuade the jury. Just as the jurors must have the ability to observe Mr. Petit and Mr. Taylor, they also must have the ability to observe the jurors and not keep their backs to them.

In the Northern District of Ohio, the Honorable Dan A. Polster has proposed a courtroom setup that puts the jurors in the gallery and counsel's tables at 90 degrees so that the jurors can still see the parties:

(image on next page)



*In Re: National Prescription Opiate Litigation*, No. 17 Md. 2804 (N.D. Ohio). A setup such as this could reduce the prejudice to Mr. Petit and Mr. Taylor by providing the jury some ability to observe them throughout trial.

The configuration of the defense table raises separate concerns. With only three seats at the table, either Mr. Petit or Mr. Taylor will be unable to communicate with his counsel in real

10

time.  That is inconsistent with the Sixth Amendment right to effective assistance of counsel.  "[A]llowing open communication between an attorney and the defendant implicates one of the core values of the Sixth Amendment—insuring that a defendant, who ordinarily is ill-equipped to understand and deal with the trial process without a lawyer's guidance, is able to receive the advice, counsel, and support of his attorney at every part of the trial, and other critical stages of his defense."  *United States v. Triumph Capital Grp., Inc.*, 487 F.3d 124, 135 (2d Cir. 2007).  Without his attorney within earshot, either Mr. Petit or Mr. Taylor will have to decide between forgoing legal advice and attempting to communicate with his attorney from across the room.  This is impermissible.  *See generally Grubbs v. O'Neill*, 744 Fed. App'x 20, 23 (2d Cir. 2018) (summary order) (even a purely subjective belief that attorney-client communications are not completely confidential can have an impermissible chilling effect).

As noted above, during counsel's tour, courthouse staff suggested that the defense counsel's table could be separated into two smaller tables, each of which could accommodate one defendant and one attorney.  Courtroom 26B, however, was not configured that way, and Courtroom 26A had not received a final configuration at the time of the tour.  While a different configuration that permits each defendant to have one attorney at counsel's table would ameliorate the problem to an extent, it would not solve it:  the limitations on the number of people in the gallery and the resulting difficulties communicating with other members of the defense team would continue to interfere with effective representation of Mr. Petit and Mr. Taylor.

The configuration of the courtroom raises possible Confrontation Clause problems, as well.  In particular, a juror sitting 60 or more feet from a witness encased in a plexiglass cube with light reflecting off it and creating a glare likely cannot make an informed assessment of the

witness's testimony.  This strikes at the heart of the purpose of the Confrontation Clause, which is to "permit[] the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility."  *Maryland v. Craig*, 497 U.S. 836, 846 (1990).  Relatedly, placing the attorney podium such that there are two panes of plexiglass meeting at a right angle in the line of sight to the witness stand, with multiples sources of reflection and glare, interferes with an examiner's ability to observe witnesses' demeanor, their subtle facial expressions, uneasy shifting, and other nonverbal cues that provide information that is indispensable to effective cross-examination.  The configuration of the courtroom raises serious concerns that Mr. Petit's and Mr. Taylor's opportunity for cross-examination will be constitutionally deficient under the Confrontation Clause.

This is particularly true for a weeks-long, complex accounting fraud trial where the key issues in dispute include questions of judgment, professional expertise, and good faith.  As described above, the relevant accounting principles that govern whether a sale can be recorded as current revenue—including, for example, whether *persuasive* evidence of an arrangement exists or collectability is *reasonably* assured—are murky, fact-sensitive guidelines on which reasonable people may disagree.  With hundreds of documents, emails, and other paper exhibits forming a large portion of the presentation of evidence, it is natural that laypersons on the jury will rely on witness testimony to draw conclusions about Mr. Petit's and Mr. Taylor's mental states, the reliability of the witnesses who testify against them, and what to make of the stacks of paper and emails from five years ago that they will review during their deliberations.  And most important of all, the jurors will rely on their personal observations of how Mr. Petit and Mr. Taylor react to the discussion of technical accounting principles and details of long-ago negotiations with distributors.  Interference with the jury's ability to observe Mr. Petit, Mr. Taylor, and witnesses,

and with Mr. Petit's and Mr. Taylor's ability to conduct effective cross-examination, takes on added significance in a complex case like this involving esoteric accounting standards.

Each of these concerns independently justifies an adjournment until the courtroom can be configured to resolve these problems. When combined with the other issues described above, including the limited legal support in the courtroom and difficulty communicating with them and counsel's inability to observe the jury during examinations and jury addresses, it is clear that Mr. Petit and Mr. Taylor cannot receive a fair trial under the circumstances.

### B. The Worsening COVID-19 Conditions Pose An Additional Risk That Mr. Petit And Mr. Taylor Will Not Receive A Fair Trial.

The deteriorating conditions of the pandemic will affect the trial beyond the courtroom layout and trial logistics. For example, if current trends continue and the risk of COVID-19 infection gets worse, even the most conscientious juror who takes her civic duty seriously cannot avoid the psychological impact from the menace of COVID-19. No doubt jurors will worry about their safety throughout the trial as they deal with the burden of an additional or extended commute to and from the courthouse; congregating in the security line, jury room, elevators, and elsewhere; and, notwithstanding the Court's efforts to make the courtroom safe, sitting in the jury boxes. Moreover, this trial will span both Election Day and possibly the Thanksgiving holiday, both of which are likely to bring jurors and other participants in the trial in contact with a larger group of people and significantly increase the risk of infection. It is not realistic to expect jurors to be able to devote sufficient care and attention to the complex accounting matters at issue in this trial in the midst of a worsening global pandemic. And after spending possibly six weeks or longer gathered indoors, they no doubt will be anxious to reach a quick verdict and return to the safety of home, even if that means surrendering their convictions, reaching a compromise verdict, or simply foregoing the lengthy deliberations that a case of this complexity

is likely to require.  *See, e.g.*, Ross Todd, *Did a Juror COVID Scare Affect the Outcome of a Federal Criminal Trial Against 2 Former Deutsche Bank Traders?*, Am. Law Litigation Daily (Sept. 29, 2020), https://bit.ly/36KoozP.

