UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

   - against -

PARKER H. PETIT and
WILLIAM TAYLOR

    Defendants.

No. 19 Cr. 850 (JSR)

**MEMORANDUM OF LAW IN SUPPORT OF WILLIAM TAYLOR'S
MOTION FOR A JUDGMENT OF ACQUITTAL OR A NEW TRIAL**

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

William D. Weinreb
Michael T. Packard
111 Huntington Ave., Suite 520
Boston, MA 02199
Tel: (617) 712-7100
Fax: (617) 712-7200
billweinreb@quinnemanuel.com
michaelpackard@quinnemanuel.com

William A. Burck
Daniel R. Koffmann
51 Madison Avenue, 22nd Floor
New York, New York
Tel: (212) 849-7000
Fax: (212) 849-7100
williamburck@quinnemanuel.com
danielkoffmann@quinnemanuel.com

*Attorneys for William Taylor*

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND .....................................................................................................................1

    A.    The Dearth Of Evidence Implicating Bill Taylor In Stability Or SLR ...................1

    B.    The Evidence Exculpating Bill Taylor Of Any Wrongdoing Regarding CPM ............................................................................................................................2

    C.    Bill Taylor's February 12, 2016 Discussion With Mike Carlton About Audit Confirmation Letters .....................................................................................3

    D.    The Government's Rebuttal Summation And Introduction Of A Brand New Theory Of Criminality Against Bill Taylor ......................................................6

    E.    The Government's Materiality Argument .................................................................7

    F.    The Jury's Deliberations And Verdict ....................................................................7

LEGAL STANDARD ...............................................................................................................8

ARGUMENT ...........................................................................................................................9

I.     MR. TAYLOR IS ENTITLED TO A JUDGMENT OF ACQUITTAL. ...........................9

    A.    No Rational Jury Could Have Convicted Mr. Taylor Based On Stability, SLR, Or CPM ........................................................................................................9

    B.    There Was No Credible Evidence That Bill Taylor Sought To Interfere With First Medical's Audit Confirmation Letter. ..................................................11

II.    IN THE ALTERNATIVE, MR. TAYLOR IS ENTITLED TO A NEW TRIAL. ............14

    A.    The Government's Last-Ditch Shift To A New Theory Of Wrongdoing Requires Vacatur ....................................................................................................14

    B.    The Government Urged The Jury To Convict Based On An Erroneous Standard Of Materiality. ........................................................................................17

    C.    The Evidence Preponderated Heavily Against The Verdict. .................................19

CONCLUSION .......................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*United States v. Archer,*
   977 F.3d 181 (2d Cir. 2020) ................................................................. 9, 19

*United States v. Cassese,*
   428 F.3d 92 (2d Cir. 2005) ............................................................. 8, 9, 11, 14

*United States v. Corsey,*
   723 F.3d 366 (2d Cir. 2013) ................................................................... 18

*United States v. Ferguson,*
   246 F.3d 129 (2d Cir. 2001) .................................................................... 8

*United States v. Glenn,*
   312 F.3d 58 (2d Cir. 2002) ..................................................................... 8

*United States ex rel. Grabcheski v. AIG,*
   687 Fed. App'x 84 (2d Cir. 2017) (summary order) ................................ 18

*United States v. Litvak,*
   889 F.3d 56 (2d Cir. 2018) ................................................................... 18

*United States v. Milstein,*
   401 F.3d 53 (2d Cir. 2005) ................................................................... 15

*United States v. Mollica,*
   849 F.2d 723 (2d Cir. 1988) ................................................................. 15

*United States v. Pierce,*
   785 F.3d 832 (2d Cir. 2015) ................................................................. 15

*United States v. Roshko,*
   969 F.2d 1 (2d Cir. 1992) ..................................................................... 15

*United States v. Salmonese,*
   352 F.3d 608 (2d Cir. 2003) ................................................................. 15

*United States v. Truman,*
   688 F.3d 129 (2d Cir. 2012) .............................................................. 8, 14

## Rules

Fed. R. Crim. P. 29 ............................................................................... 8

Fed. R. Crim. P. 33 ............................................................................... 8

Defendant William Taylor respectfully submits this memorandum of law in support of his motion for a judgment of acquittal or a new trial.

## PRELIMINARY STATEMENT

Bill Taylor's conviction on one count of conspiracy is unsupported by the trial record and resulted from improper and prejudicial arguments the government made in summation.  Mr. Taylor is entitled to a judgment of acquittal because there is no credible evidence that he agreed with anyone to mislead MiMedx's auditors.  The record is clear that Mr. Taylor knew nothing of and had no involvement in any misconduct related to Stability, SLR, and CPM.  No conviction based on transactions with any of those customers can withstand scrutiny.  And as to First Medical, the only evidence suggesting that Mr. Taylor agreed to mislead auditors is the nonsensical testimony of Mike Carlton.  Mr. Carlton's testimony was so obviously false that it cannot support the conviction.  If the Court is not prepared to acquit, it should order a new trial. The government's last-minute switch in theory in its rebuttal summation constructively amended and prejudicially varied from the Indictment; the theory of materiality it urged the jury to adopt was misleading and legally unsound; and the weight of the evidence preponderated heavily against the verdict.

