UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

PARKER H. PETIT, and
WILLIAM TAYLOR,

Defendants.

19 Cr. 850 (JSR)

## THE GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTIONS FOR A JUDGMENT OF
## ACQUITTAL OR A NEW TRIAL

AUDREY STRAUSS
United States Attorney
for the Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Edward Imperatore
Scott Hartman
Daniel Tracer
Assistant United States Attorneys
*Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

THE EVIDENCE AT TRIAL ................................................................................................. 2

    Overview of the Accounting Fraud Scheme ................................................................. 2

    MiMedx's Fraudulent Recognition of Revenue from CPM in the Second Quarter of
    2015 ................................................................................................................................ 3

    MiMedx's Fraudulent Recognition of Revenue from SLR in the Third Quarter of
    2015 ................................................................................................................................ 6

    MiMedx's Fraudulent Recognition of Revenue from Stability in the Third and Fourth
    Quarters of 2015 ........................................................................................................... 9

    MiMedx's Fraudulent Recognition of Revenue from First Medical in the Fourth
    Quarter of 2015 ........................................................................................................... 14

DISCUSSION ......................................................................................................................... 16

    I. Applicable Law ........................................................................................................ 16

        A. Rule 29 ............................................................................................................... 16

        B. Rule 33 ............................................................................................................... 17

    II. Sufficient Evidence Supported the Defendants' Convictions ................................... 18

        A. Expert Testimony Was Not Required to Establish that the Defendants Caused
        MiMedx to Report False and Misleading Revenue Figures. ................................... 19

        B. The Evidence of Petit's Criminal Intent Was Overwhelming............................. 21

            1. CPM ............................................................................................................... 22

            2. SLR ............................................................................................................... 25

            3. Stability Biologics.......................................................................................... 27

            4. First Medical ................................................................................................. 28

        C. Taylor's Conspiracy Conviction Is Equally Well-Grounded ............................. 29

    III. There is No Basis to Order a New Trial ................................................................ 32

        A. Rebuttal Argument Concerning Athletic Surgical ............................................. 32

        B. Materiality Argument ......................................................................................... 34

CONCLUSION........................................................................................................................ 36

# TABLE OF AUTHORITIES

**Cases**

*United States v. Acosta*, 17 F.3d 538, 545-6 (2d Cir. 1994) ..................................................... 30, 31

*United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) ........................................................ 17

*United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020) ........................................................ 18

*United States v. Banki*, 685 F.3d 99, 119-20 (2d Cir. 2012)....................................................... 35

*United States v. Cuti*, 720 F.3d 453, 460-2 (2d Cir. 2013) ............................................... 17, 18, 21

*United States v. Ebbers*, 458 F.3d 110, 125-6 (2d Cir. 2006)..................................................... 20

*United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008).......................................................... 17

*United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995) ...................................................... 18

*United States v. George*, 779 F.3d 113, 115 (2d Cir. 2015) ....................................................... 17

*United States v. Goyal*, 629 F.3d 916-22 (2010) ........................................................................ 22

*United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) .................................................. 17

*United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008) ......................................................... 17

*United States v. Lamorte*, 950 F.2d 80, 83.................................................................................. 36

*United States v. Miller*, 471 U.S. 130, 138 (1985)...................................................................... 34

*United States v. Natelli*, 527 F.2d 311, 318 (2d Cir. 1975) ........................................................ 22

*United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011) ......................................................... 17

*United States v. Rigas*, 490 F.3d 208, 220 (2d Cir. 2007) .......................................................... 20

*United States v. Rivera*, 22 F.3d 430, 437 (2d Cir. 1994)........................................................... 33

*United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003) .................................................. 34

*United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) ............................................. 18, 19

*United States v. Tocco*, 135 F.3d 116, 130 (2d Cir. 1998) ............................................................ 35

**Statutes**

15 U.S.C. § 78ff ............................................................................................................... 20

15 U.S.C. § 78j(b) ............................................................................................................... 1

**Other Authorities**

Fed. R. Evid. 701, advisory committee's note, 2000 amend. ...................................................... 21

iii

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to the January 8, 2021 motions of defendants Parker H. Petit and William Taylor pursuant to Federal Rules of Criminal Procedure 29 and 33.  On November 19, 2020, following a four-week jury trial, Petit was convicted of one count of securities fraud and Taylor was convicted of one count of conspiring to commit securities fraud, to make false statements in filings with the Securities and Exchange Commission ("SEC"), and to mislead the conduct of audits.  The convictions arose from the defendants' participation in a scheme to falsely inflate the reported revenue of MiMedx, a public company of which Petit was the Chief Executive Officer and Taylor was the Chief Operating Officer.  In addition to the guilty verdicts, the jury found Petit not guilty of conspiracy and Taylor not guilty of one count of substantive securities fraud.

At the close of the Government's case-in-chief, both Petit and Taylor moved for a judgment of acquittal under Rule 29.  In their motions, which were made orally, Petit and Taylor argued that there was insufficient evidence for the jury to find them guilty.  Taylor also argued that the Government had not offered evidence to establish that the false statements Taylor caused to be made regarding MiMedx's reported revenue were made "in connection with the purchase or sale of [a] security."  15 U.S.C. § 78j(b).  The Court initially reserved decision on the "purchase or sale" issue but otherwise denied the defendants' motion.  The defendants renewed their Rule 29 motions at the close of the evidence.  The Court ultimately denied those motions in their entirety.

The defendants' renewed motions repeat and elaborate on many of the same arguments regarding the sufficiency of the evidence that they made orally at the conclusion of the

1

Government's case.  They also make additional arguments regarding the Government's jury addresses to support a motion for a new trial under Rule 33.  Both sets of arguments are meritless.  As the Court previously recognized, the evidence presented at trial was more than sufficient for the jury to conclude that Petit committed securities fraud and that Taylor conspired to falsely inflate MiMedx's revenue, to lie in MiMedx's filings with the SEC, and to mislead MiMedx's auditors.  As for the defendants' arguments in support of a new trial, as explained below, they mischaracterize the evidence and argument and fall far short of the high threshold required to vacate a duly rendered jury verdict.

## THE EVIDENCE AT TRIAL

The evidence at trial established the following facts, in relevant part.

### Overview of the Accounting Fraud Scheme

MiMedx Group, Inc. ("MiMedx") is a publicly traded biopharmaceutical company headquartered in Marietta, Georgia.  MiMedx sells regenerative biologic products, such as skin grafts and amniotic fluid.  During the relevant period, MiMedx sold its products both directly to end users such as public and private hospitals and to various stocking distributors, which, in turn, resold the product to medical professionals.  MiMedx's securities traded under the symbol "MDXG" on the NASDAQ.  (Tr. 83, 93, 110 (Andersen)).  As discussed, Petit was the CEO of MiMedx and Taylor was the company's COO.  (*Id.* at 86-87 (Andersen)).

MiMedx executives, including Petit and Taylor, publicly identified revenue as the principal metric demonstrating MiMedx's growth and touted MiMedx's consistent record of quarter-over-quarter revenue growth and meeting or exceeding revenue guidance, which itself typically increased quarter-over-quarter.  (Tr. 179-188 (Andersen); Tr. 512-515 (Carlton)).  By

2015 and 2016, however, it was increasingly difficult for MiMedx to reach its revenue guidance due to decreased demand from certain distributors and the increasingly aggressive revenue targets MiMedx had publicly announced.  (Tr. 512-515 (Carlton)).

