UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                   :

UNITED STATES OF AMERICA

                                   :

          - v. -

                                   :     19 Cr. 850 (JSR)

PARKER H. PETIT and
WILLIAM TAYLOR,
                                   :

          Defendants.             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# THE GOVERNMENT'S SENTENCING MEMORANDUM

AUDREY STRAUSS
United States Attorney
for the Southern District of New York

Edward Imperatore
Scott Hartman
Daniel Tracer
Assistant United States Attorneys

- Of Counsel -

## <u>TABLE OF CONTENTS</u>

FACTUAL BACKGROUND ............................................................................................... 2

I.    The Offense Conduct ................................................................................................... 2

    A.   MiMedx's Fraudulent Recognition of Revenue from CPM in Q2 2015 ...................... 4

    B.   MiMedx's Fraudulent Recognition of Revenue from SLR in Q3 2015 ...................... 6

    C.   MiMedx's Fraudulent Recognition of Revenue from Stability in Q3 and Q4 2015 ........ 9

    D.   MiMedx's Fraudulent Recognition of Revenue from First Medical in Q4 2015 ........... 13

    E.   Obstruction of Justice ............................................................................................ 16

II.    Relevant Conduct .................................................................................................... 17

    A.   Avkare ................................................................................................................... 17

    B.   Petit's Prior Involvement in an SEC Accounting Fraud Investigation ....................... 18

III.    The Applicable Sentencing Guidelines .................................................................... 18

    A.   Discussion ............................................................................................................. 18

    B.   The Defendants' Objections ................................................................................... 20

       1.   Loss Amount ................................................................................................... 20

       2.   Role Enhancement .......................................................................................... 25

       3.   Sophisticated Means ....................................................................................... 27

       4.   Obstruction of Justice ..................................................................................... 28

IV.    Substantial Sentences of Imprisonment Are Appropriate .......................................... 29

    A.   Nature and Circumstances of the Offense and Need for Just Punishment ................... 29

       1.   Petit ................................................................................................................ 29

       2.   Taylor ............................................................................................................. 31

    B.   History and Characteristics of the Defendants ......................................................... 32

    C.   Need for Deterrence and To Promote Respect for the Law ........................................ 35

V.    Forfeiture ................................................................................................................. 35

VI.    Restitution ................................................................................................................ 36

The Government respectfully submits this memorandum in connection with the sentencing of defendant Parker H. Petit, which is scheduled for February 23, 2021 at 4:00 p.m., and defendant William Taylor, which is scheduled for February 24, 2021 at 4:00 p.m.

As set forth below, the advisory Guidelines ranges under the United States Sentencing Guidelines are 20 years for Petit and five years for Taylor, the statutory maximum sentences on their counts of conviction.  The Government agrees that a Guidelines sentence of 20 years' imprisonment for Petit is unwarranted and does not ask for such a sentence.   But given the serious nature of the defendants' criminal conduct and the need for deterrence, to promote respect for the law, and for just punishment, the Government believes that a substantial sentence of imprisonment for Petit and a Guidelines sentence of 60 months' imprisonment for Taylor are necessary and appropriate to achieve the goals of sentencing.

The United States Probation Office ("Probation") recommends that the Court sentence Petit to 72 months' imprisonment and Taylor to 60 months' imprisonment.

## FACTUAL BACKGROUND

I.      **The Offense Conduct**

The evidence presented at trial proved that the defendants orchestrated a brazen scheme to fraudulently inflate the revenue that MiMedx Group, Inc. ("MiMedx") reported to the investing public in 2015 and repeatedly lied to and misled the company's internal accountants and outside auditors about their conduct.

MiMedx is a publicly traded biopharmaceutical company headquartered in Marietta, Georgia.  MiMedx sells regenerative biologic products, such as skin grafts and amniotic fluid. During the relevant period, MiMedx sold its products both directly to end users such as public and

private hospitals and to various stocking distributors, which, in turn, resold the product to medical professionals.   (Tr. 83, 93, 110 (Andersen)).   Petit was the CEO of MiMedx and Taylor was the company's COO.   (*Id.* at 86-87 (Andersen)).

MiMedx executives, including Petit and Taylor, publicly identified revenue as the principal metric demonstrating MiMedx's growth and touted MiMedx's consistent record of quarter-over-quarter revenue growth and meeting or exceeding revenue guidance, which itself typically increased quarter-over-quarter.   (Tr. 179-188 (Andersen); Tr. 512-515 (Carlton)).   By 2015 and 2016, however, it was increasingly difficult for MiMedx to reach its revenue guidance due to decreased demand from certain distributors and the increasingly aggressive revenue targets MiMedx had publicly announced.   (Tr. 512-515 (Carlton)).

Confronted with the difficulties faced by MiMedx in meeting its quarterly and annual revenue guidance, from 2015 through 2016, Petit and Taylor orchestrated a scheme to falsely recognize revenue from four distributors: CPM, a Texas-based distributor, in the second quarter of 2015, SLR, a second Texas-based distributor in the third quarter of 2015, Stability Biologics, a Tennessee-based distributor that MiMedx later acquired, in the third and fourth quarters of 2015, and First Medical, a Saudi Arabia-based distributor, in the fourth quarter of 2015.   Through the scheme, Petit, Taylor, and others caused MiMedx to report fraudulently inflated revenue figures to the investing public in the second, third, and fourth quarters of 2015 and in MiMedx's 2015 annual filings.   Petit, Taylor and others caused MiMedx to report these fraudulently inflated revenue figures in order to ensure that the reported figures fell within MiMedx's publicly announced revenue guidance, and to fraudulently convey to the investing public that MiMedx was accomplishing consistent growth quarter after quarter, as Petit and Taylor had falsely touted to the investing public.

3

### A.  MiMedx's Fraudulent Recognition of Revenue from CPM in Q2 2015

By early 2015, CPM was a significant MiMedx distributor whose purchases helped MiMedx reach its quarterly revenue guidance.  (Tr. 599 (Carlton)).  As the end of the second quarter of 2015 approached, MiMedx had not yet reached its revenue guidance and MiMedx salespeople did not expect to generate substantial additional sales revenue from CPM.  (GX 1002; Tr. 602 (Carlton); Tr. 986-87 (Schultz)).  To meet MiMedx's revenue guidance for the second quarter of 2015, Petit and Taylor took steps to fraudulently inflate MiMedx's sales to CPM.  Petit and Taylor, through two fraudulent means, caused MiMedx to improperly recognize approximately $1.4 million of revenue in the second quarter of 2015.

First, Petit and Taylor agreed to pay Mark Brooks, the owner of CPM, $200,000 to purchase approximately $2.1 million of MiMedx product by the end of June 2015 – product that Brooks did not want.  (Tr. 603-07 (Carlton)).  To hide that the $200,000 payment was a bribe to induce CPM's purchase of MiMedx product in the second quarter of 2015 (which should have reduced the revenue that MiMedx could recognize from the sale), Petit and Taylor falsely characterized the $200,000 as payment for purported consulting services provided by Brooks. (Tr. 607-12 (Carlton)).  Prior to arranging the fraudulent consulting payment, Taylor considered funneling the $200,000 payment to Brooks through the company of a MiMedx consultant in order to disguise its purpose.  (Tr. 1003-04 (Schultz)).

