UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    - against -

WILLIAM TAYLOR,

      Defendant.

No. 19-cr-850 (JSR)

**FILED UNDER SEAL**

## WILLIAM TAYLOR'S SENTENCING MEMORANDUM

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

William D. Weinreb
Michael T. Packard
111 Huntington Ave., Suite 520
Boston, MA 02199
Tel: (617) 712-7100
Fax: (617) 712-7200
billweinreb@quinnemanuel.com
michaelpackard@quinnemanuel.com

William A. Burck
Daniel R. Koffmann
51 Madison Avenue, 22nd Floor
New York, New York
Tel: (212) 849-7000
Fax: (212) 849-7100
williamburck@quinnemanuel.com
danielkoffmann@quinnemanuel.com

*Attorneys for William Taylor*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ..............................................................................................................................2

I.   Mr. Taylor's History and Characteristics ........................................................................3

    A.   Mr. Taylor Has Humble Roots...............................................................................3

    B.   Mr. Taylor Worked Hard, Building Companies and Bringing Their
        Healing Products to Patients in Need.....................................................................5

    C.   Mr. Taylor Established a Reputation for Integrity and Selflessness.......................7

    D.   Mr. Taylor Has a Charitable Spirit and Generously Supports His Family
        and Community.....................................................................................................10

    E.   Mr. Taylor and His Family Have Already Been Devastated by This Case. ..........14

    F.   Mr. Taylor's Health Issues Make Him Vulnerable to COVID-19.......................15

II.  Sentencing Guidelines: The Correct Guidelines Range is 6-12 Months. .........................16

    A.   The Government's 22-Level Loss Enhancement is Unsupportable Because
        it is Premised on a Fundamentally Flawed Analysis. .............................................16

    B.   The Victims Enhancement Does Not Apply..........................................................20

    C.   The Sophisticated Means Enhancement Does Not Apply. ....................................21

    D.   The Manager-Supervisor Enhancement Does Not Apply. ....................................22

III. Restitution is Inapplicable.............................................................................................23

IV.  A Sentence of Home Confinement, with a Community Service Component, is
    Appropriate for Mr. Taylor and Will Achieve the Goals of Sentencing. .........................23

    A.   A Sentence of Home Confinement Is Appropriate When Balancing the
        Nature and Circumstances of the Offense and Mr. Taylor's History of
        Good Works. ........................................................................................................24

    B.   A Sentence of Home Confinement Will Achieve the Goals of Sentencing. .........26

    C.   Imprisonment Would Be Unnecessarily Harsh In Light Of COVID-19. .............28

    D.   Mr. Taylor Is Prepared to Perform Meaningful Community Service,
        Providing a Valuable Service to Society, Rather than Consuming its
        Resources. ...........................................................................................................31

CONCLUSION...........................................................................................................................33

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Basank v. Decker*,
    449 F. Supp. 3d 205, 211 (S.D.N.Y. 2020) ............................................................. 28

*Dean v. United States*,
    137 S. Ct. 1170, 1175 (2017) ................................................................................ 3

*Gall v. United States*,
    552 U.S. 38, 48 (2007) .......................................................................................... 1

*United States v. Abiodun*,
    536 F.3d 162, 168–69 (2d Cir. 2008) ................................................................. 21

*United States v. Adelson*,
    441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) .......................................................... 3

*United States v. Adepoju*,
    756 F.3d 250, 258–59 (4th Cir. 2014) ................................................................. 21

*United States v. Akhavan*,
    No. 20-cr-188-2 (JSR), 2021 WL 535736, at *3 (S.D.N.Y. Feb. 12, 2021) ........................... 30

*United States v. Anderson*,
    No. 16-cr-824 (JMF), 2020 WL 2849483, at *2 (S.D.N.Y. June 2, 2020) ........................... 29

*United States v. Boccagna*,
    450 F.3d 107, 119 (2d Cir. 2006) ....................................................................... 23

*United States v. Brown*,
    877 F. Supp. 2d 736, 752 (D. Minn. 2012) ......................................................... 22

*United States v. Carmona-Rodriguez*,
    No. 04 CR 667(RWS), 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) ........................... 26

*United States v. Catoggio*,
    326 F.3d 323, 329 (2d Cir. 2003) ....................................................................... 23

*United States v. Cavera*,
    550 F.3d 180, 189 (2d Cir. 2008) (*en banc*) ....................................................... 3

*United States v. Cole*,
    296 F. App'x 195, 197 (2d Cir. 2008) ................................................................. 21

*United States v. Henareh*,
    11-cr-93-1 (JSR), 2021 WL 119016, at *2 (S.D.N.Y. Jan. 30, 2021) ................................... 28

*United States v. Knox*,
    624 F.3d 865, 870–71 (7th Cir. 2010) ................................................................. 21

*United States v. Leitch*,
  No. 11-CR-00609(JG), 2013 WL 753445, at *12 (E.D.N.Y. Feb. 28, 2013).........................26

*United States v. Ramos*,
  18. Cr. 852 (AT), 2020 WL 6487198, at *1 (S.D.N.Y. Nov. 4, 2020)...................................29

*United States v. Rodriguez*,
  --- F. Supp. 3d ---, 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020) ..............................29

*United States v. Rutkoske*,
  506 F.3d 170, 178 (2d Cir. 2007) ..........................................................................................20

*United States v. Skys*,
  637 F.3d 146, 154–55 (2d Cir. 2011) .....................................................................................21

*United States v. Ware*,
  577 F.3d 442, 454–54 (2d Cir. 2009) .....................................................................................22

*United States v. Zangari*,
  677 F.3d 86, 93 (2d Cir. 2012) ..............................................................................................23

*United States v. Zoquier-Solano*,
  13-cr-772 (JPO) 2020 WL 6193859, at *2 (S.D.N.Y. Aug. 10, 2020)..................................29

## Statutory Authorities

18 U.S.C. § 3553................................................................................................................... 3, 20

18 U.S.C. § 3663A.....................................................................................................................22

## Additional Authorities

U.S.S.G. § 2B1.1......................................................................................................... 20, 21, 22

U.S.S.G. § 3B1.1.......................................................................................................................22

U.S.S.G. § 5B1.1.......................................................................................................................16

Defendant William Taylor respectfully submits this memorandum in advance of sentencing, currently scheduled for February 24, 2021.

## PRELIMINARY STATEMENT

Born and raised in rural Indiana, Bill Taylor rose from humble beginnings to build a personal and professional life of which anyone would be proud.  A loving and devoted father, husband, son, brother, uncle, and friend, Mr. Taylor became the emotional and financial anchor of his extended family, helping his kin endure personal tragedies and build bonds with one another.  In his community, Mr. Taylor gave his money, time, and talents to causes big and small – and never with fanfare or an expectation of personal reward.  A self-made man – the first in his family to attend college – Mr. Taylor earned the respect and admiration of colleagues through decades of hard work, building a reputation as a mentor with unimpeachable integrity.  He dedicated his professional career to building healthcare companies whose products have helped thousands of patients, saving limbs and lives.  At MiMedx, he instilled a set of principles known as "Bill's Basics," the cornerstone of which was "Do the Right Thing," a message he not only preached but practiced, leading by example.  Now, however, a jury has concluded that Mr. Taylor did not live up to that motto, and he comes before the Court for sentencing on one count of criminal conspiracy – a crime wholly at odds with his character, as demonstrated by the many letters submitted on his behalf.

As explained below, a variant sentence of  two years' probation, including one year of home confinement and a substantial community service component, is the appropriate disposition in his case: it achieves the goals of sentencing and is sufficient but not greater than necessary to punish Mr. Taylor for the crime.  As the Supreme Court recognized in *Gall v. United States*, 552 U.S. 38 (2007), home confinement is not leniency; it is a substantial restriction of liberty that will require Mr. Taylor to report to, worry about, and comply with

1

orders from Probation.  *Id.* at 48.  No more is needed to deter him or protect the public:  he has zero criminal history, has been fully compliant under supervision for over a year, and poses no risk of reoffending.  No more is needed to punish him or deter others:  already, this case has had a catastrophic impact on Mr. Taylor and his family, fundamentally changing the arc of their lives.  Before this case, Mr. Taylor had a hard-earned reputation for integrity, professional success in a field that was his passion, and financial security for his family.  Not anymore.  His professional prospects are limited.  His reputation is sullied.  His family's financial security is gone.  And his shame is deep.  As the Honorable Kevin T. Duffy once said in sentencing a defendant to time served:

> [T]he punishment lies not only in that but in the shame that [the defendant] brought to himself and more importantly to his family. [His family is] suffering now and will continue to suffer from this…. So, for the rest of his life, he will have to face up to the fact that if he ever has grandchildren, they will be the ones who say oh, yes, my grandfather, the felon.