The impact on Mr. Petit and Mr. Taylor will be no less severe.  Both have families who live outside New York.  As conditions deteriorate, they will be preoccupied trying to ensure from hundreds of miles away that their families are safe and that they, too, remain uninfected.  Under the circumstances, Mr. Petit and Mr. Taylor cannot receive a fair trial in the midst of a global pandemic that shows every sign that it is entering a perilous new phase.

*       *       *

Mr. Petit and Mr. Taylor are sensitive to the challenges that the COVID-19 pandemic poses and are sincerely grateful for the lengths to which the Court and everyone involved has gone to allow this trial go forward.  Until the Court's public webcast on September 24, 2020, during which a number of the changes in the courtroom setup and trial logistics were described, Mr. Petit and Mr. Taylor had every intention of proceeding to trial on October 26—including when defense counsel represented to the government on September 21, 2020, that, at that time, there was no intention to seek an adjournment.  But because the dramatic changes to the setup of the courtroom, the trial logistics, and the broader COVID-19 pandemic are not conducive to a constitutionally fair trial, Mr. Petit and Mr. Taylor must request an adjournment until a fair trial is possible.  Nevertheless, Mr. Petit and Mr. Taylor will continue to comply with the current pretrial disclosure schedule regardless of the Court's decision on their motion for an adjournment.  Most immediately, Mr. Petit and Mr. Taylor will produce exhibits on Monday, October 12.  Accordingly, the government will not be prejudiced as a result of pretrial disclosures it made pursuant to the parties' agreement.

**II.    AT A MINIMUM, THE COURT SHOULD ADJUST THE COURTROOM SETUP AND TRIAL LOGISTICS.**

Although it would not cure the constitutional problems described above, Mr. Petit and Mr. Taylor respectfully request that the Court adopt the following measures, which would ease some of the logistical challenges facing them in this trial:

- Permit the parties to pivot the podium during jury addresses in order to face the jury head on;

- Permit counsel to conduct jury addresses away from the podium, so long as they wear a mask and remain at least six feet apart from others in the courtroom;

- Permit defense counsel and Mr. Petit and Mr. Taylor to sit next to each other at counsel's table, behind counsel's table in the well of the courtroom, and in the gallery without maintaining social distancing, in recognition of the fact that they will be forming a "pod" throughout the course of the trial and that each member of the defense team will be tested weekly for COVID-19.  For example, the Honorable John J. Tharp, Jr. reportedly permitted defense counsel in *United States v. Vorley*, No. 18 Cr. 35 (N.D. Ill.), to suspend social distancing measures within the defense group because they had formed a "pod" and were conducting regular testing for COVID-19;

- Permit defense counsel to use a private, secure Wi-Fi network in the courtroom instead of the public, non-secure Wi-Fi available through the District Executive;

- Require jurors to wear clear facemasks;

- Reserve seats in the courtroom for defense counsel and members of Mr. Petit's and Mr. Taylor's families;

- If Courtroom 14B is designated as the overflow courtroom, permit members of the defense team to sit in the jury box and at counsel's table; and

- Permit the defense team to use the jury room in the overflow courtroom as a conference room during trial and to bring in temporary printers and copiers.

## **CONCLUSION**

For the foregoing reasons, the Court should adjourn the trial until courtroom logistics and configuration permit a fair trial for Mr. Petit and Mr. Taylor.

Dated:  October 9, 2020

| | |
|---|---|
| FRESHFIELDS BRUCKHAUS DERINGER US LLP | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| /s/ Eric B. Bruce | /s/ William Weinreb |
| Eric B. Bruce<br>Jennifer B. Loeb<br>Altin H. Sila<br>700 13th Street, NW<br>10th Floor<br>Washington, DC 20005<br>Telephone: (202) 777-4577<br>Eric.Bruce@freshfields.com<br>Jennifer.Loeb@freshfields.com<br>Altin.Sila@freshfields.com | William Weinreb<br>Michael Packard<br>111 Huntington Ave., Suite 520<br>Boston, MA 02199<br>Tel: (617) 712-7100<br>Fax: (617) 712-7200<br>billweinreb@quinnemanuel.com<br>michaelpackard@quinnemanuel.com |
| KOBRE & KIM LLP | William Burck<br>Daniel Koffmann<br>51 Madison Avenue, 22nd Floor<br>New York, New York<br>Tel: (212) 849-7000<br>Fax: (212) 849-7100<br>williamburck@quinnemanuel.com<br>danielkoffmann@quinnemanuel.com |
| Matthew I. Menchel<br>Amanda N. Tuminelli<br>800 Third Avenue<br>6th Floor<br>New York, NY 10022<br>Telephone:  (212) 488-1200<br>matthew.menchel@kobrekim.com<br>amanda.tuminelli@kobrekim.com | *Attorneys for Defendant William Taylor* |
| *Attorneys for Parker H. Petit* | |