## BACKGROUND

### A.    The Dearth Of Evidence Implicating Bill Taylor In Stability Or SLR

The government's proof at trial regarding Stability and SLR had nothing to do with Mr. Taylor.  The only witness to provide incriminating testimony about MiMedx's transactions with Stability was Brian Martin.  His testimony about Bill Taylor was that Mr. Taylor (1) attended meetings regarding MiMedx's potential acquisition of Stability, during which Mr. Taylor was "flattering" of Stability, *see* Tr. 1476, 1478, 1502–05; (2) invited Stability executives to a conference in New York City at which MiMedx spoke with investors, *id.* at 1549–51; (3) signed

the distributor agreement between MiMedx and Stability, *id.* at 1583; and (4) ultimately "made" unspecified "allegations" against Stability when MiMedx divested Stability in 2016, *id.* at 1587. The only part of Mr. Martin's testimony that had even a remote connection to anything incriminating was his comment that he told Mr. Taylor, at an unstated time, in an unidentified location, and in unspecified detail about "the role of Dover Medical with respect to Osiris." *Id.* at 1544. Mr. Martin's testimony—which was the core of the government's proof regarding Stability—was essentially irrelevant as to Mr. Taylor, so much so that there was no reason for Mr. Taylor to cross-examine Mr. Martin at all. *Id.* at 1702, 1720.

Aside from the testimony of Terry Booher, a Chase Bank relationship manager at a branch in Dallas, the government's SLR case consisted almost entirely of emails it had a paralegal read into evidence. *Cf. id.* at 1401 ("These are new documents, they relate to the SLR issues, of which the jury has not heard anything of substance, other than Mr. Booher's testimony."). This evidence—like the government's theory of the SLR allegations—had nothing to do with Bill Taylor. The most the government argued in its summation about Mr. Taylor's involvement with SLR was that he approved a one-month extension of a consulting agreement for Jerry Morrison, SLR's principal, and was aware that Mr. Morrison had communicated to others that he felt stretched thin financially. *Id.* at 2271. The government did not attempt to attribute to Mr. Taylor any misstatements to shareholders or deception of auditors with respect to SLR. Just as with Stability, Mr. Taylor was an afterthought in the SLR accusations, simply lumped in with Mr. Petit.

### B.     The Evidence Exculpating Bill Taylor Of Any Wrongdoing Regarding CPM

Mr. Taylor featured more prominently in the government's CPM case, but only because the evidence showed that Mr. Taylor played no role in the end-of-quarter negotiations that the government argued were inconsistent with revenue recognition. The government's theory

regarding CPM, which it emphasized repeatedly in its closing arguments, was that the $200,000 payment to Mark Brooks "was a kickback[,] a bribe to get an order." Tr. 2259. Alternative explanations for the payment—including that it was designed as a settlement of an ongoing dispute with CPM—were, according to the government, "lies," "bogus," "fake," "made up," "malarkey," "total bologna," "cover stories," and "a sham." *Id.* at 2257–60.

The evidence was clear, however, that Mr. Taylor was out of the loop by the time MiMedx agreed to the $200,000 payment. By the evening of June 25, 2015, Mr. Taylor had been sidelined in the discussions with Mark Brooks. For example, Mike Carlton testified that he pulled in Mr. Petit after Mr. Taylor's final efforts to make a deal failed. *See, e.g.*, *id.* at 849–50; *see also id.* at 602–03. Similarly, the documents showed that Mr. Taylor only learned that MiMedx would make a $200,000 cash payment to Mark Brooks after the agreement had been made. *See* DX 140, DX 146 ("I thought we needed him to forgo the stock from June 11 of this year for the $200k?"); *see also* Tr. 942–44 (M. Carlton).

### C.   Bill Taylor's February 12, 2016 Discussion With Mike Carlton About Audit Confirmation Letters

The theory of the government's First Medical case was that Bill Taylor sought to conceal from MiMedx's auditors that he had given First Medical certain assurances about what MiMedx would do if First Medical did not receive a tender from the Saudi Ministry of Health. Even if Mr. Taylor had given First Medical a right of return (he didn't), that only would have mattered if he intended to conceal that from the auditors. The government's evidence of that alleged intent consisted of text messages between Mr. Taylor and Mike Carlton and Mr. Carlton's testimony about those messages. In particular, the government introduced GX 1509, which contained a few text messages that Mr. Taylor and Mr. Carlton exchanged on February 12, 2016 regarding

the audit confirmation letter that MiMedx's auditors needed from First Medical.  The relevant
portion of the exhibit appears below:

**GX 1509**

| Date | Time (Eastern) | From | To | Text Message |
|------|----------------|------|-----|--------------|
| 2/12/2016 | 11:28:51 AM | Bill Taylor | Mike Carlton | Were you able to send the email to Bassam? |

| 2/12/2016 | 11:39:46 AM | Bill Taylor | Mike Carlton | See if Bassam can send a draft of the signed letter to me prior to him sending to the auditors to review. |
| 2/12/2016 | 11:47:39 AM | Mike Carlton | Bill Taylor | Ok |

| 2/12/2016 | 12:27:24 PM | Bill Taylor | Mike Carlton | This is separate. Just the confirm for the auditors. |
| 2/12/2016 | 12:27:40 PM | Bill Taylor | Mike Carlton | No extra commentary. Just sign and send. |
| 2/12/2016 | 12:27:48 PM | Mike Carlton | Bill Taylor | Ok |

| 2/12/2016 | 1:43:41 PM | Mike Carlton | Bill Taylor | Good. I'll hunt Bassam on Sunday when he's back to work |

On direct examination, Mr. Carlton testified that it was his opinion that Mr. Taylor's comments,
"This is separate. Just the confirm for the auditors." and "No extra commentary. Just sign and
send." referred to his desire that MiMedx's auditors not learn of the supposed right of return that
MiMedx had granted to First Medical.  Tr. 594–95.

On cross-examination, however, Mr. Taylor's counsel showed the jury that the text
message exchange reflected in GX 1509 was incomplete and misleading and that Mr. Carlton's
testimony lacked any credibility.  Mr. Taylor introduced DX 411, the relevant portion of which
appears on the next page:

**DX 411**

| Date | Time (Eastern) | From | To | Text Message |
|------|---------------|------|-----|-------------|
| 2/12/2016 | 11:28:51 AM | Bill Taylor | Mike Carlton | Were you able to send the email to Bassam? |
| 2/12/2016 | 11:28:58 AM | Bill Taylor | Mike Carlton | What about Charlie? |
| 2/12/2016 | 11:29:30 AM | Mike Carlton | Bill Taylor | Yes. No reply |
| 2/12/2016 | 11:39:46 AM | Bill Taylor | Mike Carlton | See if Bassam can send a draft of the signed letter to me prior to him sending to the auditors to review. |
| 2/12/2016 | 11:47:39 AM | Mike Carlton | Bill Taylor | Ok |
| 2/12/2016 | 12:23:03 PM | Mike Carlton | Bill Taylor | Charlie didn't pick up. |
| 2/12/2016 | 12:23:22 PM | Mike Carlton | Bill Taylor | Can we coordinate both calls for Monday? |
| 2/12/2016 | 12:23:49 PM | Bill Taylor | Mike Carlton | Need Charlie today if possible. |
| 2/12/2016 | 12:24:21 PM | Mike Carlton | Bill Taylor | I'll try again. Should I loop in BC? Schultz? |
| 2/12/2016 | 12:24:49 PM | Bill Taylor | Mike Carlton | No way. |
| 2/12/2016 | 12:24:59 PM | Mike Carlton | Bill Taylor | Ok. |
| 2/12/2016 | 12:26:57 PM | Mike Carlton | Bill Taylor | We discussed the payment plan option with Longo and Schultz. They will see him next week. I'll keep trying but it's a fall back |
| 2/12/2016 | 12:27:24 PM | Bill Taylor | Mike Carlton | This is separate. Just the confirm for the auditors. |
| 2/12/2016 | 12:27:40 PM | Bill Taylor | Mike Carlton | No extra commentary. Just sign and send. |
| 2/12/2016 | 12:27:48 PM | Mike Carlton | Bill Taylor | Ok |
| 2/12/2016 | 12:59:57 PM | Mike Carlton | Bill Taylor | Charlie can't talk but he said he thought Glenn Eddleman his CFO already sent it back to the auditor |
| 2/12/2016 | 01:00:31 PM | Bill Taylor | Mike Carlton | Would he be ok if I call Glenn? |
| 2/12/2016 | 01:11:29 PM | Mike Carlton | Bill Taylor | Glen just called me and said he sent it on the 10th |
| 2/12/2016 | 01:11:36 PM | Mike Carlton | Bill Taylor | I'll send you his number |
| 2/12/2016 | 01:11:43 PM | Mike Carlton | Bill Taylor | It will be a share contact |
| 2/12/2016 | 01:12:10 PM | Bill Taylor | Mike Carlton | Ok |
| 2/12/2016 | 01:13:10 PM | Mike Carlton | Bill Taylor | Attachments:<br>Size: 187<br>File name: Glenn Eddleman.vcf<br>Glenn Eddleman.vcf |
| 2/12/2016 | 01:41:56 PM | Bill Taylor | Mike Carlton | Thanks. I think we are all set here now. |
| 2/12/2016 | 01:43:41 PM | Mike Carlton | Bill Taylor | Good. I'll hunt Bassam on Sunday when he's back to work |

In filling the gaps of GX 1509, DX 411 illustrates that Mr. Taylor's comments at 12:27 p.m. had nothing to do with First Medical. For the 40 minutes preceding those comments, he and Mr. Carlton had been discussing an entirely different distributor, Athletic Surgical. Mr. Carlton confirmed this. Tr. 753–54 (Q: "That's a good point. Let's start. The last one that mentioned Bassam is at 11:39:46 a.m., right?" A: "Yes." Q: "The next one, two, three, four, five, six, seven texts from 12:23 to 12:26, almost an hour later, are all about Athletic Surgical, isn't that right?" A: "That's correct."); *see also id.* at 751 (Q: "The two [Athletic Surgical and First Medical] have nothing to do with each other, correct?" A: "They do not."). The messages for the 75 minutes following the comments at 12:27 p.m.—which the government also removed from GX 1509—likewise referred to Athletic Surgical. Mr. Carlton's testimony that Mr.