Confronted with the difficulties faced by MiMedx in meeting its quarterly and annual revenue guidance, from at least in or about 2015 through at least in or about 2016, Petit and Taylor engaged in a scheme to falsely recognize revenue from four distributors: CPM, a Texas-based distributor, in the second quarter of 2015, SLR, a second Texas-based distributor in the third quarter of 2015, Stability Biologics, a Tennessee-based distributor that MiMedx later acquired, in the third and fourth quarters of 2015, and First Medical, a Saudi Arabia-based distributor, in the fourth quarter of 2015.  Through the scheme, Petit, Taylor, and others caused MiMedx to report fraudulently inflated revenue figures to the investing public in the second, third, and fourth quarters of 2015 (together, the "Implicated Quarters") and in MiMedx's 2015 annual filings.  Petit, Taylor, and others caused MiMedx to report these fraudulently inflated revenue figures to the investing public in order to ensure that the reported figures fell within MiMedx's publicly announced revenue guidance, and to fraudulently convey to the investing public that MiMedx was accomplishing consistent growth quarter after quarter, as Petit and Taylor had falsely touted to the investing public.

<u>MiMedx's Fraudulent Recognition of Revenue<br>from CPM in the Second Quarter of 2015</u>

By early 2015, CPM was a significant MiMedx distributor whose purchases helped MiMedx reach its quarterly revenue guidance.  (Tr. 599 (Carlton)).  As the end of the second quarter of 2015 approached, MiMedx had not yet hit its revenue guidance and MiMedx salespeople

were not anticipating the ability to generate substantial additional sales revenue from CPM.  (GX 1002; Tr. 602 (Carlton); Tr. 986-87 (Schultz)).  To meet MiMedx's revenue guidance for the second quarter of 2015, Petit and Taylor took steps to fraudulently inflate MiMedx's sales to CPM.  Specifically, Petit and Taylor, through two fraudulent means, caused MiMedx to improperly recognize approximately $1.4 million of revenue in the second quarter of 2015.

First, Petit and Taylor agreed to pay Mark Brooks, the owner of CPM, $200,000 to purchase approximately $2.1 million of MiMedx product by the end of June 2015.  (Tr. 603-07 (Carlton)).  To hide the fact that the $200,000 payment was a bribe to induce CPM's purchase of MiMedx product in the second quarter of 2015 (which should have reduced the revenue that MiMedx could recognize from the sale), Petit and Taylor falsely characterized the $200,000 as payment for purported consulting services provided by Brooks.  (Tr. 607-12 (Carlton)).  Prior to arranging the fraudulent consulting payment, Taylor considered funneling the $200,000 payment to Brooks through the company of a MiMedx consultant to disguise its purpose.  (Tr. 1003-04 (Schultz)).

Second, when MiMedx management realized that they did not have in stock the particular MiMedx products that CPM agreed to order, Petit and Taylor agreed with Brooks that (1) as part of CPM's approximately $2.1 million order, CPM would purchase approximately $1.2 million of MiMedx product that CPM neither wanted nor intended to sell, and (2) in a subsequent quarter, CPM could return the unwanted product and exchange it for product of equal value that CPM actually wanted and intended to sell.  To carry out their fraudulent scheme, Petit and Taylor enlisted the assistance of Jeff Schultz, a MiMedx vice president of sales.  On or about June 29, 2015, when MiMedx management learned that the products CPM was willing to purchase were

4

not in stock, Schultz stated in an email to members of the MiMedx sales team, that was also received by Petit and Taylor: "Ship to the amount of the total dollar amount.  Fill what you can that he wants and then send the rest of the product we have in stock and we will exchange it in July."  (GX-1029).  On or about that same date, Schultz emailed Brooks, copying Petit, among others, asking Brooks to change his purchase order to reflect what MiMedx had in stock (but not the products Brooks had been willing to order).  Schultz stated in the email to Brooks: "Can we please get a change order from you so we can ship what we have now in stock and I will physically come to Dallas to make the changes in early July[.]"  (GX-1027).  After Brooks agreed to the product swap, Petit signed the purported "consulting agreement."  (GX-709).

At no time following this sale to CPM, did Petit and Taylor disclose to Cherry Bekaert, MiMedx's auditors, (1) the existence of the $200,000 "consulting agreement" with Brooks or (2) that MiMedx and Brooks had reached a side agreement that CPM would purchase approximately $1.2 million of product that it would swap for different product in a subsequent quarter.  (Tr. 1737-40 (Urbizo)).

Based upon the secret agreement between MiMedx and Brooks to swap the product, on or about June 29, 2015, CPM sent MiMedx a purchase order for approximately $2.1 million that reflected the products that MiMedx had in stock and wanted to sell to CPM.  MiMedx recognized all of that revenue in the second quarter of 2015.  (GX-718, 856).

In or about July 2015, MiMedx sales executives discussed how to provide CPM the product that Petit and Taylor had agreed to swap for the product CPM had agreed to receive the previous quarter but did not want.  On or about July 10, 2015, David Nix, a senior MiMedx operations executive emailed Brent Miller, a MiMedx executive vice president,  in relevant part: "Has it been

discussed how the [CPM] returns will be managed?"  Miller responded, in relevant part: "We have to manage timing for 2 reasons; our inventory rebuild and revenue recognition issue.  Bill [Taylor] wants to ship the [CPM] replacement product in August over a 2-3 week period in 4 shipments. We have auditors here in the end of July looking at the books.  No more emails on this." (GX-1033).  Taylor thus directed Miller to carry out the swap in a manner designed to avoid detection by MiMedx's outside auditors.

MiMedx's Fraudulent Recognition of Revenue<br>from SLR in the Third Quarter of 2015

By the third quarter of 2015, MiMedx sought to sell product to a new Texas-based distributor that could make up for the revenue shortfall resulting from the winding down of MiMedx's relationship with CPM.  To make up that revenue, MiMedx first turned to SLR, a small Texas-based distributor that was owned and operated by Jerry Morrison, a former MiMedx employee.

On or about September 15, 2015, approximately two weeks before the end of the third quarter of 2015, MiMedx and SLR entered into a written "Domestic Distributor Agreement," which made SLR MiMedx's exclusive distributor in Texas and provided that SLR would make payment for any product that SLR purchased from MiMedx within 30 days of purchase.  (GX-715).  On or about September 30, 2015, the final day of the third quarter of 2015, following negotiations with Petit and Taylor, SLR agreed to purchase approximately $4.6 million of OrthoFlo product, MiMedx's new amniotic-fluid based product. This was the largest quarterly order in MiMedx's history to date. (GX-729). The timing and size of the order were dictated by Petit and Taylor as a condition of SLR's being made MiMedx's exclusive distributor in Texas.

6

MiMedx, in turn, recognized approximately $4.6 million of revenue upon shipment of the product to SLR in the third quarter of 2015.

At the time that MiMedx recognized revenue for the September 2015 sale to SLR, Petit and Taylor fully understood that SLR would not make a timely payment of $4.6 million for the product, and certainly would not do so within contractual terms.  As noted above, SLR's $4.6 million order was, at that point, the largest quarterly order that MiMedx had ever received from any customer.  Yet SLR, a company in its infancy, had never ordered from MiMedx before and had no record of making payments.  MiMedx likewise had no record of selling OrthoFlo, a new MiMedx product, to any customer.  Moreover, as Petit and Taylor well knew, the $4.6 million order was exponentially larger than SLR's annual revenue.

Petit and Taylor further understood that SLR lacked the means to store and distribute OrthoFlo, a product that needed to be kept frozen.  Before the end of the third quarter of 2015, at the direction of Petit and Taylor, MiMedx purchased freezers, which it provided to SLR so that SLR could purchase and store the quantity of OrthoFlo that MiMedx needed SLR to buy in order for MiMedx to meet its quarterly revenue guidance.  (GX-1042).