Second, when MiMedx management realized that they did not have in stock the particular MiMedx products that CPM agreed to order, Petit and Taylor agreed with Brooks that (1) as part of CPM's approximately $2.1 million order, CPM would purchase approximately $1.2 million of MiMedx product that CPM neither wanted nor intended to sell, and (2) in a subsequent quarter, CPM could return the unwanted product and exchange it for product of equal value that CPM

4

actually wanted and intended to sell.  To carry out their fraudulent scheme, Petit and Taylor enlisted the assistance of Jeff Schultz, a MiMedx vice president of sales.   On June 29, 2015, when MiMedx management learned that the products CPM was willing to purchase were not in stock, Schultz stated in an email to members of the MiMedx sales team (an email that was also received by Petit and Taylor): "Ship to the amount of the total dollar amount.  Fill what you can that he wants and then send the rest of the product we have in stock and we will exchange it in July." (GX-1029).  On that same date, Schultz emailed Brooks, copying Petit, among others, asking Brooks to change his purchase order to reflect what MiMedx had in stock (but not the products Brooks had been willing to order).  Schultz stated in the email to Brooks: "Can we please get a change order from you so we can ship what we have now in stock and I will physically come to Dallas to make the changes in early July[.]"  (GX-1027).  After Brooks agreed to the product swap, Petit signed the purported "consulting agreement."  (GX-709).

At no time following this sale to CPM did Petit and Taylor disclose to Cherry Bekaert, MiMedx's auditors, (1) the existence of the $200,000 "consulting agreement" with Brooks or (2) that MiMedx and Brooks had reached a side agreement that CPM would purchase approximately $1.2 million of product that it would swap for different product in a subsequent quarter.  (Tr. 1737-40 (Urbizo)).

Based upon the secret agreement between MiMedx and Brooks to swap the product, on June 29, 2015, CPM sent MiMedx a purchase order for approximately $2.1 million that reflected the products that MiMedx had in stock and wanted to sell to CPM.  MiMedx recognized all of that revenue in the second quarter of 2015.  (GX-718, 856).

In or about July 2015, MiMedx sales executives discussed how to provide CPM the product that Petit and Taylor had agreed to swap for the product CPM had agreed to receive the previous

quarter but did not want.   On or about July 10, 2015, David Nix, a senior MiMedx operations executive emailed Brent Miller, a MiMedx executive vice president, in relevant part: "Has it been discussed how the [CPM] returns will be managed?"   Miller responded, in relevant part: "We have to manage timing for 2 reasons; our inventory rebuild and revenue recognition issue.   Bill [Taylor] wants to ship the [CPM] replacement product in August over a 2-3 week period in 4 shipments.   We have auditors here in the end of July looking at the books.   No more emails on this." (GX-1033).   Taylor thus directed Miller to carry out the fraudulent swap in a manner designed to avoid detection by MiMedx's outside auditors.

### B.  MiMedx's Fraudulent Recognition of Revenue from SLR in Q3 2015

By the third quarter of 2015, MiMedx sought to sell product to a new Texas-based distributor that could make up for the revenue shortfall resulting from the winding down of MiMedx's relationship with CPM.   MiMedx first turned to SLR, a small Texas-based distributor that was owned and operated by Jerry Morrison, a former MiMedx employee.

On September 15, 2015, approximately two weeks before the end of the third quarter of 2015, MiMedx and SLR entered into a written "Domestic Distributor Agreement," which made SLR MiMedx's exclusive distributor in Texas and provided that SLR would make payment for any product that SLR purchased from MiMedx within 30 days of purchase.  (GX-715).   On September 30, 2015, the final day of the third quarter of 2015, following negotiations with Petit and Taylor, SLR agreed to purchase approximately $4.6 million of OrthoFlo product, MiMedx's new amniotic-fluid based product. This was the largest quarterly order in MiMedx's history to date.  (GX-729).   Petit and Taylor dictated the timing and size of the order as a condition of making SLR MiMedx's exclusive distributor in Texas.   MiMedx, in turn, recognized approximately $4.6 million of revenue upon shipment of the product to SLR in the third quarter of

2015.

At the time that MiMedx recognized revenue for the September 2015 sale to SLR, Petit and Taylor fully understood that SLR would not make a timely payment of $4.6 million for the product, and certainly would not do so within contractual terms.  As noted above, SLR's $4.6 million order was, at that point, the largest quarterly order that MiMedx had ever received from any customer.  Yet SLR, a company in its infancy, had never ordered from MiMedx before and had no record of making payments.  MiMedx likewise had no record of selling OrthoFlo, a new MiMedx product, to any customer.  Moreover, as Petit and Taylor well knew, the $4.6 million order was larger than SLR's annual revenue.

Petit and Taylor further understood that SLR lacked the means to store and distribute OrthoFlo, a product that needed to be kept frozen.   Before the end of the third quarter of 2015, at the direction of Petit and Taylor, MiMedx purchased freezers, which it provided to SLR so that SLR could purchase and store the quantity of OrthoFlo that MiMedx needed SLR to buy in order for MiMedx to meet its quarterly revenue guidance.  (GX-1042).

Although SLR's payment to MiMedx for the product it had purchased during the third quarter of 2015 was due on October 30, 2015 (i.e., within 30 days of shipment), by the end of November 2015 SLR had paid only approximately $10,000 of the $4.6 million it owed.  (GX-733).  Additionally, in or about the fall of 2015, Morrison advised Petit that SLR was having trouble distributing the OrthoFlo and that it needed an infusion of capital to pay MiMedx.  Morrison informed Petit that he had attempted to secure a loan from a bank, but had been unsuccessful.  (GX-1612).

As Petit well knew, SLR's failure to pay down a significant amount of the money it owed to MiMedx before the end of 2015 made it more likely that Cherry Bekaert would challenge SLR's

creditworthiness, which could lead to a restatement of MiMedx's third quarter revenue figures or a reduction in the revenue that MiMedx could recognize in its annual SEC filing.   Petit, therefore, arranged for Morrison to obtain a loan from Petit's adult children to hide from MiMedx's auditors that the collectability of receivables from SLR was questionable.   Petit, in the fourth quarter of 2015, arranged for his adult children to loan money to SLR through a shell company, which was funded with money from a trust fund established by Petit for his family.

In late November 2015, Petit's three adult children and their spouses incorporated a shell company (the "Shell Company") in order to issue a loan from the Shell Company to SLR.   (GX-402).   Todd Campbell, Petit's son in law, set up a bank account in the name of the Shell Company and arranged for funds to be transferred from a generation-skipping trust that Petit had established for his family into the Shell Company's bank account in order to fund the loan to SLR. (GX-403). The trust was funded by millions of dollars of Petit's MiMedx stock.   Petit personally reviewed a promissory note between the Shell Company and SLR, which Petit sent to Morrison.   (GX-1079, 1080).   Campbell, however, privately expressed to Petit that he was not comfortable with the terms of the loan and told Petit in an email: "In general, [I am] not a huge fan of loaning money. I think that is what banks are for." (GX-1085).   Petit himself discussed the loan terms with Morrison and sent him the initial drafts of the loan paperwork.

At the time the loan was issued, Petit understood that the loan proceeds would be used, in substantial part, by SLR to pay down its debt to MiMedx for product that SLR had purchased.   On December 21, 2015, pursuant to the promissory note, the Shell Company wired approximately $1.5 million to SLR.   (GX-900).   Within approximately the next week, SLR used the loan proceeds in substantial part to make payments to MiMedx totaling approximately $1.2 million. (GX-733).

8

Petit hid from MiMedx's internal accountants and Cherry Bekaert that SLR had received a loan from Petit's adult children.  With knowledge that SLR had used the loan proceeds in substantial part to pay down its debt to MiMedx for product it had purchased in the third quarter of 2015, Petit made false and misleading statements to MiMedx's accountants and Cherry Bekaert about the collectability of payment from SLR.