Transcript at 10–11, *United States v. Garbarino*, No. 87 Cr. 860 (KTD) (S.D.N.Y. Jan. 7, 2013) (Ex. 5).

When one balances the nature and circumstances of Mr. Taylor's crime against his good works and the consequences he and his family have suffered, it is apparent that a non-custodial sentence is appropriate.  This is particularly so because Mr. Taylor's age and underlying health conditions – including obesity – put him at high risk of severe COVID-19, a disease that continues to ravage America's prisons.  In short, this sentence will provide just punishment, protect the public, deter crime, and enable Mr. Taylor to add value to society rather than consume societal resources by sitting in a penitentiary.

## **ARGUMENT**

As the Court knows, a sentence must be "sufficient, but not greater than necessary," to

vindicate the "four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017);[1] *see also* 18 U.S.C. § 3553(a).  A court fashioning a sentence must consider "the nature and circumstances of the offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to serve the four overarching aims of sentencing."  *Dean*, 137 S. Ct. at 1175. It also "must … consider the pertinent guidelines and policies adopted by the Sentencing Commission," *id.*, but not "presume that a Guidelines sentence is reasonable," *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc).  Here, regardless of how the guidelines' "abstract arithmetic" pans out, *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006), a sentence of incarceration is unnecessary and unjust – a probationary sentence including a year of home confinement and a substantial community service component is the appropriate resolution.

I.    **Mr. Taylor's History and Characteristics.**

    A.    **Mr. Taylor Has Humble Roots.**

Mr. Taylor was born and raised in a working-class farming and manufacturing community in Indiana. PSR ¶¶ 93, 96.  His parents, Charles and Rolene, both came from poor, dysfunctional homes, and neither graduated from high school.  *Id.* ¶ 97; Appendix of Letters (Ex. 2) at A010 ("Ltrs.");[2] Bill Taylor Letter (Ex. 3) at 2 ("B. Taylor Ltr.").  They married as teenagers and quickly had four children.  PSR ¶¶ 94, 97.  Mr. Taylor was the third.  Although they never had much, they worked hard at factory jobs to provide what was needed, and they

---

[1]   Unless otherwise noted, internal citations, quotation marks, and alterations have been removed from citations in this brief.

[2]   Letters submitted in support of Mr. Taylor are compiled in this Appendix (Ex. 2).  In the Appendix, letters from Mr. Taylor's family come first, followed by letters from his friends and colleagues.

taught their children the importance of hard work, honesty, and treating others as one would want to be treated.  PSR ¶ 96; Ltrs. at A008–10; B. Taylor Ltr. at 4–5.

Mr. Taylor absorbed his parents' lessons and applied them to his life – from an early age he worked hard in everything he did and thought of others before himself.  Ltrs. at A011.  Robin Yoder, his sister, remembers a young Mr. Taylor as a "kind, even tempered person [who] cared about those around him," a "rule follower [who] did not like to get into trouble or make waves." Ltrs. at A010.  Mr. Taylor's parents recall that he was "always ready to help with projects or to help whoever or whatever was needed," be it chores, running errands, or shoveling snow for elderly folks in town.  Ltrs. at A008.  As a youth, Mr. Taylor understood his family's precarious financial situation and worked hard to improve it: he helped the family's bottom line by working at McDonalds, at a local RV company, and doing double-duty as a farmhand during the summer, milking cows and bailing hay.  PSR ¶¶ 124–127.   This work ethic became part of Mr. Taylor's fundamental character, as noted by his sister, Carolyn Kern: "Bill has always been one who sets the bar high with the expectation of excellence in all he does," as he "goes beyond the normal" as a matter of course.  Ltrs. at A013.

Inspired by his parents to work hard and do better, Mr. Taylor pushed himself in the classroom, earning honors grades in high school and becoming the first in his family – and the only one of his siblings – to attend college.  PSR ¶ 97; Ltrs. at A011.  Mr. Taylor's diligence continued at Purdue University, where he earned honors grades in Mechanical Engineering while working a co-op position at Miles Laboratories.   PSR ¶¶ 115, 123; Ltrs. at A008, A011. Through his work at Miles, Mr. Taylor earned enough money to fund his entire Purdue tuition – he paid back his parents for their contribution to his freshman year and covered the rest himself. PSR ¶ 97; Ltrs. at A008, A011.

The effort Mr. Taylor put into his co-op work at Miles resulted not only in a steady paycheck, but also in his name being included on several patents, along with a full-time employment offer when he graduated from Purdue.  PSR ¶ 123; Ltrs. at A008, A011.  At Miles, Mr. Taylor worked primarily on blood glucose meters, a tool used by diabetics to monitor their blood sugar – this was Mr. Taylor's entrée into the medical device field, which became his passion.  PSR ¶ 123.

This fulltime position at Miles proved beneficial to Mr. Taylor not only professionally, but personally, because it was at Miles that Mr. Taylor met his wife, Carol.  PSR ¶ 100; Ltrs. at A001.  The two married in Indiana and began building a life together.  Two daughters, Olivia and Sophie, soon followed.  PSR ¶ 101; Ltrs. at A001.

From Miles, Mr. Taylor was recruited to join a private medical device company in Georgia called Gainor Medical. PSR ¶¶ 122–123. Deciding to leave Indiana, where his and Carol's families remain, was a difficult decision for Mr. Taylor and his young family.  PSR ¶ 100; Ltrs. at A004.  But he and Carol made that leap together because they believed it was the best opportunity to provide a better life for their children.   Ltrs. at A008.

### B.	Mr. Taylor Worked Hard, Building Companies and Bringing Their Healing Products to Patients in Need.

Mr. Taylor worked tirelessly to make his business pursuits successful, helping thousands of patients who benefitted from his companies' life-saving products.  He is extremely proud of the work he has done, the companies he helped build, and, most of all, the innovative products those companies provided to patients in need.  It is no exaggeration to say that Mr. Taylor put his heart and soul into this work, which makes the jury's conclusion all the more painful and impossible for him to comprehend.

Mr. Taylor spent almost 15 years at Gainor, helping to transform the company and

improve the lives of diabetes patients who benefitted from its products.  PSR ¶ 122; B. Taylor Ltr. at 4.  As former colleague Rick LeVaughn notes, "If you know anybody who has suffered from diabetes, … they have probably benefitted from some of the innovative blood sampling technologies that Bill Taylor has been responsible for in his career."  Ltrs. at A043.  Mr. Taylor joined Gainor as a middle manager and finished as Chief Executive Officer despite having only a college-level degree in engineering.  PSR ¶ 122.  Under Mr. Taylor's leadership, the company grew from about 20 employees to over 100, was acquired and rebranded as Facet Technologies, and was ultimately acquired again by a private equity firm.  *Id.*; B. Taylor Ltr. at 4.

After his success at Gainor/Facet, Mr. Taylor joined MiMedx in 2009, taking on a host of responsibilities as Chief Operating Officer for what was then a near-bankrupt company.  PSR ¶ 121; B. Taylor Ltr. at 4.  For the better part of a decade, Mr. Taylor worked alongside a great team to transform that company, helping tens of thousands of patients access its innovative wound-healing products.  Bringing MiMedx from the verge of bankruptcy to a company with over 1,000 employees and hundreds of millions in revenue took tremendous work from a host of people, and Mr. Taylor was at the forefront of that effort.  PSR ¶ 121; B. Taylor Ltr. at 4.  As one of the company's investors wrote, "Bill put in 80 hours per work week and was a big part of why Mimedx was successful."  Ltrs. at A033.  Indeed, according to a colleague, Mr. Taylor was "a kind of a workaholic, but very family oriented."  *Id.* at A025.