5

Taylor—abruptly and without explanation—returned for 16 seconds to discussing First Medical in the midst of an extended text message conversation about Athletic Surgical defied reality.

D.     **The Government's Rebuttal Summation And Introduction Of A Brand New Theory Of Criminality Against Bill Taylor**

The revelation during the cross-examination of Mike Carlton that GX 1509 excluded key portions of Mr. Taylor's and Mr. Carlton's exchange cast considerable doubt on the notion that Mr. Taylor was referring to First Medical when he texted: "This is separate. Just the confirm for the auditors." and "No extra commentary. Just sign and send."   DX 411.   Nevertheless, the government still argued in its summation that these text messages were an instruction to Mr. Carlton to "tell First Medical not to write that they have a right to return the product."   Tr. 2292–93.

The summation on behalf of Mr. Taylor dismantled that theory by demonstrating how implausible it is that, after spending 40 minutes texting about Athletic Surgical, which also had an outstanding audit confirmation letter, Mr. Taylor suddenly and without explanation switched to discussing First Medical—just in those two text messages—and then immediately continued discussing Athletic Surgical.   Counsel argued, "You know these texts are about Athletic Surgical, which has nothing to do with this case."   *Id.* at 2439.

The government then changed tack in its rebuttal.   In addressing Mr. Taylor's argument, the government presented an alternative argument that the jury still should find Mr. Taylor guilty even if it found the text messages actually referred to Athletic Surgical instead of First Medical. The government argued:

> So then they make this desperate claim, well, it was all actually about Athletic Surgical.  Athletic Surgical, some other distributor. What a bizarre argument.  If Bill Taylor is directing Athletic Surgical to give an audit confirm that omits the terms of the deal, well then obviously he is guilty of the crimes charged in the

indictment.  He's still lying to the auditors.  So even on the defense
theory, he's guilty.

*Id.* at 2459.

### E.    The Government's Materiality Argument

In its summation, the government argued that it was "not seriously in dispute" that investors placed importance on MiMedx's revenue and pointed to testimony from Jeff Russell. *See* Tr. 2251–52.  Mr. Russell, an asset manager at one of the institutional investors that held MiMedx shares in 2015 and 2016, testified that "any overstatement" of a company's revenue "by any amount for whatever reason" would be important, even an overstatement of one dollar.  *Id.* at 1988–89.   The government thus argued in its summation that "a misstatement of revenue by even a dollar would be of significance." *Id.* at 2251–52.

### F.    The Jury's Deliberations And Verdict

The jury reached a verdict in its fourth day of deliberations, after issuing a number of notes.  One note asked, "If we find that a defendant (1) had intent to mislead the auditors, and (2) knew that misleading the auditors would operate as a deceit upon purchasers or sellers of MiMedx stock, does that imply that he had intent to deceive purchasers or sellers of MiMedx stock?"  Tr. 2525 (quoting Jury Note 7).  Misleading auditors was one of the alleged objects of the charged conspiracy, but it was not an element of the substantive securities fraud count. Indictment ¶¶ 63–65, 68.   The Court stated in response to Jury Note 7 that "to be guilty of securities fraud, a defendant must not only know that the purchasers or sellers of MiMedx stock are being deceived but also must specifically intend to deceive them," which can be "proved by either direct or circumstantial evidence." *See* Tr. 2526–27.  The next day, the jury returned a verdict finding Mr. Taylor guilty of conspiracy and not guilty of substantive securities fraud.

Dkt. No. 121.  The jury found Mr. Petit not guilty of conspiracy—thereby rejecting the allegation

that Mr. Taylor and Mr. Petit conspired with one another—and guilty of securities fraud.  *Id.*

## **LEGAL STANDARD**

Under Rule 29 of the Federal Rule of Criminal Procedure, a district court "must enter a

judgment of acquittal of any offense for which the evidence is insufficient to sustain a

conviction."[1]  Although a defendant's burden to demonstrate the insufficiency of the evidence is

a heavy one, it is "not insurmountable."  *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir.

2005).  Courts set aside guilty verdicts when "no rational trier of fact could have found the

defendant guilty beyond a reasonable doubt," and "a reasonable jury must necessarily entertain a

reasonable doubt" when the evidence at trial, viewed in the light most favorable to the

prosecution, provides "equal or nearly equal circumstantial support to a theory of guilt and a

theory of innocence."  *Id.* at 98–99; *see also United States v. Glenn*, 312 F.3d 58, 70 (2d Cir.