Although SLR's payment to MiMedx for the product it had purchased during the third quarter of 2015 was due on or about October 30, 2015 (i.e., within 30 days of shipment), by the end of November 2015 SLR had paid only approximately $10,000 of the $4.6 million it owed. (GX-733). Additionally, in or about the fall of 2015, Morrison advised Petit that SLR was having trouble distributing the OrthoFlo and that it needed an infusion of capital to pay MiMedx. Morrison informed Petit that he had attempted to secure a loan from a bank, but had been unsuccessful.  (GX-1612).

7

As Petit well knew, SLR's failure to pay down a significant amount of the money it owed to MiMedx before the end of 2015 made it more likely that Cherry Bekaert would challenge SLR's creditworthiness, which could lead to a restatement of MiMedx's third quarter revenue figures or a reduction in the revenue that MiMedx could recognize in its annual SEC filing.  Petit, therefore, arranged for Morrison to obtain a loan from Petit's adult children to hide from MiMedx's auditors that the collectability of receivables from SLR was questionable.  Petit, in or about the fourth quarter of 2015, arranged for his adult children to loan money to SLR through a shell company, which was funded with money from a trust fund established by Petit for his family.

In or about late November 2015, Petit's three adult children and their spouses incorporated a shell company (the "Shell Company") in order to issue a loan from the Shell Company to SLR. (GX-402).  Todd Campbell, Petit's son in law, set up a bank account in the name of the Shell Company and arranged for funds to be transferred from a generation-skipping trust that Petit had established for his family into the Shell Company's bank account in order to fund the loan to SLR. (GX-403).  Petit personally reviewed a promissory note between the Shell Company and SLR, which Petit sent to Morrison.  (GX-1079, 1080).  Campbell, however, privately expressed to Petit that he was not comfortable with the terms of the loan and told Petit in an email: "In general, [I am] not a huge fan of loaning money.  I think that is what banks are for." (GX-1085).  Petit himself discussed the loan terms with Morrison and sent him the initial drafts of the loan paperwork.

At the time the loan was issued, Petit understood that the loan proceeds would be used, in substantial part, by SLR to pay down its debt to MiMedx for product that SLR had purchased.  On or about December 21, 2015, pursuant to the promissory note, the Shell Company wired approximately $1.5 million to SLR.  (GX-900).  Within approximately the next week, SLR used

the loan proceeds in substantial part to make payments to MiMedx totaling approximately $1.2 million.  (GX-733).

Petit hid from MiMedx's internal accountants and Cherry Bekaert that SLR had received a loan from Petit's adult children.  With knowledge that SLR had used the loan proceeds in substantial part to pay down its debt to MiMedx for product it had purchased in the third quarter of 2015, Petit made false and misleading statements to MiMedx's accountants and Cherry Bekaert about the collectability of payment from SLR.

For example, on or about February 4, 2016, in response to concerns raised by a member of MiMedx's accounting department about the propriety of recognizing revenue from SLR, Petit approved the submission of a response to Cherry Bekaert, which, in relevant part, touted that SLR "has paid over $1.4M since the first shipments had been made.  Their payment history to date is very similar to that of other distributors." (GX-1118).  Petit hid from Cherry Bekaert that SLR's payments of $1.2 million to MiMedx had been funded in large part by the Shell Company loan orchestrated by Petit and his children and funded from a trust fund that Petit himself had established.  Based in large part on SLR's payments to MiMedx that were funded by the Shell Company loan, Cherry Bekaert's concerns about collectability were assuaged and Cherry Bekaert continued to allow MiMedx to recognize revenue from the sale to SLR.  (Tr. 1753-55 (Urbizo)).

MiMedx's Fraudulent Recognition of Revenue from
Stability in the Third and Fourth Quarters of 2015

By the third quarter of 2015, MiMedx also sought to sell product to Tennessee-based Stability to help make up for the revenue shortfall resulting from, among other things, the winding down of MiMedx's relationship with CPM.  For example, on or about September 18, 2015, Mike

Carlton, a MiMedx senior vice president of sales, emailed Petit, Taylor, and others stating that he had just spoken with an employee of Stability and "[t]hey are excited to work with us and he asked me 'what can I personally do for you'. I told him we will need to move a significant amount of liquid into his freezer and he said 'it's done'. This couldn't have happened at a better time." (GX-1044).

At approximately the same time, during the third and fourth quarters of 2015, Petit and Brian Martin, the chief executive officer and part-owner of Stability, engaged in negotiations over MiMedx's acquisition of Stability.   These negotiations ultimately resulted in MiMedx's acquisition of Stability on or about January 13, 2016 (the "Acquisition").

Prior to the Acquisition, and while the negotiations were ongoing, MiMedx sold product to Stability in both the third and fourth quarters of 2015.  On or about September 29 and 30, 2015, the last two days of the third quarter, MiMedx sold approximately $2.2 million of product to Stability and recognized all of that revenue upon shipment.  This purchase, the first ever made by Stability from MiMedx and consisting primarily of OrthFlo product, was made at Petit's request. (Tr. 1510-17 (Martin)).  After Stability agreed to make the purchases, sales employees at MiMedx informed Stability as to which MiMedx products were immediately available for shipment, so that Stability could order those products before the end of the quarter.  (Tr. 1517-18).

On or about December 31, 2015, the last day of the fourth quarter, Petit asked Stability to purchase an additional MiMedx product at a cost of approximately $450,000.   (Tr. 1560-68 (Martin)).  At the time he made the request, Petit had already determined to recommend that MiMedx make the Acquisition.  Martin agreed to Petit's request.  MiMedx recognized all of the revenue from that sale upon shipment.  (GX-850).  On the same day, after members of MiMedx's

accounting department expressed concern that Stability had not yet paid any of the approximately $2.2 million it owed for the purchase in the prior quarter, Petit asked Martin to make a partial payment to show to MiMedx's accountants and auditors.  (Tr. 1560-68).  Accordingly, Stability paid MiMedx approximately $225,000 on or about December 31, 2015.  This was the only payment that Stability ever made for MiMedx product.  (GX-728).

These sales to Stability should not have been recognized as revenue by MiMedx in the third and fourth quarters of 2015, for at least three reasons.  First, MiMedx and Stability had not agreed upon the essential terms of the sale, including when payment was due.  In fact, substantial disagreements between Stability and MiMedx over payment terms remained unresolved well after MiMedx booked revenue for sales to Stability.  Because of these outstanding disagreements, Martin refused to sign a distribution agreement with MiMedx.  Ultimately, Martin agreed to sign a sham distribution agreement following the end of 2015, at the request of Petit and Taylor.  (Tr. 1712 (Martin), GX-716).  Taylor signed the sham agreement on behalf of MiMedx.  (GX-716). The signed distribution agreement was undated and signed by Taylor and Martin and was provided to Cherry Bekaert in support of the revenue recognition.

Second, Petit and Taylor reached a secret side understanding with Stability that Stability would buy product in the third quarter that it did not want and would not sell, and that Stability could either swap that product for different product or return the unwanted product to MiMedx in a subsequent quarter for a refund or credit.  (Tr. 1514-15 (Martin)).  For example, on or about September 29 and 30, 2015, the last two days of the third quarter, when MiMedx management realized that they did not have in stock the particular MiMedx products that Stability agreed to purchase and planned to sell, Petit and Taylor agreed with Martin that (1) as part of Stability's

approximately $2.2 million order, Stability would purchase approximately $2 million of MiMedx products that Stability neither wanted nor intended to sell, and (2) in a subsequent quarter, Stability could return the unwanted product and swap it for product of equal value that Stability could sell. Petit and Taylor reached this agreement with Stability in an effort to finalize MiMedx's $2.2 million sale to Stability during the third quarter of 2015 and thereby falsely inflate MiMedx's revenue in order to meet the company's quarterly revenue guidance.