For example, on February 4, 2016, in response to concerns raised by a member of MiMedx's accounting department about the propriety of recognizing revenue from SLR, Petit approved the submission of a response to Cherry Bekaert, which, in relevant part, touted that SLR "has paid over $1.4M since the first shipments had been made.  Their payment history to date is very similar to that of other distributors." (GX-1118).  Petit hid from Chery Bekaert that SLR's payments of $1.2 million to MiMedx had been funded by the Shell Company loan orchestrated by Petit and his children, which came from a trust fund that Petit himself had established.  Based in large part on SLR's payments to MiMedx that were funded by the Shell Company loan, Cherry Bekaert's concerns about collectability were assuaged and Cherry Bekaert continued to allow MiMedx to recognize revenue from the sale to SLR.   (Tr. 1753-55 (Urbizo)).

## C.  MiMedx's Fraudulent Recognition of Revenue from Stability in Q3 and Q4 2015

By the third quarter of 2015, MiMedx also sought to sell product to Tennessee-based Stability to help make up for the revenue shortfall resulting from, among other things, the winding down of MiMedx's relationship with CPM.   For example, on or about September 18, 2015, Mike Carlton, a MiMedx senior vice president of sales, emailed Petit, Taylor, and others stating that he had just spoken with an employee of Stability and "[t]hey are excited to work with us and he asked me 'what can I personally do for you'. I told him we will need to move a significant amount of liquid into his freezer and he said 'it's done'.  This couldn't have happened at a better time."

(GX-1044).

At the same time, during the third and fourth quarters of 2015, Petit and Brian Martin, the chief executive officer and part-owner of Stability, engaged in negotiations over MiMedx's acquisition of Stability. These negotiations ultimately resulted in MiMedx's acquisition of Stability on or about January 13, 2016 (the "Acquisition"). Prior to the Acquisition, and while the negotiations were ongoing, MiMedx sold product to Stability in both the third and fourth quarters of 2015. On or about September 29 and 30, 2015, the last two days of the third quarter, MiMedx sold approximately $2.2 million of product to Stability and recognized all of that revenue upon shipment. This purchase, the first ever made by Stability from MiMedx and consisting primarily of OrthFlo product, was made at Petit's request. (Tr. 1510-17 (Martin)). After Stability agreed to make the purchases, sales employees at MiMedx informed Stability as to which MiMedx products were immediately available for shipment, so that Stability could order those products before the end of the quarter. (Tr. 1517-18).

On December 31, 2015, the last day of the fourth quarter, Petit asked Stability to purchase additional MiMedx product for approximately $450,000. (Tr. 1560-68 (Martin)). At the time he made the request, Petit had already determined to recommend that MiMedx make the Acquisition. Martin agreed to Petit's request. MiMedx recognized all of the revenue from that sale upon shipment. (GX-850). On the same day, after members of MiMedx's accounting department expressed concern that Stability had not yet paid any of the approximately $2.2 million it owed for the purchase in the prior quarter, Petit asked Martin to make a partial payment to show to MiMedx's accountants and auditors. (Tr. 1560-68). Accordingly, Stability paid MiMedx approximately $225,000 on or about December 31, 2015. This was the only payment that Stability ever made for MiMedx product. (GX-728).

10

These sales to Stability should not have been recognized as revenue by MiMedx in the third and fourth quarters of 2015, for at least three reasons.   First, MiMedx and Stability had not agreed upon the essential terms of the sale, including when payment was due.   In fact, substantial disagreements between Stability and MiMedx over payment terms remained unresolved well after MiMedx booked revenue for sales to Stability.   Because of these outstanding disagreements, Martin refused to sign a distribution agreement with MiMedx.   Ultimately, Martin agreed to sign a sham distribution agreement following the end of 2015, at the request of Petit and Taylor.   (Tr. 1712 (Martin), GX-716).   Taylor signed the sham agreement on behalf of MiMedx.   (GX-716). The signed distribution agreement was undated and provided to Cherry Bekaert in support of the revenue recognition.

Second, Petit and Taylor reached a secret side understanding with Stability that Stability would buy product in the third quarter that it did not want and would not sell, and that Stability could either swap that product for different product or return the unwanted product to MiMedx in a subsequent quarter for a refund or credit.   (Tr. 1514-15 (Martin)).   For example, on September 29 and 30, 2015, the last two days of the third quarter, when MiMedx management realized that they did not have in stock the particular MiMedx products that Stability agreed to purchase and planned to sell, Petit and Taylor agreed with Martin that (1) as part of Stability's approximately $2.2 million order, Stability would purchase approximately $2 million of MiMedx products that Stability neither wanted nor intended to sell, and (2) in a subsequent quarter, Stability could return the unwanted product and swap it for product of equal value that Stability could sell.   Petit and Taylor reached this agreement with Stability in an effort to finalize MiMedx's $2.2 million sale to Stability during the third quarter of 2015 and thereby falsely inflate MiMedx's revenue in order to meet the company's quarterly revenue guidance.

Moreover, toward the end of 2015, in an effort to induce Martin to purchase additional MiMedx product in the fourth quarter and sign a distribution agreement, Petit gave Martin a secret letter granting Stability the right to return any and all MiMedx product that it had been previously purchased.  (GX-701).   On December 31, 2015, Petit provided the secret letter to Martin, stating that if the Acquisition did not proceed, MiMedx would "commit to exchange or take back any of our amniotic related products so you may proceed on your own."  (*Id.*).   Petit back-dated the letter to September 25, a date immediately prior to Stability's first purchase of MiMedx product, and hid the letter from MiMedx's internal accountants and Cherry Bekaert.   After receiving this letter, Martin emailed an employee of Stability: "I told [Petit] I would not sign the distribution agreement unless we could return the product! :-)."  (GX-1251).   Accordingly, as Petit well knew, the sales to Stability were not final because Stability had the right to return the product to MiMedx at any time and the amount of any return could not be reasonably estimated.   Ultimately, Stability returned more than half of the product that it had purchased from MiMedx and exchanged some of it for other products.

Third, Petit and Taylor understood that Stability could not and would not pay for the product in a timely fashion.   Stability ultimately paid MiMedx only approximately $225,000, less than ten percent of the value of product that it purchased during the third and fourth quarters of 2015.

In early 2016, as part of its annual audit, Cherry Bekaert questioned MiMedx's senior management about the propriety of revenue recognized from sales to Stability.   In response, Petit and Taylor made false and misleading statements to Cherry Bekaert about MiMedx's arrangement with Stability.   For example, in a written summary prepared for Cherry Bekaert on February 4, 2016, Petit and Taylor asserted that "[t]he MiMedx products were sold to [Stability] under a signed

12

distributor agreement similar to agreements signed with other distributors such as [CPM]."   (GX-1118).   As set forth above, however, Petit and Taylor knew that statement was false, because there was no such distribution agreement at the time the products were sold in the third quarter of 2015. In reality, the distribution agreement was not actually signed until in or about 2016, but was undated in order to conceal when it was actually executed.   Similarly, Petit and Taylor asserted in the written summary that Stability's sales of MiMedx product in the fourth quarter were "minimal" because Martin was "preoccupied during the fourth quarter," and that Stability made an additional order in the fourth quarter "as they wanted to be assured they could continue to supply their customers if the merger agreement negotiations slowed down or were discontinued."   (GX-1118). In truth and in fact, as Petit and Taylor well knew, Stability never intended to sell most of the product it had purchased in the third quarter, let alone within the following three months, and Stability purchased additional product in the fourth quarter only because Petit had requested that Stability do so as part of the Acquisition negotiations.   None of these terms of the Stability transaction were revealed to MiMedx auditors.   (Tr. 1757-62 (Urbizo)).

**D.  MiMedx's Fraudulent Recognition of Revenue from First Medical in Q4 2015**

As the end of the fourth quarter of 2015 approached, in order to reach its quarterly and annual revenue guidance, MiMedx sought to sell product to First Medical, a Saudi Arabia-based distributor that sold medical products to hospitals in the Middle East.   At the time, First Medical was attempting to obtain a "tender" (or contract) to sell products to state-sponsored hospitals in Saudi Arabia.