In his effort to build MiMedx, Mr. Taylor never lost sight of the company's core purpose – to help patients heal.   Dr. Bob Guldberg, a scientist who prepared educational materials on MiMedx's wound care products, observed that although he had "experienced many people from [the healthcare] industry who … tried to influence [his] opinion of their technology or control what [was] published[,] [t]here was never a hint of that from Bill or his team."  *Id.* at A021.  To

6

the contrary, he "was always impressed with [Mr. Taylor and his team's] sincere interest in understanding the science behind their product and determining whether it could help people who were suffering." *Id.* An anecdote from Mr. Henry Mellon, one of MiMedx's investors, brings home this point. When Mr. Mellon learned that a woman with "three open wounds on her leg below the knee" had been denied access to MiMedx's tissue grafts due to cost, and was instead scheduled for an *amputation*, he called Mr. Taylor, who took care of it: Mr. Taylor "arrange[d] for Mimedx to donate the tissue grafts," which healed the wounds, saved the woman's leg, and enabled her to "stand through her 18 year[] old daughter's High School graduation ceremony – something that would not have been possible without that decision by Bill Taylor." *Id.* at A033–34.

C.    **Mr. Taylor Established a Reputation for Integrity and Selflessness.**

While Mr. Taylor worked tirelessly to make his companies successful, he developed a reputation not only as a skilled operations executive, but as a man of integrity and a mentor devoted to helping others succeed.

Gloria Matthews worked with Mr. Taylor at MiMedx, and she praises his honesty and support of others. She saw him take "exceptional care of MiMedx employees," exhibiting "a personal interest in ensuring people were in the best roles to enable them to be fulfilled and productive." *Id.* at A031. To her, Mr. Taylor's integrity was beyond reproach: "I never experienced anything from Bill, in dealing with me or anyone else, other than ethical, objective, honest, authentic behavior…. He stood behind every statement he made[,] treated everyone with respect and compassion," and brought "warmth" to the company's culture, often through his self-deprecating sense of humor. *Id.* at A031–32.

Takehito Ito also worked with Mr. Taylor, developing a deep appreciation for his professional and personal attributes. He calls Mr. Taylor a "mentor" who set an example Mr. Ito

7

tried to follow in building his own company in Japan:  "[H]e went above the typical business relationship and demonstrated his work ethic, commitment, ambition, and most importantly, perseverance.  Bill has been an inspiration to others and myself…. Everyone looks up to him…. He is highly trusted because of his warm personality" and "always motivates others."  *Id.* at A025–26.  Mr. Taylor's integrity stood out to Mr. Ito, too: "One thing in particular [I recall] about working with Bill is something he said often during meetings: 'Do the right thing.'  He always valued honesty, trustworthiness, and fairness in ethics.  Those four words will forever be engrained in my head, and still words I live by today."  *Id.* at A026.  Indeed, Mr. Taylor's influence on Mr. Ito was so profound that it inspired him to immigrate to the U.S., where Mr. Taylor helped him secure a visa and "adapt" to life here – a series of events that "drastically changed [Mr. Ito's] family's life for the better."  *Id.*

Another former colleague, Leana Tatum, echoes this praise.  She worked closely with Mr. Taylor for eight years; she travelled with him, worked with him on critical projects, and gained insight into his personal and professional life through full access to his calendar, emails, and credit card record.  She writes: "Never in any of these areas did I witness Bill make any decisions which would give me pause."  *Id.* at A039.  Ms. Tatum calls Mr. Taylor a "servant leader," the kind of boss who personally "tak[es] out the trash," and leads by example.  *Id.*  She, too, calls Mr. Taylor a mentor:  "To this day, I follow what we called 'Bill's Basics.'  These are operating principles that he lives by and requires that all around him observe.  They include: 'Do the right thing,' … among others.  I personally watched him lead by example and expect no less from those in his charge."  *Id.*

Mr. Taylor's commitment to integrity was also noted by Brent Miller, who worked alongside Mr. Taylor for more than two decades.  Mr. Miller also recalled "Bill's Basics,"

including the mantras to "Do the right thing!," "Lead by Example," and "Turn complaints into actions." *Id.* at A035. To Mr. Miller, "'Do the right thing' was Bill's overriding, guiding principle that he brought up on almost a daily basis in meetings/discussions," even when doing the right thing meant making "tough decisions," not necessarily those that "would result in the largest profit[.]" *Id.* Based on their two-plus decades together, Mr. Miller knows that "Bill is a caring, straight forward, honest person who tries every day to 'Do the right thing' in all aspects of his life, both personal and professional." *Id.* at A036.

Kevin Lilly has also known Mr. Taylor for over 25 years. He worked with Mr. Taylor at two companies and likewise admires his integrity and leadership. He writes that Mr. Taylor consistently focused on others, making sure team members were "recognize[d] and … fe[lt] included," even when their performance fell short – and that he did so "*behind the scenes*," not because he was looking for credit, but because it was the right thing to do. *Id.* at A029. Mr. Lilly also recalls Mr. Taylor's "commitment to fairness for everyone." *Id.* As an example, Mr. Lilly writes that, during a business meeting with a foreign counterparty, Mr. Taylor noticed an important female executive being shunted aside, relegated to "serving everyone coffee instead of meeting" with key decision-makers, and he put a stop to it – "When they told us that was her job as a woman, Bill became very upset. He pulled the VP aside and lit into him," and "[a]s a result … she was included a full partner from that point forward." *Id.* at A028–29. Mr. Lilly's admiration for Mr. Taylor's integrity and decency is clear:

> Bill is a reserved person who always tries to do the right thing[,] a humble person who came from humble beginnings. Once he started achieving success, he didn't change. He stayed grateful and shared his success with his family and friends. He's been the same person the entire time I have known him[:] a low-key Midwesterner from rural Indiana. I trust him because he has been honest with me and I've seen him be consistently honest with others. He is a loving family man

9

and has a loving family that he has supported throughout his life.[3]

Mr. Taylor's character for integrity stood out not only to his colleagues, but also to his counterparts.  For example, one of Mr. Taylor's former suppliers, Steve Motisi, recalls how Mr. Taylor helped Mr. Motisi's company through a challenging financial situation by paying invoices far earlier than contractually called-for, "an usual type of assistance that [neither] he nor his company had an obligation to [do]."  *Id.* at A037.  As Mr. Motisi notes, "Bill could have easily declined our request for assistance and place[d] his business elsewhere," but he agreed in order to help Mr. Motisi through that "difficult time," enabling Mr. Motisi "to get [his] financial house in order … likely preserv[ing] some 90 jobs at [his] company."  *Id.*  To a seasoned business executive like Mr. Motisi, Mr. Taylor's act of "moral character" was extremely memorable.  *Id.*

### D.     Mr. Taylor Has a Charitable Spirit and Generously Supports His Family and Community.

In addition to being respected for his diligence, integrity, and kindness, Mr. Taylor is loved and admired by family, friends, and community members who have witnessed his many acts of generosity.

Although Mr. Taylor's professional journey led him far from his home in the Indiana countryside, both geographically and socioeconomically, Mr. Taylor never forgot the lessons his parents taught him, including to "treat [people] with respect and love and help them in any way you can."  *Id.* at  A009. Applying that lesson, Mr. Taylor has supported many folks in need, without fanfare or expectation of reciprocity, simply because he believed it was the right thing to do.  For example, recognizing that higher education had opened doors never accessible by his parents or siblings, Mr. Taylor gave back by sponsoring a scholarship at his *alma mater*, Purdue,

---

[3]  Ltrs. at A028–29.

that supports the next generation of hardworking, would-be engineers from Indiana.  PSR ¶ 142. Letters from those scholarship recipients illustrate how Mr. Taylor's generosity has helped better their lives.  *See* Scholarship Letters (Ex. 4). Mr. Taylor has also provided hundreds of thousands of dollars in charitable support to a host of causes, including his parish, his children's schools, youth sports teams, and organizations supporting cancer research, veterans, and more.  PSR ¶ 142.

Mr. Taylor has donated not only his money, but also his time and talents, to worthy organizations, big and small, helping them thrive.  For example, he helped Mr. Motisi by taking on a "non-compensated advisory board position" at a "small" and "struggling" manufacturing company, where Mr. Taylor's "business acumen and experience proved most helpful."  Ltrs. at A037.  Mr. Taylor also spent years serving on the board of Anna Crawford Children's Center (a charity dedicated to helping childhood-abuse victims), the Board of Advisors for the Institute for Bioscience and Bioengineering at Georgia Tech, as well as the Metro Atlanta Chamber of Commerce business counsel.  PSR ¶ 128.