2002).  And because "few events in the life of an individual assume the importance of a criminal

conviction," district courts must "take the 'beyond a reasonable doubt' requirement with the

utmost seriousness."  *Cassese*, 428 F.3d at 103.  Witness testimony that is "incredible on its

face" does not meet the threshold for sufficiency.  *United States v. Truman*, 688 F.3d 129, 139

(2d Cir. 2012).

District courts' authority under Rule 33 is even broader than under Rule 29.  Rule 33

provides a district court with "broad discretion" to set aside a jury verdict and order a new trial to

"avert a perceived miscarriage of justice."  *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir.

2001).  The Court's broad discretion empowers it to grant relief based on a "contrary view" of

the jury verdict "after weighing the evidence."  *Id.* at 136.  While the Court may not "elect its

---

[1]   Unless otherwise noted, all internal quotations, citations, and alterations have been removed
from citations in this brief.

own theory of the case and view the evidence through that lens," the Court nevertheless should grant relief under Rule 33 where, as here, "the evidence at trial, taken as a whole, preponderated heavily against the verdict." *United States v. Archer*, 977 F.3d 181, 198 (2d Cir. 2020).

## ARGUMENT

## I.   MR. TAYLOR IS ENTITLED TO A JUDGMENT OF ACQUITTAL.

### A.   No Rational Jury Could Have Convicted Mr. Taylor Based On Stability, SLR, Or CPM.

The evidence of Mr. Taylor's conduct with respect to Stability, SLR, and CPM was insufficient to sustain the conviction for conspiracy.  The jury's verdict—finding Mr. Taylor guilty of conspiracy and Mr. Petit not guilty of conspiracy—can only be understood as a rejection of the allegation in the Indictment that Mr. Petit and Mr. Taylor conspired together to commit securities fraud.  That jury finding is not surprising:  the government's case against Mr. Petit focused almost entirely on Stability, SLR, and CPM, and it presented almost no evidence implicating Mr. Taylor in any of the alleged wrongdoing associated with those distributors.

As described above at 1–2, the government's case on Stability rested on the word of Brian Martin, who described a number of entirely uncorroborated conversations between himself and Mr. Petit.  The most he said about Bill Taylor was that Mr. Taylor attended a few meetings related to MiMedx's acquisition and subsequent divestment of Stability, signed the distributor agreement between the two companies shortly before the acquisition was announced, and was aware that Mr. Martin's company Dover Medical engaged in suspicious transactions with MiMedx competitor Osiris Therapeutics.  *Id.*  That has nothing to do with MiMedx making sales to Stability in the third and fourth quarters of 2015 that did not meet the criteria for revenue recognition under GAAP.  No rational jury could have found Mr. Taylor guilty of conspiracy based on Stability.  *Cassese*, 428 F.3d at 98.

Likewise with SLR.  Neither the government's document dump into the record at the end of trial, nor the testimony of Terry Booher, point to Mr. Taylor's complicity in alleged misconduct regarding MiMedx's sales to SLR.  The heart of the government's case on SLR was that SLR acquired more product from MiMedx than it could sell in a reasonable timeframe, and a trust associated with Mr. Petit's family loaned money to SLR that SLR used to pay down its debt to MiMedx.  Tr. 35–36, 2277–81.  The government alleged that MiMedx's disclosures about SLR were materially misleading because they made SLR seem more financially sound than it actually was and did not disclose that the trust was the ultimate source of funds SLR used to repay MiMedx.  But there was no evidence Bill Taylor knew anything about the loan to SLR.  Nor was there evidence that he made a single statement to auditors about SLR.  And the jury's finding that Mr. Taylor and Mr. Petit did not conspire with one another rebuts any suggestion that evidence regarding Mr. Petit's statements to auditors could be attributed to Mr. Taylor.  No rational jury could have convicted Mr. Taylor based on SLR.

Finally, the evidence regarding CPM exonerated Mr. Taylor.  The documents and the testimony made clear that Mr. Taylor removed himself from the negotiations with Mark Brooks that led to CPM making an order in the second quarter of 2015.  *Id.* at 849–50, 602–03.  When Mr. Taylor learned that MiMedx would make a $200,000 payment to Mark Brooks, Mr. Taylor asked those involved in the negotiations why, and they told him it related to past disputes between the companies.  DX 140; DX 146; Tr. 942–44.  The government made a half-hearted attempt to argue Mr. Taylor's email was designed to create a favorable paper trail, *see* Tr. 2259, but there was no evidence to support that theory, and it made no sense.  No rational jury could have convicted Mr. Taylor based on CPM.

Mr. Taylor was an afterthought in the Stability, SLR, and CPM allegations.  Even viewed in the light most favorable to the government, the evidence regarding Mr. Taylor's involvement in these transactions, at worst, gives "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence."  *Cassese*, 428 F.3d at 99.  As a result, the Court should give this evidence no weight in evaluating whether the verdict against Bill Taylor was based on sufficient evidence.