Moreover, toward the end of 2015, in an effort to induce Martin to purchase additional MiMedx product in the fourth quarter and sign a distribution agreement, Petit gave Martin a secret letter granting Stability the right to return any and all MiMedx product that it had been previously purchased.  (GX-701).  On or about December 31, 2015, Petit provided the secret letter to Martin, stating that if the Acquisition did not proceed, MiMedx would "commit to exchange or take back any of our amniotic related products so you may proceed on your own."  (*Id.*).  Petit back-dated the letter to September 25, a date immediately prior to Stability's first purchase of MiMedx product, and hid the letter from MiMedx's internal accountants and Cherry Bekaert.  After receiving this letter, Martin emailed an employee of Stability: "I told [Petit] I would not sign the distribution agreement unless we could return the product! :-)." (GX-1251).  Accordingly, as Petit well knew, the sales to Stability were not final because Stability had the right to return the product to MiMedx at any time and the amount of any return could not be reasonably estimated.  Ultimately, Stability returned more than half of the product that it had purchased from MiMedx and exchanged some of it for other products.

Third, Petit and Taylor understood that Stability could not and would not pay for the product in a timely fashion.  As noted above, Stability ultimately paid MiMedx only approximately

$225,000, less than ten percent of the value of product that it purchased during the third and fourth quarters of 2015.

In or about early 2016, as part of its annual audit, Cherry Bekaert questioned MiMedx's senior management about the propriety of revenue recognized from sales to Stability. In response, Petit and Taylor made false and misleading statements to Cherry Bekaert about MiMedx's arrangement with Stability. For example, in a written summary prepared for Cherry Bekaert on or about February 4, 2016, Petit and Taylor asserted that "[t]he MiMedx products were sold to [Stability] under a signed distributor agreement similar to agreements signed with other distributors such as [CPM]." (GX-1118). As set forth above, however, Petit and Taylor knew that statement was false, because there was no such distribution agreement at the time the products were sold in the third quarter of 2015. In reality, the distribution agreement was not actually signed until in or about 2016, but was undated in order to conceal when it was actually executed. Similarly, Petit and Taylor asserted in the written summary that Stability's sales of MiMedx product in the fourth quarter were "minimal" because Martin was "preoccupied during the fourth quarter," and that Stability made an additional order in the fourth quarter "as they wanted to be assured they could continue to supply their customers if the merger agreement negotiations slowed down or were discontinued." (GX-1118). In truth and in fact, as Petit and Taylor well knew, Stability never intended to sell most of the product it had purchased in the third quarter, let alone within the following three months, and Stability purchased additional product in the fourth quarter only because Petit had requested that Stability do so as part of the Acquisition negotiations. None of these terms of the Stability transaction were revealed to MiMedx auditors. (Tr. 1757-62 (Urbizo)).

13

<u>MiMedx's Fraudulent Recognition of Revenue</u>
<u>from First Medical in the Fourth Quarter of 2015</u>

As the end of the fourth quarter of 2015 approached, in order to reach its quarterly and annual revenue guidance, MiMedx sought to sell product to First Medical, a Saudi Arabia-based distributor that sold medical products to hospitals in the Middle East. At the time, First Medical was attempting to obtain a "tender" (or contract) to sell products to state-sponsored hospitals in Saudi Arabia.

During negotiations between MiMedx and First Medical, Bassam El Hage, a principal of First Medical, made clear to Taylor that there was a risk that the Saudi government would not award the tender to First Medical and that First Medical therefore could not assume the risk of purchasing MiMedx product if the tender was not awarded. Accordingly, Taylor agreed with El Hage, in substance, that (1) MiMedx sales representatives would assist First Medical in selling product to Saudi hospitals, (2) MiMedx would take back the product if the tender were not awarded, (3) MiMedx would not leave First Medical with any losses, and (4) MiMedx would give First Medical additional extended payment terms.

First Medical ultimately agreed to purchase approximately $2.54 million of MiMedx's EpiFix product in or about late December 2015, and MiMedx recognized revenue from the sale upon shipment. After Taylor agreed to let First Medical make their purchase of product contingent on the tender, Taylor was told by members of MiMedx's accounting team that that would preclude revenue recognition and Taylor agreed to change the payment term to 180-day fixed terms. Taylor then crafted a false cover story to mislead MiMedx's internal accountants and Cherry Bekaert about the true terms of MiMedx's arrangement with First Medical.

14

On or about December 21, 2015 at approximately 2:30:02 p.m., Taylor sent an email, entitled "Purchase Order," (the "Cover Email") to the El Hage, copying Carlton, stating:

> Thank you very much for the EpiFix order placed earlier today.  It is very much appreciated.  Our accountants have asked for a clarification on the Payment Terms.  Because the email referenced was related to the 2015 tender and the July order, they wish to have a clarification.  I know this order is for 2016 sales by [First Medical].  I have clarified below their proposal.
>
> Payment terms:  180 days from receipt of product by [First Medical].
>
> Thank you for your consideration.  Please advise if this will be acceptable.

Just four seconds later, on or about December 21, 2015 at approximately 2:30:06 p.m., Taylor sent a second email to the El Hage, entitled "Purchase Order – Clarification" (the "Clarification Email").  The Clarification Email did not copy anyone at MiMedx and memorialized terms that differed materially from those set forth in the Cover Email.  Taylor's Clarification Email stated:

> Further to my email that I just sent relative to the Purchase order 212-2015.  We understand that it is expected that the 2016 tender will be issued in March 2016, and it is expected to be as big, or bigger than the tender that was issued to [First Medical] in 2015.  In the event the tender is delayed, or for some unlikely event does not occur, MiMedx will give [First Medical] additional extended payment terms if request[ed] and will assist [First Medical] in selling the product or another option would be to repurchase the product.  We will continue supporting sales efforts in the territory by continued training . . . . Thank you again for a strong partnership with MiMedx. Please feel free to contact me at any time with any questions.  Best regards, Bill.

Taylor subsequently arranged for the Cover Email, but not the Clarification Email, to be circulated to MiMedx's accounting department.  As Taylor well knew, the Clarification Email memorialized the true terms of First Medical's purchase, and the Cover Email was a false cover

15

story designed to mislead MiMedx's internal accountants and Cherry Bekaert into believing that First Medical was required to make payment to MiMedx within 180 days and that, accordingly, MiMedx could immediately recognize revenue from the sale.

In or about early 2016, in connection with its annual audit, Cherry Bekaert sought written confirmation from First Medical that it had purchased MiMedx product in or about December 2015 subject to specified payment terms. Taylor thereafter arranged for El Hage to receive and sign an audit confirmation that falsely indicated that First Medical had agreed to pay within 180-day terms and omitted the true terms of First Medical's arrangement with MiMedx as reflected in the Clarification Email. Taylor hid the Clarification Email and the true terms of the deal from MiMedx's internal accountants and Cherry Bekaert.

## DISCUSSION

### I.  Applicable Law

#### A.  Rule 29

A defendant challenging the sufficiency of the evidence "bears a heavy burden." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (quoting *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008)). A conviction must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011) (internal quotation marks and citation omitted; emphasis in original). The Court cannot disturb a jury's verdict unless "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt

16

beyond a reasonable doubt." *United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) (internal quotation marks omitted).