During negotiations between MiMedx and First Medical, Bassam El Hage, a principal of First Medical, made clear to Taylor that there was a risk that the Saudi government would not award the tender to First Medical and that First Medical therefore could not assume the risk of

purchasing MiMedx product if the tender was not awarded.   Accordingly, Taylor agreed with El Hage, in substance, that (1) MiMedx sales representatives would assist First Medical in selling product to Saudi hospitals, (2) MiMedx would take back the product if the tender were not awarded, (3) MiMedx would not leave First Medical with any losses, and (4) MiMedx would give First Medical additional extended payment terms.   Petit participated in the negotiations with El Hage and approved the final terms of the transaction on a conference call.

First Medical ultimately agreed to purchase approximately $2.54 million of MiMedx's EpiFix product in or about late December 2015, and MiMedx recognized revenue from the sale upon shipment.   Taylor and Petit agreed to let First Medical make their purchase of product contingent on the tender.   When Taylor was told by members of MiMedx's accounting team that this arrangement would preclude revenue recognition, Taylor agreed to change the payment term to 180-day fixed terms.   (Tr. 229-232 (Andersen)). Taylor then crafted a false cover story to mislead MiMedx's internal accountants and Cherry Bekaert about the true terms of MiMedx's arrangement with First Medical.

On or about December 21, 2015 at approximately 2:30:02 p.m., Taylor sent an email, entitled "Purchase Order," (the "Cover Email") to the El Hage, copying Carlton, stating:

> Thank you very much for the EpiFix order placed earlier today.   It is very much appreciated.   Our accountants have asked for a clarification on the Payment Terms. Because the email referenced was related to the 2015 tender and the July order, they wish to have a clarification.   I know this order is for 2016 sales by [First Medical]. I have clarified below their proposal.

> Payment terms:   180 days from receipt of product by [First Medical].

> Thank you for your consideration.   Please advise if this will be acceptable.

(GX-1093).   Just four seconds later, on or about December 21, 2015 at approximately 2:30:06 p.m., Taylor sent a second email to the El Hage, entitled "Purchase Order – Clarification" (the

"Clarification Email").   The Clarification Email did not copy anyone at MiMedx and memorialized terms that differed materially from those set forth in the Cover Email.   Taylor's Clarification Email stated:

> Further to my email that I just sent relative to the Purchase order 212-2015.   We understand that it is expected that the 2016 tender will be issued in March 2016, and it is expected to be as big, or bigger than the tender that was issued to [First Medical] in 2015.   In the event the tender is delayed, or for some unlikely event does not occur, MiMedx will give [First Medical] additional extended payment terms if request[ed] and will assist [First Medical] in selling the product or another option would be to repurchase the product.   We will continue supporting sales efforts in the territory by continued training . . . . Thank you again for a strong partnership with MiMedx. Please feel free to contact me at any time with any questions.   Best regards, Bill.

(GX-1094).

Taylor subsequently arranged for the Cover Email, but not the Clarification Email, to be circulated to MiMedx's accounting department.   As Taylor well knew, the Clarification Email memorialized the true terms of First Medical's purchase, and the Cover Email was a false cover story designed to mislead MiMedx's internal accountants and Cherry Bekaert into believing that First Medical was required to make payment to MiMedx within 180 days and that, accordingly, MiMedx could immediately recognize revenue from the sale.

In or about early 2016, in connection with its annual audit, Cherry Bekaert sought written confirmation from First Medical that it had purchased MiMedx product in or about December 2015 subject to specified payment terms.   Taylor thereafter arranged for El Hage to receive and sign an audit confirmation that falsely indicated that First Medical had agreed to pay within 180-day terms and omitted the true terms of First Medical's arrangement with MiMedx as reflected in the Clarification Email.   Taylor hid the Clarification Email and the true terms of the deal from MiMedx's internal accountants and Cherry Bekaert. (Tr. 1764-65 (Urbizo)).

15

### E. Obstruction of Justice

In 2019, the defendants made repeated efforts to improperly influence the testimony of Mike Carlton, who, at the time, was cooperating and proffering with the Government.   In February 2020, during the Government's criminal investigation, Petit arranged through a MiMedx secretary to meet with Carlton, Petit's neighbor, at Petit's and Carlton's shared back fence. During the meeting, in an effort to influence Carlton's account, Petit falsely told Carlton, in substance, that the $200,000 payment to Brooks was for valid consulting work, not for CPM's second quarter order.   Petit further advised Carlton to stand his ground in meetings with the Government.   Petit also acknowledged to Carlton, in substance, that he was not supposed to be talking to him.   Carlton understood that Petit was attempting to influence his account.   (PSR ¶ 67).

In early 2019, Taylor visited Carlton's house and handed Carlton a book entitled *License to Lie*, which purports to be about Justice Department improprieties.   Taylor told Carlton that the book was from "you know who," a reference to Petit.   Taylor also acknowledged that he was not supposed to be talking to Carlton.   (PSR ¶ 66).

In March 2019, a MiMedx secretary called Carlton while Carlton was in New York meeting with the Government to ask if Carlton would meet again with Petit.   In July 2019, Petit called Carlton on the phone multiple times.   When Carlton answered, Petit repeated to Carlton that the $200,000 payment to Brooks was for consulting services, not for CPM's order.   (PSR ¶¶ 64-65).

In or about August 2020, Petit sat for sworn testimony before the SEC.   Petit provided false testimony about the $200,000 payment to Mark Brooks.   Petit falsely testified that the $200,000 payment was for "G-2" intelligence information on competitors.   (PSR ¶ 62).

In September 2020, Petit sent to Carlton in the mail, among other things, a press release

16

that Petit had filed as part of a proxy statement with the SEC, in which Petit falsely stated that the CPM consulting agreement was for valuable market intelligence.   Petit also sent Carlton a book entitled *Cardiac Arrest*, another book about purportedly improper tactics undertaken by the Justice Department in the prosecution of a corporate executive. (PSR ¶ 63).

Similarly, in the middle of 2018 and during an Audit Committee investigation, Petit made efforts to influence Jeffrey Schultz in connection with the scheme to pay $200,000 to Mark Brooks in exchange for a CPM product purchase.   In particular, at a birthday party for Taylor, Petit approached Schultz and falsely suggested to him that the $200,000 payment was in exchange for stock options that had been taken away from Brooks.

## II.      Relevant Conduct

In addition to the conduct proven at trial, the Government's investigation uncovered evidence of additional misconduct by Petit and Taylor that is relevant to the instant offense and the application of the factors under Title 18, United States Code, Section 3553(a).

### A. Avkare

In November 2019, the SEC filed a lawsuit against Petit and Taylor for fraud offenses in connection with MiMedx's recognition of revenue from CPM, SLR, Stability, and First Medical, as well as from Avakre, MiMedx's largest distributor.   The SEC's lawsuit alleged that from 2013 through 2017, MiMedx prematurely recognized revenue from millions of dollars of sales to Avkare and falsely reported MiMedx's revenue growth.   In addition, the SEC alleged that Petit and Taylor repeatedly lied to outside attorneys and auditors during an internal investigation relating to Avkare.   *SEC v. MiMedx Group, Inc., et al.*, 19 Civ. 10927, Dkt. 1 (S.D.N.Y.).

**B.  Petit's Prior Involvement in an SEC Accounting Fraud Investigation**

From 1985 until 1987, the United States Securities and Exchange Commission ("SEC")

conducted an investigation into accounting issues at Healthdyne, Inc. ("Healthdyne").   (*See*

*generally* Gov't Motion *in Limine*, Dkt. No. 72, at 4-6).   At that time, Petit served as Healthdyne's

President and Chief Executive Officer and Chairman of Healthdyne's Board of Directors.   The

SEC's inquiry of Healthdyne concerned revenue recognition issues, including Healthdyne's

extension of non-standard payment terms and conditional sales to customers.   The SEC asked

Petit extensively about these issues during Petit's sworn testimony before the SEC.