This same generosity of spirit is on display in Mr. Taylor's daily life, in how he treats his neighbors and friends.  By serving as a church usher, working on food drives and community-building events, "help[ing one] neighbor put out a gas fire," "help[ing another] through a serious insulin reaction," giving a friend in need a place to stay for weeks at a time, and helping others "make meaningful professional contacts" and better their careers – Mr. Taylor has earned the compliment paid by his wife, that he "is the most hospitable, generous, civic-minded person [she] know[s]."  Ltrs. at A002.

Mr. Taylor has also been generous closer to home, becoming the emotional and financial anchor for his extended family, many of whom remain in Indiana.  He helped his parents,

siblings, in-laws, and their families through a host of difficult issues, providing advice and emotional support, as well as hundreds of thousands of dollars in financial assistance. *See, e.g.*, PSR ¶ 98–99; Ltrs. at A001–17.   For example:

- When his sister-in-law, Becky, was struggling as a divorced mother of two, Mr. Taylor, "without even being asked, provided financial assistance, guidance and support for [her] and [her] children."  Ltrs. at A017.  For instance, when Becky needed to take time off work to care for her aging and ailing parents in South Bend, it was Mr. Taylor who provided the financial support she needed to do so.  *Id.* at A002.

- When his younger brother, Bryan, passed away unexpectedly at 40, Mr. Taylor immediately flew back to Indiana, supported his parents in their grief, handled arrangements for the funeral services, and paid the bills – and he did so "in the background," without telling anyone he covered the costs.  *Id.* at A014, A009; PSR ¶ 98.

- Because his family members often could not afford to travel, Mr. Taylor routinely paid for his parents, siblings, in-laws, and their families to travel and see one another, go on vacations as a group, and make memories together.  PSR ¶ 98; Ltrs. at A002, A009, A011, A014.  Several of these trips were essential in helping the family mourn as a unit, including trips taken after the untimely passing of his brother and his sister-in-law, Diane. Ltrs. at A002, A014, A017.  As his sister-in-law, Becky, notes, these trips provided "[a] much needed time for healing and family."  *Id.* at A017.

- When his nephew, Jason Kern, needed professional support and guidance, Mr. Taylor invited Jason to live with the Taylor family in Georgia and arranged for an internship at the company where he then worked – Facet.  *Id.* at A015–16.  This was no cushy assignment, as Mr. Taylor was "always the hardest" on Jason, "push[ing] [him] not only to do [his] best but to go above and beyond" to make sure Jason made "a name for [him]self" and prevent anyone from thinking he was getting a "free ride."  *Id.* at A015. That experience launched Jason's career, and he is clear about the impact of Mr. Taylor's mentorship: "I would not be where I am today without the professional and personal guidance of Bill Taylor."  *Id.* at A016.

Mr. Taylor has been a rock on which his extended family relies.  As Carol makes clear, Mr. Taylor provided all of this support without hesitation or self-aggrandizement: "Bill didn't think twice about helping.  He didn't make a show of it, either – that's not how he was raised.  And he didn't expect anything in return.  He just did it because he knew it was the right thing to do. That's how Bill is.  It's who he is."  *Id.* at A002.

In addition to supporting his extended family, Mr. Taylor has been a devoted husband to his wife, Carol, and father to their daughters, Olivia (now 26) and Sophie (now 23).   As Carol put it, "Bill has always been an extremely hard working and loyal husband and father," the kind of dad who, even "after long days working," would spend his nights "quizzing [his] daughters for their math and science exams."   *Id.* at A001.   He "has a natural instinct for creating community and fostering a safe, happy environment for kids to enjoy themselves," an instinct he put into action coaching his girls' softball teams, leading their academic enrichment programs, cheering on their basketball and lacrosse games, applauding their theatre performances, and opening the Taylor home to their friends and families.   *Id.*   As Carol sums it up, "Bill was absolutely devoted to providing the most stable, loving home possible.   He put us first, always…. Bill's love and guidance is a big part of why our daughters became the kind, straight forward, hard-working young women that they are."   *Id.* at A001–02.

Both Olivia and Sophie recognize the role their father played in shaping the admirable young women they have become.   Their letters speak for themselves, providing a peek into the core of who Mr. Taylor is: a mentor, a cheerleader, a coach, a man of charity, a calm and steady voice helping others make good decisions, a shoulder to cry on when life is hard, and a selfless provider.   *Id.* at A004–07.   Olivia understands the sacrifices her father made to improve his family's fortunes – the "long hours," the "travel and time away from" home that was necessary to "provide opportunities for [his daughters] to get a good education," to provide "stability and opportunity for his family and community."   *Id.* at A004.   Mr. Taylor's profound influence on Olivia is evidenced by her decision to follow in his footsteps:  like her father, she is now an engineer in the medical device industry, who feels "fortunate to be able to provide for [her]self and … have a positive impact in [her] career and community."   *Id.* at A005.   Sophie, too, is

deeply appreciative of her father, and the blend of logic and love he brought to parenting: on one hand, he would sit her down and work through budgets so she could better understand the consequences of important personal decisions; on the other, he would "drop everything to drive 2 hours to Athens, Georgia at 10pm on a random Friday night after [she] called in tears about a terrible date." *Id.* at A006–07.   Perhaps she put it best when she wrote: "My dad cannot be summed up in one letter; even 10 letters could not encompass everything my dad has done for me and my family. He has been a constant source of support and love, and he has always been there, not just for me but for everyone else in our family as well." *Id.* at A007.

### E.    Mr. Taylor and His Family Have Already Been Devastated by This Case.

For Mr. Taylor and his family, the fallout from this investigation and prosecution already goes well beyond any sentence the Court might impose.

The most concrete and obvious consequences are financial, as Mr. Taylor faces the prospect of bankruptcy based not only on possible penalties in this case, but much more.  ***First***, MiMedx has already clawed back Mr. Taylor's long-term stock compensation that accounted for more than half of his net worth.  PSR ¶ 121; B. Taylor Ltr. at 6.  ***Second***, MiMedx recently sued Mr. Taylor to cease its future advancement/indemnification obligations *and* recoup all fees paid in defense of this case and a bevy of others – and the sum MiMedx seeks far exceeds the assets Mr. Taylor has left.  PSR ¶ 144; B. Taylor Ltr. at 6.  ***Third***, Mr. Taylor remains a defendant in a federal securities fraud class action *and* a civil enforcement action brought by the SEC, both of which raise the prospect of additional financial penalties.  PSR ¶ 144; B. Taylor Ltr. at 6.  Mr. Taylor understands the harsh reality: "In short, I'm looking at going bankrupt and losing everything I had saved to provide safety and security for my wife, daughters, and family members."  B. Taylor Ltr. at 6.

Carol is understandably "scare[d] to think where things go from here, especially if Bill is sentenced to prison."  Ltrs. at A003.  Since Mr. Taylor was indicted, the family has been living off savings, and prospects are dim for any substantial income in the near future.  Carol's letter describes how Mr. Taylor's termination from MiMedx thrust her back into the workforce at age 56, after 25 years spent managing their household.  Although Carol has managed to find a series of jobs, and "knows[s] how incredibly lucky [she is]" to have done so "in this current environment," *id.* at A002, she earns less now than she did back in 1994, before she became a stay-at-home mom, B. Taylor Ltr. at 7.  After a quarter century out of the workforce, Carol will struggle to find and keep steady work that can sustain the family.

Then there are the emotional consequences, which are harder to describe but no less real. In his letter, Mr. Taylor admits the "crushing and humiliating" impact this case has had on his personal and professional life, and how, despite all that came before, it "has redefined the last 30 years of [his] life's work."  B. Taylor Ltr. at 6.  Carol describes how "neighbors and folks [she]'d considered friends started looking the other way to avoid talking to [her]," how "[a]t times, it's been downright humiliating."  Ltrs. at A002; *see also* B. Taylor Ltr. at 7.  ███████████████

████████████████████████████████████████████████████████████████

███████████████████████████  B. Taylor Ltr. at 7.

Whatever sentence the Court imposes, the consequences of this case are—and will continue to be—severe for Mr. Taylor and his family.