**B.**     **There Was No Credible Evidence That Bill Taylor Sought To Interfere With First Medical's Audit Confirmation Letter.**

The evidence was not sufficient to convict Mr. Taylor based on First Medical either.  Although it is impossible to know the basis for the jury's verdict, it is clear that the jury rejected the government's theory that Mr. Taylor conspired with Mr. Petit given its acquittal of Mr. Petit of conspiracy.  In light of that, the only remotely plausible First Medical theory the government presented was that Mr. Taylor conspired with Mike Carlton to mislead MiMedx's auditors with respect to the December 2015 transaction.  Jury Note 7 supports that conclusion, to the extent it suggests that the jury was considering finding "that a defendant [] had intent to mislead the auditors," Tr. 2525, which was an alleged object of the charged conspiracy but not an element of the substantive securities fraud charge, Indictment ¶¶ 63–65, 68, of which Mr. Taylor was acquitted.  The only evidence suggesting that Mr. Taylor had anything to do with representations to auditors regarding *anything* consisted of his text messages with Mike Carlton and Mr. Carlton's testimony about those messages.  But it is obvious from the face of those messages that Mr. Taylor was not discussing any deception of auditors regarding First Medical (or any other MiMedx customer), and Mr. Carlton's testimony to the contrary was incredible as a matter of law.

The relevant text messages, DX 411, occurred on February 12, 2016 and are reproduced above at 5.  The only plausible reading of the messages is that when Mr. Taylor says, "No extra commentary. Just sign and send," he is referring to Athletic Surgical.  The prior 40 minutes of the exchange discusses Athletic Surgical.  In those messages, Mr. Carlton explains that Charlie Hopper, the principal of Athletic Surgical, "didn't pick up" when Mr. Carlton called him; Mr. Taylor says that he needs confirmation from "Charlie today if possible"; Mr. Carlton then raises a payment issue with Athletic Surgical not related to the audit confirmation; Mr. Taylor responds, "This is separate. Just the confirm for the auditors," meaning that the audit confirmation is separate from the payment issue.  DX 411.  Mr. Taylor and Mr. Carlton continue discussing Athletic Surgical for another hour until Mr. Carlton briefly references First Medical in his final message of the day.

Mr. Carlton's testimony that "This is separate" was a transition back to discussing First Medical is absurd.  *See* Tr. 753–54.  It makes no sense.  To credit that testimony, the jury would have to believe that in the course of a two-hour text message exchange about Athletic Surgical, Mr. Taylor abruptly, without any warning or explanation, switched topics for 16 seconds, and then returned, again without explanation, to discussing Athletic Surgical.  This could only be plausible if Mr. Taylor somehow telepathically communicated with Mr. Carlton during the course of their text message exchange.  It is no surprise that Mr. Carlton's testimony on this issue devolved essentially into incoherent stammering:

> Q:  "So your testimony is that somehow Mr. Taylor suddenly decided to refer back to an hour before the series of texts that he had just seen to go back to First Medical, that's your testimony?"
>
> A:  "The way I read this is when he said this is separate, he was referring to that conversation with BC, Shultz, Joe Longo, payment plan, and then it went back to -- this is my opinion -- just the confirm for the auditors, no extra commentary, sign and send.

That's the confirm he was originally asking me to get from Bassam. That's the way I read it."

. . .

Q:  "And do you recall in that meeting you told them these texts were about Athletic Surgical, you think?"

A:  "I can't remember. It's a confusing topic. I may have said that, I don't remember."

. . .

Q:  "And what did you say to the government in May of 2019?

A:  "I was completely confused. It looked like it was two issues combining on the same text, and I was referring to the word 'might,' 'I think.' It was confusing, so I wasn't really sure what exactly he meant by each of the different texts. I was confused."

*Id.* at 754–55.

Apart from whether Mr. Taylor was referring to Athletic Surgical or First Medical, Mr. Carlton's testimony also rebutted the inference the government tried to draw from the text message exchange.  The government argued that when Mr. Taylor said "No extra commentary. Just sign and send," he was "saying tell First Medical not to write that they have a right to return the product, because I don't want Cherry Bekaert to know."  *Id.* at 2293; *see also id.* at 2459 ("He's straight up telling First Medical, 'I want a false audit confirm so I can lie to the auditors.'").  But Mr. Carlton testified that (1) Mr. Taylor *never* told Mr. Carlton not to tell anybody that Mr. Taylor had agreed to let First Medical have a right of return; (2) Mr. Taylor *never* told Mr. Carlton not to show anyone the email that supposedly memorialized First Medical's right of return; and (3) Mr. Taylor *never* asked Mr. Carlton to conceal information from anyone at MiMedx.  *Id.* at 755–56 (Q:  "Now did Mr. Taylor ever tell you: Don't tell anybody about this deal we have with First Medical."  A:  "He did not."  Q:  "Did he ever tell you: Don't send this email to anybody."  A:  "He did not."  Q:  "Did he ever ask you to conceal

13

information from anybody at MiMedx?  A:  "He did not.").  Mr. Carlton not only could not keep straight what customer Mr. Taylor was talking about, he also could not keep straight what Mr. Taylor was saying.