In considering the sufficiency of the evidence supporting a guilty verdict, the evidence must be viewed "in the light most favorable to the Government." *United States v. George*, 779 F.3d 113, 115 (2d Cir. 2015). The Court must analyze the pieces of evidence "in conjunction, not in isolation," *United States v. Persico*, 645 F.3d at 104 (quoting *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008)), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Cuti*, 720 F.3d at 462 (quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999)). The Court must also "credit[] every inference that the jury might have drawn in favor of the government," because "the task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing court." *Cuti*, 720 F.3d at 461-62 (internal quotation marks and citations omitted).

**B. Rule 33**

The district court "may grant a new trial to [a] defendant if the interests of justice so require." Fed. R. Crim. P. 33. Because "motions for a new trial are disfavored in the Second Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), a district court, after examining the totality of the evidence and considering objectively all of the facts and circumstances, should grant the motion only if the court finds "a real concern that an innocent person may have been convicted." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).

In short, "[i]t is only when it appears that an injustice has been done that there is a need for a new trial 'in the interests of justice.'" *Id*.

Because courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, "[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *United States v. Sanchez*, 969 F.2d at 1414. In particular, "[a] district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020) (internal quotation marks omitted). The trial court's discretion to grant a new trial under Rule 33 should be exercised "sparingly" and in "the most extraordinary circumstances." *Sanchez*, 969 F.2d at 1414.

## II. Sufficient Evidence Supported the Defendants' Convictions

Continuing to press arguments that were previously rejected by both the jury and this Court, the defendant seeks judgements of acquittal on their respective counts of conviction. Petit makes a kitchen-sink argument, asserting that the Government failed to offer sufficient proof that MiMedx's recorded revenues did not comply with Generally Accepted Accounting Principles ("GAAP") or, in the alternative, that he knew about the accounting misstatements, and that there was no foundation for the jury's finding of intent to defraud. (Petit Mot. 5-7). Taylor argues more generally that the evidence was insufficient to establish his participation in the charged conspiracy. (Taylor Mot. 9-14).

The defendants' sufficiency arguments have no merit. As discussed below, there was ample evidence that the defendants caused MiMedx to report false and misleading revenue figures,

18

that they understood the accounting implications of their secret side deals with MiMedx's distributors, and that they acted with criminal intent to deceive MiMedx's investors and auditors.

## A. Expert Testimony Was Not Required to Establish that the Defendants Caused MiMedx to Report False and Misleading Revenue Figures.

Petit's lead sufficiency argument can be easily dismissed. Petit argues that the Indictment in this case alleges that the defendants caused MiMedx to report revenue in violation of GAAP and that the Government's failure to call an expert witness to establish that the accounting was in fact improper under GAAP renders the evidence *per se* insufficient. (Petit Mot. 7). This is wrong on multiple fronts.

First, the Second Circuit has explicitly rejected the argument that, in order to prove accounting fraud, the Government must prove that the accounting was improper under GAAP. *United States v. Ebbers*, 458 F.3d 110, 125 (2d Cir. 2006). "[I]f the government proves that a defendant was responsible for financial reports that intentionally and materially misled investors, the [penalty provision of the Exchange Act] is satisfied." *Id.* The Government "is not required in addition to prevail in a battle of expert witnesses" to establish that the accounting was improper. *Id.* at 125-26; *see also United States v. Rigas*, 490 F.3d 208, 220 (2d Cir. 2007) ("The government was not required to present expert testimony about GAAP's requirements because these requirements are not essential to the securities fraud alleged here.").

Contrary to Petit's claim, this rule is no different where the Government has asserted that the defendants' fraudulent conduct has, in fact, resulted in a misstatement of financials under GAAP. "[E]ven where improper accounting is alleged, the statute requires proof only of intentionally misleading statements that are material, *i.e.*, designed to affect the price of a

security." *Ebbers*, 458 F.3d at 125 (citing 15 U.S.C. § 78ff).  That is because, in an accounting

fraud case, compliance with GAAP "neither establishes nor shields guilt" but is instead "relevant

only as evidence of whether a defendant acted in good faith." *Rigas*, 490 F.3d at 220.

Accordingly, Petit's repeated assertions that the Indictment in this case recited GAAP literature

or alleged improprieties under GAAP (Petit Mot. at 7-8) are irrelevant.  The Government was

under no obligation to prove the GAAP accounting implications in order to secure a conviction.

 Relatedly, nothing in the law requires that, where accounting improprieties are alleged,

those improprieties must be proven through expert testimony.  False or misleading statements in

a company's financial statements may be proven, as here, by testimony that the accountants and

auditors who were responsible for recording and reviewing the transactions at issue would have

reached a different accounting conclusion if they had known the facts that the defendants hid

from them.  As the Second Circuit recognized in *Cuti*, a case in which, as here, the Government

alleged that the defendants had recognized revenue in violation of GAAP, the relevant issue is

not the specifics of the accounting rules or their interpretation, but instead, "whether the facts

[withheld from the accountants] would have altered the rules' application."  720 F3d at 460.

Because in such circumstances, "the issue for the fact-finder's determination is reduced to

impact—whether a witness would have acted differently if he had been aware of additional

information—the witness so testifying is engaged in 'a process of reasoning familiar in everyday

life'" and is properly understood as offering lay opinion testimony.  *Id.*  (quoting Fed. R. Evid.

701, advisory committee's note, 2000 amend.).

 In this case, just as in *Cuti*, the testimony that the Government presented from Mark

Andersen and Matt Urbizo established overwhelmingly that the defendants' lies and omissions

affected the accounting for the transactions at issue and resulted in MiMedx's publishing falsely inflated revenue figures.  This evidence was thus more than sufficient to support the convictions.

### B.  The Evidence of Petit's Criminal Intent Was Overwhelming

Next Petit argues that that the evidence of his intent to defraud was lacking.  (Pet. Mot 8-12).  He begins this argument by aiming at a straw man, spending pages taking issue with evidence that the Government introduced to establish that he was strongly motivated to report favorable revenue figures for MiMedx and that he stood to benefit financially from doing so.  (*Id*. at 8-10).  But while it is uncontroversial that an executive's desire to meet revenue targets, and his personal stake in meeting those objectives, are not necessarily indicative of a guilty mind, when paired with evidence that the same executive hid key terms of transactions and affirmatively misled accountants regarding the nature of those transactions, such incentives provide powerful evidence that these actions were intentional efforts to defraud investors and not the product of mistake or accident.  As the Second Circuit has recognized, "proof of motive, where available, is often sufficient to convince a reasonable man of criminal intent beyond a reasonable doubt."  *United States v. Natelli*, 527 F.2d 311, 318 (2d Cir. 1975).

Apparently recognizing this fact, Petit next attacks the Government's evidence of his lies and omissions.  Relying heavily on the Ninth Circuit's decision in *United States v. Goyal*, 629 F.3d 919 (2010), he argues that the falsehoods in his management representation letters and his failure to disclose the side-deals cannot provide evidence of criminal intent.  (Petit Br. at 10-11).  *Goyal*, however, is not binding on this Court and is, in any event, distinguishable.  In *Goyle*, the Government sought to prove the defendant's guilt of lying to auditors by relying on his attestations in management representation letters that the company's financial statements

"complied with GAAP" and the company "had disclosed all sales terms" to the auditors.  *Goyal*,

629 F.3d at 916.  The Ninth Circuit concluded that the Government had failed to offer evidence

as to certain transactions that the company's accounting did not comply with GAAP, had failed

to establish that the defendant knew of the accounting problems as to others, and had failed to

show that the defendant knew that there were sales terms that were not disclosed to the auditors.