In July 1986, the SEC provided a "Wells" notice to Petit's counsel, informing him that the

SEC intended to file a civil action against Petit, Healthdyne, and others, alleging violations of the

federal securities laws.   The SEC's inquiry put Petit on notice of the SEC's concerns about

accounting and revenue recognition issues.   In 1987, the SEC filed a civil action against

Healthdyne and simultaneously entered into a settlement with Healthdyne to resolve the civil

action.   Healthdyne neither admitted nor denied the SEC's allegations.

**III.    The Applicable Sentencing Guidelines**

**A.  Discussion**

Consistent with the recommendations of the Presentence Report, the Government submits

that the Guidelines applicable to Petit's conduct are calculated as follows:

- Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level for Count Two is 7.

- Pursuant to U.S.S.G. § 2B1.1(b)(1)(L), 22 levels are added because the amount of loss exceeds $25,000,000, but does not exceed $65,000,000.

- Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), 2 levels are added because the offense involved ten or more victims.

18

- Pursuant to U.S.S.G. § 2B1.1(b)(10)(1), 2 levels are added because the offense involved sophisticated means.

- Pursuant to U.S.S.G. § 2B1.1(b)(20), 4 levels are added because the offense involved a violation of securities law and, at the time of the offense, the defendant was an officer or a director of a publicly traded company.

- Pursuant to U.S.S.G. § 3B1.1, 4 levels are added because Petit was a leader of an offense that involved five or more participants.

- Pursuant to U.S.S.G. § 3C1.1, 2 levels are added because Petit engaged in obstruction of justice.

Petit's total offense level is 43.   Accordingly, at Criminal History Category I, Petit's Guidelines Range is life imprisonment, capped by the statutory maximum sentence on Count Two of 20 years' imprisonment.

Consistent with the recommendations of the Presentence Report, the Government submits that the Guidelines applicable to Taylor's conduct are calculated as follows:

- Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level for Count One is 6.

- Pursuant to U.S.S.G. § 2B1.1(b)(1)(L), 22 levels are added because the amount of loss exceeds $25,000,000, but does not exceed $65,000,000.

- Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), 2 levels are added because the offense involved ten or more victims.

- Pursuant to U.S.S.G. § 2B1.1(b)(10)(1), 2 levels are added because the offense involved sophisticated means.

- Pursuant to U.S.S.G. § 2B1.1(b)(20), 4 levels are added because the offense involved a violation of securities law and, at the time of the offense, the defendant was an officer or a director of a publicly traded company.

- Pursuant to U.S.S.G. § 3B1.1, 3 levels are added because Taylor was a manager or supervisor of an offense that involved five or more participants.

19

Taylor's total offense level is 39.   Accordingly, at Criminal History Category I, Taylor's Guidelines Range is 262 to 327 months' imprisonment, capped by the statutory maximum sentence on Count One of five years' imprisonment.

### B.  The Defendants' Objections

#### 1.  Loss Amount

The base offense level is increased by the greater of intended or actual loss caused by the defendants' criminal conduct.   U.S.S.G. § 2B1.1 & app. note 3(A).   Pursuant to Section 2B1.1(b)(1), the court "need only make a reasonable estimate of the loss."   U.S.S.G § 2B1.1(b)(1) app. note 3(C).   While the Government believes the actual loss amount is arguably much higher, a conservative methodology yields a loss amount of $34.6 million.   (*See generally* February 9, 2021 Report of Dr. Artur Minkin, attached hereto as Exhibit A; exhibits to Minkin report, attached as Exhibit B, and Minkin curriculum vitae, attached as Exhibit C).   This conservative figure yields a loss enhancement of 22 levels.

As set forth in his report, Dr. Artur Minkin, an SEC economist, arrived at the $34.6 million loss figure by engaging in an event study – a widely accepted economic methodology – that analyzed the drop in MiMedx's stock price on February 20, 2018, after the first indication of potential fraud by the defendants was revealed to the market.   Dr. Minkin's assessment also appropriately accounts for other factors, including other stock market events and the normal fluctuation of MiMedx's stock price.   Dr. Minkin's analysis presents a reasonable calculation of actual loss.   In calculating the loss amount under the Guidelines, a sentencing court need only make a "reasonable estimate."   *See* U.S.S.G. § 2B1.1, application note 3(c).   The "Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision." *United States v. Bryant*, 128 F.3d 74, 75 (2d Cir. 1997).   Moreover, the calculation of loss need

only be determined by a preponderance of the evidence. *See United States v. Watts*, 519 U.S. 148, 156 (1997). The Second Circuit has explicitly approved of the use of the type of analysis conducted by Dr. Minkin in securities fraud cases. *See, e.g.*, *United States v. Ebbers*, 458 F.3d 110, 126–27 (2d Cir. 2006) ("In this case, therefore, the loss is that suffered by those investors who bought or held WorldCom stock during the fraud period either in express reliance on the accuracy of the financial statements or in reliance on what *Basic, Inc. v. Levinson* described as the "integrity" of the existing market price.").

Dr. Minkin's analysis is a conservative measure of loss for at least three reasons: first, it assumes the fraud began in February 2016, when MiMedx's 2015 year end revenue was announced, even though the proof at trial demonstrated that the fraud began with the reported revenue for the second quarter of 2015 (*see* Ex. A, ¶¶ 28, 32); second, it assumes the fraud ended in February 2018, even though additional information about the fraud continued to be disclosed to the market, which in turn caused additional decreases in MiMedx's stock price until March 2020 (*see* Ex. A, ¶ 32); and third, it calculated loss based only on stock trading by institutional investors, which accounts for only approximately between 42.5 and 82.6 percent of MiMedx's shares (*see* Ex. A, ¶ 34).

As a threshold matter, in their objections to the PSRs, the defendants dispute that there is any loss on the ground that the defendants did not intend any loss to shareholders. (Petit and Taylor letters to Probation). This argument is misplaced. The defendants' contention that they did not intend any loss to shareholders is inconsistent with the evidence at trial and the jury's verdict. The evidence at trial demonstrated that the defendants understood the correlation between MiMedx's reported revenue and stock price, and thus sought to inflate revenue in order to support the company's stock price. (*See, e.g.*, GX-1056 (email from Petit to Taylor and others

explaining that MiMedx's "valuation all hinges on revenue growth rate.   We all need to focus on that issue.")).   The evidence that the defendants engaged in a willful scheme to inflate revenue thus demonstrates that the defendants understood that their conduct would affect MiMedx's stock price and harm investors.   (*See* U.S.S.G. § 2B1.1, application note 3(A)(iii) (defining "'reasonably foreseeable pecuniary harm' [as] pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.")).

In their objections to the PSRs, the defendants also challenge Dr. Minkin's calculation of loss, including (a) that the February 20, 2018 disclosure did not disclose all of the details of the fraud; (b) that other "unknown factors unrelated to the fraud" affected the stock price (Petit letter to Probation); and (c) that there was no statistically significant correlation between MiMedx's revenue and stock price (Taylor letter to Probation).   While their letters to Probation did not elaborate on any of these issues, on Friday February 12, 2021, the defendants provided the Government and the Court with the expert report of Dr. Atanu Saha, which purported to provide a detailed explanation of why these three concerns undermined the loss calculation set forth by Dr. Minkin.   After identifying these supposed defects in Dr. Minkin's analysis, Dr. Saha concluded that "it is not possible to compute shareholder loss attributable to the conduct at issue with any degree of certainty."   (Saha Report at 37).   Accordingly, the defendants and Dr. Saha contend that the Court should rely on the defendants' gain in calculating the defendants' guidelines, relying the Government's trial exhibits that computed the portion of their 2015 bonuses attributable to inflated revenue.[1]

---

[1] Even if the Court were to use gain – and as set forth below, it should not – the gain numbers advanced by the defendants are substantially understated because they rely only on non-equity compensation and do not include the substantially greater realized and unrealized gains that the defendants obtained through the appreciation of their MiMedx stock.