### F.      Mr. Taylor's Health Issues Make Him Vulnerable to COVID-19.

Mr. Taylor suffers from obesity[4] and high cholesterol, and he takes prescribed medication

---

[4]   At 5'8" and 225 lbs., Mr. Taylor has a Body Mass Index ("BMI") of 34.2, which the CDC classifies as obese.  *Adult BMI Calculator*, CDC.GOV, available at https://www.cdc.gov/ healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (last visited (footnote continued)

for the latter.  PSR ¶¶ 106–107.   The CDC has recognized that obesity "increas[es] the risk of severe illness from COVID-19."  *See, e.g., Obesity, Race/Ethnicity, and COVID-19*, CDC.GOV.[5] And studies have identified high cholesterol as a risk factor for COVID-19 severity.  *See, e.g.*, Alena Hippensteele, *BMI, LDL Cholesterol Are Important Metrics in Assessing COVID-19 Risk*, PHARMACYTIMES.COM, Dec. 1, 2020.[6]

## II.    Sentencing Guidelines: The Correct Guidelines Range is 6-12 Months.

Mr. Taylor's guidelines range is 6-12 months, a Zone B range for which probation and home confinement are permissible under U.S.S.G. § 5B1.1(a)(2).  Mr. Taylor's criminal history category is I (PSR ¶ 88) and his Total Offense Level is 10 – a figure generated by adding 4 points to a Base Offense Level of 6 (PSR ¶ 74) because Mr. Taylor was an officer of MiMedx at the time of the crime (PSR ¶ 78).  The 60-month range proposed by Probation (*e.g.*, PSR ¶ 151) and advanced by the government is incorrect as a matter of law and excessive as a matter of common sense.   Indeed, but for the 60-month statutory maximum, the PSR would suggest an absurd range of 262-327 months (PSR ¶ 151), driven primarily by an incorrect determination of "loss"  (PSR ¶ 75).  Although many of the PSR's proposed enhancements are rendered academic by the 60-month cap, the Court should still reject them, as follows.

### A.    The Government's 22-Level Loss Enhancement is Unsupportable Because it is Premised on a Fundamentally Flawed Analysis.

The government's $34,601,475 loss amount (PSR ¶ 75) is unsupportable because it suffers from three fundamental flaws.

*First*, the basic assumption that underlies the government's expert analysis is incorrect,

---

Feb. 16, 2021).

[5]   Available at https://www.cdc.gov/obesity/data/obesity-and-covid-19.html (last visited Feb. 16, 2021).

[6]   Available at https://www.pharmacytimes.com/news/bmi-ldl-cholesterol-are-important-metrics-in-assessing-covid-19-risk (last visited Feb. 16, 2021)

rendering the entire analysis fatally flawed.  The incorrect assumption is that meeting revenue forecasts actually inflated MiMedx's stock price.  As Dr. Atanu Saha demonstrates in his accompanying report, meeting revenue forecasts more often *deflated* MiMedx's stock price. Expert Report of Dr. Atanu Saha (Ex. 1) at 5–6, 12–17  (hereinafter, "Saha Rep.").  The absence of a positive relationship between revenue inflation and stock price inflation is "well documented for numerous publicly traded companies in various academic studies."  Saha Rep. at 6; *see also id.* at 17–18.  Investors and analysts *say* they care whether companies meet revenue targets but behave as if they do not care.  Yet the government's loss calculation begins with the assumption that, for MiMedx, revenue inflation and stock price inflation bore a positive, one-to-one correspondence.  That is demonstrably false.  *See id.* at 12–17.  The government cannot establish by a preponderance of the evidence that any revenue fraudulently recorded by MiMedx in 2015 inflated the stock price at all.

**Second:**  If the revenue overstatements in 2015 did not inflate the stock price, why did the company lose $600 million in market capitalization on a single day, two years later, when those revenue overstatements were disclosed?  The answer to that question reveals the second major flaw in the government's loss calculation.  The government takes February 20, 2018 as the date on which the fraud was disclosed.  But MiMedx disclosed nothing about the 2015 revenue overstatements on that day.  *See id.* at 6–7, 24.  The only thing MiMedx announced was that it was postponing the release of its 2017 financials, and that the "Audit Committee of MiMedx's Board of Directors ha[d] engaged independent legal and accounting advisers to conduct an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices."  *Id.* at 24 (quoting MiMedx's Feb. 20, 2018 press release).

Had MiMedx in fact disclosed on February 20, 2018 that, more than two years earlier, the company had overstated revenue by $8.26 million over the course of three quarters, it is hard to believe the market would have cared at all.  The reason MiMedx's actual disclosure caused the stock to fall by nearly 80% over the course of several weeks was something else entirely.  During 2017, short sellers had mounted a coordinated attack on the company's stock price, shorting the stock while flooding the market with rumors of improprieties (which did not include any of the 2015 sales charged in the indictment).  *See id.* at 27–31.  Despite the rumors, MiMedx's business thrived and its stock price continued to climb.  The rising stock price resulted in a short squeeze that required the shorts to cover, driving the stock price even higher.  *See id.* at 31–34.  Then, on February 20, 2018, the company made a disclosure so vague and portentous that it created something investors actually do care about and act on:  "***uncertainty***."  *Id.* at 34 (emphasis added).  Rather than disclose the modestly bad news that it ultimately disclosed 18 months' later in March 2020 – namely, that the company had recorded revenue in the wrong quarters but had collected nearly all of it – MiMedx made a disclosure that allowed room for the market to wonder whether the company's sales and earnings figures were entirely made up.  The market had no idea what the company was worth at that point, so it assumed the worst – that it was worth next to nothing.  When the mistimed revenue from 2015 (and other quarters) was *actually disclosed* on March 17, 2020, MiMedx's share price rebounded, gaining nearly 120% by year's end.  *See id.* at 7, 26.  Yet the government's loss calculation is based on the untenable twin assumptions that the entire stock price drop on February 20, 2018 corresponds on a one-to-one basis with undisclosed revenue inflation, and that this revenue inflation was disclosed to the market in the company's vague February 20, 2018 press release.

***Third***, even assuming, contrary to fact, that the 2015 revenue inflation (and all other

revenue inflation) resulted in corresponding stock price inflation, the existence and extent of the revenue inflation was actually disclosed to the market on March 17, 2020, not February 20, 2018. *See id.* at 8, 35. March 17, 2020 is the date on which MiMedx restated its revenues for the years 2014–2016 and the first three quarters of 2017. MiMedx disclosed on that date that even though "the Company recovered the majority of its billings made between 2012 and 2017 with insignificant write-offs recorded,"[7] it should have recorded those billings when the cash was collected rather than when the product was shipped; and if it had done so, reported revenue for the period 2014–2017 would have been different. This was the first date on which the public actually learned about the nature and extent of the revenue inflation charged in the indictment.

The closing price of the stock before MiMedx made its March 17, 2020 disclosure was $4.14. *Id.* at 36. The average price of the stock over the following 90 days was $4.11 – a three-cent difference. *Id.* at 35–36. That is what one might expect from a disclosure that the company had actually collected the cash from all of its sales but had reported a small percentage of its total revenues over a four-year period in the wrong quarters. Applying the government's own approach of apportioning that $0.03 impact between the fraud and other factors (based on the ratio of $8.26M revenue at issue to total revenue of $70.74M for the years 2014–2017) yields a per-share price inflation attributable to the fraud of $0.0036, and a total loss to shareholders of only $192,750. *See id.* at 35–36. Meaning that even if the Court accepts the erroneous premise that revenue inflation has a one-to-one correspondence with stock price inflation, the government's own modified recissionary approach to loss calculation, using the true disclosure date of March 17, 2020, yields a loss amount to shareholders of just $192,750. *See id.* That loss

---

[7]   MiMedx, Form 10-K (Mar. 17, 2020), F-27, ¶ 1 (emphasis added). Available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1376339/00013763392 0000009/restated2016-2018annua.htm (last visited Feb. 3, 2021).

amount would result in a 10-level enhancement under the guidelines (§2B1.1(b)(1)(F)), rather than the 22-levels called for in the PSR.