Although the Court must view the evidence in the light most favorable to the government, a conviction cannot survive on the basis of testimony that is "incredible on its face." *Truman*, 688 F.3d at 139.  When a court is faced with wholly unbelievable testimony, it may not defer to the jury's assessment of credibility and instead should find that the testimony is incapable of establishing guilt beyond a reasonable doubt.  *Id.*  That is the case here.  The only plausible reading of Mr. Taylor's February 12 text messages is that when he said, "No extra commentary. Just sign and send," he was referring to Athletic Surgical.   Mike Carlton's testimony was, at best, patently false and, at worst, perjured.  At a bare minimum, the evidence, in the best case for the government, gives "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence." *Cassese*, 428 F.3d at 99.  As a result, "a reasonable jury must necessarily entertain a reasonable doubt." *Id.*  Mr. Taylor is entitled to a judgment of acquittal.

## II.     IN THE ALTERNATIVE, MR. TAYLOR IS ENTITLED TO A NEW TRIAL.

### A.     The Government's Last-Ditch Shift To A New Theory Of Wrongdoing Requires Vacatur.

The government's argument in its rebuttal summation that the jury should convict Mr. Taylor even if his "Just sign and send" comment referred to Athletic Surgical, rather than First Medical, was improper and can be remedied only by vacating the conviction.  The Constitution forbids the government from obtaining a conviction based on a theory of criminality that differs from the theory on which the grand jury indicted, and that is exactly what the government did here.  This impermissible practice can take two forms—constructive amendment and variance.

14

The government constructively amends an indictment "[w]hen the trial evidence or the jury charge operates to broaden the possible bases for conviction from that which appeared in the indictment." *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005).  The risk of constructive amendment is especially pronounced in fraud trials, making it "critical that courts vigilantly enforce the Fifth Amendment requirement that a person be tried only on the charges contained in the indictment returned by the grand jury." *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988); *see also United States v. Roshko*, 969 F.2d 1, 4–5 (2d Cir. 1992) ("[B]ecause the fraud statutes target a broad range of conduct, it is even more critical that reviewing courts be vigilant to ensure that the government does not attempt to broaden the already pervasive and widesweeping nets of conspiracy prosecutions.").  A constructive amendment is a *per se* violation of the Grand Jury Clause of the Fifth Amendment, requiring vacatur without a showing of prejudice.  *Roskho*, 969 F.2d at 5–6.

"A variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003).  Variance is unconstitutional where, as here, it "substantial[ly] prejudice[s]" the defendant.  *United States v. Pierce*, 785 F.3d 832, 845 (2d Cir. 2015).  Such prejudice exists, for example, when the pleading and the proof do not substantially correspond, when the variance could have misled the defendant at trial, or when the variance could deprive the accused of his right to be protected against another prosecution for the same offense.  *Salmonese*, 352 F.3d at 621–22.  The government's conduct in this case is unconstitutional under either standard.

After it became clear that Bill Taylor's text message had nothing to do with First Medical, the government shifted its theory and constructively amended, and varied from, the

Indictment.  As the evidence showed, and Mr. Taylor argued in summation, the text messages

stating "This is separate. Just the confirm for the auditors." and "No extra commentary. Just sign

and send." referred to Athletic Surgical, not First Medical.  Mike Carlton's testimony to the

contrary was patently false, and the government risked appearing foolish in front of the jury by

continuing to rely on it.  Its apparent response to this hole in its theory was to implicitly concede

that the text messages referred to Athletic Surgical, but argue that the jury should convict Mr.

Taylor anyway.  The government argued:

> So then they make this desperate claim, well, it was all actually
> about Athletic Surgical.  Athletic Surgical, some other distributor.
> What a bizarre argument.  If Bill Taylor is directing Athletic
> Surgical to give an audit confirm that omits the terms of the deal,
> well then obviously he is guilty of the crimes charged in the
> indictment.  He's still lying to the auditors.  So even on the defense
> theory, he's guilty.

Tr. 2459.

Athletic Surgical does not appear in the Indictment.  Instead, the Indictment discusses, at

length, four specific MiMedx customers and a handful of transactions with those customers that

the government alleged should not have generated revenue in the financial reporting period in

which MiMedx recorded the revenue.  *See generally* Indictment ¶¶ 20–59.  There can be no

gainsaying that the grand jury did not indict Mr. Taylor based on conduct relating to Athletic

Surgical.  In urging the jury to convict Mr. Taylor based on Athletic Surgical, the government

constructively amended the Indictment.

The prejudice from the government's argument is manifest.  Mr. Taylor did not know his

trial would have anything to do with Athletic Surgical until the government disclosed its exhibits

on the eve of trial and Mr. Taylor saw the misleadingly excerpted text message exchange

between himself and Mr. Carlton.  And he had no inkling until the government's rebuttal—after

the evidence was closed and his own counsel summed up—that the government would argue he was guilty of fraud based on a transaction with Athletic Surgical.