*Id.* at 917-22.

This case is easily distinguishable.  As to each of the distributors in this case, the

Government offered affirmative proof that (1) Petit and Taylor entered into secret side deals to

artificially inflate MiMedx's revenue, (2) that as a result of these secret deals, MiMedx recorded

revenues in a way that was contrary to GAAP,  (3) that Petit understood the accounting

implication of his actions, and (4) that the defendants did not simply fail to disclose their actions,

they acted affirmatively to hide them from MiMedx's accountants and auditors, including after

Andersen raised questions about the propriety of revenue recognition.  *Cf.* Goyal, 629 F.3d at

922 (noting the absence of any evidence that the defendants "willfully concealed" side deals

from auditors).

### 1.  CPM

Beginning with CPM, Matt Urbizo offered clear testimony that if the circumstances and

motivations of the $200,000 payment to Mark Brooks, and the company's commitment to ship

CPM product that it knew would be returned, had been disclosed to him, then he would have

concluded that the company's recognition of revenue from its second quarter 2015 sale to CPM

was overstated under GAAP, irrespective of the size of the company's reserves.  (Tr. 1738-44

(Urbizo)).  The evidence established that Petit and Taylor knew this as well.

22

With respect to the $200,000 payment to Brooks, Jeff Schultz, a participant in the CPM transaction, testified that he understood that Petit and Taylor would not want to reduce the recorded revenue from the sale to account for the payment to Brooks.  It was for that reason that Schultz suggested to Taylor that the payment could be run through another distributor's accounts.  (Tr. 1337).  Taylor did not balk at this suggestion or indicate that there was no need to disguise the payment.  But rather than take up Schultz's suggestion, Taylor and Petit arranged to disguise the payment to Brooks in a different way: as consideration for purported consulting work done.  (GX 354).  Petit doubled down on this claim, testifying under oath to the SEC that the payment was for consulting work (GX 1612), and telling investors that it was for "very valid intelligence information" (GX 354).  Yet, at trial, he did not challenge the testimony of Carlton and Schultz that Brooks was not inclined to do any consulting work and, in fact, never did any. (Tr. 609-6012 (Carlton); 1006-09 (Schultz)).  Petit also offered other, contradictory explanations regarding the purpose of the payment, reporting in an email sent to MiMedx's general counsel that the money was intended to settle a dispute regarding MiMedx's sales to group purchasing organizations (GX 146), and attempting to pressure Jeff Schultz to tell investigators that the payment was for lost stock (Tr. 1019).  The jury was entitled to infer that Petit's contradictory and inconsistent explanations regarding the purpose of the payment, as well as his efforts to corruptly influence Schultz's and Carlton's testimony, were indicative of an effort to affirmatively hide the fact that the payment was an inducement, and his knowledge and understanding that disclosing that fact would cause the payment to be offset against recorded revenue.  Petit's suggestion otherwise (Petit Br. at 13-14) simply ignores this evidence.

The evidence of Petit's criminal intent with respect to the CPM product swap was also substantial. Petit argues in his motion that he was not aware of the swap negotiations (Petit Br. at 14), but that is plainly false. Jeff Schultz testified that he included Petit on an email regarding the swap because Petit "had to be aware of everything that was going on at CPM," (Tr. at 1012). And, indeed, it was Petit who, in September, sent Brooks the list of products that MiMedx expected would be coming back. (GX 1041). At a minimum, the jury could infer from this evidence that Petit was aware of and participated in negotiating the swap.

As to whether the defendants knew the swap was wrongful, as the Government argued at trial, it made no business sense for MiMedx to ship product it knew would be coming back. The only plausible inference is that the swap was orchestrated to artificially and improperly inflate revenue. Indeed, both Michel Carlton and Jeff Schultz, who were less expert in accounting than either of the defendants, testified that they understood the swap arrangement made no business sense, and was an effort to artificially inflate revenue. (Tr. 617-18 (Carlton); Tr. 975-76, 1013-14 (Schultz)). The jury was entitled to infer from this testimony that Petit and Taylor, who participated with Schultz and Carlton in arranging the transaction, understood this as well. That conviction is only reinforced by Brent Miller's email indicating that Taylor wanted to manage the timing of the CPM product swap to avoid a "revenue recognition issue" given that MiMedx would "have auditors in here at the end of July looking at the books." (GX 1033). While the email does not explicitly mention Petit, the jury could infer that, given Petit's close involvement in the CPM negotiations, including his later involvement in carrying out the swap, he shared

Taylor's instruction to hide the fact of the swap from MiMedx's auditors.[1]  Indeed, Petit and

Taylor concealed the swap from both MiMedx's internal accountants and outside auditors.

### 2.  SLR

As to MiMedx's $4.6 million sale to SLR in the third quarter of 2015, the evidence

established that all parties to the transaction understood that SLR's ability to pay for the product

within a reasonable amount of time was dubious.  The sales to SLR were the largest sales by

dollar amount that MiMedx had ever made, and SLR was a new distributor with limited cash

flows selling a new product, Orthoflow, without an established market.  (Tr. 982, 2010).  Schultz

testified that shortly after the sale, SLR's principal, Jerry Morrison, showed him his freezers full

of Orthoflo and commented, "It will probably take me two years to sell this product. . . . I don't

know how I am going to get rid of it."  (Tr. 983).  Petit and Taylor were aware of all of these

facts.  They were also both aware that SLR lacked the financial means to pay for the product, as

they were propping up SLR's business.  In addition to providing Morrison with freezers to store

the OrthoFlo he purchased from MiMedx, the defendants saw to it that Morrison got severance

payments from MiMedx and $25,000 a month for supposed consulting work.  (DX 362).

Petit, however, hid his knowledge of SLR's precarious financial position from MiMedx's

auditors when they specifically inquired into this issue at the end of 2015, after Andersen raised

---

[1] Petit also argues in passing that there was insufficient evidence that the inflations with respect to CPM were material, but the jury heard contrary evidence from two investors, as well as Mimedx's external auditor.  Moreover, the jury was not required to conclude that the inflation with respect to CPM alone was material.  Rather, the question was whether the inflation attributable to the scheme as a whole was of a nature or magnitude that it would have mattered to a reasonable investor.

concerns about the propriety of recognizing revenue for sales to SLR.  Rather than explain the

true facts and circumstances around SLR, in an email he prepared for the auditors and was cc'ed

to Taylor, Petit make misleading representations about how long SLR had been in business,

suggested that it was an established distributor, and suggested that the company was performing

so well that it was able to make a $1.5 million payment to MiMedx in December 2015.  (GX

1123).

   In truth, Petit had funded the $1.5 million payment through a loan orchestrated through

his children, a fact that he did not disclose to the auditors.  While Petit claims that there was no

evidence that he intentionally sought to hide the loan (Petit Br. at 17), that argument ignores the

evidence that Petit structured the loan to flow through a shell company and, despite having the

means to loan the money to Morrison himself, arranged for the loan to be made by his adult

children, who had virtually no personal involvement in vetting Morrison's creditworthiness or

negotiating the loan terms, all of which Petit undertook himself.  (Tr. 2273-77).  Petit's

machinations in this regard are strong evidence that he knew the loan had revenue recognition

implications, as is the fact that he made no mention of it when Cherry Bekaert specifically asked

about what he knew regarding SLR's financial position.  The reason Petit sought to hide the loan,

as well as the other facts he knew about SLR's precarious finances is obvious.  He understood

that if MiMedx's auditors knew these facts, they would conclude that MiMedx could not record

revenue from its third quarter sale to SLR.