These objections by the defendants are meritless, and the Court should adopt the loss amount set forth in Dr. Minkin's analysis.   *First*, the defendants' failure to identify any alternative methodology alone makes their argument singularly unpersuasive.   The commentary to section 2B1.1 provides that "The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined" and that "[t]he court need only make a reasonable estimate of the loss."   Here, the Government has set forth reasonable basis for calculating loss and the Court is entitled to rely upon it.   *Ebbers*, 458 F.3d at 126–27 (observing that while calculating loss in an accounting fraud was "no easy task," "some estimate must be made for Guidelines' purposes, or perpetrators of fraud would get a windfall"); *see United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007) ("Determining the extent to which a defendant's fraud, as distinguished from market or other forces, caused shareholders' losses inevitably cannot be an exact science.   The Guidelines' allowance of a 'reasonable estimate' of loss remains pertinent." (citation omitted)).

Moreover, the gain amount advanced by the defendants cannot serve as an "alternative measure of loss."   (Application note 3(B)).   Unlike in a case of theft, in an accounting fraud case, the harm to shareholders bears no relation to the defendants' non-equity compensation.   This is especially true where the bonus amounts paid to the defendants were far less than the inflation of revenue, let alone the impact that the revenue had on the company's stock price.   There is no justification for abandoning any assessment of loss amount and resorting to figures that do not relate to the relevant harm.

*Second*, the defendants' objections to Dr. Minkin's calculation of loss are wrong. The Government intends to submit a supplemental report by Dr. Minkin responding to Dr. Saha's arguments by Friday, February 19.   As the supplemental report will make clear, Dr. Saha's report

23

does not undermine Dr. Minkin's analysis.   First, Dr. Saha argues that there was no correlation between MiMedx's revenue and its share price.   (Saha Report at 9).   Dr. Saha's assessment is based upon a flawed analysis of how MiMedxs' reported revenue affected its stock price including, for example, relying solely on how reported revenue compared to the lower bound of the company's reported revenue guidance while ignoring the effect of whether the reported number was within or above that range.[2]   Moreover, the evidence at trial demonstrated that the defendants understood the correlation between MiMedx's reported revenue and stock price, and thus sought to inflate revenue in order to support the company's stock price.   *See, e.g.*, GX-1056.   Second, Dr. Saha suggests that Dr. Minkin fails to account for "confounding factors" that contributed to MiMedx's stock drop on February 20, 2018.   (Saha Report at 23).   Yet, Dr. Saha's report fails to list any supposedly "confounding factors" that actually affected the stock on February 20, 2018, other than the "uncertainty" that the February 20, 2018 announcement itself created.   Dr. Saha also overlooks that the February 2018 announcement ultimately led to the discovery of the fraud proven at trial.   Third, Dr. Saha takes issue with Dr. Minkin's use of February 20, 2018 as the proper date for the corrective disclosure.   (Saha Report at 35).   This argument is also meritless. On February 20, 2018, MiMedx first announced that it was conducting an internal investigation into sales and distribution practices.   Regardless of whether this announcement included all the details of the fraud proven at trial, this was the first public announcement that put the investing public on notice of potential revenue recognition problems.   Dr. Saha's proposal to use March 17, 2020 as the relevant corrective disclosure date is meritless and defies common sense, as the March

---

[2]  In addition, as the supplemental report will make clear, Dr. Saha's analysis on this score is also based on a mischaracterization of the trial evidence concerning when MiMedx would have missed its revenue guidance.

2020 disclosure postdated the return of the indictment in this case.    The indictment revealed the details of the defendants' scheme to the investing public approximately four months prior to the March 2020 disclosure.

Dr. Minkin's supplemental report will address these and other defects in Dr. Saha's analysis.[3]   For the reasons discussed above and in Dr. Minkin's report, the Court conclude that 22 levels are added, pursuant to U.S.S.G. § 2B1.1(b)(1)(L), because the amount of loss exceeds $25,000,000, but does not exceed $65,000,000.

### 2.  Role Enhancement

Pursuant to U.S.S.G. § 3B1.1(c), because Petit was the leader of fraudulent conduct involving five or more participants, a four-level leadership enhancement is appropriate.

With respect to Petit, the evidence demonstrated that he was a leader in the scheme that involved five or more participants.   (*See* U.S.S.G. § 3B1.1(a)).   Petit carried out the fraud in his role as CEO and chairman of MiMedx.   The scheme involved the participation of numerous counterparties with whom Petit dealt as well as numerous MiMedx employees that Petit relied on to carry out the details.   The evidence, moreover, that the scheme involved five or more participants or was otherwise extensive.   At the very least, the evidence proved by at least a preponderance of the evidence that there were seven participants in the scheme: Petit, Taylor, Carlton, Schultz, Martin, Morrison, and Brent Miller, and the evidence demonstrated that Petit provided direction to Carlton, Schultz and Martin, among others.   *See, e.g.*, Tr. 1477 (Martin agreeing to make purchases on behalf of Stability; GX-1079 (Morrison's agreement to SLR loan);

---

[3]  Because Dr. Minkin's analysis includes more than 20 investors who were harmed by the effects of the defendants' fraud on MiMedx's stock price (*see* Minkin Report, Exhibits 4 & 5), a two-level enhancement is warranted based on the involvement of 10 or more victims.

GX-709 (Brooks agreement to enter into sham consulting agreement); Tr. 554-55 (direction to Carlton); Tr. 1012 (direction to Schultz).   Indeed, Carlton, Schultz, and Martin explicitly testified that they were participants in the revenue recognition scheme.   Accordingly, a 4-level enhancement applies to Petit.

While Petit rejoins that he was acquitted of the conspiracy count and thus could not have led any other participants in a crime, he overlooks that the Government must demonstrate that the enhancement applies only by a preponderance of the evidence and the Court is not limited by the jury verdict in any event.  *See United States v. Vaughn*, 430 F.3d 518, 526–27 (2d Cir. 2005) (observing that "district courts may find facts relevant to sentencing by a preponderance of the evidence, even where the jury acquitted the defendant of that conduct").   As the evidence introduced at trial proved, Petit's scheme involved five or more participants and Petit provided direction or oversight to at least one, if not all, of the other participants in the scheme.

With respect to Taylor, the evidence demonstrated that he was a manager or supervisor of criminal activity that involved five or more participants or was otherwise extensive.   (*See* U.S.S.G. § 3B1.1(b)).   Taylor was the COO, the second highest position within MiMedx, and he worked closely with Petit and others to commit the fraud.   Both Carlton and Schultz testified that they took direction from Taylor in connection with their dealings with First Medical and CPM, respectively, to fraudulently inflate revenue.   (*See, e.g.*, Tr. at 591 (Carlton); Tr. at 1012 (Schultz)).   Likewise, the evidence showed that Brent Miller, a participant in the scheme who reported to Taylor, acted at Taylor's criminal direction to hide the fraudulent CPM swap from Mimedx's outside auditors.   (GX-1033).   In addition, the evidence was sufficient to support the inference that various MiMedx distributors acted at Taylor's direction in the revenue recognition scheme, including Brian Martin of Stability (who, along with Taylor, signed a sham distribution

agreement, *see* GX-716), and Bassam El-Hage of First Medical (who agreed to purchase product under the terms of a side agreement documented in a secret email, *see* GX-1094).   Accordingly, Taylor's arguments are without merit.