But the Court should not accept the government's erroneous assumption that the 2015 revenue inflation caused a corresponding stock price inflation – or any stock price inflation at all – because the MiMedx-specific data and scholarly literature suggest otherwise. *See id.* at 5–6. The government may not simply ask the court to assume this crucial fact; it has to prove it by a preponderance of the evidence, which it cannot do. Further, even assuming *arguendo* Mr. Taylor's 2015 conduct inflated the stock price and caused a loss to investors nearly three years later, the fact is that the loss cannot reasonably be calculated. *See, e.g.*, U.S.S.G. § 2B1.1, cmt. n.3(A)(i) (defining "[a]ctual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense"); *United States v. Rutkoske*, 506 F.3d 170, 178 (2d Cir. 2007) (explaining that although a "court need only make a reasonable estimate of the loss," its determination must be "legally acceptable"). That means the Court must look to the "gain that resulted from the offense as an alternative measure of loss[.]" U.S.S.G. § 2B1.1, cmt. n.3(B). Here, Carina Chambarray, the government's own trial witness and an SEC economist, has already calculated that the gain to Mr. Taylor was $125,208 to $153,408. *See* Tr. 2067:15–17. That results in a loss enhancement of 8 or 10 points, depending on which figure the Court selects. U.S.S.G. § 2B1.1(b)(1)(E)–(F). Should such an enhancement apply, Mr. Taylor's guidelines range would be either 27–33 months (I/18) or 33–41 months (I/20), both of which are lower than the 60-month range proposed by the PSR – although still excessive under the section 3553(a) factors.

### B.     The Victims Enhancement Does Not Apply.

No enhancement under § 2B1.1(b)(2)(A)(i) is appropriate because, as just discussed,

there is no proof that *anyone* suffered actual loss attributable to Mr. Taylor.[8] *Cf.* U.S.S.G. § 2B1.1 cmt. n.1 (defining "victim" as "any person who sustained any part of the actual loss determined under (b)(1)"). The "number of victims" enhancement applies only where the government can prove loss *and* identify those who were harmed. *See, e.g.*, *United States v. Skys*, 637 F.3d 146, 154–55 (2d Cir. 2011); *United States v. Abiodun*, 536 F.3d 162, 168–69 (2d Cir. 2008). The government's inability to establish actual loss precludes an enhancement under §2B1.1(b)(2)(A)(i). *See id.*

### C.     The Sophisticated Means Enhancement Does Not Apply.

The sophisticated means enhancement is inappropriate because the conspiracy at issue was not "notably more intricate than that of a garden-variety" fraud scheme.[9] *United States v. Cole*, 296 F. App'x 195, 197 (2d Cir. 2008); *see also United States v. Adepoju*, 756 F.3d 250, 258–59 (4th Cir. 2014) (enhancement requires more than what is necessary to commit the crime, and more than just "thoughtful or potentially successful planning"); *United States v. Knox*, 624 F.3d 865, 870–71 (7th Cir. 2010) (enhancement proper "when the conduct shows 'a greater level of planning or concealment' than a typical fraud of its kind").

The case against Mr. Taylor boiled down to the claim that he granted a right of return to First Medical on a single purchase order, did not tell MiMedx's accountants about it, and then asked Michael Carlton to ask First Medical to omit that information from an audit confirmation letter. None of Mr. Taylor's actions or Mr. Carlton's (i.e., communications between themselves and with First Medical, and an email from Bill Taylor to MiMedx's Accounting Department) qualifies as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense," such as "hiding assets or transactions, or both, through

---

[8]  PSR ¶ 76.
[9]  PSR ¶ 77.

the use of fictitious entities, corporate shells, or offshore financial accounts."  U.S.S.G. § 2B1.1 cmt. n.9(B); *see, e.g.*, *United States v. Brown*, 877 F. Supp. 2d 736, 752 (D. Minn. 2012) (same). Thus, this enhancement does not apply.

### D. The Manager-Supervisor Enhancement Does Not Apply.

A manager-supervisor enhancement is inappropriate for Mr. Taylor because the "criminal activity" of which he was convicted did not involve five or more participants, and was not otherwise extensive.[10] U.S.S.G. § 3B1.1(b).  The crux of the government's case against Mr. Taylor was First Medical, which, given Mr. Petit's acquittal on Count One, apparently amounted to a conspiracy between Mr. Taylor and Mr. Carlton concerning the terms of a *single* sale.  They were the only participants in the First Medical conspiracy.  The government did not prove that anyone from First Medical was a "participant" in this conspiracy, *i.e.*, someone "criminally responsible for the commission of the offense," U.S.S.G. § 3B1.1 cmt. n.1, nor could it, since there is no evidence any First Medical employee understood GAAP revenue recognition rules, U.S. securities laws, or anything else that would have sufficiently informed them that they were involved in a crime.  Nor can the government prove that anyone else from MiMedx was involved.  And no facts establish that this two-person conspiracy was "otherwise extensive." *See, e.g.*, *United States v. Ware*, 577 F.3d 442, 454–54 (2d Cir. 2009) (holding criminal activity was not "otherwise extensive" when it included four participants, spanned a period of months, and involved unwitting participants performing wire services).  Accordingly, this enhancement should not apply.

---

[10]   PSR ¶ 80.

### III.     Restitution is Inapplicable.

There is no basis for restitution because, as explained *supra* § II.A, (i) no shareholder loss was caused by Mr. Taylor's conduct, or, (ii) assuming *arguendo* there was, it is not reasonably calculable.  *See, e.g.*, 18 U.S.C. § 3663A(c)(1)(B) (MVRA applies only when "an identifiable victim or victims has suffered a physical injury or pecuniary loss"); *United States v. Boccagna*, 450 F.3d 107, 119 (2d Cir. 2006) ("Criminal restitution … is not concerned with a victim's disappointed expectations but only with his actual loss."); *United States v. Catoggio*, 326 F.3d 323, 329 (2d Cir. 2003) (vacating trial court's restitution order that was not based on an "accurate" figure of the victims' losses); *see also* Transcript at 31–32, *United States v. Lumiere*, 16-cr-000483 (JSR) (S.D.N.Y. June 14, 2017) (Ex. 6) (no restitution when no loss could be reasonably calculated for identifiable victims).[11]  Indeed, although the government is now asking for 90 additional days to resolve restitution (Gov. Mem. 37 (Dkt. No. 145)), the fact is that the prosecutors previously conceded it is impossible to apportion any loss in this case, and told Probation and the defense that it was *not* seeking restitution.  PSR ¶ 161; *id.* at 38 ("The Government is not seeking restitution in this case given the market-wide nature of the harm and the difficulty in apportioning loss.").  The Court should reject the government's sudden about-face on this issue and enter no restitution.

### IV.     A Sentence of Home Confinement, with a Community Service Component, is Appropriate for Mr. Taylor and Will Achieve the Goals of Sentencing.

A sentence of home confinement, with a significant community service component, is sufficient but not greater than necessary to punish Mr. Taylor.  Although the crime is serious, letters submitted in support of Mr. Taylor make clear that it is wholly inconsistent with his

---

[11]   Nor can Mr. Taylor's gain from the offense be used to set a restitution figure.  *See United States v. Zangari*, 677 F.3d 86, 93 (2d Cir. 2012) ("[A] sentencing court ordering restitution under the MVRA may not substitute a defendant's ill-gotten gains for the victim's actual loss.").

history and character, the hallmark of which is his integrity.  Further, Mr. Taylor has already suffered severe consequences: he has been humiliated before his family, friends, and community, with his reputation tarnished, prospects limited, and financial security erased.  What's more, given Mr. Taylor's age, health conditions, and the still-raging pandemic, imprisonment will put his life at risk.  In light of these factors, there is no justification for sending Mr. Taylor to prison.  One year of home confinement, bolstered with a community service component, is the appropriate resolution.

### A. A Sentence of Home Confinement Is Appropriate When Balancing the Nature and Circumstances of the Offense and Mr. Taylor's History of Good Works.

Mr. Taylor's conviction stands in stark contrast to his life's work, to the values he has embodied, and to the glowing impression he has made and positive influence he has had on kin and colleagues alike.  Although the offense in this case was serious, certain factors mitigate its seriousness.