Jury Note 7 dispels any doubt that the government's eleventh-hour shift prejudiced Mr. Taylor. The note asked, "If we find that a defendant (1) had intent to mislead the auditors, and (2) knew that misleading the auditors would operate as a deceit upon purchasers or sellers of MiMedx stock, does that imply that he had intent to deceive purchasers or sellers of MiMedx stock?" Tr. 2525 (quoting Jury Note 7). Although it is impossible to know for sure, the note suggests that the jury may have concluded that one of the defendants "had intent to mislead auditors," which was an alleged object of the charged conspiracy but not an element of the substantive securities fraud count, *see* Indictment ¶¶ 63–65, 68, and was unsure whether the government had met its burden with respect to securities fraud. Given the jury's verdict convicting Mr. Taylor of conspiracy and acquitting him of securities fraud, it appears that Jury Note 7 may well have referred to Mr. Taylor, which suggests that the basis for its verdict was a finding that Mr. Taylor was part of a conspiracy to mislead auditors but *not* to commit securities fraud. If so, that would mean that the government's change in theory related to the precise issue on which the jury reached its guilty verdict as to Mr. Taylor. Given the government's improper last-minute shift, the Court cannot be confident that the jury convicted Mr. Taylor based on First Medical or another distributor actually charged in the Indictment. The Court should vacate the conviction.

**B.** **The Government Urged The Jury To Convict Based On An Erroneous Standard Of Materiality.**

The government's argument in summation that it had satisfied the materiality element of the statute because "a misstatement of revenue by even a dollar would be of significance" to investors was improper because it urged the jury to convict based on an illusory conception of

materiality.  Tr. 2251–52.  "Fraud requires more than deceit.  A person can dissemble about many things, but a lie can support a fraud conviction only if it is material, that is, if it would affect a reasonable person's evaluation of a proposal."  *United States v. Corsey*, 723 F.3d 366, 373 (2d Cir. 2013); *see also United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018) (a fact is material if there is "a substantial likelihood that a reasonable investor would find" it "important in making an investment decision").  The government's argument was that any misstatement, by definition, is material.  But that reduces the materiality element to the point that it vanishes entirely.  That is improper.  *Livtak*, 889 F.3d at 64.

Nor does Jeff Russell's testimony make the government's argument permissible.  Mr. Russell testified "any overstatement by any amount for whatever reason is important for [him] to understand," even if the overstatement is only "one dollar."  Tr. 1988–89.  Testimony from an investor about what he finds important in making investment decisions can establish materiality *only if* the government shows that it is "within the parameters of the thinking of reasonable investors in the particular market at issue.  In other words, there must be evidence of a nexus between a particular trader's viewpoint and that of the mainstream thinking of investors in that market."  *Litvak*, 889 F.3d at 65.  "Mistaken beliefs" are not sufficient to establish materiality. *Id*.  First, whether or not a question about the integrity of management is important to investors, no reasonable investor would find one dollar of revenue material for a company that reported annual revenue of $187.3 million.  *Cf. United States ex rel. Grabcheski v. AIG*, 687 Fed. App'x 84, 87 (2d Cir. 2017) (summary order) (affirming dismissal of False Claims Act complaint where plaintiff alleged overstatement of $100 million in the context of transaction of more than $24 billion).  Second, even if a reasonable investor, in fact, would find a 0.000001% difference in revenue material, that would create the same problem described in the preceding paragraph—a

defendant could be convicted of fraud on the basis of any misstatement, no matter how trivial or inconsequential.  The theory improperly removes the materiality element entirely.

Because of the government's misleading and erroneous argument to the jury, the Court can have no confidence that the jury reached its verdict based on a justifiable understanding of materiality.  The Court should vacate Mr. Taylor's conviction.

C.      **The Evidence Preponderated Heavily Against The Verdict.**

The deficiencies in the government's case described in Section I demonstrate that, at minimum, the evidence preponderated heavily against the guilty verdict on Count One of the Indictment.  As a result, allowing the guilty verdict to stand would be a manifest injustice.  If the Court is not prepared to issue a judgment of acquittal, it should vacate the verdict and set for retrial.  *Archer*, 977 F.3d at 198 (Rule 33 based on the weight of the evidence appropriate where evidence preponderates heavily against the verdict).

## <u>CONCLUSION</u>

For the foregoing reasons, as well as those raised in Defendant Parker H. Petit's memorandum of law in support of his motion for judgment of acquittal or a new trial, and those Mr. Taylor raised at trial, all of which Mr. Taylor re-raises and incorporates by reference, the Court should issue a judgment of acquittal or, in the alternative, vacate Mr. Taylor's conviction on Count One of the Indictment and set a date for a retrial on that count.

Dated: January 8, 2021
Boston, Massachusetts

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

 /s/ William D. Weinreb
William D. Weinreb
Michael T Packard
111 Huntington Ave., Suite 520
Boston, MA 02199
Tel: (617) 712-7100
Fax: (617) 712-7200
billweinreb@quinnemanuel.com
michaelpackard@quinnemanuel.com

William A. Burck
Daniel R. Koffmann
51 Madison Avenue, 22nd Floor
New York, New York
Tel: (212) 849-7000
Fax: (212) 849-7100
williamburck@quinnemanuel.com
danielkoffmann@quinnemanuel.com

*Attorneys for William Taylor*