   And on this score, Petit was correct.  Urbizo testified that if he had been made aware of

the loan, he would have concluded that the $4.6 million in revenue that MiMedx recorded for its

third quarter sale to SLR was not reasonably collectable at the time the revenue was booked, and

26

accordingly that GAAP required that any revenue recorded in the third quarter must be reversed. (Tr. 1755).

### 3. Stability Biologics

Petit's arguments regarding Stability Biologics fare no better. He claims that the evidence that Petit agreed to permit Stability to delay or defer payment for product that it ordered from MiMedx in the third quarter of 2015 consisted only of speculation on the part of Brian Martin. (Petit Br. at 18). But Martin's testimony, which the jury was entitled to credit, revealed that his understanding was far from speculative. Rather, Martin testified that he made clear to Petit in no uncertain terms that Stability could not pay for the product (Tr. at 1705), and Petit's suggestion that the parties would "figure out a payment plan" made clear that MiMedx would not expect payment from Stability within any fixed term. (Tr. 1510). Moreover, Urbizo testified that the absence of a fixed term of payment made revenue recognition improper under GAAP. (Tr. 1760.) As to whether Petit understood that his open-ended payment term created a revenue recognition problem, the jury could fairly conclude that he did based on (1) Petit's false representation in his management representation letter that the terms of the sale were governed by the company's "standard product terms and conditions" (GX 601); (2) his efforts to procure a signed distribution agreement containing fixed terms in anticipation of the annual audit (Tr. 1582; GX 1140); (3) and his plea that Martin make a payment toward Stability's outstanding receivable in advance of the annual audit (Tr. 1562).

Relatedly, from the very first conversation, Petit made clear to Martin that if Stability could not resell the product, it had the right to return or exchange it. Petit made this representation orally to Martin in September of 2015 (Tr. 1510-11) and later reduced it to writing

27

in order to secure a supplemental order from Stability before the end of the fourth quarter (Tr. 1573-1580, GX 701, 1520).  Matt Urbizo testified that the existence of this right of return prevent MiMedx from recognizing any of the revenue that it sold to Stability.  (Tr. 1758-59).  Moreover, while Petit cites *Goyal* for the proposition that, in order to base an accounting fraud claim on an undisclosed right of return, the Government must offer evidence that "returns were not amenable to reasonable estimation," 629 F.3d at 918, he overlooks the fact that, unlike in *Goyal*, the accounting issues raised by the Stability letter and the other side agreements in this case did not turn on MiMedx's inability to estimate returns or reserve, but rather a failure of those transactions to meet other revenue recognition criteria.  (Tr. 1943-45 (Urbizo, testifying that the "concept of estimating returns" has no bearing if "you don't meet all of the criteria for recognizing revenue at the time of sale;" 1742-44).  Nor can it seriously be disputed that Petit understood the revenue recognition implications of the blanket right of return he granted to Stability.  Not only did Petit fail to disclose the letter to Cherry Bekaert despite his representation that he had disclosed "all side agreements or other arrangements (either written or oral)," (GX-602), he also took care to limit the distribution of the letter within MiMedx and caused it to be sent to Martin by FedEx rather than by email.  (GX-700).  This evidence powerfully indicates that Petit understood the accounting significance of the letter, and the jury was entitled to rely on it in finding that he had criminal intent.

### 4.  First Medical

Finally, with regard to First Medical, Petit argues that there is no evidence linking him to the accounting improprieties.  (Petit Br. at 23).  He acknowledges, however, that there was evidence that he participated in a call on December 9, 2015, during which representatives of First

Medical sought and obtained from MiMedx a guarantee that they could return any product if they were unable to resell it. Tr. 545-47. Petit also acknowledges the evidence that he was aware of the importance that the prospective First Medical order played in ensuring that MiMedx met its revenue guidance. In light of this evidence, and the other evidence adduced in the case regarding Petit's knowledge and understanding of the implications of a blanket right of return for the proper accounting of a sale, as well as the evidence of Petit and Taylor's close working relationship and detail-oriented management at MiMedx, the jury could fairly rely on his participation in the First Medical conversations in reaching its verdict.

## C. Taylor's Conspiracy Conviction Is Equally Well-Grounded

Taylor's sufficiency arguments are no stronger than Petit's. At the outset, Taylor attempts improperly to narrow the range of conduct that the Court can consider in assessing his sufficiency claims, insisting that the jury's verdict can "only be understood as a rejection of the allegation in the Indictment that Mr. Petit and Mr. Taylor conspired together to commit securities fraud." (Taylor Br. at 9). The Second Circuit, however, has repeatedly admonished against engaging in the sort of speculative inquiry regarding the jury's intent that Taylor's motion invites. "A court knows only what the jury's verdicts were, not what the jury found, and it is not within the province of the court to attempt to determine the reason or reasons for verdicts that are inconsistent." *United States v. Acosta*, 17 F.3d 538, 546 (2d Cir. 1994). For that reason, "one defendant's conspiracy conviction does not become infirm by reason of jury verdicts of not guilty against all of his alleged coconspirators." *Id.* at 545.

Accordingly, in assessing Taylor's sufficiency claim, the Court may properly consider the evidence outlined above regarding his role, with Petit, in structuring the $200,000 payment to

Mark Brooks, in arranging the $1.3 million CPM product swap, in booking the $4.6 million sale to SLR despite ample evidence that SLR could not pay for the product, and in signing a sham distribution agreement with Stability just in time for the annual audit.  With regard to the CPM swap in particular, Taylor makes no mention of GX 1033, the email regarding the CPM product swap in which Brent Miller reports that Taylor has directed him to time the product returns so that they were not noticed by MiMedx's auditors.  Nor does he acknowledge that the jury could rely on this email to conclude that, even if he did not conspire with Petit, he conspired with Brent Miller or others to effectuate the substantive securities fraud with respect to CPM and to mislead MiMedx's auditors.

Nor is Taylor correct that, in light of the acquittal of Petit on the conspiracy count, "the only remotely plausible First Medical theory the Government presented was that Mr. Taylor conspired with Mike Carlton to mislead MiMedx's auditors with respect to the December 2015 transaction." (Taylor Br. at 11).  This argument is wrong on multiple levels.  Beyond the fact that it is inappropriate to speculate regarding the reasons for the jury's verdict, *Acosta*, 17 F.3d at 546, Taylor ignores the evidence that he and Mike Carlton worked together not simply to mislead MiMedx's auditors, but also to record the fraudulent First Medical transaction in the first place. Indeed, Carlton's testimony and contemporaneous text messages and emails established that Carlton and Taylor worked together in the fourth quarter of 2015, well before the audit, to ensure that First Medical received and understood the secret side email as part of the process of finalizing the First Medical order, to clarify MiMedx's commitment to repurchase product from First Medical in the event the tender was denied, and to record the fraudulent revenue that resulted from the order in order to reach MiMedx's revenue guidance.  Tr. 559-66.  In other words, they

30

knowingly agreed to improperly record revenue at the time of the sale to First Medical in December 2015.  The jury could easily have relied on this evidence to conclude that Taylor conspired with Carlton to commit substantive securities fraud with respect to First Medical.