### 3.   Sophisticated Means

A two-level enhancement for sophisticated means applies to both Petit and Taylor pursuant to U.S.S.G. § 2B1.1(b)(10).   Under application note 9(b), "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."   Here, both the execution and the concealment of the fraudulent revenue scheme were complex.   The scheme proven at trial involved secret agreements with four different distributors, the use of a shell company to disguise the nature of a transaction (in the case of SLR), a sham consulting agreement to disguise a cash inducement (in the case of CPM), and a sham distribution agreement to hide the true circumstances of a distributor sale (in the case of Stability Biologics).   Moreover, the defendants used sophisticated means to conceal the offense, including attempting to manipulate an audit confirmation that was supposed to provide independent verification from First Medical to Cherry Bekaert.   Petit's and Taylor's participation in the scheme required their sophisticated knowledge of revenue recognition practices and the means by which MiMedx's internal accountants and outside auditors reviewed distributor sales.   The sophisticated means by which Petit and Taylor carried out the fraud and concealed it warrant a two-level enhancement.

The defendants' arguments that their conduct is not especially complex are misplaced. That Petit was acquitted of conspiracy does not mean his conduct was not sophisticated or that he

did not participate in an elaborate scheme (Petit letter to Probation).   To the contrary, the evidence demonstrated that Petit arranged for Torpin LLC, a shell company, to be used to funnel money that he gifted to his children in order to repay SLR's outstanding receivable.   Taylor's argument that his conduct with respect to First Medical was not especially complex is also misplaced.   (Taylor letter to Probation).   With respect to First Medical alone, Taylor engaged in sophisticated scheme to conceal the true terms of the First Medical transaction, including directing a false cover story to accountants and auditors and interfering with the submission of an audit confirmation to MiMedx's external auditor.   *See, e.g.*, *United States v. Fiumano*, 721 F. App'x 745, 748 (2d Cir. 2018) (affirming application of sophisticated means enhancement for executive in mortgage modification scheme based upon executive's efforts to conceal his conduct and evade scrutiny).   Taylor's conduct also reflected a sophisticated understanding of the revenue recognition rules and the means by which accountants and auditors would assess the propriety of MiMedx's sales practices.

The evidence thus proves by at least a preponderance of the evidence that Petit's and Taylor's offenses involved sophisticated means.

### 4.  Obstruction of Justice

A two-level enhancement for obstruction of justice is warranted for Petit pursuant to U.S.S.G. § 3C1.1.

Petit argues that the obstruction enhancement is not warranted because he did not "threaten or intimidate" Mike Carlton, or ask him explicitly to "lie, minimize, or shade the information." (Petit letter to Probation).   These arguments are beside the point.   Under U.S.S.G. § 3C1.1, application note 4(A), an enhancement is warranted for "threatening, intimidating, or *otherwise unlawfully influencing* a co-defendant, witness, or juror, directly or indirectly, or attempting to do so."   (emphasis added).   While Petit may not have explicitly asked to Carlton to lie, Petit's

conduct, which involved meeting through an intermediary in a surreptitious location and providing information to Carlton that both Petit and Carlton knew was false, was plainly intended to influence Carlton's testimony improperly.    (Tr. at 664-65; GX-1510).    That Petit contacted Carlton immediately before Carlton was scheduled to meet with the Government further supports the influence that Petit attempted to influence that meeting improperly.    Carlton testified that he believed the purpose of Petit's contact was to get him to "change his story" for the Government. (Tr. at 669).    This evidence is thus sufficient to satisfy Section 3C1.1 and warrants a two-level enhancement.

## IV.    Substantial Sentences of Imprisonment Are Appropriate

The Government does not dispute that a 20-year sentence, the sentence called for by the Guidelines, is not necessary for Petit and the Government does not seek such a sentence.    Yet the factors set forth in Title 18, United States Code, Section 3553(a) strongly and unequivocally indicate that a substantial sentence of imprisonment is warranted for Petit.    Similarly, the Government submits that the Section 3553(a) factors weigh in favor of a Guidelines sentence of five years' imprisonment for Taylor.    Such sentences are sufficient but not greater than necessary to serve the goals of sentencing.

Probation recommends that the Court sentence Petit to 72 months' imprisonment and Taylor to 60 months' imprisonment.

### A.  Nature and Circumstances of the Offense and Need for Just Punishment

#### 1.  Petit

Petit's offense was extremely serious.    Petit, the former CEO of MiMedx, orchestrated a multi-faceted, year-long scheme to falsely inflate MiMedx's revenue and lie to the investing public about MiMedx's performance.    His conduct was systematic and calculated and far from aberrant.

In three quarters in 2015, Petit orchestrated multi-million dollar sales to distributors that he understood violated applicable revenue recognition rules in order to ensure that MiMedx reached its revenue targets.   Petit concealed the true terms of those transactions from MiMedx's internal accountants and outside auditors and engaged in an elaborate cover-up, which involved, among other things, entering into a sham consulting agreement with CPM, a sham distribution agreement with Stability, and orchestrating a secret loan from his adult children through a shell company in order to conceal that the SLR receivable was not collectable.

When Mark Andersen and Cherry Bekaert questioned the propriety of MiMedx's revenue recognition practices, Petit doubled down on his lies and provided a false narrative in order to evade their scrutiny.   During the Government's investigation, Petit engaged in a concerted campaign to obstruct justice by attempting to influence the testimony of Mike Carlton, and he lied under oath during his SEC testimony.   Petit's conduct is particularly egregious given that he had escaped an SEC investigation into his revenue recognition practices more than twenty years earlier. From that earlier SEC investigation, Petit understood the SEC's areas of focus and how his conduct would be perceived by government regulators.

A fundamental purpose of the Securities Exchange Act of 1934 is to ensure fair dealing and to outlaw deceptive and inequitable practices in the securities markets.   The integrity of the capital markets is critical to the functioning of the nation's economy, which depends upon well-functioning markets for liquidity and access to capital.   Those markets in turn rely on the accuracy of information provided from publicly traded companies – information about the companies' financial performance and wellbeing that can come from nowhere else.   Petit's conduct threatens the integrity of the financial markets and contributes to lack of confidence among investors in

those markets.   Conduct that undermines the free functioning of the financial markets is serious conduct that warrants substantial punishment.

Petit's conduct is particularly pernicious given the highly-publicized accounting scandals in the past and his evasion of the regulatory mechanisms (such as Sarbanes-Oxley self-certifications) implemented in order to combat fraud.   As CEO of MiMedx, Petit was responsible for ensuring the integrity of MiMedx's financial reporting.   But Petit failed in that duty and abused his position of trust in order to mislead the investing public and enrich himself.   His deceptive conduct had devastating consequences on shareholders who relied on the accuracy of MiMedx's representations to the market.

In sum, Petit engaged in an egregious effort to manipulate the most important financial metric used by investors to evaluate MiMedx's performance.   He betrayed the trust conferred in him by MiMedx's shareholders and failed in his responsibility as the chief guardian of the company's financial interests.   A significant sentence of imprisonment is necessary to reflect the nature and circumstances of the offense and promote respect for the law.

### 2.  Taylor

Taylor's offense was likewise very serious.   As MiMedx's chief operating officer, Taylor was the second most significant and influential executive at the company.   He oversaw MiMedx's extensive sales function, negotiated the company's most significant distributor sales, reviewed SEC filings, and interacted directly with MiMedx's internal accountants and outside auditors. While the Government agrees that Taylor is less culpable than Petit, Taylor is wrong that his participation in the scheme was limited to orchestrating the First Medical sale.   The evidence introduced at trial proved that Taylor was involved in nearly every major facet of the scheme, including:

- o Taylor agreed with Petit to use a fake consulting agreement to conceal the $200,000 payment to Mark Brooks for CPM's second quarter order.