*First*, although it is impossible to parse the verdict completely, it seems clear that the jurors did not find a conspiracy of the size and scope alleged in the indictment and re-alleged in the PSR's statement of the offense conduct.  PSR ¶¶ 8–68.  Mr. Petit's acquittal on the conspiracy charge shows the jury rejected the allegation that he and Mr. Taylor conspired to commit *any* of the underlying offenses.  Mr. Taylor's acquittal on the securities fraud reflects his minimal role in reporting the company's financial results to investors.[12]  Furthermore, given the

---

[12] As auditor Matthew Urbizo testified, MiMedx's Controller was generally responsible for providing information necessary to conduct audits, *not* Mr. Taylor – who was not part of MiMedx's accounting department, not a member of the Audit Committee of its Board of Directors, had "no involvement drafting financial statements," and did not sign quarterly/annual financial disclosures or management representation letters.  *See* Tr. 1872–73; *id.* at 1875–77; GX 300; DX 431.

split verdicts, the focus of the prosecutors' arguments,[13] the nature of the evidence,[14] and the content of jury's notes,[15] it is likely the jury found only that Mr. Taylor conspired with Mr. Carlton to mislead MiMedx's auditors, and no more than that. In respect for the jury's assessment of the trial evidence, this Court should likewise reject the government's overbroad account of Mr. Taylor's offense conduct.

*Second*, unlike many accounting fraud cases, this one included no allegation (let alone evidence) that the defendants reported nonexistent revenue, only that they caused it to be reported in the wrong quarters. First Medical, for example, ultimately paid for all of the products it received. And, as noted earlier, MiMedx acknowledged when it restated its financials that it "recovered the majority of its billings between 2012 and 2017 with insignificant write-offs recorded," albeit with "a significant amount … collected well after payment was due." MiMedx, Form 10-K (Mar. 17, 2020), F-27, ¶ 1 (emphasis added).[16]

*Third*, unlike many criminal defendants, Mr. Taylor was not personally enriched through the fraud at issue. By the government's own assessment, his gain was only $125,208 to $153,408 in non-equity compensation. Tr. 2067:15–17. That sum is dwarfed by what Mr. Taylor has already lost and stands still to lose, as noted above and discussed further below.

Balancing Mr. Taylor's admirable history and characteristics against this aberrant criminal conduct, a sentence of incarceration would be excessive.

---

[13] *See* Tr. 2286–2293 (focusing on First Medical and Mr. Taylor), 2454–2461 (same); *see also id.* 2461:16–17,("Convict Bill Taylor based on First Medical alone.").

[14] *See, e.g.*, Dkt. No. 126, at 1–3, 9–11 (discussing lack of evidence regarding Stability, SLR, and CPM); Dkt. No. 140, at 7–9 (same). *See also* DX 165 & DX 168 (showing MiMedx's General Counsel, Chief Financial Officer, and Controller were all contemporaneously aware of Mark Brooks' amended consulting agreement and $200K payment).

[15] *See, e.g.*, Dkt. No. 126, at 7–8, 17 (focusing on Jury Note 7 [Dkt. No. 137]).

[16] Available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1376339/00013763392 0000009/restated2016-2018annua.htm (last visited Feb. 16, 2021).

**B.     A Sentence of Home Confinement Will Achieve the Goals of Sentencing.**

A sentence of home confinement is sufficient to punish Mr. Taylor, protect the public, and deter him and others from future crimes.

*As to Just Punishment:*  MiMedx has already clawed back equity compensation form Mr. Taylor that constituted more than half of his net worth and sued to recoup legal fees that would drain the rest (and then some).  Additional financial penalties still loom in this case, a companion SEC case, and a shareholder class action.  Mr. Taylor faces the very real prospect that he, his wife, his daughters, and the many family and community members who have long benefitted from his generosity, will lose *everything* he built through decades of industry and integrity.  That crushing loss, plus the additional burden of a year in home confinement, adequately reflect the seriousness of his crime.  Enhancing those "significant" consequences with a community service requirement – a "constructive" form of punishment – is more than sufficient to satisfy section 3553(a)'s requirements.  *United States v. Leitch*, No. 11-CR-00609 (JG), 2013 WL 753445, at *12 (E.D.N.Y. Feb. 28, 2013).

*As to Protecting the Public:* Mr. Taylor poses no threat.  Conspiracy is a serious offense, but Mr. Taylor's crime is inconsistent with his history and characteristics as a businessman, family man, and friend, as reflected in the many supportive letters submitted.  There is no risk that Mr. Taylor will expose the public to future harm, financial or otherwise. He had a spotless record before this case (PSR ¶¶ 86–91) and has been fully compliant on pre-trial release for over a year.  All of that, not to mention his age,[17] shows he is not likely to reoffend, regardless of

---

[17]   Defendants "over the age of forty," like Mr. Taylor, "exhibit markedly lower rates  of recidivism in comparison to younger defendants."  *United States v. Carmona-Rodriguez*, No. 04 CR 667 (RWS), 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005); *see also Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, U.S. SENTENCING COMMISSION, at 12, 28 (2004) (available at https://www.ussc.gov/research/research-(footnote continued)

whether he is incarcerated.  Furthermore, bolstering Mr. Taylor's sentence with a community service requirement will not only *protect* the public, but *benefit* it.

*As to Deterrence:* No incarceration is necessary to promote specific or general deterrence here.  With respect to Mr. Taylor, this case has sullied his hard-earned reputation and left his family on the precipice of financial disaster – the notion that he will return to crime unless imprisoned is farfetched. With respect to general deterrence, incarceration is unnecessary for similar reasons.  Already, the consequences suffered by Mr. Taylor and his family send a powerful reminder to anyone considering accounting fraud that, even if one is not an accountant, has never run afoul of the law, and has been a model citizen and corporate executive for decades, the U.S. government will not hesitate to bring an indictment that carries a potential sentence of 25 years in prison, leaving an otherwise decent person's reputation, finances, and personal life in shambles.  Such catastrophic consequences are sufficient to deter an operations executive from participating in revenue recognition fraud – if not, there is little reason to think that the prospect of imprisonment would be sufficient, either.

Mr. Taylor recognizes that, in certain circumstances, "some meaningful prison time does serve a major deterring effect in white collar cases because it sends the message to others similarly situated that you can't buy your way out of this."   Ex. 6 at 15 (*Lumiere* sentencing transcript).  But that principle does not apply here for three reasons.  *First*, although serious, the conduct in this case is less severe than that in many other white collar matters this Court has seen.  *See supra*, § IV.A.  *Second*, Mr. Taylor's personal circumstances have not allowed him to

---

publications/measuring-recidivism-criminal-history-computation-federal-sentencing-guidelines) (last visited Feb. 16, 2021) ("Recidivism rates decline relatively consistently as age increases. Generally, the younger the offender, the more likely the offender recidivates. . . .  Among all offenders under age 21, the recidivism rate is 35.5 percent, while offenders over age 50 have a recidivism rate of 9.5 percent.")

"buy [his] way out of" anything – already, he stands to lose all he has.  Far from seeking to buy his way out of prison, Mr. Taylor would gladly pay the price of incarceration if it would guarantee his wife and family a measure of financial security.  But that kind of trade is not on offer – MiMedx and the SEC are coming, regardless of what this Court does.  For defendants like Mr. Taylor – executives who are successful but not wildly rich – a case like this spells the end to their financial security, regardless of whether they spend a day in prison.  That chilling reality alone should be sufficient deterrence.  ***Third***, and as discussed below, Mr. Taylor's personal characteristics make him vulnerable to dying from COVID-19 if imprisoned.

### C.     Imprisonment Would Be Unnecessarily Harsh In Light Of COVID-19.

Incarceration is also unjustified in light of the danger it would pose to Mr. Taylor's health, given the COVID-19 pandemic, his age, and his underlying conditions.  At 52 years old, Mr. Taylor is at higher risk for severe illness than the many younger defendants appearing before this Court.  *See Older Adults*, CDC.GOV, Dec. 13, 2020 (updated) ("The risk for severe illness with COVID-19 increases with age…. For example people in their 50s are at higher risk for severe illness than people in their 40s.").[18]  This Court recently recognized that, per the CDC, "adults age 50–64 who contract COVID-19 are 30 times more likely to die than adults age 18–29."  *United States v. Henareh*, 11-cr-93-1 (JSR), 2021 WL 119016, at *2 (S.D.N.Y. Jan. 30, 2021).  Mr. Taylor also suffers from obesity,[19] a condition recognized by the CDC as "increas[ing] the risk of severe illness from COVID-19."  *See, e.g., Obesity, Race/Ethnicity, and*

---

[18]  Available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Feb. 16, 2021).

[19] At 5'8" and 225 lbs., Mr. Taylor has a Body Mass Index ("BMI") of 34.2, which the CDC classifies as obese.  *Adult BMI Calculator*, CDC.GOV, available at https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (last visited Feb. 16, 2021).