As for the communications between Taylor and Carlton regarding the First Medical audit confirmation, Taylor rehashes arguments that were previously rejected by the jury and invites the Court to reweigh the evidence.  (Taylor Br. at 12).  He argues that the text message that Taylor sent him at 12:27 PM on February 12, 2015 (DX 411) must be viewed as pertaining to Athletic Surgical rather than First Medical.  Taylor acknowledges that this argument is contradicted by the testimony of Mike Carlton, but he essentially asks the Court to disregard that testimony.  This is improper.  Whether to credit witness testimony and what weight to assign it is the province of the jury.  Taylor's suggestion that no reasonable juror could read the text messages as pertaining to First Medical is plainly incorrect.  While it is true that the text message exchange shows Carlton and Taylor toggling back and forth between First Medical and Athletic Surgical, it begins and end with discussions of "Bassam," a principal at First Medical.  Moreover, other messages in the chain provide equally strong support for the notion that Taylor attempted to interfere with the audit confirmation process for First Medical.  Most significantly, at 11:39 AM that day, Taylor texted Carlton, "See if Bassam can send a draft of the signed letter to me prior to sending to the auditors to review."  (DX 411).  The jury could well infer from this message that Taylor sought to review First Medical's audit confirmation prior to its being transmitted to

Cherry Bekaert precisely because he wanted to hide from the auditors the existence of the right of return and that, accordingly, he conspired with Carlton to mislead MiMedx's auditors.[2]

## III.   There is No Basis to Order a New Trial

Recognizing the weakness in their sufficiency claims, the defendants also briefly argue that perceived unfairness in certain of the Government's arguments entitles them to a new trial.  As discussed below, however, the Government's arguments were fair and grounded in the evidence. Indeed, the defendants did not even object to these arguments or respond to them when they were made.  Certainly the statements at issue are a far cry from the "flagrant abuse" that the defendants must show in order to obtain a new trial.  *United States v. Rivera*, 22 F.3d 430, 437 (2d Cir. 1994) ("If the defendant failed to make timely objection to a statement contained in the prosecutor's summation, the statement will not be deemed a ground for reversal unless it amounts to a flagrant abuse.").

### A.   Rebuttal Argument Concerning Athletic Surgical

Taylor seeks a new trial on the basis of brief comments that Government counsel made without objection during the rebuttal summation in response to Taylor's argument that the "no extra commentary" text message concerned Athletic Surgical, not First Medical.  After characterizing the defense argument as a "desperate claim" counsel noted "If Bill Taylor is directing Athletic Surgical to give an audit confirm that omits the terms of the deal, well then obviously he is guilty of the crimes charged in the indictment. He's still lying to the auditors. So

---

[2] Given the strength of the evidence outlined above, Taylor's cursory argument that he should be granted a new trial because the evidence "preponderates heavily against the verdict" should be summarily rejected.  (*See* Taylor Br. at 19, citing *Archer*, 977 F.3d at 198).

even on the defense theory, he's guilty." Tr. 2459.  Government counsel then immediately pivoted, "But you also know from the messages that Bill Taylor was obviously talking about First Medical, right?" and went on to explain why this was so.  *Id.*  As noted, Taylor did not object to this line of argument when it was made. He now argues, however, that the Government's comments regarding Athletic Surgical posed a new theory of liability that amounted to a prejudicial variance or a constructive amendment of the Indictment.  (Taylor Br. 15-18).  Taylor is wrong.

A constructive amendment occurs when the trial evidence or the jury charge operates to "broaden[] the possible bases for conviction from that which appeared in the indictment." *United States v. Miller*, 471 U.S. 130, 138 (1985).  By contrast, a variance occurs "when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003) (internal quotation marks omitted).  The Government's rebuttal comment was neither.

In this case, the evidence conclusively demonstrated—and the Government consistently argued—that the text messages at issue related to Taylor's efforts to interfere with the audit confirmation sent to First Medical.  The brief remarks regarding Athletic Surgical in no way endorsed the defense's argument that that the messages related to Athletic Surgical—the very thing that the Government had taken pains to disprove throughout trial and had disparaged as "desperate" and "bizarre." (Tr. 2459). The Government was simply pointing out that, on the defendant's own account, he would also have been committing a crime. The Government's repudiation of the defense's argument did not advance a new theory that the Government agreed with the defense argument that the text messages concerned Athletic Surgical.  In fact, it was Taylor, not the Government, who introduced the Athletic Surgical evidence over the Government's

33

objection during the cross-examination of Carlton.  In summation, the Government was merely responding to defense evidence and argument by pointing out that it was not, in fact, exculpatory. In any event, the Government's argument fairly characterized the Athletic Surgical evidence, which was within the time period of the charged conspiracy to mislead MiMedx's auditors. Accordingly, the Government's argument was entirely proper and certainly not a basis to overturn a conviction.  *Cf. United States v. Tocco*, 135 F.3d 116, 130 (2d Cir. 1998) ("[u]nder the fair response doctrine, the defense summation may open the door to an otherwise inadmissible prosecution rebuttal"); *see also United States v. Banki*, 685 F.3d 99, 119-20 (2d Cir. 2012), (affirming the denial of a Rule 33 motion based upon a constructive amendment or variance where Government's rebuttal comments were responsive to the defense summation).

### B.  Materiality Argument

Finally, both Petit and Taylor take issue with the materiality argument in the Government's principal summation.  Their complaint concerns one line in a larger discussion of the materiality element that referenced testimony by Jeffrey Russell, a MiMedx investor who, under questioning on cross-examination *by the defense*, indicated that he did not "regard any overstatement [of revenue] necessarily as trivial," and that he would "want to understand the reason for [any] overstatement" because it "speaks to the integrity of management."  (Tr. 1988-89).  After noting that [i]t was not seriously in dispute [that] investors cared that MiMedx met their revenue guidance, and citing to testimony by investor Joseph Docter to this effect, Government counsel cited Russell's testimony regarding management integrity.  (Tr. 2251-52).

Contrary to the defendants' contention, Government counsel's passing reference— without any objection—to Russell's testimony was merely intended to highlight a memorable

34

portion of his testimony and underscore how critical a metric revenue was at MiMedx and among MiMedx's investors; it did not constitute an argument to the jury that it could convict if it found that MiMedx's revenue was misstated by merely $1.  Nor could the jury have understood the reference in this manner.  Nothing in the evidence or the parties' arguments suggested that a misstatement of that size was at issue in this case.  The misstatements alleged and proven by the Government were in the millions of dollars.  And while defense counsel vigorously contested whether misstatements were made at all and whether the Government could establish intent to defraud, they offered almost no proof and made no arguments that went to the issue of materiality.  Indeed the defendants' failure to lodge a contemporaneous objection to the Government's reference to Russell's testimony or request a curative instruction on the issue of materiality suggests strongly that, at the time the arguments were made, the defense itself did not view them as reflecting on the standard for materiality that the jury should apply.

　　　　Relatedly, in light of their failure to contest materiality in any meaningful way, even if the defendants could establish that the Government mischaracterized the materiality standard— and, as discussed, they cannot—their motion would still fail on the ground that they cannot show how they would be prejudiced by any such a mischaracterization.  *See United States v. Lamorte*, 950 F.2d 80, 83 ("In evaluating whether allegedly improper comments by the prosecutor are grounds for reversal, the fundamental question is whether, if there was misconduct, it caused substantial prejudice to the defendant, thereby depriving him of his right to a fair trial.). This Court provided the jury with accurate instructions on materiality and there is no basis upon which the Court could conclude that the jury disregarded those instructions.

## CONCLUSION

For the reasons set forth above, the defendants' motions under Rules 29 and 33 should be denied.

Dated:  New York, New York
         January 22, 2021

                                   Respectfully submitted,

                                   AUDREY STRAUSS
                                   United States Attorney for the
                                   Southern District of New York

                    By:    _____/s/_____
                                   Edward Imperatore
                                   Scott Hartman
                                   Daniel Tracer
                                   Assistant United States Attorneys
                                   (212) 637-2327/2357/2329