- o Taylor approved the CPM product swap and orchestrated the timing of the swap so that the auditors would not see it.

- o Taylor was involved in securing Jerry Morrison to purchase product in the third quarter and helped give him freezers because he lacked the means to store and distribute product.

- o Taylor helped give Morrison start-up capital and was aware that SLR could not pay for its huge third quarter product purchase in a reasonable period of time.

- o Taylor signed a fake backdated distribution agreement for Stability the day after Andersen's email in order to trick the auditors into thinking that product was sold under a signed distribution agreement.

- o Taylor negotiated the First Medical fourth quarter order, including the secret right of return, and sent two emails four seconds apart in order to conceal the true terms of the deal.

- o Taylor arranged for First Medical to sign a false audit confirmation.

- o During the Andersen inquiry, Taylor was involved in submitting a fraudulent written management summary to Cherry that contained misrepresentations about SLR, First Medical, and Stability.

- o Taylor drafted a memo on revenue recognition for the sales staff that showed his knowledge of the revenue recognition rules and conflicted with the terms of product sales that he and Petit had orchestrated.

- o Taylor interacted directly with investors and touted MiMedx's false revenue figures and track record of reaching its revenue guidance.

Thus, Taylor's conduct, like Petit's, was calculated and far from aberrant. That Taylor abused his position as a senior executive in order to inflate MiMedx's most significant earnings metric, deceived the company's accountants and auditors, and enriched himself through hundreds of thousands of dollars in stock sales at the height of the scheme underscores the seriousness of his offense and the need for just punishment.

**B. History and Characteristics of the Defendants**

Unlike many of the defendants who appear before this Court, Petit and Taylor have enjoyed lives of material and financial comfort. It is evident from the Presentence Reports and the defendants' backgrounds and personal circumstances that they did not commit this crime out of

any financial need.   By the defendants' own account, they are well educated, successful businessmen and corporate executives, and enjoyed status in their community and the support of family and friends.   They both have led lives of personal and financial stability, filled with benefits that many people never receive.   Their abuse of their positions of trust and commission of financial crimes in spite of their many advantages weigh in favor of a substantial sentence.   In recommending a Guidelines sentence for Taylor, Probation observes that "[d]espite being educated, gainfully employed, and not under any financial constraints, Taylor voluntarily chose to engage in the instant offense, which occurred over the span of several months, and resulted in a significant amount of loss."   (Taylor PSR at 35).

The Government expects that Petit will argue that a substantial prison term for a man his age would be especially harsh.   But Courts have routinely rejected such arguments in cases, like this one, involving sustained criminal conduct.   See, e.g., *United States v. Seijan*, 547 F.3d 993, 998 (9th Cir. 2008) (affirming sentence of 87 year-old defendant to 240 months' imprisonment); *United States v. Lewis*, 594 F.3d 1270, 1276-77 (10th Cir. 2010) (affirming 330-year sentence for fraud offenses and upholding district court's rejection of a 72-year old defendant's request for a variance based upon age and health); *United States v. Dowd*, 451 F.3d 1244, 1256-57 (11th Cir. 2006) (rejecting defendant's argument that his 305-month sentence was unreasonable because he was 65 years old); *United States v. Kerns*, 2009 WL 1956258 at *1-*2 (11th Cir. July 9, 2009) (rejecting defendant's argument that his 240-month sentence for fraud offenses, which was already a departure, was a *de facto* life sentence and noting that "the district court weighed Kerns's advanced age against the seriousness of his offense and the need to protect the public from fraud").

As Judge Kaplan observed in rejecting a requested downward variance for a 73-year-old, infirm white-collar defendant who had committed an accounting fraud:

With people in this age bracket, it is a very small number, really, from this social and economic bracket of society who can't make a medical case for avoiding incarceration of some level of persuasiveness or another. Sentences in cases like this, therefore, have to be cognizant of the need for people in general who, were they informed of the circumstances, to say well, this individual is going to pay a price for the crime, maybe not the same price that the individual would pay if he was a healthy 48-year old, but a serious price.

There has got to be a perception that justice is done, that people get their just desserts, and that requires judges to impose sentences in some cases that if the sentences were considered only from the perspective of the defendant being sentenced might be harsher, more severe than might seem appropriate. . . . I feel it needs to be done so that people in general will feel you can't rip off a bank for $5 million and walk away from it because you're 70-plus-years old and know a lot of doctors and have [found] various things wrong with you.

*United States v. Emanuel Cohen*, 15 Cr. 396 (LAK), Sept. 9, 2016 Sentencing Tr., Dkt. No. 88, at 21-22 (imposing 27-month sentence for CEO of privately held company in $5 million fraud).

Petit's history and characteristics are also reflected in his concerted campaign to conceal his conduct and keep it from coming to light during the Andersen inquiry and during this criminal investigation.   Petit's obstructive conduct – which involved lies to the SEC and an effort to corrupt witnesses – goes to the heart of the criminal justice system.   These aggravating facts weigh in favor of a significant sentence.

In recommending a 72-month sentence for Petit, Probation observes:  "Petit played a leadership role in the offense which occurred over the course of several months and resulted in a substantial amount of loss.   Petit . . . attempted to obstruct the administration of justice by improperly contacting a cooperating witness.   Were it not for the mitigating sentencing factors present in this case, the Probation Department would have ordinarily recommended a sentence within the guideline advisory range for imprisonment in light of these aggravating sentencing factors."   (Petit PSR at 34).

### C. Need for Deterrence and To Promote Respect for the Law

The need for deterrence and to promote respect for the law is also important.   Because accounting fraud schemes like the defendants' are difficult to detect and investigate, significant punishment is necessary to deter others from similar conduct.   *See United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, *J.*) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it.").   Should the defendants receive a light sentence, financial professionals may be emboldened to engage in similar crimes, knowing that such schemes are difficult to detect and that, even if they are caught, they will not face significant repercussions.   *See, e.g., United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009) ("[I]t is difficult to imagine a would-be white-collar criminal being deterred from stealing millions of dollars from his company by the threat of a purely probationary sentence.").   A lenient sentence would further erode the public's confidence in the integrity of financial markets by sending the message that corporate executives are only lightly punished when caught engaging in white-collar crimes.   To deter criminal conduct by executives like the defendants, effectuate the purpose of the securities fraud laws, and send an appropriate message that this type of fraud and obstruction of justice will not be tolerated, a significant sentence is warranted.

## V.    Forfeiture

The Government requests that, at sentencing, the Court order forfeiture in the amount of $165,224 for Petit and $276.280.40 for Taylor, as set forth in the proposed preliminary orders, attached as Exhibits D and E.   These amounts represent (1) the amounts of Petit's and Taylor's cash bonuses that were inflated by the charged fraud (*see* GX-50 (slides of SEC economist Carina

Chambarry)), and (2) the profits earned by Taylor from the artificial inflation of the stock price from his MiMedx stock sales between February 2016 and February 2018 (consistent with Dr. Minkin's analysis of stock price inflation described above).

**VI.    Restitution**

Pursuant to 18 U.S.C. § 3664(d)(5), the Court has 90 days from the date of sentencing to resolve restitution issues.   The Government is still considering restitution-related issues and respectfully requests that the Court and the parties resolve any restitution issues within 90 days after the sentencing in accordance with Section 3664(d)(5).   If amenable to the Court, at or shortly after the sentencing, the Government will ask the Court to set a schedule for submissions relating to restitution that would enable the Court to resolve any disputed restitution issues within the 90-day time period.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By:    /s/_____
Edward Imperatore/Scott Hartman/Daniel Tracer
Assistant United States Attorneys
Tel.:    (212) 637-2327/2357/2329

Dated: February 16, 2021
New York, New York