*COVID-19*, CDC.GOV.[20]  And he has high cholesterol, which studies have identified as a risk factor for COVID-19 severity.  *See, e.g.*, Alena Hippensteele, *BMI, LDL Cholesterol Are Important Metrics in Assessing COVID-19 Risk*, PHARMACYTIMES.COM, Dec. 1, 2020.[21]

Courts have taken judicial notice of the fact that COVID-19 is more lethal for older individuals with underlying health conditions like Mr. Taylor's.  *See, e.g.*, *Basank v. Decker*, 449 F. Supp. 3d 205, 211 (S.D.N.Y. 2020) ("The Court takes judicial notice that, for people of advanced age, with underlying health problems, or both, COVID-19 causes severe medical conditions and has increased lethality.").  In turn, courts have sentenced non-dangerous offenders with underlying conditions to home confinement, in part because of the risk prison would pose to their health.  *See, e.g.*, Transcript at 38–43, *United States v. Cohen*, 19 Cr. 741 (WHP) (S.D.N.Y. June 9, 2020) (Ex. 7) (one year home confinement, with community service, for 34-year old insider trading defendant with underlying condition).  Similarly, this Court and others have found that obesity constitutes an "extraordinary and compelling reason" to justify a sentence reduction and/or immediate release.  *See, e.g.*, *United States v. Rodriguez*, --- F. Supp. 3d ---, 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020) (Rakoff, J.) (obesity and diabetes constituted extraordinary and compelling reason to reduce sentence); *United States v. Ramos*, 18. Cr. 852 (AT), 2020 WL 6487198, at *1 (S.D.N.Y. Nov. 4, 2020) (combination of conditions, including obesity, constituted extraordinary and compelling reason for compassionate release); *United States v. Zoquier-Solano*, 13-cr-772 (JPO), 2020 WL 6193859, at *2 (S.D.N.Y. Aug. 10, 2020) (same); *United States v. Anderson*, No. 16-cr-824 (JMF), 2020 WL 2849483, at *2 (S.D.N.Y. June 2, 2020) (obesity constituted extraordinary and compelling reason for compassionate

---

[20] Available at https://www.cdc.gov/obesity/data/obesity-and-covid-19.html (last visited Feb. 16, 2021).

[21] Available at https://www.pharmacytimes.com/news/bmi-ldl-cholesterol-are-important-metrics-in-assessing-covid-19-risk (last visited Feb. 16, 2021).

release).   Furthermore, although one might argue that this concern would be alleviated by vaccinating Mr. Taylor prior to his beginning any prison sentence, that is simply not so, given the recent "arrival of more transmissible, *vaccine-resistant* variants" of COVID-19.   *United States v. Akhavan*, 20-cr-188-2 (JSR), 2021 WL 535736, at *3 (S.D.N.Y. Feb. 12, 2021) (emphasis added).

Indeed, even if the Court sentenced Mr. Taylor to prison, BOP policy would favor his immediate release to home confinement.  In April 2020, the Attorney General directed the BOP "to immediately review all inmates who have COVID-19 risk factors," and then "immediately process … for transfer" all " inmates whom [the BOP] deem[s] suitable candidates for home confinement,"  and "transfer them" out of BOP custody "following a 14-day quarantine." Memo. from Att'y Gen. to Dir. of BOP, *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* at 2 (Apr. 3, 2020).[22]  An earlier memorandum listed factors to guide the determination about transfer to home confinement, which included an inmate's "age and vulnerability to COVID-19, in accordance with the [CDC] guidelines."  Memo. from Att'y Gen. to Dir. of BOP, *Prioritization of Home Confinement As Appropriate in Response to COVID-19* at 1–2 (Mar. 26, 2020).[23]  There can be no real dispute that Mr. Taylor would qualify for transfer to home confinement if in BOP custody.  Imposing a sentence of imprisonment, only for the BOP to put him in a brutal, 14-day quarantine in solitary confinement, and then immediately transfer him back home, makes little sense.

---

[22]  Available at https://www.justice.gov/file/1266661/download (last visited Feb. 16, 2021).
[23]  Available at https://www.justice.gov/file/1262731/download (last visited Feb. 16, 2021).

**D.      Mr. Taylor Is Prepared to Perform Meaningful Community Service, Providing a Valuable Contribution to Society, Rather than Consuming its Resources.**

Mr. Taylor's history of generosity – with his time, money, and talents – demonstrates his commitment to giving back and helping others.  Here, the Court has an opportunity to put Mr. Taylor's industry and ability to good use by imposing a probationary sentence with a substantial community service component, enabling society to benefit from this sentence, rather than pay for it.  As the Administrative Office of the United States Courts has observed, community service is "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community.  It is practical, cost-effective, and fair – a 'win-win' proposition for everyone involved."  *Community Service*, Court & Community: An Information Series About U.S. Probation & Pretrial Services (2007). [24] Whether the Court orders 2,000 hours of service, something less, or something more, Mr. Taylor will devote himself to fulfilling his commitment to the community.

Mr. Taylor has already identified one non-profit that is eager to put him to work – the Straight-A Guide Foundation (the "Foundation"), an organization primarily dedicated to improving life outcomes for those in America's prison system.  *See* Santos/Straight-A Guide Foundation Letter (Ex. 8).  Among other things, the Foundation creates content used by inmates in state and federal facilities to better prepare themselves for release – including general and specific job training, motivational programming, and more.  As described by the Foundation's Program Director, Michael Santos, Mr. Taylor's experience as a job-creator and executive would prove particularly valuable in the creation of better/more content to help inmates improve their ability to secure/maintain employment upon release.  *Id.* at 1.  Further, given Mr. Taylor's

---

[24] Available at https://www.nhp.uscourts.gov/sites/default/files/pdf/ccservice.pdf (last visited Feb. 16, 2021).

leadership and process-creation experience, the Foundation would benefit from his analysis of its overall strategy, project implementation, and more. *Id.*  In short, Mr. Taylor's tasks would run the gamut, from using his engineer's knack for problem-solving to review and improve the Foundation's processes and procedures, to the nitty gritty work of generating and compiling content for incarcerated individuals seeking to better their lives.  *See id.*

That said, Mr. Taylor is willing to engage in any community service program that this Court or any supervising officer identify or approve.  Given Mr. Taylor's experience in engineering and business operations, he had hoped to be in a position to present the Court with additional ready-made options in those fields – ideally, with organizations based in the Atlanta, Georgia, area, where Mr. Taylor would be well positioned for an active, in-person role. Unfortunately, efforts to coordinate with several organizations have been hampered by the COVID-19 pandemic.  For example, our effort to coordinate with the Steve and Marjorie Harvey Foundation initially appeared promising, given that they have a particular need for STEM-focused mentors for inner city youth (a task for which Mr. Taylor is ideally suited, given his technical background and experience mentoring kids in academic/engineering settings), but then our contact at that organization contracted COVID-19, putting discussions on hold.  Similarly, our efforts to coordinate with Hosea Helps – an Atlanta organization combatting poverty and promoting social justice – did not come to fruition because the organization is not presently accepting new volunteers due to the pandemic.  Nonetheless, if the Court orders a sentence of confinement, Mr. Taylor will redouble his efforts to identify additional opportunities, so that the Court can be assured that a robust community service program is in place.

*     *     *

## CONCLUSION

For the foregoing reasons, a term of imprisonment is unnecessary and unjust.   Mr. Taylor's lifetime of good works, the punishment already visited upon him, the additional punishment of home confinement, and the uniquely dangerous prison environment created by the COVID-19 pandemic, demonstrate that a non-custodial sentence is sufficient, but not greater than necessary.   Accordingly, we request the Court impose a sentence of two years' probation, including one year of home confinement and a substantial community service requirement.

Dated: February 17, 2021
New York, New York

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

William D. Weinreb
Michael T Packard
111 Huntington Ave., Suite 520
Boston, MA 02199
Tel: (617) 712-7100
Fax: (617) 712-7200
billweinreb@quinnemanuel.com
michaelpackard@quinnemanuel.com

William A. Burck
Daniel R. Koffmann
51 Madison Avenue, 22nd Floor
New York, New York
Tel: (212) 849-7000
Fax: (212) 849-7100
williamburck@quinnemanuel.com
danielkoffmann@quinnemanuel.com

*Attorneys for William Taylor*